## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS,
90 W. Broad St.
Columbus, OH 43215;

MAYOR AND CITY COUNCIL OF
BALTIMORE,
100 N. Holiday St., Suite 101
Baltimore, MD 21202;

CITY OF CHICAGO,
121 N. Lasalle St., Room 600
Chicago, IL 60602;

DOCTORS FOR AMERICA,
2300 18th St NW
Washington, DC 20009; and

MAIN STREET ALLIANCE,
909 Rose Ave, Suite 400
North Bethesda, MD 20852,

       *Plaintiffs*,

    vs.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services,
200 Independence Ave. SW
Washington, DC 20201;

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Ave. SW
Washington, DC 20201;

MEHMET OZ, in his official capacity as
Administrator of the Centers for Medicare and
Medicaid Services,
7500 Security Blvd.
Baltimore, MD 21244; and

Case No. <u>1:25-cv-2114</u>

CENTERS FOR MEDICARE & MEDICAID
SERVICES,
7500 Security Blvd.
Baltimore, MD 21244,

        *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the City of Columbus, Ohio; the Mayor and City Council of Baltimore;

Maryland; the City of Chicago, Illinois; Doctors for America; and Main Street Alliance hereby

sue Defendants Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S.

Department of Health and Human Services; the U.S. Department of Health and Human Services;

Mehmet Oz, in his official capacity as Administrator of the Centers for Medicare & Medicaid

Services; and the Centers for Medicare & Medicaid Services, and allege the following:

## INTRODUCTION

1.      When the Affordable Care Act (ACA) was enacted in 2010, millions of

Americans gained access to affordable, comprehensive health care for the first time.  Individuals

could seek the medical care they needed, when they needed it, and medical providers across the

country were better able to provide optimal treatment to their patients.  One of the ways the ACA

has achieved this result is through the establishment of health insurance Exchanges, where

individuals can identify and enroll in affordable insurance policies that meet their health care

needs.  To ensure lower costs for more comprehensive coverage, the ACA subsidizes the costs of

that coverage, which leads younger and healthier individuals to the insurance market, improving

the risk pool and lowering premiums for everyone. And the ACA guarantees that individuals are

not denied coverage because of a pre-existing health condition or discriminated against based on

their history of insurance coverage.

2.      The Centers for Medicare & Medicaid Services (CMS), on behalf of the

Department of Health and Human Services (HHS), has now published a final rule, purportedly

pursuant to the ACA, whose effects will be directly contrary to that landmark legislation.  That

rule—entitled "Patient Protection and Affordable Care Act; Marketplace Integrity and

Affordability" (2025 Rule), 90 Fed. Reg. 27,074—purports to "strengthen[] the integrity of the

Patient Protection and Affordable Care Act (ACA) eligibility and enrollment systems to reduce waste, fraud and abuse" and "provide emergent relief from rising improper enrollment and health care costs." *Id.* at 27,074. But the rule accomplishes the opposite.

3.    Rather than reducing the cost of insurance for consumers, or increasing their enrollment rates and benefits, Defendants' new policies will cause at least 1.8 million Americans to lose coverage on the ACA's health insurance Exchanges in 2026 alone and will ultimately result in higher premiums in the long term and higher out-of-pocket costs for the remaining enrollees.

4.    The 2025 Rule does not spring from nowhere; rather, it is a clear continuation of the prior Trump Administration's yearslong effort to undermine the ACA. During the first Trump presidency, the Administration vowed to "watch Obamacare go down the tubes."[1] Previously, in a 2019 rule, 83 Fed. Reg. 16,930 (Apr. 17, 2018), CMS and HHS attempted to contravene the ACA with proposals that would have eliminated many of the ACA's guarantees, deterred consumers from enrolling in quality health insurance plans, and increased out-of-pocket costs, similar to the 2025 Rule. This Court responded to those efforts, vacating and remanding portions of the rule as arbitrary and capricious.

5.    Now, the Trump-Vance Administration returns with another "death by a thousand paper cuts" approach to the ACA. Cloaked in the pretense of government efficiency and fraud prevention, the 2025 Rule creates numerous barriers to affordable insurance coverage, negating the ACA's goal of extending affordable health coverage to all Americans, and instead increasing the population of underinsured and uninsured Americans. Many of the 2025 Rule's provisions are in direct conflict with federal law. And many of its provisions are arbitrary, having been

---

[1] *Excerpts From The Times's Interview with Trump*, N.Y. Times (July 19, 2017), https://perma.cc/XT6Q-LSPA.

promulgated without observance of proper procedure, reasonable explanation, or meaningful response to public comments, and without consideration of the harm the Rule will impose on the millions of consumers whose health and wellbeing depend on access to affordable coverage and, ultimately, on the American public.  In the absence of judicial intervention, the 2025 Rule will into effect on August 25, 2025.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Plaintiffs' challenge to the 2025 Rule is reviewable under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

7.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) and (C).  Defendants are agencies and officers of the United States and Defendant CMS is headquartered in Woodlawn, Maryland.  Plaintiffs Main Street Alliance and the Mayor and City Council of Baltimore also reside in Maryland.

## PARTIES

8.    Plaintiff the City of Columbus, Ohio, is a municipal corporation organized under Ohio law.  *See* Ohio Const. art. XVIII.  Columbus has all the powers of local self-government and home rule under the constitution and laws of the state of Ohio, which are exercised in the manner prescribed by the Charter of the City of Columbus.[2]  Columbus, located in Franklin County, is the capital of Ohio.  It is the largest city in the state and the fifteenth largest city in the United States, with a population of around 933,000, according to 2024 census estimates.  Columbus provides a wide range of services on behalf of its residents, including health services for families and children, public health, public assistance, and emergency medical care.

