**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CITY OF COLUMBUS *et al.*,

        *Plaintiffs*,

v.

ROBERT F. KENNEDY JR. *et al.*,

        *Defendants*.

Case No. 1:25-cv-2114

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR STAY UNDER 5 U.S.C. § 705 OR,
IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

I.  Statutory Background ...................................................................................................2

II.  The 2025 Marketplace Rule ........................................................................................6

    A.  The Final Rule Erodes the Value of Coverage ......................................................6

    B.  The Final Rule Imposes Barriers on Enrollment ..................................................8

    C.  The Final Rule Limits the Availability of Subsidized Coverage ........................10

III.  The Disastrous Effects of the Final Rule ...................................................................15

STANDARD OF REVIEW .................................................................................................17

ARGUMENT .......................................................................................................................18

I.  Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Erode the Value of Coverage ................................................................................................18

    A.  The Rule's Imposition of a Junk Fee on Certain Plans Is Unlawful and Arbitrary ...........................................................................................................18

        1.  The Imposition of the Junk Fee Is Unlawful ..............................................18

        2.  The Imposition of the Junk Fee Is Arbitrary ...............................................19

    B.  The Revised Premium Adjustment Methodology Is Arbitrary ...........................21

    C.  The New Actuarial Value Policy Is Arbitrary .....................................................24

II.  Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Impose Barriers on Enrollment ...............................................................................................26

    A.  The Rule Unlawfully and Arbitrarily Revokes the Act's Guarantee That Anyone Can Buy Insurance ................................................................................26

    B.  The Revocation of the Low-Income Special Enrollment Period Is Arbitrary ...........................................................................................................28

    C.  The Verification Requirements for SEP Enrollments Are Arbitrary ..................31

III.  Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Limit the Availability of Subsidized Coverage ....................................................................32

    A.  The Failure-to-Reconcile Policy Is Unlawful and Arbitrary ..............................32

    B.  The New Data-Matching Policies Are Arbitrary .................................................35

IV.  Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction ........39

V.  The Remaining Factors Weigh in Favor of an Injunction .........................................44

VI.  The Court Should Not Require a Bond ......................................................................45

CONCLUSION ....................................................................................................................45

**INTRODUCTION**

The Affordable Care Act (ACA) extends a promise: all Americans are guaranteed access to insurance coverage that will pay for their health needs.  One of the ways that the ACA seeks to fulfill that promise is by establishing health insurance Exchanges, through which individuals can shop for and buy an affordable policy that covers a set of essential health benefits.  The Act aims to keep the costs of these policies down by subsidizing the cost of coverage, which attracts younger and healthier people into the market, improving the risk pool and lowering premiums for everyone.  When the Act is implemented as Congress intended, it succeeds at this goal.

New policymakers at the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS), however, do not share this vision.  They prefer policies that would lower federal subsidy payments by driving people off coverage on the Exchanges.  CMS is now seeking to accomplish this result through a new rule governing policies for enrollment in subsidized coverage on the Exchanges. 90 Fed. Reg. 27,074 (June 25, 2025). Through a combination of measures, the agency aims to drive up consumers' cost of coverage on the Exchanges, make it harder for people to enroll in policies through the Exchanges, and impose barriers on obtaining subsidized coverage even for those people who do successfully enroll. Many of the policies in this rule are unlawful, contrary to the ACA, and exceed CMS's statutory authority.  All of the policies at issue are arbitrary, violating the Administrative Procedure Act (APA)'s requirements for reasoned decisionmaking.  And several of the challenged policies will go into effect for only one year, although the proposed rule provided no notice of such one-year implementation, and CMS failed to justify that decision or consider the whiplash effect it will cause.  The new Administration was not free to undermine the purposes of the Act simply because they disagree with it.

These new policies will impose grave and irreparable harm on Plaintiffs. Municipalities like the cities of Columbus, Baltimore, and Chicago are providers of last resort. Because they operate clinics and other facilities that treat all comers without regard to their insurance status, when more people are driven off insurance coverage, these cities are left to foot the bill. Main Street Alliance's members are small business owners and entrepreneurs, many of whom rely on the Act's promise of affordable insurance coverage through the Exchanges to keep employees healthy and their businesses afloat. And Doctors for America's members are clinicians across the nation, many of whose patients would have their health coverage limited or lost as a result of the final rule. This would lead to greater administrative hurdles and less compensation for clinicians, who would be hindered from providing all of their patients with optimal care.

In the absence of a stay of the rule under 5 U.S.C. § 705 or a preliminary injunction, the rule will go into effect on August 25, 2025. Plaintiffs respectfully seek relief from this Court on or before that date to protect themselves and their members from irreparable harm and to vindicate the promise of the Affordable Care Act.

## BACKGROUND

### I.  Statutory Background

In 2010, Congress enacted the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119 (2010) (as amended by Pub. L. No. 111-152, 124 Stat. 1029 (2010)). "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012); *see also King v. Burwell*, 576 U.S. 473, 479 (2015).

Before the Act's market reforms went into effect in 2014, "individual health insurance markets were dysfunctional." *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 740 (D. Md. 2021). Insurers were free to deny coverage for people with pre-existing conditions, to refuse to

renew such coverage, or even to revoke such coverage after it had been issued. Now, however, the Act's "guaranteed issue" requirement specifies that every "health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), subject to exceptions specified in the statute, such as the restriction of new enrollments to an annual open enrollment period or specified special enrollment periods, *id*. § 300gg-1(b); *see Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020). "In other words, the Act 'ensure[s] that anyone can buy insurance.'" *Me. Comty. Health Options*, 590 U.S. at 301 (quoting *King*, 576 U.S. at 493).

Separately, the Act's "guaranteed renewability" provision requires issuers to renew or continue in force such coverage, 42 U.S.C. § 300gg-2(a), again subject to statutory exceptions, including an exception for persons who have failed to pay premiums owed on their policy, *id*. § 300gg-2(b)(1); *see also id.* §§ 300gg-12, 300gg-42.

Health insurance plans must cover a set of "essential health benefits," such as prescription drugs. *Id*. § 300gg-6(a). And to protect patients from devastating costs when a medical condition exhausts their coverage, the Act limits so-called "cost-sharing"—like, deductibles and copayments—for these essential health benefits. *See id.* § 18022(a)(2). The limitation on cost-sharing is adjusted each year by a "premium adjustment percentage," which compares average premiums for "health insurance coverage" in the current year with the same average for 2013, before the Act's marketplace reforms went into effect. *Id.* § 18022(c)(1), (4).

To help individuals learn about and enroll in health insurance, the Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 479 (quoting 42 U.S.C. § 18031(b)(1)); *see Me. Cmty. Health Options*, 590 U.S. at 301. These Exchanges, also known as health insurance Marketplaces, enable people not

3

eligible for Medicare or Medicaid to obtain adequate, affordable insurance independent of their jobs. The Exchanges therefore serve as "marketplace[s] that allow[] people to compare and purchase" ACA-compliant plans. *King*, 576 U.S. at 479.

There are several different types of Exchanges. Some states have elected to create Exchanges themselves (state-based Exchanges or SBEs), as is the case in Maryland, while others have created Exchanges that operate on the federal Healthcare.gov platform (state-based Exchanges on the federal platform, or SBE-FPs), such as the Exchange currently in use in Illinois while it transitions to an SBE. The Exchange in other states, including Ohio, is operated by the Centers for Medicare & Medicaid Services (CMS) (federally facilitated Exchange, or the FFE). See CMS, Consumer Info. & Ins. Oversight, *State-Based Exchanges*, https://perma.cc/JFT3-6EAK.

Plans that meet the requirements described above and that are offered on the Exchanges are known as "qualified health plans." Individuals primarily enroll in qualified health plans for a given benefit year during an annual open enrollment period, or under specified special enrollment periods. 42 U.S.C. § 18031(c)(6). To assist with enrollment, the Act requires Exchanges to award grants to healthcare "Navigators" that conduct public education and awareness campaigns, help consumers understand their choices, facilitate their enrollment, and ensure their access to consumer protections. *Id.* § 18031(i)(1), (3).

Plans on the Exchanges offer various levels of generosity: a "bronze" plan is designed to provide benefits that are actuarially equivalent to 60% of the full value of benefits to the plan (meaning that premiums are calculated in the expectation that 40% of the cost of coverage would be paid for through enrollee out-of-pocket spending), and "silver," "gold," and "platinum" plans are designed to provide benefits that are actuarially equivalent to 70%, 80%, and 90%, respectively, of the full value of benefits under the plan. *Id*. § 18022(d)(1). Because actuarial

predictions may be imprecise, the Act specifies that CMS may "provide for a de minimis variation . . . to account for differences in actuarial estimates." *Id.* § 18022(d)(3).

The Act also "seeks to make insurance more affordable by giving refundable tax credits to individuals." *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits" (PTCs) vary depending on an individual's income—individuals who earn more must pay more toward the cost of their monthly premium—but are generally pegged to the cost of the so-called "benchmark silver plan," or the second-lowest-cost silver plan offered within a market. *See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)–(C). The Act initially made these tax credits available to individuals with incomes between 100% and 400% of the federal poverty level. *Id.* There is no income cap on these tax credits under current law, *see* 26 U.S.C. § 36B(b)(3)(A)(iii), but the 400% income cap will be reinstated for 2026 absent further congressional action.

PTCs are claimed on an individual's tax return after the end of the year, and are paid by the IRS. *Id.* § 36B(h). Rather than waiting to recover their costs the next year, enrollees may claim "advance premium tax credits" (APTCs) up front so that the value of the tax credits may be applied directly to the purchase of insurance. 42 U.S.C. §§ 18081, 18082; *City of Columbus*, 523 F. Supp. 3d at 741. CMS is responsible for determining whether individuals meet the statutory eligibility requirements for APTCs, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B).

In sum, the Act requires that insurers generally offer only quality health insurance and aims to lower the cost of coverage to encourage individuals to enroll. This coverage improves access to care and overall health and reduces financial burdens on consumers as well as institutions that pay for uncompensated care. Decl. of Christen Linke Young ¶¶ 6–10.