---

[2] *See City Code and Charter*, City of Columbus (May 28, 2025), https://perma.cc/B9VK-D6JH; Ohio Rev. Code Ann. § 715.01 (West 1953).

9.     Plaintiff the Mayor and City Council of Baltimore represent the largest city in Maryland and thirtieth largest city in the United States, with a population of over 568,000, according to 2024 census estimates.  The Baltimore City Health Department is a city agency that has wide-ranging responsibilities for providing health services to residents of the city. [3]

10.     Plaintiff the City of Chicago, Illinois, is a municipal corporation and home-rule unit organized and existing under the constitution and law of the state of Illinois.[4]  Located in Cook County, Chicago is the largest city in Illinois and the third-largest city in the United States, with a population of over 2.7 million, according to 2024 census estimates.  Chicago provides a wide range of services on behalf of its residents, including health services, public assistance, and emergency medical care.

11.     Plaintiff Doctors for America (DFA) is a not-for-profit, § 501(c)(3) organization with over 27,000 member physicians and medical trainees (including medical residents and students) in all 50 states.  DFA mobilizes doctors, medical trainees, and other health professionals to be leaders who put patients over politics to improve the health of patients, communities, and the nation. DFA also advocates for comprehensive health system reform, expansion of health insurance coverage, and improvements to health care delivery so that the health system better meets patients' needs.

12.     Plaintiff Main Street Alliance (MSA) is 501(c)(3) organization and national network of small businesses, with approximately 30,000 small business members throughout the United States, many of whom rely on the ACA marketplace for health insurance.

13.     Defendant Robert F. Kennedy, Jr., is sued in his official capacity as Secretary of the U.S. Department of Health and Human Services.

---

[3] *See* Balt. City Charter, art. VII §§ 54-56, https://perma.cc/9WAJ-BUXZ (captured June 28, 2025).
[4] *See* Ill. Const. art. VII.

14.     Defendant HHS is a federal agency headquartered at 200 Independence Ave. SW, Washington, D.C. 20201.

15.     Defendant Mehmet Oz is sued in his official capacity as Administrator of CMS.

16.     Defendant CMS is a component of Defendant HHS and is headquartered at 7500 Security Boulevard, Baltimore, MD 21244.

## BACKGROUND

### I.     The ACA Aims to Provide Affordable Health Insurance for All Americans

17.     In 2010, Congress enacted the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119 (2010) (as amended by Pub. L. No. 111-152, 124 Stat. 1029 (2010)).  "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012); *see also King v. Burwell*, 576 U.S. 473, 479 (2015).

18.     Before the Act's market reforms went into effect in 2014, "individual health insurance markets were dysfunctional." *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 740 (D. Md. 2021).  Insurers were free to deny coverage for people with pre-existing conditions, to refuse to renew such coverage, or even to revoke such coverage after it had been issued. Now, however, the Act's "guaranteed issue" requirement specifies that every "health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), subject to exceptions specified in the statute, such as the restriction of new enrollments to an annual open enrollment period or specified special enrollment periods, *id.* § 300gg-1(b); *see Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020).  "In other words, the Act 'ensure[s] that anyone can buy insurance.'" *Me. Cmty. Health Options*, 290 U.S. at 301 (quoting *King*, 576 U.S. at 493).

19.     Separately, the Act's "guaranteed renewability" provision requires issuers to renew or continue in force such coverage, 42 U.S.C. § 300gg-2(a), again subject to statutory exceptions, including an exception for persons who have failed to pay premiums owed on their policies, *id.* § 300gg-2(b)(1); *see also id.* §§ 300gg-12, 300gg-42.

20.     Health insurance plans must cover a set of "essential health benefits," such as preventive care. *Id.* § 300gg-6(a). And to protect patients from devastating costs when a medical condition exhausts their coverage, the Act limits so-called "cost-sharing"—for example, deductibles and copayments—for these essential health benefits. *See id.* § 18022(a)(2). The limitation on cost-sharing is adjusted each year by a "premium adjustment percentage," that compares average premiums for "health insurance coverage" in the current year with the same average for 2013, before the Act's marketplace reforms went into effect. *Id.* § 18022(c)(1), (4).

21.     To help individuals to learn about and enroll in the health insurance options that are available to them, the Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King,* 576 U.S. at 479 (quoting 42 U.S.C. § 18031(b)(1)); *see Me. Cmty. Health Options*, 590 U.S. at 301. These Exchanges, also known as health insurance Marketplaces, enable people not eligible for Medicare or Medicaid to obtain adequate, affordable insurance independent of their jobs. The Exchanges therefore serve as "marketplace[s] that allow[] people to compare and purchase" ACA-compliant plans. *King*, 576 U.S. at 479.

22.     There are several different types of Exchanges. Some states have elected to create Exchanges themselves (state-based Exchanges or SBEs), as is the case in Maryland. Other states have created Exchanges that operate on the federal Healthcare.gov platform (state-based Exchanges on the federal platform, or SBE-FPs), such as the Exchange currently in use in

6

Illinois while it transitions to an SBE.  Still other states, including Ohio, have an Exchange that is operated by CMS (federally facilitated Exchange, or the FFE).  *See* CMS, Consumer Info. & Ins. Oversight, *State-based Exchanges*, https://perma.cc/JFT3-6EAK (captured June 28, 2025).

23.    Plans that meet the requirements described above and that are offered on the Exchanges are known as "qualified health plans."  Individuals primarily enroll in qualified health plans for a given benefit year during an annual open enrollment period, or under certain special enrollment periods.  42 U.S.C. § 18031(c)(6).  To assist with enrollment, the Act requires Exchanges to award grants to healthcare "Navigators" that conduct public education and awareness campaigns, help consumers understand their choices, facilitate their enrollment, and ensure their access to consumer protections.  *Id.* § 18031(i)(1), (3).