Increasing enrollment in quality health insurance coverage is not only the ACA's immediate goal; it is also key to the Act's long-term success. Insurance market stability requires

robust enrollment, particularly by relatively healthy individuals. *Id.* ¶ 9; 42 U.S.C. § 18091(2)(I) (finding that "broaden[ing] the health insurance risk pool to include healthy individuals . . . will lower health insurance premiums"); *King*, 576 U.S. at 480. Limiting the cost of health insurance is, in turn, essential to promoting enrollment. Young Decl. ¶ 10; *King*, 576 U.S. at 480–81. By driving costs down and insured rates up, the Act ensures that insurance markets function smoothly.

When faithfully implemented, the Act's reforms successfully meet Congress's goal of enabling more individuals to enroll in health insurance coverage. *See* Young Decl. ¶ 7. More than 24 million individuals are enrolled in Marketplace coverage in 2025. CMS, Press Release, *Over 24 Million Consumers Selected Affordable Health Coverage in ACA Marketplace for 2025* (Jan. 17, 2025), https://perma.cc/N8QF-NKHG.

## II.  The 2025 Marketplace Rule

CMS new, final rule, 90 Fed. Reg. 27,074 (June 25, 2025), contains a number of provisions that, in their individual and collective effect, will raise consumers' premiums for plans on the Exchanges, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers of last resort. Independent experts project that the rule will lead to at least 1.8 million fewer people enrolling on the Exchanges.  Young Decl. ¶ 4.  The rule accomplishes this result through measures that erode the value of coverage obtained through the Exchanges, impose barriers designed to depress enrollment in the Exchanges, and impose further barriers limiting the availability of subsidized insurance even for those enrollees that do successfully enroll.

### A.  The Final Rule Erodes the Value of Coverage

*Imposition of a Junk Charge on Certain Enrollees*.  Under regulations that have been in place since the ACA was first implemented, 45 C.F.R. § 155.355(j), enrollees that remain

eligible for a Marketplace plan from one year to the next are automatically re-enrolled in the same plan unless they terminate coverage or actively enroll in a different plan. Depending on an enrollee's income level and the level of coverage selected, an enrollee may be eligible for a zero-premium plan, that is, a plan in which the entire cost of the premium is covered by the enrollee's APTCs. The new rule adds 45 C.F.R. § 155.355(n), only for the upcoming 2026 plan year, to require the federally facilitated Exchange to impose a monthly surcharge of $5 on each such enrollee until the enrollee confirms his or her intent and eligibility to remain on the zero-premium plan. CMS invokes 42 U.S.C. § 18081(f)(1)(B) as authority for this surcharge, 90 Fed. Reg. at 27,109, but that authority is limited to the establishment of procedures to redetermine an applicant's eligibility for APTCs, not to reduce the amount of the APTC that is awarded under the statutory formula. CMS acknowledges that research demonstrates this provision will reduce enrollment among enrollees who used to have access to a zero-premium plan by 14% to 33%. 90 Fed. Reg. at 27,195.

*Increased Costs through Revisions to the Premium Adjustment Methodology*. As noted above, the maximum annual limit on cost-sharing is adjusted annually by a "premium adjustment percentage," which measures the rate of premium growth. The IRS also uses the premium adjustment percentage to adjust the value of PTCs. CMS has historically used data from premiums for employer-sponsored insurance to calculate this percentage, because the individual insurance market premiums are more volatile. The final rule incorporates individual insurance market data into this measure, resulting in a 15% increase in the maximum annual out-of-pocket limit on cost sharing and a 4.5% increase in average premiums, which will lead to lost coverage, a worsened risk pool, and higher levels of uncompensated care.

*Eroding the Actuarial Value of Coverage*. As noted above, the Act sets targets for the actuarial value of bronze, silver, gold, and platinum plans on the Exchanges, subject to

7

permissible range of "de minimis" variation to "account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). The final rule expands the range of de minimis variation to permit bronze plans to range from 5 points above to 4 points below the statutory target (that is, bronze plans may offer coverage ranging from 56% to 65% of anticipated expenditures) and silver, gold, and premium plans to fall 4 points below the target (that is, silver plans may cover as little as 66% of anticipated expenditures). 45 C.F.R. § 156.140(c)(1). By eroding the value of silver plan coverage, the final rule will also reduce PTCs, which are calculated based on silver plan premiums. 26 U.S.C. § 36B(b)(2)(B). Overall, net premiums on the Exchange will increase by up to $714 per year for a typical family as a result of this provision, as the rule acknowledges. 90 Fed. Reg. at 27,208.

## B. The Final Rule Imposes Barriers on Enrollment

*Revocation of the Act's Guarantee That Anyone Can Buy Insurance*. In some instances, enrollees may incur debts for premiums owed without realizing it. For instance, some enrollees may believe that they may terminate their coverage simply by stopping premium payments, without realizing (or being informed) that the coverage remains in effect and they continue to owe payments to their insurer. The final rule permits insurers to refuse to enroll these individuals and to apply any payments that these individuals make to the outstanding debt instead of to the premium for new coverage, without prior notice to that enrollee. 45 C.F.R. § 147.104(i). In other words, an individual might complete all of the steps to enroll in coverage, including making the payment they understand to be needed to complete the transaction, only to learn at the end of the process that they have not been enrolled. This rule is contrary to the "guaranteed-issue" requirement of 42 U.S.C. § 300gg-1. CMS makes no attempt to quantify the impact of this change, but commenters offered analysis of data from the 2026 payment notice showing that 180,000 people owed debts for premiums as low as $10, all of whom would be

8

denied coverage under the 2025 rule. Indeed, CMS noted that more than 135,000 policies were terminated for the 2023 plan year for unpaid premiums of $10 or less—and this provision in the final rule could have an even bigger impact because it allows insurers to cover debts from *any time* in the past, not just the prior 12 months. 90 Fed. Reg. at 27,085.

*Changes to Enrollment Periods*. Under current policy, the open enrollment period for the Exchanges runs from November 1 to January 15. This two-and-a-half-month period has been beneficial for the health of the Exchanges, as younger and healthier people tend to enroll later in the process, and are particularly prone to enroll, if given the opportunity, after the end-of-the-year holiday period, when people face unusual financial distress. The final rule prohibits open enrollment in January by requiring all Exchanges to hold open enrollment periods that begin no later than November 1, end no later than December 31, and are no more than nine weeks in duration. 45 C.F.R. § 155.410(e).[1]

Current policy also provides a special enrollment period (SEP), on a monthly basis for persons with incomes at or below 150% of the federal poverty level. 45 C.F.R. § 155.420(d)(16). This SEP was established as an additional safety net for consumers with variable income who may transition from Medicaid eligibility to Exchange eligibility over the course of the year. *See* 86 Fed. Reg. 53,412, 53,434 (Sept. 27, 2021). These enrollees tend to pose a lower risk of serious health conditions, so easing their ability to enroll in Exchange coverage has improved the financial viability of the Exchanges. *See* Mark A. Hall & Michael J. McCue, *Does Making Health Insurance Enrollment Easier Cause Adverse Selection?*, Commonwealth Fund (Apr. 4, 2022), https://perma.cc/9P86-ZFCR. The final rule, however, revokes this SEP for 2025 and 2026. 90 Fed. Reg. at 27,079. This provision will lead to longer

---

[1] This rule goes into effect for 2027 and so is not challenged in this motion but will be addressed later in merits briefing.

periods of time where people lack insurance, resulting in uncompensated care costs for hospitals, providers, community health centers, and municipalities. *Id*. at 27,145.

The final rule also requires the federally facilitated Exchange to conduct pre-enrollment verification for SEP eligibility for at least 75% of new enrollments through SEPs. 45 C.F.R. § 155.420(g). Commenters noted that the addition of this paperwork burden will depress coverage on the Exchanges, and CMS itself estimated that it would cost consumers more than $7 million in 2026. 90 Fed. Reg. at 27,186–87, 27,204. CMS declined to make this policy permanent but is requiring it for the upcoming 2026 plan year.

### C.  The Final Rule Limits the Availability of Subsidized Coverage

*Failure to Reconcile Penalty*. The amount of APTCs that an enrollee receives over the course of a year and the amount of PTCs that the enrollee receives on his or her tax return depend on the same statutory formula; APTCs are intended to be a substitute for the tax credit. 26 U.S.C. § 36B; 42 U.S.C. § 18082. But APTCs are calculated based on the enrollee's projected income, so if the enrollee provides an incorrect estimate (because, for example, he or she works more hours than expected), the enrollee might owe a tax payment at the end of the year without realizing that any such debt is owed. Under current policy, any such enrollee must be given a notice of the tax debt in the first year of enrollment in coverage after the debt is incurred, so that the debt can be repaid; if the enrollee does not do so, eligibility for APTCs may be revoked in the second year. 45 C.F.R. § 155.305(f)(4)(i), (ii). The final rule revokes that grace period, for 2026 only, and requires the Exchanges to determine the enrollee to be ineligible for APTCs in the first year, *id.* § 155.305(f)(4)(iii), even though CMS lacks any authority to alter the statutory formula for eligibility for APTCs.

*Changes to Data-Matching Policies*. When an Exchange attempts to verify an applicant's income for purposes of determining his or her eligibility for, and the amount of,

APTCs, and it finds an inconsistency in that applicant's data, it notifies the applicant and provides him or her with an opportunity to respond. 42 U.S.C. § 18081(e)(4). The statute provides a default period of 90 days for that response, subject to CMS's authority to modify the procedures for this verification process. *Id.* §§ 18081(c)(4), (e)(1), (e)(4). In many cases, 90 days is not enough time for an applicant to track down the proof of income needed to verify APTC eligibility. The current regulations accordingly provide for an additional 60 days where necessary. 45 C.F.R. § 155.315(f)(7). The final rule revokes that 60-day extension. 90 Fed. Reg. at 27,120.

The final rule further implements changes to a 2017 policy that required Exchanges to audit all enrollees who project that their household income for the upcoming year will be greater than 100% of the federal poverty level, if the IRS reports data indicating that the enrollee's current income is below that threshold. Because this policy created "immense administrative burdens" for low-income enrollees, this Court held that it "defie[d] logic" and vacated it as arbitrary and capricious under the APA. *City of Columbus*, 523 F. Supp. 3d at 763. CMS did not appeal that judgment, and it again acknowledges that this policy would cause tens of thousands of enrollees to lose their coverage. 90 Fed. Reg. at 27,200. The final rule nevertheless attempts to reinstate this policy for the 2026 plan year, forthrightly asserting its disagreement with this Court's prior decision. *Id.* at 27,121.