24.    Plans on the Exchanges offer different levels of generosity.  A "bronze" plan is designed to provide benefits that are actuarially equivalent to 60% of the full value of benefits to the plan (meaning that premiums are calculated in the expectation that 40% of the cost of coverage would be paid for through enrollee out-of-pocket spending).  *Id.* § 18022(d)(1). "Silver," "gold," and "platinum" plans are designed to provide benefits that are actuarially equivalent to 70%, 80%, and 90%, respectively, of the full value of benefits under the plan.  *Id.* Because actuarial predictions may be imprecise, the Act specifies that CMS may "provide for a de minimis variation . . . to account for differences in actuarial estimates."  *Id.* § 18022(d)(3).

25.    The Act also "seeks to make insurance more affordable by giving refundable tax credits to individuals."  *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B).  These "premium tax credits" (PTCs) vary depending on an individual's income—individuals who earn more must pay more toward the cost of their monthly premium—but are generally pegged to the cost of the so-called "benchmark silver plan," or the second-lowest cost silver plan offered within a market.

*See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)–(C).  The Act initially made these tax credits available to individuals with incomes between 100% and 400% of the federal poverty level.  *Id.*  There is no income cap on these tax credits under current law, *see id.* § 36B(b)(3)(A)(iii), but the 400% income cap will be reinstated for 2026 absent further congressional action.

26.    Premium tax credits are claimed on an individual's tax return after the end of the year and are paid by the Internal Revenue Service (IRS).  *Id.* § 36B(h).  Rather than waiting to recover their costs the next year, enrollees may claim "advance premium tax credits" (APTCs) up front so that the value of the tax credits may be applied directly to the purchase of insurance. 42 U.S.C. §§ 18081, 18082; *City of Columbus*, 523 F. Supp. 3d at 741.  CMS is responsible for determining whether individuals meet the statutory requirements of eligibility for APTCs, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances."  42 U.S.C. § 18081(f)(1)(B).

27.    In sum, the Act requires that insurers generally offer only quality health insurance and aims to lower the cost of coverage to encourage individuals to enroll.  This coverage improves access to care and overall health, and it reduces financial burdens on consumers as well as institutions that pay for uncompensated care.

28.    But increasing enrollment in quality health insurance coverage is not only the ACA's immediate goal; it is also key to the Act's long-term success.  Insurance market stability requires robust enrollment, particularly by relatively healthy individuals.  *Id.* § 18091(2)(I) (finding that "broaden[ing] the health insurance risk pool to include healthy individuals . . . will lower health insurance premiums"); *King*, 576 U.S. at 480.  Limiting the cost of health insurance is, in turn, essential to promoting enrollment.  *Id.* at 480–81.  By driving costs down and insured rates up, the Act ensures that insurance markets function smoothly.

II.    **CMS Publishes Its Marketplace Integrity and Affordability Rule, Flouting the Goals and Purpose of the ACA**

29.    When faithfully implemented, the Act's reforms successfully met Congress's goal of enabling more individuals to enroll in health insurance coverage.  More than 24 million individuals are enrolled in Marketplace coverage in 2025.  CMS, Press Release, *Over 24 Million Consumers Selected Affordable Health Coverage in ACA Marketplace for 2025* (Jan. 17, 2025), https://perma.cc/N8QF-NKHG.

30.    The 2025 Rule, however, sets forth a wide range of changes that will render coverage on the Exchanges less affordable, less generous, and harder to obtain.  Together, these policies undermine the ACA's purpose by reducing insurance affordability and benefits, creating administrative burdens that make it harder for individuals to enroll in and maintain insurance coverage, and narrowing eligibility for coverage across the board.

31.    *Imposition of a Junk Charge on Certain Low-Income Enrollees*.  Under regulations that have been in place since the Act was first implemented, 45 C.F.R. § 155.355(j), enrollees that remain eligible for a Marketplace plan from one year to the next are automatically re-enrolled in the same plan unless they terminate coverage or actively enroll in a different plan. Depending on an enrollee's income level and the level of coverage he or she is enrolled in, he or she may be eligible for a zero-premium plan, that is, a plan in which the entire cost of the premium is covered by the enrollee's APTCs.  The 2025 Rule adds 45 C.F.R. § 155.335(n), only for the upcoming 2026 plan year, to require the federally facilitated Exchange to impose a monthly surcharge of $5 on each such enrollee until the enrollee confirms his or her intent and eligibility to remain on the zero-premium plan.  90 Fed. Reg. at 27,102.  CMS invokes 42 U.S.C. § 18081(f)(1)(B) as statutory authority for this surcharge, 90 Fed. Reg. at 27,109, but that authority is limited to the establishment of procedures to determine an applicant's eligibility for

9

APTCs, not to reduce the amount of the APTC that is awarded under the statutory formula. CMS acknowledges that this provision will reduce enrollment among enrollees who used to have access to a zero-premium plan; independent estimates find enrollment among this population would be reduced by at least 14%, and possibly by as much as 33%.  90 Fed. Reg. at 27,195.

32.    *Increased Costs through Revisions to the Premium Adjustment Methodology.*  The Act protects consumers in both the individual and group markets by imposing a maximum annual limit on cost-sharing.  This limit is adjusted annually by a "premium adjustment percentage," which measures the rate of premium growth.  The IRS also uses the premium adjustment percentage to adjust the value of PTCs.  CMS has historically used data from premiums for employer-sponsored insurance to calculate this percentage, because the individual insurance market premiums are more volatile.  The 2025 Rule incorporates individual insurance market data into this measure, resulting in a 15% increase in the maximum annual out-of-pocket limit on cost sharing and a 4.5% increase in average premiums, which will lead to lost coverage, a worsened risk pool, and higher levels of uncompensated care.