Following the *City of Columbus* decision, under current policy, an Exchange must accept an applicant's attestation of his or her projected annual income if the IRS reports that there is no tax return data available. 45 C.F.R. § 155.320(c)(5). The final rule revokes that policy, and for the 2026 plan year will require Exchanges to verify income with other data sources and to require applicants to submit documentary evidence or otherwise resolve the income inconsistency; if no such evidence is available, the applicant will lose eligibility for APTCs. 90

11

Fed. Reg. at 27,131.  These new data-matching policies are projected to cause more than 400,000 people to lose coverage for the upcoming plan year.  90 Fed. Reg. at 27,199–200.[2]

\*    \*    \*

The final rule acknowledges that these provisions will cause many people to lose access to affordable coverage through the Exchange.  Nonetheless, it asserts that these provisions are needed to address the problem of unscrupulous brokers enrolling people on the Exchanges without their knowledge or consent.  The final rule cites a report from the Paragon Health Institute that purports to find a high rate of fraudulent enrollments.  90 Fed. Reg. at 27,025; Brian Blase & Drew Gonshorowski, *The Great Obamacare Enrollment Fraud*, Paragon Health Inst. (June 2024), https://perma.cc/4BCT-S63E (Paragon Report).  This report, however, suffers from numerous methodological errors that render its conclusions useless.  It predates numerous efforts that CMS put in place in the second half of 2024 to address the issue of improper enrollments.  And, even if the report's conclusions were accurate, there is a fundamental disconnect between the problem described in that report and the measures adopted in the final rule, which are designed to make it more difficult for eligible individuals to enroll in the Exchanges, rather than to focus on the wrongful conduct of certain brokers.

First, Paragon estimates that as many as 5 million low-income people were improperly enrolled in coverage in the Exchanges, based on a comparison of the number of people who applied for APTCs (which, as noted above, is based on the enrollee's projection of their anticipated income for the coming year) with the number of people whose income ended up falling within the range entitling them to subsidies.  *See* Paragon Report at 15; 90 Fed. Reg. at

---

[2]  These are not the only objectionable provisions in the final rule.  The rule also misinterprets CMS's legal authorities by revoking the eligibility for coverage of recipients of Deferred Action for Childhood Arrivals and by excluding the treatment of gender dysphoria from the set of essential health benefits.  Those provisions are, or likely will be, the subject of other litigation.

27,122.  But this is the wrong comparison; there are many legitimate reasons why an enrollee might not accurately estimate his or her future income.  Lower-income people in particular tend to have incomes that fluctuate widely, and these amounts are "hard to estimate, especially for households whose members may work part-time or seasonally, expect to change jobs, or are self-employed."  Urban Institute comment at 2 (Apr. 11, 2025), https://perma.cc/7457-27KN.[3] Moreover, the Paragon report compared apples to oranges by including children in its estimated number of applicants but not in its count of eligible persons; by mismatching 2023 data to estimate improper enrollments for 2024, when many more people gained eligibility for the Exchanges in light of changes in Medicaid enrollment standards; and by using fundamentally different measures of income for its two data sets.  *See id.* at 2–3; *see also* Jason Levitis et al. comment at 28–31 (Apr. 11, 2025), https://perma.cc/X3KY-KZLW; Ctr. for Budget & Policy Priorities comment at 4–5 (Apr. 11, 2025), https://perma.cc/KP9W-J63N.  These flaws in the Paragon analysis were pointed out to CMS by commenters, but CMS did not explain why it chose to ignore them.

Second, both the Paragon report and the final rule itself relied on estimates of fraudulent enrollments from early in 2024, without acknowledging that since that time CMS had put in place enforcement efforts against unscrupulous brokers, and those measures have since borne fruit.  *See* 90 Fed. Reg. at 27,074 n.2 (citing data from January through August 2024); Paragon

---

[3] Plaintiffs respectfully request that the Court take judicial notice of the cited public comments to the proposed rule, which are publicly available at Regulations.gov.  "Courts are . . . permitted to consider facts and documents subject to judicial notice because, under Federal Rule of Evidence 201, courts 'at any stage of a proceeding' may 'judicially notice a fact that is not subject to reasonable dispute.'"  *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 793 (D. Md. 2020) (quoting *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015)); *see also, e.g.*, *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (noting that "[t]his court and numerous others routinely take judicial notice of information contained on state and federal government websites"); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of publicly available information on state government's website).

Report at 25 & n.40.  CMS itself has recited, "Marketplace system changes that were implemented in July 2024 are having the desired effect of successfully preventing consumers from being switched to different plans or enrolled in coverage without their informed consent." CMS, *Update on Actions to Prevent Unauthorized Agent and Broker Marketplace Activity* (Oct. 17, 2024), https://perma.cc/M79K-CVL6.  These measures include new documentation requirements for brokers to show that individuals have consented to enroll, enhanced IT systems to detect suspicious activity, and regulatory changes strengthening CMS's enforcement authority against brokers.  Levitis comment at 30–31.  These measures are working; indicators of potentially improper enrollments have dropped by as much as 90% since they were put into place.  *Id.* at 31.  Yet the final rule does not account for these recent efforts in any way.

Third, even if the Paragon analysis were accurate or reflective of current circumstances, it could not justify the provisions of the final rule.  The final rule attempts to justify many measures as efforts to combat the phenomenon of brokers fraudulently enrolling consumers without their consent.  90 Fed. Reg. at 27,091–92.  But there is a basic disconnect between that rationale and the measures that the final rule adopts.  Many of its provisions are targeted at enrollees who are attempting to gain subsidized coverage for themselves and for their families, and not at brokers. For example, the revocation of the 60-day grace period for individuals to document their incomes wouldn't matter to an unscrupulous broker, but it could matter immensely to an actual enrollee who has difficulty documenting his or her income.  Moreover, the Paragon analysis is based on a review of nine states, all of which use the federally facilitated Exchange.  The report did not identify any systematic issues with enrollment on the state-based Exchanges.  *See* Levitis comment at 30–32.  Yet the final rule imposes many of its policies on a nationwide basis.  *See, e.g.*, 45 C.F.R. § 155.305(f)(4)(iii).  It would have made more sense for CMS to target its efforts against practices unique to the federally facilitated Exchange states, such as the practice of

14

permitting enhanced direct enrollment entities to submit enrollment paperwork on an enrollee's behalf. *See* Levitis comment at 32–33. What's more, even by CMS's own telling, the problem of improper enrollments has been driven by the enhanced subsidies available through the end of 2025. 90 Fed. Reg. at 27,091. CMS assumes that those subsidies will expire this year, which "will substantially mitigate the threat of future improper enrollments," *id.* at 27,075, but CMS imposes new policies to be effective in 2026 (and, in some cases, for 2026 only) when the incentive for unscrupulous broker behavior will no longer be in place.

## III. The Disastrous Effects of the Final Rule

As noted above, the 2025 rule contains numerous provisions that will worsen the barriers to coverage on the Exchanges by making coverage more expensive or by heightening the administrative obstacles consumers face. Young Decl. ¶ 29. These provisions will decrease the number of people with coverage by nearly 2 million; some of these people will find other coverage, but overall, 1.8 million more people will be uninsured. *Id.* ¶ 4. Younger and healthier people are more likely to drop from coverage, worsening the risk pool and leading to higher health insurance premiums, further exacerbating the problem of high costs, which in turn can cause additional people to become uninsured. *Id.* ¶ 5. This will lead to increased burdens of uncompensated care, especially for safety net providers. *Id.* ¶ 6.

These predictions are not merely hypothetical. Insurers are currently preparing rates for the coming year, and they are incorporating substantial premium increases in their models to account for CMS's rule. As one Maryland insurer noted, it needs to raise its premiums substantially because the rule "will lead to healthier enrollees leaving the market and an overall worsening of the risk pool." United Healthcare, *Optimum Choice, Inc*., *Part III: Actuarial Memorandum: PUBLIC; Maryland 2026 Individual Exchange Rates* 7 (May 22, 2025), https://perma.cc/35L2-M49D. This coverage loss and erosion, and overall increase in health care

costs will cause harms that radiate out from individuals to their businesses, medical providers, and broader communities.

Among many others, Plaintiffs will suffer significant and irreparable harm if the challenged provisions of the rule were to go into effect. The rule's policies would harm the owners and employees of small businesses like members of Main Street Alliance (MSA), many of whom rely on affordable health coverage through the Exchanges—not only to access the health care they need but, by extension, to provide them the freedom to operate their own businesses without seeking employer-sponsored insurance elsewhere. *See* Decl. of Shawn Phetteplace ¶¶ 3–6; Decl. of Brooke Legler ¶¶ 8. By eroding the value of their insurance coverage and creating additional administrative barriers, the final rule's provisions would strip that freedom from many small business owners operating on narrow margins, as well as their employees. Legler Decl. ¶ 11.

The final rule would also harm medical providers in myriad ways. Because patients with no or inadequate insurance are less likely to seek the medical care they need until conditions become serious, clinicians like members of Doctors for America (DFA) would see patients with more serious or emergency needs; would receive less compensation for many of their patients, even while expending more time navigating the administrative barriers to coverage for their patients; and would lose contact with many of their patients, particularly in low-income and rural communities. Decl. of Janet Krommes ¶ 6. This greater expenditure of time and effort, even while seeing decreased compensation, will hinder clinicians' ability to provide their patients with optimal health care.

The harms from the final rule would radiate out further to patients' communities and local governments in cities like Columbus, Baltimore, and Chicago. These cities fund and operate a range of community health centers, general and specialty clinics, and other health care

services, as well as emergency medical transport.  *See* Decl. of Olusimbo Ige ¶ 5; Decl. of Edward Johnson ¶ 11; Decl. of Faith Leach ¶¶ 7–8.  To ensure that their residents get the care that they need, they all provide these services to patients regardless of their insurance coverage or ability to pay.  An increase in the number of uninsured and underinsured residents resulting from the final rule would create a strain on those services and, ultimately, the cities' budgets, which must make up the shortfall from decrease compensation and increased demand for emergency services.  *See* Ige Decl. ¶¶ 6, 14; Johnson Decl. ¶¶ 9–11; Leach Decl. ¶ 12.  An erosion of insurance coverage will also lead residents to neglect to get the medical care that they need, when they need it, resulting in less healthy and productive communities.