33.    *Eroding the Actuarial Value of Coverage.*  The Act sets targets for the actuarial value of various types of plans on the Exchanges, subject to permissible range of "de minimis" variation to "account for differences in actuarial estimates."  42 U.S.C. § 18022(d)(3).  The 2025 Rule expands the range of de minimis variation to permit bronze plans to range from 5 points above to 4 points below the statutory target (that is, bronze plans may offer coverage ranging from 56% to 65% of anticipated expenditures) and silver, gold, and premium plans to fall 4 points below the target (that is, silver plans may cover as little as 66% of anticipated expenditures).  90 Fed. Reg. at 27,207.  By eroding the value of silver plan coverage, the final rule will also reduce PTCs, which are calculated on the basis of silver plan premiums.  *Id.* at

27,208.  Overall, net premiums on the Exchange would increase by up to $714 for a typical

family per year as a result of this provision.  *Id.* at 27,208.

34.    *Revocation of the Act's Guarantee That Anyone Can Buy Insurance*.  In some

instances, enrollees in plans on the Exchanges may incur debts for premiums owed without

realizing it.  For instance, some enrollees may believe that they may terminate their coverage

simply by stopping payment on premiums, without realizing (or being informed) that the

coverage remains in effect and they continue to owe payments to their insurer.  The 2025 Rule

permits insurers to refuse to enroll these individuals and to apply any payments that these

individuals make to the outstanding debt instead of to the premium for new coverage, without

prior notice to the individuals.  90 Fed. Reg. at 27,084.  In other words, an individual might

complete all of the steps to enroll in coverage, including making the payment they understand to

be needed to complete the transaction, only to learn at the end of the process that they have not

been enrolled.  This rule is contrary to the "guaranteed issue" requirement of 42 U.S.C. § 300gg-

1.  This provision is projected by independent experts to lead to the denial of coverage for

180,000 people who owe debts for old premiums as low as $10.  90 Fed. Reg. at 27,085.

35.    *Changes to Enrollment Periods*.  Under current policy, the open enrollment

period for the Exchanges runs from November 1 to January 15.  This two-and-a-half-month

period has been beneficial for the health of the Exchanges, as younger and healthier people tend

to enroll later in the process, and are particularly prone to enroll, if given the opportunity, after

the end-of-the-year holiday period, when people face unusual financial distress.  The 2025 Rule

prohibits open enrollment in January by requiring all Exchanges to hold open enrollment periods

that begin no later than November 1, that end no later than December 31, and that are no more

than nine weeks in duration.  This provision goes into effect for 2027.

11

36.    Current policy also provides a special enrollment period (SEP) on a monthly basis for persons with incomes at or below 150% of the federal poverty level.  45 C.F.R. § 155.420(d)(16).  This SEP was established as an additional safety net for consumers with variable income who may transition from Medicaid eligibility to Exchange eligibility over the course of the year.  *See* 86 Fed. Reg. 53,412, 53,434 (Sept. 27, 2021).  These enrollees tend to pose a lower risk of serious health conditions, so easing their ability to enroll in Exchange coverage has improved the financial viability of the Exchanges.  *See* Mark A. Hall and Michael J. McCue, *Does Making Health Insurance Enrollment Easier Cause Adverse Selection?*, Commonwealth Fund (Apr. 4, 2022), https://perma.cc/9P86-ZFCR.  The final rule, however, revokes this SEP, but only for 2025 and 2026.  90 Fed. Reg. at 27,079.  This provision will lead to longer periods of time where people lack insurance, resulting in uncompensated care costs for hospitals, providers, community health centers, and municipalities.  *Id.* at 27,145.

37.    The final rule also requires the federally facilitated Exchange to conduct pre-enrollment verification for SEP eligibility for at least 75% of new enrollments through SEPs. Commenters on the proposed rule noted that the addition of this paperwork burden will depress coverage on the Exchanges.  CMS acknowledged this concern and accordingly declined to make this policy permanent, but kept it in place for the upcoming 2026 plan year at an estimated $7 million cost to consumers.  90 Fed. Reg. at 27,204, 27,187.

38.    *Failure to Reconcile (FTR) Penalty*.  The amount of APTCs that an enrollee receives over the course of a year and the amount of PTCs that the enrollee receives on his or her tax return depends on the same statutory formula; APTCs are intended to be a substitute for the tax credit.  26 U.S.C. § 36B; 42 U.S.C. § 18082.  But APTCs are calculated on the basis of enrollees' projected income, so if an enrollee, for example, works more shifts or hours than

expected and thus provides an incorrect estimate, he or she might owe a tax payment at the end

of the year without realizing that any such debt is owed.  Under current policy, any such enrollee

must be given a notice of the tax debt in the first year that he or she enrolls in coverage after the

debt is incurred, so that the debt can be repaid; if the enrollee does not do so, eligibility for

APTCs may be revoked in the second year.  45 C.F.R. § 155.305(f)(4)(i), (ii).  The 2025 Rule

revokes that grace period, for 2026 only, and requires the Exchanges to determine the enrollee to

be ineligible for APTCs in the first year, 45 C.F.R. § 155.305(f)(4)(iii), despite the fact that CMS

lacks any authority to alter the statutory formula for eligibility for APTCs.