## STANDARD OF REVIEW

Under section 705 of the APA, "a reviewing court may stay 'agency action' pending judicial review 'to prevent irreparable injury,'" *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949 (D. Md. 2020) (quoting 5 U.S.C. § 705), and "may issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705.  "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Maryland*, 486 F. Supp. 3d at 950 (quoting *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

17

## ARGUMENT

## I. Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Erode the Value of Coverage

### A. The Rule's Imposition of a Junk Fee on Certain Plans Is Unlawful and Arbitrary

#### 1. The Imposition of the Junk Fee Is Unlawful

Eligibility for PTCs and APTCs and the calculation of those credits are determined by statutory formula set forth in the ACA. A taxpayer is eligible for tax credits if he or she enrolls in coverage through the Exchange, falls within the specified income thresholds, and lacks an offer for other affordable health insurance. 26 U.S.C. § 36B(c)(1), (2). The amount of the tax credit is determined by the taxpayer's income and the cost of a benchmark plan offered through the Exchange. *Id.* § 36B(b). Eligibility for, and the amount of, APTCs turn on the same statutory criteria. 42 U.S.C. § 18081(a)(2); *see also id.* § 18082(a)(1). CMS is responsible for establishing a program "for determining" an applicant's eligibility for and the amount of APTCs, *id.* § 18081(a), and for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances," *id.* § 18081(f)(1)(B).

CMS's authority under the statute is to determine whether the statutory criteria for APTC eligibility are met, not to alter those criteria. *See Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 975 (E.D. Va. 2005) (ERISA plan administrator's authority to "determine" eligibility under the plan is not a discretionary power to alter the plan terms). Yet CMS invoked its redetermination authority under section 18081(f)(1)(B) to change the statutory formula for APTCs. In particular, it requires the federally facilitated Exchange to reduce APTCs by $5 per month for applicants who automatically re-enroll in a plan that would otherwise be fully subsidized. Nothing in section 18081 or the remainder of the Act grants CMS the power to change the statutory calculation in this way. *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S.

109, 117 (2022) ("Administrative agencies . . . possess only the authority that Congress has provided.").

Moreover, the authority and obligation to pay APTCs lies with the Treasury, not with CMS. Once CMS applies the statutory criteria to determine eligibility and the amount of APTCs, it reports that information to the Treasury, which then "shall make the advance payment . . . under this section of any premium tax credit allowed under section 36B of title 26" to the enrollee's insurer. 42 U.S.C. § 18082(c)(2). The statute's use of the word "shall" "creates an obligation impervious to discretion," *Me. Cmty. Health Options*, 590 U.S. at 310, and Treasury's obligation is to pay the amount that would be owed under the section 36B formula, not a different amount arbitrarily selected by CMS. CMS accordingly lacks authority to require enrollees to pay a junk fee where the statutory formula would otherwise entitle them to a payment that fully covers their premiums.

### 2. The Imposition of the Junk Fee Is Arbitrary

CMS describes the $5 per month junk fee as a "nominal" amount that will not impose "undue financial hardship" on enrollees. 90 Fed. Reg. at 27,107. But a wealth of empirical evidence shows that the addition of even nominal charges can profoundly depress coverage for low-income enrollees. When Massachusetts introduced a nominal payment for zero-premium plans, "1 in 7 enrollees lost coverage as a result of new monthly premiums," Adrianna McIntrye comment at 10 (Apr. 11, 2025), https://perma.cc/3VKT-NRLJ (citing Adrianna McIntyre et al., *Small Marketplace Premiums Pose Financial and Administrative Burdens: Evidence from Massachusetts, 2016-17*, 43 Health Affairs 80, 80 (2024)), demonstrating that "even small premium burdens act to depress enrollment, particularly by health consumers." Partnership to Protect Coverage comment at 7, https://perma.cc/74R9-D2Q6. Moreover, younger and healthier enrollees are more likely not to notice that they now owe a payment, while sicker enrollees will

be more likely to resolve paperwork issues more quickly.  As a result, this policy will worsen the

risk pool and raise premiums for other participants.  *See id.* at 6; *see also* Avalere Health, *HHS*

*Proposed Changes Could Reduce ACA Coverage and Increase Premiums* (Feb. 18, 2019),

https://perma.cc/48GB-HBT3 (projecting a 5.7% increase in premiums from a proposal to end

auto-enrollment).

CMS acknowledged that "even small premium increases may affect enrollment patterns

and risk pool composition," but still finalized this provision, asserting that it would be helpful to

combat improper enrollments.  90 Fed. Reg. at 27,195.  But, as discussed above, the agency has

inflated the problem of improper enrollments, has ignored the effect of its own efforts over the

past year to address that problem, and has adopted a policy that is at best tangentially related to

the problem the agency claims it is aiming to address.  CMS has thus acted arbitrarily by

ignoring important aspects of the problem, by failing to reasonably explain its policy, and by

failing to establish a rational connection between the facts found and the policy choice that it

made.  *See Ohio v. EPA*, 603 U.S. 279, 292–93 (2024).

Moreover, Exchanges, insurers, and individuals will all now incur costs in responding to

the confusion that the new policy will cause, given that many individuals will not understand

why they suddenly owe a payment that is not connected with the value of their policy.  *See* Nat'l

Ass'n of Community Health Ctrs. comment at 5–6 (Apr. 11, 2025), https://perma.cc/Y4AU-

DUQ7; Nat'l Ass'n of Insurance Comm'rs comment at 2 (Apr. 10, 2025), https://perma.cc/948V-

URWU.  CMS recognized this possibility, but it asserted without evidence that education efforts

should suffice to address it.  90 Fed. Reg. at 27,196.  Yet CMS has also virtually eliminated

funding for the Act's Navigators, cutting funding by 90% for the organizations that would

provide these public education efforts.  CMS, *CMS Announcement on Federal Navigator*

*Program Funding* (Feb. 14, 2025), https://perma.cc/ZYC8-54YZ.  It is implausible that the

remaining Navigators will be able to fully handle the increased workload that CMS's new policy creates. CMS ignores this "important aspect of the problem," *Appalachian Voices v. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022), and so acted arbitrarily. CMS also ignored the reliance interests of consumers who have come to expect that they will be able to continue in zero-premium coverage without unexpected fees, and the rule is arbitrary for this reason as well. *See DHS v. Regents of Univ. of Cal.,* 591 U.S. 1, 29 (2020).

In addition, the final rule's provision departs from the proposed rule significantly by sunsetting this provision after 2026. This departure fails to accord with the APA's "requirement that the notice in the Federal Register of a proposed rulemaking contain 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1102 (4th Cir. 1985). Numerous commenters asked CMS, at a minimum, to delay the imposition of the junk fee until 2027, given the sizable administrative costs that stakeholders would incur if they were required to implement this rule on short notice for 2026. CMS acknowledged this concern but responded by imposing the rule for 2026 only. 90 Fed. Reg. at 27,108. Thus, CMS is imposing these costs on stakeholders for the coming year, and then requiring them to incur even greater costs to switch back to the original system for 2027. Commenters could have pointed out the absurdity of this approach if it had been described in the proposed rule. The final provision is therefore not "a 'logical outgrowth' of the notice and comments already given." *Chocolate Mfrs. Ass'n*, 755 F.2d at 1105. By adopting this unexpected policy, CMS "substantially depart[ed] from the terms or substance of the proposed rule," rendering the notice-and-comment process "inadequate." *Id.* (cleaned up).

### B. The Revised Premium Adjustment Methodology Is Arbitrary

As noted above, the Act requires CMS to calculate an annual "premium adjustment percentage," which is used both to update the maximum limits on cost-sharing that an enrollee in

the Exchanges will owe and to adjust the value of PTCs that these enrollees receive. This percentage also has effects beyond Exchange coverage and is used to set the maximum limits on cost-sharing for most individual and employer-based coverage. *See* 42 U.S.C. § 300gg-6(a), (b); *id.* § 18022(c)(1). The percentage is based on a comparison of the current "average per capita premium for health insurance coverage in the United States" with the same average premium for such coverage for 2013, before the Act's reforms to the health insurance market took effect. *Id.* § 18022(c)(4). CMS initially used data from the market for employer-sponsored insurance to perform this comparison, because data from the individual insurance market was too volatile to provide a useful measure. 79 Fed. Reg. 13,744, 13,802 (Mar. 11, 2014). Although CMS briefly experimented with a different measure, it reverted to its original methodology, given continued volatility in individual insurance market data and the fact that premiums in this market are more likely to be influenced by risk premium pricing. 86 Fed. Reg. 24,140, 24,234 (May 5, 2021). CMS reasoned at that time that its original methodology was more in keeping with the Act's purpose to lower health care costs for individuals and families. *Id.* The rule, however, now incorporates individual insurance market data into this measure, 90 Fed. Reg. at 27,169, even though individual insurance premiums from 2013, before the Act's market reforms went into effect, could not provide an apples-to-apples measure to the present-day market.

As a result, the maximum out-of-pocket limit in 2026 will be about $450 higher for an individual and $900 higher for a family than it otherwise would have been. 90 Fed. Reg. at 27,206. This will lead to increased premiums across the board and 80,000 fewer enrollments in the Exchanges under CMS's own estimates, *id.*, running the risk of "a spiral of a worsening risk pool and increased premiums," Ass'n of Community Affiliated Plans comment at 21 (Apr. 11, 2025), https://perma.cc/E44R-J6X6, as well as "higher volumes of uninsured patients being seen by health centers," Nat'l Ass'n of Community Health Ctrs. comment at 2.

CMS acknowledged that its choice ran contrary to the Act's goals, but it brushed this concern aside, reasoning that it didn't need to take these issues into account when it exercised its discretion under section 18022(c)(4) to adopt an "appropriate" methodology. 90 Fed. Reg. at 27,172; *see also* 90 Fed. Reg. 12,942, 12,990 (Mar. 19, 2025) (proposed rule).[4]  This was error. It is black-letter law that an agency's rationale for a rule cannot be "unmoored from the purposes and concerns" of the statute as a whole. *Judulang v. Holder*, 565 U.S. 42, 64 (2011).  And the central purpose of the Act is to lower health care costs for Americans. *See King*, 576 U.S. at 479. *See also* 42 U.S.C. § 18114(1) (prohibiting CMS from adopting rules that create "unreasonable barriers" to obtaining health care).  CMS, then, was not free to disregard the costs it was imposing on Exchange enrollees.