> 39.     *Changes to Data Matching Policies.*  When an Exchange attempts to verify an

applicant's income for purposes of determining his eligibility for, and the amount of, APTCs,

and it finds an inconsistency in that applicant's data, it notifies the applicant and provides him or

her with an opportunity to respond.  42 U.S.C. § 18081(e)(4).  The statute provides a default

period of 90 days for that response, subject to CMS's authority to modify the procedures for this

verification process.  *Id.* § 18081(c)(4), (e)(1), (e)(4).  In many cases, 90 days is not enough time

for an applicant to track down the proof of his or her income needed to verify APTC eligibility.

The current regulations accordingly modify the response deadline to provide for an additional 60

days where necessary.  45 C.F.R. § 155.315(f)(7).  The final rule revokes that 60-day extension.

90 Fed. Reg. at 27,120.

> 40.     In 2017, CMS adopted a policy requiring the Exchanges to audit all enrollees who

project that their household income for the upcoming year will be greater than 100% of the

federal poverty level, if the IRS reports data indicating that the enrollee's current income is

below that threshold.  Because this policy created "immense administrative burdens" for low-

income enrollees, this Court held that it "defie[d] logic" and vacated it as arbitrary and capricious

under the Administrative Procedure Act.  *City of Columbus*, 523 F. Supp. 3d at 763.  CMS did not appeal that judgment, and it again acknowledges that this policy would cause tens of thousands of enrollees to lose their coverage.  90 Fed. Reg. at 27,200.  The 2025 Rule nevertheless attempts to reinstate this policy for the 2026 plan year, forthrightly asserting its disagreement with this Court's prior decision.  *Id.* at 27,121.

41.     Following the *City of Columbus* decision, under current policy, an Exchange must accept an applicant's attestation of his or her projected annual income in cases where the IRS confirms that there is no tax return data available.  45 C.F.R. § 155.320(c)(5).  The final rule revokes that policy, and for the 2026 plan year will require Exchanges to verify income with other trusted data sources and to require applicants to submit documentary evidence or otherwise resolve the income inconsistency; if no such evidence is available, the applicant will lose eligibility for APTCs.  90 Fed. Reg. at 27,131.  These new data-matching policies, together, are projected to cause more than 400,000 people to lose coverage for the upcoming plan year.  *Id.* at 27,199–200.

42.     These provisions, each of which is prohibitive on its own, have a compounding effect in further restricting access to affordable health insurance coverage on the Marketplace.

43.     Defendants justify the 2025 Rule's policies by citing a need to address "fraudulent and improper enrollment at scale by the enrollee's own doing or by a third party without the enrollee's knowledge."  90 Fed. Reg. at 27,074.  But the provisions of the 2025 Rule that address these third parties—agents, brokers, and web-brokers—do not regulate them using penalties or other direct measures.  Nor does the Rule adopt more common-sense approaches to prevent fraud that would not pose barriers to enrollment, like "requiring two-factor authentication, requiring verbal authorization from a consumer before certain changes can be made, better monitoring of

14

DE/EDE pathways, additional monitoring requirements for agents and brokers with fully-subsidized clients, new penalties for agents and brokers, and more resources for State Departments of Insurance to investigate fraud," as commenters suggested. *Id.* at 27,147.

44.     Instead, the 2025 Rule's provisions create significant barriers to coverage for consumers and burdens on insurers and the Marketplace that will lead to coverage losses.[5] Indeed, CMS concedes that as many as 1.8 million individuals will lose coverage in 2026 alone as a result of the provisions in the 2025 Rule.  90 Fed. Reg. at 27,212.

### III.     Defendants Failed to Adequately Consider Public Comments or Provide Adequate Reasoning for the Marketplace Integrity and Affordability Rule

45.     CMS published a proposed version of the 2025 Rule on March 19, 2025.  90 Fed. Reg. 12,942.  The agency received more than 26,000 comments[6] on the proposed rule, despite a shortened 23-day (rather than 30-day) formal comment period.  Commenters raised serious concerns with many provisions of the 2025 Rule, highlighting flaws with the proposed changes to ACA policy.

46.     But Defendants provided only surface-level responses to many of the public comments CMS received.  And in most cases, rather than address the substance of public comments, Defendants excused themselves from taking account for the burdensome effect of the Rule's provisions by purporting to impose many policies on a temporary basis: almost half (eight out of seventeen) of the Rule's provisions that take effect this year or for the 2026 plan year are scheduled to sunset at the end of 2026.  90 Fed. Reg. at 27,178–79.

---

[5] *See* Katie Keith, *HHS Finalizes ACA Marketplace Rule, Part 1: Enrollment Restrictions, Premiums, Actuarial Value, and More*, Health Affs. (June 23, 2025), https://perma.cc/5WBT-JR9U.

[6] Regulations.gov, *Comments on CMS-2025-0020-0011*, https://perma.cc/GAC2-EFRB (captured June 28, 2025).

47. Defendants asserted that the "temporary policies in this rule and the expiration of fully subsidized plans" will cause "the level of improper enrollments to come down drastically in [plan year] 2026, diminishing the need for ongoing crisis-level program integrity policies." 90 Fed. Reg. at 27,144. But Defendants provided no explanation to justify that expectation, or to account for the incredible administrative burdens that compliance with the Rule will put on consumers, insurers, and the Marketplace this year. Nor do Defendants explain why they would be willing "to accept some risk of future improper enrollments after these policies sunset, in favor of limiting overall disruptions as the market adjusts and sheds holdover improper enrollments" in 2027, but yet remain willing to disrupt the same market next year, in 2026. *Id.* at 27,091. Defendants also failed to reasonably explain the rationale behind the Rule's most burdensome provisions.