CMS might have avoided these errors had it not had an unalterably closed mind on this matter.  The proposed rule candidly declared that CMS would disregard "special interests" if they asked it to retain the original methodology. 90 Fed. Reg. at 12,989–90.  Since it would ignore these commenters anyway, it provided only a 23-day period for them to offer evidence on its complex proposal. *Id.* at 12,942.  And seven days after it published the proposed rule, it published a calculator that instructed insurers to assume that its proposal would be finalized. CMS, *Revised Final 2026 Actuarial Value (AV) Calculator Methodology* (Mar. 26, 2025), https://perma.cc/S4QQ-9W7D.  It is thus no surprise that CMS finalized this provision without change, even in the face of comments showing the harms it would cause to enrollees.  By

---

    [4]  Although CMS recognized it had discretion to choose a methodology, the final rule contains language also suggesting that it believed the new method was required by the statute. 90 Fed. Reg. at 27,206.  To be clear, the Act does not require CMS to shift to a calculation that will add hundreds of dollars of costs to each enrollee.  The Act requires CMS to compare the relative costs of "health insurance coverage" in 2013 and the present, 42 U.S.C. § 18022(c)(4), and premiums for individual health insurance in 2013 were not premiums for "health insurance coverage," as that term is used in the Act, because plans on that market were not yet subject to the Act's core requirements like the guaranteed-issue and community-rating requirements.

arriving at a "predetermined answer," *Kravitz v. Dep't of Com*., 366 F. Supp. 3d 681, 750 (D. Md. 2019), CMS rendered the notice-and-comment process to be an empty formality.  The new methodology should be vacated on this ground as well.

### C.  The New Actuarial Value Policy Is Arbitrary

An individual shopping for health insurance on the Exchange would expect to buy a plan with a certain level of generosity.  For example, someone shopping for a silver plan would expect coverage for 70% of expected health costs, leaving 30% to be covered by cost-sharing. The rule permits insurers to engage in a bait-and-switch by allowing plans to be marketed as silver plans that cover as low as 66% of anticipated expenditures.  45 C.F.R. § 156.140(c)(1).

The formula for PTCs turns on the cost of the second-lowest-cost silver plans available on the Exchange.  26 U.S.C. § 36B(b)(2)(B).  By permitting insurers to sell cheaper, but less comprehensive, silver plans, CMS will therefore decrease the value of the tax credits for all enrollees, leading to a reduction in PTCs by $1.22 billion overall for 2026 alone, by CMS's own calculation.  90 Fed. Reg. at 27,208.  A typical family of four would see their subsidies decrease, and their cost of coverage rise, by up to $714 for the year.  Ctrs. for Budget & Policy Priorities comment at 34–35.  And, because healthier people are more likely to drop out of coverage when premiums rise, the result will be a weaker risk pool, leading to even higher premiums for those who remain in the market.  *Id.* at 35 (citing Am. Acad. of Actuaries, *Issue Brief: Ensuring Access, Affordability, Choice, and Competition in the Individual Health Insurance Market* at 5 (Mar. 2025), https://perma.cc/Z8L2-ECXH).  This relationship between subsidies and the strength of the risk pool is well established by empirical research, but CMS simply stated that it "expect[ed]" its rule to have the opposite effect, 90 Fed. Reg. at 27,107, without citing any evidence to support this subjective belief or engaging with the record.  This was arbitrary.  *See Ohio v. EPA*, 603 U.S. at 292.

CMS permitted this erosion in the value of coverage by invoking 42 U.S.C.

§ 18022(d)(3), which instructs the agency to develop guidelines to "provide for a de minimis

variation in the actuarial valuations used in determining the level of coverage of a plan to

account for differences in actuarial estimates."  But the rule permits far more than a "de

minimis" variation.  "Whether a particular activity is a de minimis deviation from a prescribed

standard must, of course, be determined with reference to the purpose of the standard."  *Wisc.*

*Dep't of Revenue v. William Wrigley, Jr., Co*., 505 U.S. 214, 232 (1992); *see also Perez v.*

*Mountaire Farms, Inc*., 650 F.3d 350, 378 (4th Cir. 2011) (Wilkinson, J., concurring in part and

concurring in the judgment) ("to give the de minimis rule too broad a reach would contradict

congressional intent by denying proper effect to a statute").  The purpose of the standard is set

forth in section 18022(d)(3) itself; the only permissible "de minimis" variations are those that

account for uncertainties in "differences in actuarial estimates," not variations to reflect a new

Administration's policy preference for less generous subsidies. The rule does not even attempt to

justify the new policy as an effort to account for differences in actuarial estimates.  *See* 90 Fed.

Reg. at 27,175.  By "rel[ying] on factors which Congress has not intended it to consider," *Sierra*

*Club v. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018), CMS acted arbitrarily.

CMS also displayed an unalterably closed mind with respect to this proposal. The

calculator mentioned above informed insurers that they should assume that the agency would

finalize its proposal to permit less valuable coverage.  *See supra* at 24.  Again, by treating its rule

as a foregone conclusion, CMS rendered the notice-and-comment process to be meaningless.

*See Kravitz*, 366 F. Supp. 3d at 750.

## II. Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Impose Barriers on Enrollment

### A. The Rule Unlawfully and Arbitrarily Revokes the Act's Guarantee That Anyone Can Buy Insurance

The 2025 rule permits any insurer (within the same controlled group as an insurer that previously extended coverage to the enrollee) to deny coverage to any person who might owe a premium on an old policy, 45 C.F.R. § 147.104(i), which could cause hundreds of thousands of people to lose coverage for old debts as low as $10 that they might not even know about, 90 Fed. Reg. at 27,085. This runs flatly contrary to one of the core provisions of the ACA. The statute uses absolute terms to guarantee the availability of health insurance coverage: "each health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept *every* employer and individual in the State that applies for such coverage," subject only to specified exceptions. 42 U.S.C. § 300gg-1(a) (emphasis added); *see also id.* §§ 18032(a)(1), (d)(3)(C). By requiring insurers to accept "every" individual, the statute does not admit of any exceptions, apart from those listed in section 300gg-1 itself. *See Conner v. Cleveland Cnty.*, 22 F.4th 412, 425 (4th Cir. 2022) ("Simply put, all means all."). An exception for past-due premiums is not one of the Act's enumerated exceptions to the guaranteed-issue requirement, as CMS itself has long understood. *See* 77 Fed. Reg. 70,584, 70,599 (Nov. 26, 2012). The agency was not free to rewrite the text to carve out a new exception to the statute's categorical rule. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent" (cleaned up)).

Notably, there is such an exception for past-due premiums in the Act's parallel provision that guarantees the renewability of policies. *See* 42 U.S.C. § 300gg-2(b)(1). But, again, that exception is absent from the guaranteed-issue provision. This demonstrates Congress's

understanding that an outstanding debt could prevent an enrollee from maintaining the policy he or she currently has, but that the debt wouldn't lock the enrollee out of the market altogether. *See Bittner v. United States*, 598 U.S. 85, 94 (2023).

CMS's statutory theory is not clear on this point, but it apparently believes that it would make sense for the guaranteed-renewability exception to apply to the guaranteed-issue provision as well. 90 Fed. Reg. at 27,087. Simply put, statutory interpretation doesn't work in this way. Agencies "aren't free to rewrite clear statutes under the banner of [their] own policy concerns." *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019).

In any event, the agency's asserted policy concerns do not justify this rule. Commenters noted the potential for widespread coverage losses, but CMS derided that possibility by describing any such losses as "small" or "minimal." 90 Fed. Reg. at 27,087. This is internally inconsistent with the agency's recognition that even small payment obligations can have outsized effects on enrollment, *see supra* at 20, and the rule should be set aside for this reason alone, *see ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018)). The rule would have far more than "minimal" effects; commenters submitted empirical evidence based on data in the 2026 payment notice that 180,000 people who owe less than $10 would lose access to insurance on the Exchanges as a result of this trap for the unwary. 90 Fed. Reg. at 27,085. Lower-income people would be more likely to be cut off from coverage from owing small back debts, as CMS previously recognized. 87 Fed. Reg. 27,208, 27,218 (May 6, 2022). The result will be more people lacking insurance and greater strains on providers of last resort that are left to shoulder the burden of uncompensated care, as CMS now acknowledges. 90 Fed. Reg. at 27,192.

Moreover, as commenters explained, there are many legitimate reasons why individuals might fail to pay a premium. Enrollees often don't realize that they need to take steps to terminate their old coverage when they switch to other coverage. 90 Fed. Reg. at 27,088. The

agency acknowledged this point, but responded only that individuals have "the ability to contact their issuer[s]." *Id.* This entirely misses the point that many people wouldn't know that they need to do so. CMS claimed that this provision "is principally intended to prevent the minimum debt in the first instance," *id.* at 27,089, but if CMS's goal is prevention, it makes little sense not to impose an attendant notice requirement to ensure that consumers know of the policy, which would allow them to avoid or resolve that debt before facing the draconian, and unlawful, consequence. And, to the extent that CMS was motivated by a desire to address enrollees who are somehow gaming the system, it simply failed to engage with the point that there is no evidence of any such widespread gaming, and that this rule is instead far more likely to create a barrier for people who would not know that they owe any back payment. *See* Ctrs. for Budget & Policy Priorities comment at 6. By failing to engage with this important aspect of the problem, CMS acted arbitrarily. *See Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915, 926 (4th Cir. 2022).