48. For example, in promulgating the provision imposing a $5 premium penalty on automatic re-enrollees, CMS (i) failed to explain how implementation of the policy for only the 2026 plan year would combat fraudulent enrollments; (ii) failed to account for the substantial loss of coverage and increase in premiums that the provision will cause; and (iii) failed to address or consider consumer reliance interests or the existing procedures adequately safeguarding against eligibility errors.

49. CMS reversed the current policy prohibiting insurers from denying coverage to individuals with unpaid premiums without examining how the policy might impact unsubsidized consumers, including small businesses; supporting its assertion that the benefits of the policy outweigh "some negative impacts on low-income individuals," 90 Fed. Reg. at 27,087; and without considering suggested protective measures—like allowing installment or partial payments, appeals processes, or exemptions for fraud.

50.     CMS <u>revoked subsidized coverage for individuals that fail to file and reconcile</u> <u>tax credits by reinstating a one-year policy</u>, only for 2026, without explaining CMS's analysis of "new evidence regarding unauthorized enrollments," *id.* at 27,133, adequately providing the data the agency relied on, or addressing concerns about coverage loss, impacts on risk pools, and long IRS processing times that may negatively impact FTR efforts.

51.     CMS <u>removed the automatic 60-day extension afforded to individuals verifying</u> <u>their household income under 45 C.F.R. § 155.315(f)(7)</u>, and in so doing asserted that the policy is a "statute-driven change," 90 Fed. Reg. at 27,120, to dismiss evidence that many eligible enrollees need the additional time to track down documentation for their applications for Exchange coverage.

52.     CMS <u>required Exchanges to generate household income inconsistencies when a</u> <u>tax filer's attested projected annual household income differs from "trusted data sources</u>," by relying on reasoning from a 2019 Payment Notice, 83 Fed. Reg. at 16,985, that was rejected as insufficient by this Court in *City of Columbus*, 523 F. Supp. 3d at 763.

53.     CMS <u>shortened the open enrollment period</u> despite comments that such changes to the open enrollment period would have adverse effects on coverage in the Exchanges, particularly for rural populations and non/limited-English speaking communities, and would strain enrollment assisters.

54.     CMS <u>eliminated a monthly special enrollment period for certain low-income</u> <u>people</u>, but only from the effective date of the Rule through the end of the 2026 plan year, without explaining how the policy will address improper enrollments, adequately addressing comments raising concerns about potential coverage loss, or reviewing data suggesting that most

low-income SEP enrollees have fewer claims than non-SEP enrollees and remain enrolled for the full plan year.  90 Fed. Reg. at 27,145.

54.    CMS imposed <u>prohibitive verification requirements on SEP enrollees</u>, but only for the 2026 plan year, without explaining why the additional burden and barriers the policy would create "is not significant enough to outweigh the merits of SEP verification," *id.* at 27,151, or why "the effect of deterring some young people from enrolling in coverage" does not "outweigh[] the benefits of preventing improper enrollments in Exchanges on the Federal platform," *id.*

56.    CMS altered its methods for calculating <u>premium adjustment percentages</u>, permanently, rejecting suggestions that the provision be delayed to 2027 so that Exchanges' rates can adjust, and brushing aside comments asserting that the change will result in higher net premiums, out-of-pocket costs, coverage losses, increased medical debt and uncompensated care, and adverse selection in the Exchange.  90 Fed. Reg. at 27,172.

57.    CMS expanded the permissible "de minimis" range for <u>actuarial value calculations for plans on the Exchanges</u>, resulting in plans that will offer less value to consumers, dismissing concerns that the changes will make it harder for consumers to compare plans and lead to greater out-of-pocket consumer costs.  *Id.* at 27,208.

**IV.    Plaintiffs Have Been, and Will Continue to Be, Harmed by the 2025 Rule**

58.    The 2025 Rule's challenged provisions, both individually and in combination, will raise premiums for plans on the Exchanges, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers of last resort.  Independent experts project that the rule will lead to at least 1.8 million fewer people enrolling on the Exchanges.

59.     The rule accomplishes this result through the various measures discussed above. *First*, measures that will erode the value of coverage obtained through the Exchanges include the imposition of a junk charge on enrollees who are automatically reenrolled in the same plan; the revisions to the premium adjustment methodology that will increase average premiums and the maximum annual out-of-pocket limit on cost sharing; and the expansion of the permissible range of de minimis variation in coverage. *Second*, measures that impose barriers designed to depress enrollment in the Exchanges include the revocation of the ACA's guaranteed-issue requirement; the shrinking of the open enrollment period; and the revocation of the SEP for low-income individuals. *Third*, measures that impose further barriers limiting the availability of subsidized insurance, even for those enrollees that do successfully enroll, include the imposition of a penalty for failure to reconcile an enrollee's inaccurately projected income and changes to data-matching policies.

60.     The resulting increase in premiums overtime, erosion of coverage, and decreased enrollment will increase the number of uninsured and underinsured individuals and will cause Plaintiffs irreparable harm.

61.     Columbus, through its Department of Public Health, provides a wide range of services on behalf of its residents, including health services for families and children, public health, public assistance, and emergency medical care. The city also subsidizes a community health center, which serves residents regardless of insurance coverage; a number of specialty clinics that each focus a particular area, such as dental services and family planning; and a collection of eleven neighborhood health centers dedicated to the health care needs of vulnerable, uninsured, and underinsured residents. The increase in the number of uninsured and

19

underinsured individuals resulting from the 2025 Rule would lead to a greater burden on those city services and lower reimbursement, which will impose additional costs on the city.