### B. The Revocation of the Low-Income Special Enrollment Period Is Arbitrary

There is currently a monthly SEP for persons at or below 150% of the federal poverty level. 45 C.F.R. § 155.420(d)(16). This SEP, which helps ensure that qualifying people have an opportunity to enroll in free or low-cost healthcare coverage, has become an important safety net for individuals who cycle in and out of Medicaid eligibility. 89 Fed. Reg. 26,218, 26,320 (Apr. 15, 2024). Initially, individuals eligible for a zero-premium plan on the Exchanges could take advantage of the SEP only while enhanced PTCs were authorized by Congress. But in 2024, recognizing the SEP's success and a lower-than-anticipated risk of adverse selection,[5] CMS eliminated the requirement. *Id.* at 26,321. The final rule revokes this SEP for the remainder of

---

[5] The term "adverse selection" refers to "problems that can arise in insurance markets when the healthy have insufficient incentive to purchase health insurance, and thus the resulting pool of insureds consists predominantly of the sick and those actively using their insurance." *Cutler v. HHS*, 797 F.3d 1173, 1176 n.1 (D.C. Cir. 2015).

2025 and through the end of 2026. As a result, for at least the next year, individuals who want to enroll in coverage but do not qualify for another type of SEP could remain uninsured until the 2026 open enrollment period, incurring uncompensated care costs in the meantime that will be borne by providers of last resort like municipalities and many DFA members. 90 Fed. Reg. at 27,145.

CMS reasoned that the statute compelled it to revoke this SEP. 90 Fed. Reg. at 27,147. This is plainly incorrect. The ACA instructs CMS to "provide for . . . special enrollment periods . . . under circumstances similar to such periods under part D of title XVIII of the Social Security Act," that is, Medicare Part D. 42 U.S.C. § 18031(c)(6). Medicare Part D has had a similar low-income SEP since the beginning of that program. 42 C.F.R. 423.38(c)(4); 70 Fed. Reg. 4194, 4530 (Jan. 28, 2005). CMS acknowledges this point, but it contends that the Medicare low-income SEP was established under a regulation, not under the Medicare statute itself. 90 Fed. Reg. at 27,147. This is a distinction without a difference. Medicare Part D gives CMS rulemaking authority to establish procedures for enrollment, 42 U.S.C. § 1395w-101(b)(1)(A), (b)(3), and CMS established the Medicare low-income SEP under that authority. That SEP thus falls "under," meaning "pursuant to or by reason of the authority of," Medicare Part D. *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 124 (2018) (cleaned up). So the ACA provision establishing a similar SEP fell squarely within the agency's section 18031(c)(6) authority, if the agency chose to exercise it. But, because CMS incorrectly believed that it was compelled by the statute to adopt this rule, the provision must be vacated. *See Perez v. Cuccinelli*, 949 F.3d 865, 873 (4th Cir. 2020) (en banc); *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597 (D.C. Cir. 2023) ("agency action may not stand if the agency has misconceived the law").

Despite representing that its hands were tied by the statute, CMS assured the public that it would be adopting this rule only for one year. 90 Fed. Reg. at 27,147. If the agency genuinely believed it lacked authority to establish a low-income SEP, it would be absurd for it to bring that SEP back into operation for 2027. "This logical inconsistency alone renders the [rule] arbitrary and capricious." *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1117–18 (D.C. Cir. 2024).

CMS relied on the purportedly temporary nature of this policy to discount concerns raised by commenters that eliminating the SEP will lead to coverage losses, financial instability, and uncompensated care, especially for vulnerable populations who may face barriers to enrollment during the open enrollment period or other SEPs. *See* 90 Fed. Reg. at 27,145. Similarly, CMS acknowledged the point that state-based Exchanges have not seen the same issue of improper enrollments that the agency claims to be solving, but it nonetheless relied on the supposedly short-term nature of the policy to impose administrative costs on these states as well. *Id.* at 27,147. Moreover, although the best data shows that the low-income SEP has not been a driver of adverse selection, the agency acknowledged these studies and responded only by noting its unexplained disagreement with that data, *id.* at 27,146, again relying on the one-year nature of the policy to discount the harms that its rule would cause to lower-income persons. CMS's logical error in treating a rule that it claimed to be legally required as only a temporary measure, then, infected its entire approach, and the rule cannot stand. *See Ohio v. EPA*, 603 U.S. at 292.

In any event, CMS failed to explain how pausing the SEP would accomplish the agency's goal of addressing "the currently high rate of improper enrollments." 90 Fed. Reg. at 27,145. In fact, the agency's own data indicates that improper enrollments are already being addressed under its current policy. The agency received 7,000 complaints in December 2024, a decrease of more than 75% from the number of complaints it received in February 2024. 90 Fed. Reg. at

12,980.  But even if improper enrollments remain at high levels, as CMS claims, there is a

fundamental mismatch between that problem and the agency's chosen solution.  Ending the SEP

to reduce improper enrollments is like "trying to prevent car theft by making it more difficult for

people to own cars."  Levitis comment at 10 (citing Justin Giovannelli & Stacey Pogue,

*Policymakers Can Protect Against Fraud in the ACA Marketplaces without Hiking Premiums*,

Commonwealth Fund (Mar. 5, 2025), https://perma.cc/V54M-TK7R).

      Finally, CMS did not notify the public in its proposed rule that this policy would apply

only on a one-year basis, *see* 90 Fed. Reg. at 12,979, and resultingly, commenters had no

opportunity to point out the fundamental illogic of this approach.  CMS's failure to make this

disclosure renders the notice-and-comment process inadequate.  *See Chocolate Mfrs. Ass'n*, 755

F.2d at 1105; *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 558 (D. Md. 2020).

      **C.  The Verification Requirements for SEP Enrollments Are Arbitrary**

      CMS imposed two new requirements on the federally facilitated Exchange for 2026.

That Exchange must conduct pre-enrollment verification for each of its SEPs, and it must

conduct eligibility verification for at least 75% of new enrollments through SEPs.  45 C.F.R.

§ 155.420(g).  If the Exchange cannot complete the verification for an applicant, the enrollment

must be cancelled.  *Id.*   This rule will generate 293,000 verification issues to resolve in the

coming year, 90 Fed. Reg. at 27,186, resulting in a further barrier to coverage, through additional

paperwork and administrative burdens, and costing consumers more than $7 million in 2026, *id.*

at 27,186.  Younger and healthier people are more likely to drop coverage as a result, leading to

a worsening of the risk pool, as CMS itself realized the last time it considered (and rejected) a

similar policy.  87 Fed. Reg. at 27,279; *see* Levitis comment at 14–15 (discussing evidence of

adverse selection from paperwork burdens).

CMS acknowledged the harm that this new policy would cause but reasoned that it had adequately addressed commenters' concerns by applying the rule only for 2026 and only for the federally facilitated Exchange.  90 Fed. Reg. at 27,151.  This may explain why the agency chose not to go farther, but it is not an adequate explanation for why the agency acted at all. CMS attempted to justify this policy as a response to the problem of improper enrollments by brokers. *Id.* at 27,150.  But, for the reasons discussed above, the agency fundamentally misconceived the scope of that problem and ignored the success of recent efforts to address broker misconduct. *See supra* at 14.  And there is no evidence that imposing this obstacle for *enrollees* would affect the behavior of *brokers*.  *See* Ctrs. for Budget & Policy Priorities comment at 30.  Moreover, since—even on the agency's own telling—the problem of improper enrollments hasn't arisen on the state-based Exchanges, CMS should have focused its attention on why the federally facilitated Exchange might be different, such as the ability of enhanced direct enrollment entities to submit applications on behalf of enrollees.  Given this fundamental mismatch between the agency's policy and the problem it claimed it was trying to solve, CMS acted arbitrarily in imposing these new burdens for 2026, for which it also did not provide adequate notice.  *See Ohio v. EPA*, 603 U.S. at 292; *supra* at 21–22.

## III. Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Limit the Availability of Subsidized Coverage

### A. The Failure-to-Reconcile Policy Is Unlawful and Arbitrary

As noted above, enrollees are required to reconcile the APTCs that they claim on the basis of their projected income with the PTCs that they receive on their tax return on the basis of the income they actually received.  *See* 26 U.S.C. § 36B(f)(3).  CMS has a process that requires applicants for coverage to report whether they have reconciled their tax credits on prior tax returns and that checks that reporting against IRS data.  45 C.F.R. § 155.340(c).  But many

people are flagged in error, often because the data that the IRS reports to the Exchange lags in time. *See* Ctr. for Budget & Policy Priorities comment at 12. This issue is particularly acute for the 3.3 million people who are self-employed, many of whom do not file their tax returns until October, leaving insufficient time for the IRS to update records before the next enrollment season. *See* Families USA comment at 7 (Apr. 11, 2025), https://perma.cc/2NTV-DZS3.

Under the current policy, an applicant might lose eligibility for APTCs if they do not reconcile their tax return in a second year, after receiving notice in the first year of the issue. 45 C.F.R. § 155.305(f)(4)(i), (ii). CMS has now revised that policy, for 2026 only, to require the Exchanges to determine the enrollee to be ineligible for APTCs in the first year that the issue arises. *Id.* § 155.305 (f)(4)(iii). Enrollees who lose this eligibility become responsible for the full cost of their coverage, which in many cases is prohibitively expensive.

Both the current rule and the new rule are unlawful.[6] As discussed above, *supra* at 5, CMS has authority to determine whether the statutory standards for APTC eligibility are met, but it does not have authority to alter those standards. *See* 42 U.S.C. §§ 18081(a), (f). Eligibility for APTCs turns on whether an applicant is eligible for tax credits, *id.* § 18081(a)(2), and eligibility for tax credits turns on whether one is an "applicable taxpayer," 26 U.S.C. § 36B(c), a term that depends on the applicant's income. The statute does not contemplate that the existence of a prior tax debt affects an applicant's eligibility for APTCs in any way. And if Congress intended to condition eligibility for a tax credit on the reconciliation of old tax debts, it knew how to do so. *See* 26 U.S.C. §§ 24(*l*), 32(k) (conditioning eligibility for future child and earned income tax credits); *see also Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy*, 654 F.3d 496, 507 (4th Cir. 2011).

---

[6] Although this motion does not seek relief as to the current failure-to-reconcile rule, Plaintiffs intend to seek final relief on that policy as well.

So, if debt for a PTC is unresolved, the statute contemplates that the IRS, not CMS, would use its enforcement tools to ensure the debt is collected.  *See* 26 C.F.R. § 1.6011-8.