62.     In addition, Columbus maintains excellent emergency medical services (EMS) through its Columbus Division of Fire.  That system dispatches ambulances to meet urgent health needs, regardless of whether the call comes from an individual who has health insurance or is otherwise able to pay for the call.  Although reimbursement is sought from patients' Medicare, Medicaid, or commercial health insurance provider where applicable, Columbus serves uninsured residents equally and recoups only a small fraction of its costs for EMS transport services for uninsured residents.  Uninsured residents are also more likely to delay care until conditions become serious and therefore more likely to require emergency transport services.  An increase in the number of uninsured or underinsured individuals will thus result in more EMS transports for which Columbus does not receive reimbursement, and the city must make up for the shortfall in its budget.

63.     Baltimore, through the Baltimore City Health Department, provides a wide range of health services to its residents and operates a number of specialty clinics.  Baltimore also provides or subsidizes a number of other services for Baltimore's uninsured and underinsured residents, including a visiting-nurse program and various condition-specific programs.  In addition, Baltimore subsidizes several other entities that provide health services to its residents. An increase in the number of uninsured and underinsured individuals will lead to a greater burden on each of those services and programs and create a strain on the city's budget.

64.     The Baltimore City Fire Department (BCFD) also maintains an ambulance system.  BCFD's EMS seeks reimbursement for its costs from patients' health insurance, but the EMS answers calls regardless of the individuals' health insurance coverage or ability to pay.

Although EMS has in the past been able to recoup approximately 90% of its costs from patients who have insurance, it has been able to recover less than 4% of costs from uninsured patients. An increase in the number of uninsured and underinsured individuals therefore leads to more ambulance calls for which Baltimore does not receive reimbursement, and the city must make up for the shortfall in its budget. An increase in uninsured and underinsured individuals also increases the avoidable use of acute health services, increasing the strain on Baltimore's EMS and other health programs.

65.    Chicago's Department of Public Health operates seven mental health centers, four immunization clinics, and three clinics that provide free testing and treatment for sexually transmitted infections. It also provides at-home and in-field programs and funds and staffs a network of Women, Infants, and Children (WIC) clinics. These clinics and programs serve thousands of uninsured and underinsured city residents, and an increase in those types of patients increases the burden on those city services. By increasing health care costs, barriers to coverage, and the number of uninsured residents, the 2025 Rule would add to the burden on Chicago's health care safety net and the city's budget.

66.    The Chicago Fire Department provides ambulance transportation services to Chicago residents, including its uninsured and underinsured residents, without regard to income and insurance status. Chicago generally does not receive full reimbursement for ambulance services from uninsured and underinsured residents. Those same residents are more likely to wait until their conditions become more severe and require emergency care, and they disproportionately rely on ambulance services for transport. A higher number of uninsured and underinsured individuals will therefore result in greater emergency services needs and more

ambulance transports for which Chicago does not receive reimbursement and thus must make up for the shortfall in its budget.

67.    Further, all city Plaintiffs would be irreparably harmed by the increase in uninsured and underinsured individuals caused by the 2025 Rule for the additional reason that when individuals do not get the medical care that they need, they are necessarily less healthy, less productive, and less able to participate in city life.  This has cascading negative effects on city programs and communities.

68.    Many of Main Street Alliance's members rely on the Marketplace for health insurance, and those members would be significantly harmed by the 2025 Rule.  The erosion of coverage under the rule will create additional costs for MSA members and negatively affect the health of those who rely on care or medication that they cannot afford without insurance coverage.  The increase in costs would even threaten the continued operation of some MSA members.  Small businesses often operate on small profit margins, so if health insurance through the marketplace becomes unaffordable or inadequate, then owners and their employees may be forced to seek alternative employment to have access to employer-sponsored health insurance.

69.    For example, one MSA member operates a small business in Wisconsin and needs affordable health insurance that covers expensive medications that she takes to prevent the degradation of her bones due to rheumatoid arthritis.  She operates her business, which has about 10 employees, on narrow margins.  The 2025 Rule would increase her health insurance costs to levels that she cannot afford.  This would force her to close her business, to either find different employment with employer-sponsored insurance or explore other coverage options through a state health care system.

70.    DFA's members, including physicians and medical trainees, will likewise be irreparably harmed by the 2025 Rule's disastrous effects on the costs, administrative burdens, and coverage of health insurance under the ACA.  With the increased number of uninsured and underinsured patients, DFA's members would be more likely to see patients who delay care until their needs are acute; they would receive less than full reimbursement for those patients who lose insurance or whose coverage becomes more limited; and they would lose contact with many patients altogether, particularly in low-income communities.  The Rule will thus force medical providers to direct more time to providing uncompensated care, more administrative time to determining whether insurance coverage is possible, and more time locating patients who are no longer seeking care for serious conditions.

71.    Even when DFA's members provide uncompensated patient care—which will occur increasingly if the final rule is implemented—their work does not end with the patient visit.  Lack of insurance coverage when a patient needs treatment requires finding a specialist willing to provide care, trying to find an alternative medicine that a patient may be able to afford but is not the optimal treatment, and intervening on behalf of a patient in an attempt to get testing or procedures performed.  This will take up greater amounts of clinicians' time as patients lose coverage.  The end result is additional time for which DFA members do not get paid that detracts from patient care.  Medical providers will expend more time and effort, receive less compensation—threatening the continuation of medical practices, particularly in rural areas—and be unable to provide optimal care to their patients.

72.    Some patients will be forced to forgo standard medical care altogether, despite the efforts of their physician to solve these problems, and some will be forced to go to an emergency

room.  Not only will this strain community resources, but the care will be limited to what an

emergency room can provide.  The outcomes will be worse, and the cost will be greater.

## CAUSES OF ACTION

73.    Plaintiffs reallege and incorporate by reference all prior and subsequent

paragraphs.