In any event, CMS has now compounded this error in its new failure-to-reconcile (FTR) policy.  The new rule will trap some consumers in a Catch-22.  Although current policy requires notice in the first year before APTC eligibility may be revoked in a second year, the new policy will require APTCs to be revoked if tax issues aren't resolved immediately.  But an applicant's federal tax information must be handled consistently with federal tax privacy law, and so in many cases an applicant with a failure-to-reconcile issue will learn only that they have been barred from subsidized insurance, but not the reason why.  *See* Young Decl. ¶ 54.  This "Kafka-esque" scenario will cause numerous people to lose coverage, worsening the risk pool.  *Id.* ¶ 55.  And this problem of delayed IRS reporting will only worsen, given the Administration's  large-scale staff reductions at the IRS.  *See* Ctrs. for Budget & Policy Priorities comment at 12; *see also* 90 Fed. Reg. at 27,117 (acknowledging IRS "data constraints" and "error" in FTR data).

At one time, CMS acknowledged a one-year FTR policy would be "overly punitive" on enrollees who lose access to subsidies as a result of "delayed data" from IRS, in many cases without knowing why their applications have been rejected.  87 Fed. Reg. 78,206, 78,256 (Dec. 11, 2022).  Now, however, the agency brushes aside this concern, noting simply that rejected applicants may file an appeal if they wish.  90 Fed. Reg. at 27,116.  This ignores the point that many frustrated applicants will drop out of the process altogether, and the loss of these enrollees, who tend to be healthier, will worsen the risk pool for everybody else.  Young Decl. ¶ 55.  CMS asserts that its policy is nonetheless worthwhile, albeit only for 2026, to address the "imminent" concern of widespread improper enrollments identified in the Paragon Institute report.  90 Fed. Reg. at 27,116.  But, as discussed above, that report is fatally flawed, for reasons that were identified by commenters but that the agency refused to address.  *See supra* at 12–15.  In any

event, there is a fundamental mismatch between this rule and the problem that CMS claims it is trying to solve.  The FTR policy does not in any way address the conduct of brokers, but it does deprive enrollees of coverage, oftentimes for reasons that the Exchange cannot even disclose to them.  By failing to draw a "rational connection between the facts found and the choice made," *Appalachian Voices*, 912 F.3d at 753, CMS acted arbitrarily.  And by again failing to notify the public in its proposed rule that this policy would be on a one-year basis only, CMS failed to provide adequate notice.  *See Chocolate Mfrs. Ass'n*, 755 F.2d at 1105.

### B.  The New Data-Matching Policies Are Arbitrary

As discussed above, CMS has made it more difficult for applicants to resolve any concerns that the Exchange identifies with their applications for subsidized coverage by (a) shortening the period for an applicant to provide requested information from 150 days to 90 days, 90 Fed. Reg. at 27,120; (b) reinstating a requirement to audit all enrollees who project a household income higher than the poverty level, if IRS data indicates income below that level; and (c) revoking a rule that permitted applicants to self-attest their own income if IRS data is unavailable.  Each of these policies will make it harder for people to enroll in coverage, and each of these policies is arbitrary.

*First*, CMS wrongly reasoned that it was compelled by the statute to impose a 90-day policy.  *Id.* at 27,119; *see also id.* at 12,962 (proposed rule).  It notes that 42 U.S.C. § 18081(e)(4)(A) describes a 90-day period for applicants to verify their information for the Exchanges, and that the provision expressly permits CMS to extend that period for 2014.   From there, the agency concludes that Congress withheld the authority to grant extensions after 2014.  But the Act also permits CMS to "modify the methods under the program established by [section 18081] for . . . verification of information."  42 U.S.C. § 18081(c)(4)(B).  CMS asserts that this provision addresses only the relationship between the agency and "trusted data sources," 90 Fed.

Reg at 27,119, but nothing in the text of the provision itself even hints at this limitation.  Instead, by its express terms, the statute grants the agency the power to modify any of the methods set forth in section 18081, and this includes the power to modify the timeline described in paragraph (e)(4)(A).  Indeed, CMS must itself understand the statute to operate in this way, given that it has allowed for extensions of the 90-day period in other circumstances.  *See* 45 C.F.R. § 155.315(f)(3).

Nor did Congress revoke the modification power that it granted in paragraph (c)(4)(B) by reiterating in the next paragraph that extensions could be granted in 2014.  After all, "redundancies are common in statutory drafting," sometimes due to "a congressional effort to be doubly sure," *Barton v. Barr*, 590 U.S. 222, 239 (2020), an observation that applies with particular force to the ACA, *see King*, 576 U.S. at 491.  Because CMS wrongly believed that it was required by the statute to adopt this rule, the provision must be vacated.  *See Perez*, 949 F.3d at 873; *Me. Lobstermen's Ass'n*, 70 F.4th at 597.

If CMS had correctly understood its statutory authority, it could have engaged with the evidence showing the need for a 150-day verification period.  By the agency's own telling, this provision will cause 226,000 enrollees to lose eligibility for tax credits on the Exchanges, 90 Fed. Reg. at 27,199, and these individuals will almost certainly be thrown off coverage altogether.  These enrollees tend to be healthier, so if they do not participate in the Exchanges, the risk pool will worsen, and premiums will increase for remaining enrollees.  *Id*. at 27,119; *see* Young Decl. ¶¶ 5, 26.  Apart from incorrectly asserting that its hands were tied, CMS only briefly averted to "program integrity" needs, without explaining how those needs would be advanced in any way.  CMS, then, acted arbitrarily by failing to address the relevant factors that should have driven its decision.  *See Sierra Club*, 899 F.3d at 270.

36

*Second*, the mandatory audit policy is arbitrary for precisely the same reasons that this Court vacated the same policy four years ago.  *See City of Columbus*, 523 F. Supp. 3d at 763. There are many reasons why an individual could, in good faith, project that he or she will have income next year higher than the federal poverty level even if current-year IRS data shows a lower income.  Governing for Impact comment at 12, https://perma.cc/745K-J55Q; *see also* Cynthia Cox et al., *Repayments and Refunds: Estimating the Effects of 2014 Premium Tax Credit Reconciliation*, KFF (Mar. 24, 2015), https://perma.cc/AL3R-C5H5 (roughly half of low-income ACA enrollees experience year-over-year income changes of 20% or more).  Many such people are self-employed, or may have difficulty obtaining documentation to support their projections. *See City of Columbus*, 523 F. Supp. 3d at 762.  As a result, these people will be more likely to drop out of the market; by CMS's own estimate, 81,000 people will lose coverage.  90 Fed. Reg. at 27,200.  And because these individuals tend to be younger and healthier, their exit from the health insurance market will worsen the risk pool.  *See* Ctrs. for Budget & Policy Priorities comment at 14–15.

As it did before, CMS improperly assumed that these enrollees must have been attempting to defraud the Exchanges.  And CMS again "improperly elevated the objective of fraud prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance."  *City of Columbus*, 523 F. Supp. 3d at 762.   The agency's "decision to prioritize a hypothetical risk of fraud over the substantiated risk that its decision result in immense administrative burdens at best, and a loss of coverage for eligible individuals at worst, defies logic."  *Id*. at 763.

CMS did assert that some new evidence has arisen supporting its claim that fraud is prevalent among the individuals that would be subject to its mandatory audit policy.  90 Fed. Reg. at 27,122 (citing Hopkins et al., *How Did Take-Up of Marketplace Plans Vary with Price,*

*Income, and Gender?*).  But one of the authors of that study submitted a comment to CMS (which the agency ignored) cautioning that the report did not support the agency's conclusions, given the difficulties that low-income people face in estimating their future incomes.  Urban Institute comment at 2; *see supra* at 13.  CMS, then, committed the same errors in this rule as it did before, and this provision should be vacated for the same reason.

*Third*, CMS acted arbitrarily by revoking the option for applicants to attest to their own income where tax data is unavailable.  It is a relatively common occurrence for tax data to be missing for an applicant, for entirely legitimate reasons.  An individual might have changed his or her name, had a change in family composition, had a change in filing status, or might not have been subject to a filing requirement for the year in question.  *See* Ctrs. for Budget & Policy Priorities comment at 15.  For this reason, by CMS's own estimate, its rule will generate *more than 2.7 million* instances of data discrepancies that Exchanges and applicants will need to resolve.  90 Fed. Reg. at 27,185.  For many of these people, other documentation might not be readily available to substitute for tax data, which means that if these people are not permitted to attest to their income, they will be deprived of subsidized coverage.  *Id.*  And once again, it is younger and healthier people who are more likely to be deterred from coverage by this paperwork burden, as sicker people will be more motivated to take the needed steps to retain their coverage.  *Id.*  CMS estimates that 407,000 people will lose some or all APTC as a result of this rule.  90 Fed. Reg. at 27,200.

CMS attempted to justify these burdens and these coverage losses simply by reciting that self-attestation "may have played a role in weakening the Exchange eligibility system," but it provided no support for this assertion.  *Id.* at 27,130.  Unscrupulous brokers, after all, would have no way of knowing whether tax data is available for a given person before targeting him or her for an unauthorized enrollment.  Once again, CMS has adopted a rule that is entirely

disconnected from the problem it claims it is trying to solve, with hundreds of thousands of people being driven out of coverage as a result. This fell short of the basic standards for rational rulemaking that the APA requires. *See Appalachian Voices*, 912 F.3d at 753.

## IV. Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

The 2025 rule will cause Plaintiffs irreparable harm that warrants a section 705 stay or preliminary injunction of the challenged provisions. A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. A plaintiff must clearly show that it will suffer actual, imminent harm that "cannot be fully rectified" by a final judgment after trial. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (cleaned up). Plaintiffs easily meet this standard.

Although "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough, irreparable harm may still occur in extraordinary circumstances, such as when monetary damages are unavailable or unquantifiable." *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 858 (D. Md. 2025) (cleaned up). For example, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation," *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019), and where such injury "threaten[s] a party's very existence," *Mountain Valley Pipeline*, 915 F.3d at 218.

The final rule's challenged provisions, both individually and in combination, will raise premiums for plans on the Exchanges, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers of last resort. Young Decl. ¶¶ 4–5. The resulting increase in costs, erosion of coverage, and decreased enrollment will increase the number of uninsured and underinsured individuals and will cause Plaintiffs irreparable harm.