### COUNT I
### Violation of the Administrative Procedure Act – Contrary to Law
### (Against All Defendants)

74.    The APA provides that courts "shall . . . hold unlawful and set aside agency

action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."

75.    The 2025 Rule is a "final agency action for which there is no other adequate

remedy in a court" and is "subject to judicial review."  5 U.S.C. § 704.

76.    Several of the 2025 Rule's provisions violate the ACA and other federal statutes

and regulations and are therefore "not in accordance with the law," including:

a.    the $5 premium penalty on automatic re-enrollees in the 2025 Rule's

addition of 45 C.F.R. § 155.335(a)(3) and (n) and revisions to 45 C.F.R.

§ 155.330(j) is contrary to 42 U.S.C. §§ 18081 and 18082, as the statutes

provide no authority for the Secretary to set APTC amounts, withhold

APTCs, or require consumers to pay an arbitrary amount in pre-APTC

premiums;

b.    the revocation of guaranteed insurance coverage for individuals with past-

due premiums in the 2025 Rule's amendment to 45 C.F.R. § 147.104(i) is

contrary to the requirement in 42 U.S.C. § 300gg-1 that "each health

24

insurance issuer that offers health insurance coverage in the individual or

group market in a State must accept every employer and individual in the

state that applies for such coverage," subject to exceptions not applicable

here, 42 U.S.C. § 300gg-1(a), and the guaranteed renewability requirement

in 42 U.S.C. § 300gg-2(a); and

c.   the failure to reconcile (FTR) policy provision in the 2025 Rule's

amendments to 45 C.F.R. § 155.305(f)(4) is contrary to the requirement in

26 U.S.C. § 36B(a) and (c) that access to premium tax credits is

guaranteed so long as an individual qualifies as an "applicable taxpayer."

77.     Accordingly, this Court must hold unlawful and set aside the aforementioned

provisions of the 2025 Rule.

**COUNT II**
**Violations of the Administrative Procedure Act – Arbitrary and Capricious and Without**
**Observance of Procedure Required by Law**
**(Against All Defendants)**

78.     The APA provides that courts "shall . . . hold unlawful and set aside agency

action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law" or that is "without observance of procedure required by law."  5 U.S.C. § 706.

79.     The 2025 Rule is a "final agency action for which there is no other adequate

remedy in a court" and is subject to judicial review.  *Id.* § 704.

80.     As detailed above, Defendants failed to provide adequate reasons for, and failed

to adequately respond to comments about, the following provisions, such that they are arbitrary

and capricious under the APA, and Defendants failed to observe required procedure in adopting

these provisions, *id.* § 706(2)(A), (D):

a.  the $5 premium penalty on automatic re-enrollees in the 2025 Rule's addition

    of 45 C.F.R. § 155.330(a)(3) and (n) and revisions to 45 C.F.R. § 155.330(j);

b.  the premium nonpayment penalty reversing the guaranteed-issue requirement

    in the 2025 Rule's amendment of 45 C.F.R. § 147.104(i);

c.  the failure to reconcile (FTR) policy in 45 C.F.R. § 155.305(f), including the

    2025 Rule's amendments to 45 C.F.R. § 155.305(f)(4);

d.  the shortening of the open enrollment period in the 2025 Rule's amendments

    to 45 C.F.R. § 155.410(e) and (f);

e.  the elimination of the low-income special enrollment period in the 2025

    Rule's removal of 45 C.F.R. §§ 147.104(b)(2)(i)(G) and § 155.420(d)(16);

f.  the imposition of special enrollment period verification in the 2025 Rule's

    amendments to 45 C.F.R. § 155.420(g);

g.  the prohibitive data-matching requirements in the 2025 Rule's removal of 45

    C.F.R. § 155.315(f)(7) and amendment to 45 C.F.R. § 155.320(c)(5);

h.  the requirement in the 2025 Rule's amendments to 45 C.F.R.

    § 155.320(c)(3)(iii) that Exchanges find general household income

    inconsistencies when a tax filer's attested projected annual household income

    differs from "trusted data sources";

i.  the amendment to the premium adjustment percentages set forth in 90 Fed.

    Reg. 27,166 through 27,178; and

j.  the revisions to the de minimis ranges for actuarial value calculations in the

    2025 Rule's amendments to 45 C.F.R. §§ 156.140(c), 156.200(b)(3), and

    156.400.

81.    These provisions, individually and collectively, also violate section 1554 of the ACA, which bars CMS from issuing any rule that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."  42 U.S.C. § 18114.

82.    Accordingly, this Court must hold unlawful and set aside the aforementioned provisions of the 2025 Rule.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

83.    declare that the provisions of the 2025 Rule identified in Counts I and II are arbitrary, capricious, without observance of proper procedure, or otherwise not in accordance with law under the Administrative Procedure Act;

84.    vacate and set aside the provisions of the 2025 Rule identified in Counts I and II under the Administrative Procedure Act;

85.    stay the effective date of the provisions of the 2025 Rule identified in Counts I and II under 5 U.S.C. § 705;

86.    preliminarily and permanently enjoin Defendants from implementing the provisions identified in Counts I and II;

87.    award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

88.    grant such other and further relief as the Court may deem just and proper.

Dated: July 1, 2025                    Respectfully submitted,

                    */s/ Joel McElvain*
                    JOEL MCELVAIN (BAR NO. 31673)

CORTNEY ROBINSON*
CHRISTINE L. COOGLE (BAR NO. 21846)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 935-2082
jmcelvain@democracyforward.org
crhenderson@democracyfoward.org
ccoogle@democracyfoward.org

*Counsel for Plaintiffs*

*\*Pro hac vice* motion pending