*First*, the erosion of coverage under the 2025 rule will create burdensome additional costs for MSA members and will negatively affect the health of the member businesses' owners and employees who rely on care or medication that they cannot afford without insurance coverage. *See* Phetteplace Decl. ¶¶ 3–5. Crucially, the increase in premiums and limitations on insurance coverage will threaten the "very existence" of some of MSA's members. *Mountain Valley Pipeline*, 915 F.3d at 218. For example, Brooke Legler is a small business owner and MSA member located in Wisconsin. Legler Decl. ¶¶ 2–4. She has a chronic condition that requires her to take significant medication, including a biologic that costs approximately $10,000 per month. *Id.* ¶¶ 5–6. By giving her access to affordable and comprehensive health insurance, the ACA gave her the freedom to start and operate her small business, which now employees about 10 individuals. *Id.* ¶ 8. Like many other small business owners, she operates that business on narrow margins. *Id.* ¶ 11. The increase in premiums that will result from the final rule would likely force her to shut down her business, because her current insurance through the ACA would no longer be affordable and comprehensive enough to cover her medications, so she would need to find different employment with employer-sponsored insurance or explore other state-sponsored coverage options. *Id.* The rule therefore threatens the "very existence" of her business, and those of other MSA members, causing them irreparable harm. *Mountain Valley Pipeline*, 915 F.3d at 218.

*Second*, DFA's members, including physicians and medical trainees, will also be irreparably harmed by the 2025 rule. With the increased number of uninsured and underinsured patients, DFA's members would be more likely to see patients who delay care until their needs are acute; they would receive less than full reimbursement for those patients who lose insurance or whose coverage becomes more limited; and they would lose contact with many patients altogether, particularly in low-income communities. Krommes Decl. ¶ 6.

Appropriate medical care includes referral to a specialist when needed, the prescription of medicine as warranted, and recommendation for procedures when necessary. *Id.* ¶ 7. Even when clinicians provide uncompensated patient care—which will occur increasingly if the final rule is implemented—their work does not end with the patient visit. *Id.* When a patient requires treatment but lacks insurance, clinicians must spend time finding a specialist willing to provide care, trying to find an alternative medicine that a patient may be able to afford but is not the optimal treatment, and intervening on behalf of a patient in an attempt to get testing or procedures performed. *Id.* These efforts consume greater amounts of clinicians' time as patients lose coverage. *Id.* The end result is additional time for which DFA members do not get paid that detracts from patient care. *Id.* At bottom, medical providers will expend more time and effort and receive less compensation, all of which will prevent them from providing optimal care to their patients.

For example, DFA member Dr. Beth Oller is a family medicine physician in Rooks County, Kansas. Decl. of Dr. Beth Oller ¶¶ 3–4. She treats a panel of more than 800 patients of all ages for a broad range of health care needs, ranging from wellness checks to treating illnesses and chronic conditions to providing the full range of reproductive health care. *Id.* Sustaining a medical practice is particularly difficult in a rural area like hers, where health care providers are sparse and many residents are low-income and self-employed (for example, as farmers and ranchers). *Id.* ¶ 5. Even after the ACA allowed many of her patients to access affordable health insurance—and thus preventative care and early treatment—for the first time, Dr. Oller was unable to sustain an independent practice, and she now practices as a primary care provider with a county health center. *Id.* ¶ 4. But the continued operation of rural hospitals and health centers would be put at risk if the rule were to go into effect and cause many patients like Dr. Oller's to see the value of their insurance coverage erode or to lose that coverage altogether. *Id.* ¶ 6–7, 9.

As a result, Dr. Oller would receive compensation for less of the treatment she provides and would receive compensation for fewer patients overall. *Id.* ¶¶ 7, 8. The increase in administrative burdens would also require Dr. Oller and her practice to spend more time (without compensation) helping patients navigate red tape to determine their coverage. *Id.* ¶ 7. These results would hinder Dr. Oller's ability to provide optimal care to her patients and ultimately jeopardize their long-term health. *Id.*

*Third*, Columbus, Baltimore, and Chicago (the city Plaintiffs) would likewise suffer irreparable injury that could not be rectified after final judgment on the merits if the final rule were to go into effect. By driving up the rate of uninsured or underinsured individuals within the city Plaintiffs' jurisdictions, the rule would force these cities to devote additional funding, personnel, and other resources to subsidizing and providing uncompensated care for their residents. The rule thereby hits the city Plaintiffs' budgets, including the budgets for their public health departments, free or reduced-cost clinics, and ambulance services.

Fulfilling their responsibility to care for their residents, all of the city Plaintiff governments operate a range of clinics and programs that offer health care services to residents regardless of their insurance coverage and ability to pay. *See* Ige Decl. ¶ 5, 11; Johnson Decl. ¶ 11; Leach Decl. ¶¶ 7–8. Because the rule would cause an increase in the number of uninsured and underinsured individuals, *see, e.g.*, Young Decl. ¶ 4, it would increase the burden on those city programs and services and therefore on the cities' budgets. The city Plaintiffs would necessarily be servicing more individuals with no or inadequate coverage, and the cities would not be able to recoup the costs of those services. *See* Ige Decl. ¶¶ 6, 14; Johnson Decl. ¶¶ 9–11; Leach Decl. ¶ 12; *see also City of Columbus v. Trump*, 453 F. Supp. 3d 770, 787–88 (D. Md. 2020) (recognizing that city plaintiffs challenging CMS's 2019 rule "suffered injury from having

to pay greater costs to provide uncompensated care to their under- and uninsured residents"); *City of Columbus*, 523 F. Supp. 3d at 744.[7]

In addition, individuals who lack insurance coverage are more likely to wait until their conditions are more severe before seeking care, so the increase in the number of such individuals would lead to an increase in ambulance calls and other emergency medical services. *See* Ige Decl. ¶ 8.[8] This would increase the strain on the city Plaintiffs' often already overstretched emergency medical services and, again, create budgetary shortfalls that the cities will have to make up. *See* Ige Decl. ¶ 9; Johnson Decl. ¶¶ 12–14; Leach Decl. ¶¶ 11–13.

Moreover, the city Plaintiffs would be irreparably harmed by the increase in uninsured and underinsured individuals caused by the rule for the additional reason that when individuals do not get the medical care that they need, they are necessarily less healthy, less productive, and less able to participate in city life. *See, e.g.*, Ige Decl. ¶ 14; Johnson Decl. ¶ 15; Leach Decl. ¶ 14. This would have cascading negative and irreparable effects on city programs and communities.

---

[7] *See also* John Holahan & Bowen Garnett, *The Cost of Uncompensated Care With and Without Health Reform* 4, Urban Institute (Mar. 2010), https://www.urban.org/sites/default/files/publication/28431/412045-The-Cost-of-Uncompensated-Care-with-and-without-Health-Reform.PDF (an increase in "number of uninsured and the amount of uncompensated care . . . will translate into increased pressure on state and local government to finance the growing cost of the uninsured"); Erin F. Taylor et al., *Community Approaches to Providing Care for the Uninsured*, 25 Health Affairs 173, 173 (2006), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.25.w173 ("[i]ncreases in the number of uninsured people often strain local safety nets and health systems").

[8] *See also* Institute of Medicine, "Who Pays for Uninsured Persons," *A Shared Destiny: Community Effects of Uninsurance* (2003), https://perma.cc/468G-ZZB9; James Benedict, *Chronic Disease Management of the Uninsured Patient at Ohio Free Clinics* 5, Walden University (2016), https://scholarworks.waldenu.edu/cgi/viewcontent.cgi?article=3816&context=dissertations.

## V.  The Remaining Factors Weigh in Favor of an Injunction

The balance of equities and public interest prongs merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). While "[t]here is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of the United States, v. Newby*, 838 F.3d. 1, 12 (D.C. Cir. 2016), "the public undoubtedly ha[s] an interest in seeing its governmental institutions follow the law," *Roe v. Dep't of Defense*, 947 F.3d 207, 230–31 (4th Cir. 2020).  In particular, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).  The Plaintiffs' requested relief—a stay under the APA—would require nothing more.

Granting preliminary relief here in the public interest because, as detailed above, the challenged provisions of the rule will reduce enrollment and result in coverage loss for millions of Americans.  Young Decl. ¶ 4.  And those who manage to keep their health insurance can anticipate higher out-of-pocket costs and administrative burdens in the marketplace.  *Id.* ¶ 29. Increases in uninsured people lead to increases in uncompensated care, putting a strain on providers of last resort and emergency services and limiting the quality of care that medical professionals can deliver, with particularly harmful results for lower-income people. *See supra* at 41–42.  These circumstances create life-or-death situations for both the insured and uninsured, as patients without insurance coverage forgo standard medical care altogether.  Krommes Decl. ¶ 8. Those patients—even those under the care of diligent physicians—will end up in emergency rooms where care is less comprehensive and more expensive and health outcomes are worse long-term.  *Id.*

In light of the real and immediate harm that the public faces as a result the rule's provisions, the equities and public interest strongly favor preliminary relief.  On the other side,

the burden of a stay or injunction on the government would be minimal.  "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (cleaned up); *see also Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

## VI. The Court Should Not Require a Bond

Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court" to require bonds, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), including "to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quotation marks omitted).  The bond amount "ordinarily depends on the gravity of the potential harm to the enjoined party." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d. 411, 421 n.3 (4th Cir. 1999)).  And a bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).  Here, staying provisions of the rule will not create monetary injury for Defendants, particularly when a number of the provisions the government hopes to impose will only be effective for the 2026 plan year.  Plaintiffs thus request that the Court not require a bond.

## CONCLUSION

For these reasons, the Court should stay the effective date of the challenged provisions of the final rule or, in the alternative, enter a preliminary injunction.


Dated: July 2, 2025                    Respectfully submitted,

                                       */s/ Joel McElvain*
                                       JOEL MCELVAIN (BAR NO. 31673)
                                       CORTNEY ROBINSON*
                                       CHRISTINE L. COOGLE (BAR NO. 21846)
                                       DEMOCRACY FORWARD FOUNDATION

P.O. Box 34553
Washington, D.C. 20043
(202) 935-2082
jmcelvain@democracyforward.org
crhenderson@democracyfoward.org
ccoogle@democracyfoward.org

*Counsel for Plaintiffs*

*\*Admitted pro hac vice*