## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CITY OF COLUMBUS *et al.*,<br><br>          *Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY JR. *et al.*,<br><br>          *Defendants*. | Case No. 25-cv-2114 |

## DECLARATION OF CHRISTEN LINKE YOUNG

I, Christen Linke Young, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.     The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' challenge to the Marketplace Program Integrity Final Rule (Final Rule).

2.     I am a visiting fellow with the Brookings Center on Health Policy, a research center within the Economic Studies program at the Brookings Institution. My research concerns a variety of topics in health policy, including issues related to health insurance: how Americans get health care coverage, how that coverage is financed, and how the health care system can be improved to make coverage more affordable and accessible. I have published many pieces of scholarly analysis on these topics. I have testified before Congress and before state legislatures, my work is frequently cited in national media, and I have served in multiple leadership roles in state and federal government. My full curriculum vitae, including a list of publications, appears as an Appendix to this declaration.

**Summary of Observations**

3.      The American health insurance system is complicated. Most Americans who do not get health insurance from their own or a family member's employer are eligible for a form of subsidized coverage, but many face barriers accessing that coverage. For people seeking coverage through the Health Insurance Marketplaces, these barriers include (1) the fact that coverage may be too expensive, and (2) that the system of applying for and obtaining coverage may create administrative obstacles that consumers do not successfully navigate. As a result, people who are eligible for coverage often remain uninsured.

4.      Several provisions of the Marketplace Program Integrity Final Rule (Final Rule) are expected to worsen the barriers to Marketplace coverage by making coverage more expensive or by heightening the administrative obstacles consumers face. These changes are expected to directly *decrease* the number of people with coverage and *increase* the number of uninsured. For example, the Congressional Budget Office has concluded that the rule as a whole will decrease enrollment in Marketplace coverage by 2.2 million and increase the number of uninsured by 1.8 million.[1]

5.      People who are relatively younger and healthier are more likely to be deterred from enrolling by higher costs or additional administrative obstacles. Therefore, the policies in the final rule that raise costs and increase administrative obstacles will generally be expected to worsen the Marketplace risk pool. A worse risk pool will generally lead to higher health insurance premiums, further exacerbating the problem of high costs, which in turn can cause additional people to become uninsured.

---

[1] *See* Email from Cong. Budget Office, Estimated Effects of Proposed Marketplace Rule (Apr. 9, 2025), https://democrats-waysandmeans.house.gov/sites/evo-subsites/democrats-waysandmeans.house.gov/files/evo-media-document/cbo-aca-coverage-loss-estimates.pdf.

6.      The decrease in Marketplace enrollment and increase in the uninsured will result in increased burden of uncompensated care, especially for safety net providers.

**The Structure of the Affordable Care Act and the Health Insurance Marketplaces**

7.      A primary goal of the Affordable Care Act (ACA) was to create pathways to quality, affordable health insurance for Americans who do not get coverage from their jobs. The law did this through two primary mechanisms: expanding Medicaid and creating the Health Insurance Marketplaces where individuals could buy regulated and often subsidized coverage. Promoting access to health coverage was designed to ensure that Americans had access to the health care system and the health benefits that flow from reliable health care, had financial protection in the event of illness or injury, and benefited from improved overall health and well-being. Analyses since passage of the law consistently demonstrate that the law has helped to achieve those goals.[2]

8.      The Health Insurance Marketplaces are the mechanism the ACA created to provide coverage to people with incomes generally over the poverty level. A critical feature of the Marketplaces is that all available plans meet standards for health plan quality by covering a robust set of benefits and protecting consumers from exposure to very high-cost care. This

---

[2] *See, e.g.*, Jacob Goldin, Ithai Z. Lurie & Janet McCubbin, *Health Insurance and Mortality: Experimental Evidence from Taxpayer Outreach*, 136 Q.J. Econ. 1 (2021), https://academic.oup.com/qje/article-abstract/136/1/1/5911132 (experimental evidence that health insurance reduces mortality through a randomized study of taxpayers who received informational letters about ACA penalty requirements); American Hospital Association, Report: The Importance of Health Coverage, https://www.aha.org/guidesreports/report-importance-health-coverage (health insurance coverage improves access to care, health outcomes, and financial well-being, while highlighting the continuing challenges faced by the uninsured population); Kaiser Family Foundation, The Effects of Medicaid Expansion under the ACA: Studies from January 2014 to January 2020, https://www.kff.org/medicaid/report/the-effects-of-medicaid-expansion-under-the-aca-updated-findings-from-a-literature-review/ (analyzing 404 studies published from January 2014 through January 2020 on Medicaid expansion impacts, finding positive effects on coverage gains, access to care, financial security, health outcomes, and economic benefits for states and providers); Kosali Simon, Aparna Soni & John Cawley, The Impact of Health Insurance on Preventive Care and Health Behaviors: Evidence from the First Two Years of the ACA Medicaid Expansions, 36 J. Pol'y Analysis & Mgmt. 390 (2017), https://onlinelibrary.wiley.com/doi/abs/10.1002/pam.21972 (the Affordable Care Act affected preventive healthcare utilization and health behaviors during the first two years of implementation).

allows consumers to shop and insurers to compete on a level playing field.[3]

9.     Marketplaces serve to pool risk between healthy and sick individuals. Health insurance premiums in the Marketplace are set by insurance plans based on the total costs of providing coverage to the entire covered population in the state, not on the expected costs of any one individual. If only the very sickest individuals enroll, then coverage will be extremely expensive; if a robust mix of healthy and sick individuals enroll, then premiums will be lower because they reflect the average cost of a much healthier pool.[4]

10.     Critically, the premiums that individuals have to pay influence their decisions about whether or not to enroll. Economic theory and empirical evidence show that when coverage is expensive, only people with high expected health care costs choose to enroll, because they are the only individuals for whom the expected value of the coverage exceeds its costs. However, if coverage is less expensive, individuals in better health will find it attractive to enroll.[5] For this reason, affordable premiums that draw in healthy individuals are an important predicate for a stable and well-functioning Marketplace.

**A Wide-Ranging Literature Establishes that High Costs and Increased Administrative Obstacles Decrease Enrollment and Worsen Risk Pools**

11.     Twenty-eight million Americans are currently uninsured.[6] Studies have established that most people who are uninsured are eligible for subsidized coverage through Medicaid or the Health Insurance Marketplaces established by the ACA. For instance, a recent

---

[3] *See* Christen Linke Young, Taking a Broader View of "Junk Insurance," Brookings Institution (July 2020), https://www.brookings.edu/articles/taking-a-broader-view-of-junk-insurance/.

[4] *See, e.g.,* American Academy of Actuaries, Risk Pooling: How Health Insurance in the Individual Market Works (June 2023), https://actuary.org/wp-content/uploads/2017/11/RiskPoolingFAQ071417.pdf.

[5] For a discussion of this literature, *see, e.g.*, Linda J. Blumberg & John Holahan, Early Experience with the ACA: Coverage Gains, Pooling of Risk, and Medicaid Expansion, 44 J Law Med Ethics 538 (2016), https://pubmed.ncbi.nlm.nih.gov/28661254/.

[6] Elizabeth M. Briones & Robin A. Cohen, Health Insurance Coverage: Early Release of Quarterly Estimates from the National Health Interview Survey, 2023–December 2024, Nat'l Ctr. for Health Statistics (June 2025), https://www.cdc.gov/nchs/nhis/early-release/health-insurance-coverage.html.

analysis using data from 2023 to study the nonelderly uninsured finds that 57 percent are eligible for subsidized coverage, 25 percent through Medicaid and 32 percent through the Marketplaces.[7] These results are generally consistent across age and race and for most income categories, but do vary by geography and for certain income groups.[8]

12.    Eligible people remain uninsured for a variety of reasons. In one survey, about one quarter of the uninsured say that they do not need or want coverage, while most report that the reason they are uninsured is because they are experiencing some sort of barrier to obtaining health insurance.[9]

*Costs*

13.    Cost is a common reason that uninsured people do not enroll in coverage for which they are eligible; in the survey described above, 62 percent of the uninsured indicated that they did not have coverage because it was too expensive.[10]

14.    For consumers shopping for coverage through the Health Insurance Marketplaces, a number of factors affect the costs faced by different groups. Some potential enrollees— including those who are relatively higher income—pay the gross or "sticker" premium charged by insurance companies. Therefore, policies that increase gross premiums will directly increase the cost of coverage for this group.

---

[7] Jennifer Tolbert et al., Key Facts About the Uninsured Population, KFF (Dec. 18, 2024), http://kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population.

[8] *See, e.g.*, Patrick Drake et al., A Closer Look at the Remaining Uninsured Population Eligible for Medicaid and CHIP, KFF (Mar. 15, 2024), https://www.kff.org/uninsured/issue-brief/a-closer-look-at-the-remaining-uninsured-population-eligible-for-medicaid-and-chip/, Jameson Carter et al., Uninsurance and Medicaid Eligibility Among Young Adults in 2025, Urban Inst. (Mar. 18, 2025), https://www.urban.org/research/publication/uninsurance-and-medicaid-eligibility-among-young-adults-2025; Linda J. Blumberg, et al., Characteristics of the Remaining Uninsured: An Update, Urban Inst. 2 (July 2018), https://www.urban.org/sites/default/files/publication/98764/2001914-characteristics-of-the-remaining-uninsured-an-update_2.pdf.

[9] *See* Tolbert et al., *supra* note 7.

[10] *Id.*; *see also*, Reaching the Remaining Uninsured: An Evidence Review on Outreach & Enrollment, Ass't Sec'y for Planning & Evaluation (Oct. 2021), https://aspe.hhs.gov/sites/default/files/documents/666bcb121e373ec517def3b1fcd4af23/aspe-remaining-uninsured-outreach-enrollment.pdf.

15.    Most consumers who buy coverage through the Marketplace qualify to receive financial assistance.[11] These consumers pay a "net premium" that is the gross premium for coverage less the amount of financial assistance they receive. The structure of this assistance means that gross premiums are not usually the most important factor influencing the net cost the household will pay for coverage. For this group, household net premiums are primarily affected by policies that change the terms on which they receive financial assistance.

16.    For any product, higher costs are associated with reduced demand. A body of literature has specifically examined how increased premiums affect enrollment in health coverage through Health Insurance Marketplaces. This literature demonstrates that even small increases or decreases in premiums have significant impacts on enrollment. For example:

- Decreases in financial assistance, and the associated increase in net premiums, has a large enrollment effect: each $40 increase in net monthly premiums decreases enrollment by 25 percent.[12]

- For enrollees without financial assistance, increases in gross premiums are associated with large reductions in Marketplace enrollment, including a decline of more than 5 percent in one year.[13]

- A premium increase of less than $10 per month was associated with a 14% reduction in enrollment.[14]

---

[11] For 2025, 92% of Marketplace enrollees receive financial assistance. 2025 Marketplace Open Enrollment Period Public Use Files, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/data-research/statistics-trends-reports/marketplace-products/2025-marketplace-open-enrollment-period-public-use-files.

[12] Amy Finkelstein et al., Subsidizing Health Insurance for Low-Income Adults: Evidence from Massachusetts, 109 Am. Econ. Rev. 1530 (2019), https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20171455.

[13] Michael Cohen & Michelle Anderson, Premium Effects on ACA Enrollment, Wakely (Apr. 2019), https://www.wakely.com/wp-content/uploads/2024/04/premium-effects-aca-enrollment-final.pdf.

[14] Adrianna McIntyre, Mark Shepard & Timothy J. Layton, Small Marketplace Premiums Pose Financial and Administrative Burdens: Evidence from Massachusetts, 2016–17, 43 Health Aff. 80 (2024), https://www.healthaffairs.org/doi/10.1377/hlthaff.2023.00649.

- The availability of $0 premium plans increases days of enrollment in the Marketplace.[15]

- Overall, studies find a high price elasticity of demand for coverage in the Marketplaces: a 1 percent premium increase for a plan decreases enrollment by 1.7 percent[16] (though note that this is not a direct measure of coverage loss).

17.     Therefore, there is significant evidence that policies that increase gross and net premiums by even small amounts are expected to lead to reduced enrollment and an increased number of uninsured.

18.     Policy changes can affect gross premiums in different ways. For example, policies that decrease the benefits covered by plans in the Marketplace will decrease gross premiums, while policies that decrease the share of relatively healthy people covered by Marketplace plans will increase gross premiums.[17]

19.     Similarly, policies can change net premiums for people receiving financial assistance through a variety of mechanisms. At the most extreme end, policies that eliminate (or newly provide) eligibility for financial assistance will dramatically increase (or decrease)

---

[15] Coleman Drake et al., Financial Transaction Costs Reduce Benefit Take-up Evidence from Zero-Premium Health Insurance Plans in Colorado, 89 J. Health Econ. 102752 (2023), https://www.sciencedirect.com/science/article/abs/pii/S0167629623000292.

[16] Jean Abraham et al., Demand for Health Insurance Marketplace Plans Was Highly Elastic in 2014–2015, 159 Econ. Letters 69 (2017), https://www.sciencedirect.com/science/article/abs/pii/S0165176517302823; see also Benjamin Hopkins, Jessica Banthin & Alexandra Minicozzi, How Did Take-up of Marketplace Plans Vary with Price, Income, and Gender?, 11 Am. J. Health Econ. (2025), https://www.journals.uchicago.edu/doi/10.1086/727785.

[17] Policies that decrease the share of low-income people covered by Marketplaces can also decrease gross premiums for certain types of Marketplace plans (specifically "silver" plans). This is because of a practice referred to as "silver-loading," under which premiums for silver plans in Marketplaces are raised to cover the cost of providing cost-sharing reductions. Independent of any risk pool effects, policies that decrease the share of low-income people in Marketplaces will decrease silver plan gross premiums. However, such policies may worsen the risk pool overall and therefore increase premiums for other types of plans. Further, lower silver plan premiums mean higher net premiums for many people with financial assistance, and do not affect the lowest-cost options available for people who pay gross premiums. Therefore, lower silver plan premiums do not mean consumers face lower costs; instead, it will often mean the opposite. See, e.g., Christen Linke Young, Understanding Marketplace "Silver Loading," Brookings Inst. (May 9, 2025), https://www.brookings.edu/articles/understanding-marketplace-silver-loading/.

premiums. Policies can also change the formula used for calculating financial assistance, which will have smaller impacts.

*Administrative Obstacles*

20.    Beyond costs, administrative obstacles—like paperwork submission requirements—are also a significant factor that results in eligible people remaining uninsured. Twenty-four percent of the uninsured say the primary reason they do not have coverage is that "signing up was too difficult or confusing." An additional 18 percent report difficulty finding a plan, which may also reflect administrative barriers.[18]

21.    The Marketplace application process contains a number of steps. At a minimum, consumers (on their own, or in partnership with a broker or assister) must (1) submit an application that contains responses to questions, (2) receive and understand fairly detailed information about their eligibility, (3) select a health plan from among the dozens of options available, and (4) establish a relationship with the insurance company offering their coverage, including providing payment information in most cases. Some consumers are also required to submit additional documentation by mail or upload to an online portal, or to resolve issues that may be affecting their coverage with other entities, like the Internal Revenue Service (IRS), their state Medicaid agency, or an insurance plan.[19]

22.    Literature within and outside health care has established that administrative obstacles generally reduce enrollment of eligible people. Analyses looking specifically at Marketplace health insurance have found:

- Adding an additional step to the reenrollment process for Marketplace health

---

[18] Tolbert et al., *supra* note 7.

[19] *See. e.g.,* Rachel Schwab et al., Policy Innovations in the Affordable Care Act Marketplaces, Commonwealth Fund (Nov. 21, 2023), https://www.commonwealthfund.org/publications/issue-briefs/2023/nov/policy-innovations-affordable-care-act-marketplaces.

insurance decreases enrollment by 33 percent.[20]

- A randomized experiment examining a checkbox to reduce a step in the enrollment process increased enrollment by 11 percent.[21]

- Scholars argue that the literature on the ways in which *costs* deter Marketplace enrollment can also be understood as administrative burdens deterring enrollment, because the costs are often small and it is likely that the time and paperwork burden of establishing payment contributes to the enrollment effects.[22]

23.    Outside of the Marketplaces, researchers have documented similar impacts. For example:

- Making an administrative component of the food assistance application process more flexible increases enrollment by 6 percentage points.[23]

- Offering assistance resolving administrative obstacles to enroll in food assistance increases enrollment by 12 percentage points.[24]

- Many researchers have shown that simplifying enrollment in retirement savings plans increases take-up significantly.[25]

24.    Thus, there is significant evidence that policies that an increase in administrative

---

[20] Mark Shepard & Myles Wagner, Do Ordeals Work for Selection Markets? Evidence from Health Insurance Auto-Enrollment, 115 Am. Econ. Rev. 772 (2025), https://doi.org/10.1257/aer.20231133.

[21] Keith Marzilli Ericson et al., Reducing Administrative Barriers Increases Take-Up of Subsidized Health Insurance Coverage: Evidence from a Field Experiment, Rev. Econ. & Stat., Mar. 5, 2025, at 1, https://doi.org/10.1162/rest_a_01573.

[22] *See, e.g.,* Adrianna McIntyre, Mark Shepard & Myles Wagner, Can Automatic Retention Improve Health Insurance Market Outcomes?, 111 AEA Papers & Proc. 560 (2021), https://doi.org/10.1257/pandp.20211083; Letter from Matthew Fiedler to Ctrs. for Medicare & Medicaid Servs., Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability [CMS-9884-P] (Apr. 11, 2025), https://www.brookings.edu/wp-content/uploads/2025/04/Fiedler-Comment-on-Program-Integrity-Rule-FINAL.pdf.

[23] Eric Giannella et al., Administrative Burden and Procedural Denials: Experimental Evidence from SNAP, 16 Am. Econ. J.: Econ. Pol'y 316 (2024), https://doi.org/10.1257/pol.20220701

[24] Amy Finkelstein & Matthew J. Notowidigdo, Take-Up and Targeting: Experimental Evidence from SNAP, 134 Q.J. Econ. 1505 (2019), https://economics.mit.edu/sites/default/files/2022-08/aaFinkelstein_Noto_QJE_August_2019%20%281%29.pdf.

[25] *See, e.g.*, Brigitte C. Madrian & Dennis F. Shea, The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior, 116 Q.J. Econ. 1149 (2001), https://doi.org/10.1162/003355301753265543.

obstacles leads to reduced enrollment and an increased number of uninsured.

25.     Policy changes can add additional administrative obstacles or complexify administrative burdens that already exist. For example, more consumers can be required to submit additional documentation, the document process can be made more challenging, or consumers can be required to interact with third parties in more or different circumstances. Such changes can affect all Marketplace enrollees or certain subsets. The evidence indicates that these policy changes would be expected to decrease enrollment.

*Risk Pool Impacts*

26.     The economic literature has also established that the individuals deterred from enrollment by higher costs and administrative obstacles tend to be healthier. For example:

- Enrollees who would potentially lose coverage if an additional administrative step was required at reenrollment have health costs 44% lower than those who are not likely to be affected.[26]

- The group of enrollees retained through a change to reduce administrative burden have spending 2.5% lower than other enrollees.[27]

27.     When healthy people exit health insurance markets, the risk pool worsens and gross premiums for the market as a whole tend to go up. That is, the insurance market becomes less effective at pooling risk and has higher overall costs.

28.     As noted above, higher gross premiums resulting from worsened risk pools can further deter enrollment and increase the number of uninsured.

---

[26] Shepard & Wagner, *supra* note 20.
[27] McIntyre, Shepard & Wagner, *supra* note 22.

**The Challenged Provisions of the Final Rule Are Expected to Increase Costs and Administrative Obstacles, and Therefore Reduce Enrollment**

29.     The Final Rule includes a variety of policies that are expected to increase net premiums for people receiving financial assistance, increase gross premiums for at least some plans, and impose additional administrative obstacles, which are in turn expected to cause decreases in enrollment.

*$5 Premium at Reenrollment*

30.     The Final Rule makes changes for enrollees who are being automatically enrolled into plans that would otherwise have a $0 net premium. Specifically, the rule requires a $5 premium charge be added unless the individual actively reenrolls.

31.     This is transparently an increase in net premiums. Consistent with all of the evidence described above, it would be expected to decrease enrollment.

32.     Moreover, there are several analyses that look *specifically* at the impacts of added premium charges at reenrollment—examining how a change from a $0 net premium to a small charge (generally under $10) decreases enrollment. This literature consistently finds large decreases in enrollment associated with the exact policy change advanced in the Final Rule.[28]

33.     The individuals deterred from enrollment under this policy are likely to be healthier than average, worsening risk pools.

*Premium Adjustment Percentage*

34.     The Final Rule alters the formula that is the basis for calculating the value of

---

[28] *See, e.g.*, McIntyre, Shepard & Layton, *supra* note 14 (increasing premiums at reenrollment from $0 to less than $10 decreases enrollment 14 percent); Drake et al., *supra* note 15 ($0 premium at reenrollment meaningfully increases enrollment); Laura Dague, The Effect of Medicaid Premiums on Enrollment: A Regression Discontinuity Approach, 37 J. Health Econ. 1 (2014), https://doi.org/10.1016/j.jhealeco.2014.05.001 (adding premiums at reenrollment in Medicaid decreases enrollment).

financial assistance.[29] The changes mean that financial assistance will be lower for nearly all enrollees who receive it, and net premiums will be higher. CMS notes that net premiums will be about 2 percent higher on average.

35.    This increase in net premiums will decrease enrollment. Indeed, CMS reaches the same conclusion and estimates 80,000 people will lose coverage as a result of this change.[30]

36.    Consistent with the literature described above, these enrollees are likely to be healthier than average, and their loss will likely worsen the risk pool.

*Actuarial Value*

37.    Marketplace plans are generally required to cover a specified percentage (60, 70, 80, or 90 percent) of total health care costs, and rules have long allowed some de minimis variation from the target amount. The Final Rule asymmetrically widens the allowable de minimis range, including allowing plans to be as much as 4 percentage points below the target and still be considered in compliance. Prior policy had allowed variation only 2 percentage points below the target, and 0 for silver plans.

38.    This change will generally decrease the value of the health insurance purchased through the Marketplace and lower gross premiums for this reason. It will also affect net premiums. Because the policy's impact on silver plans is larger compared to prior law than other types of plans, the gross premium impact for silver plans will be larger as well. This will reduce the value of financial assistance and *increase* net premiums for people seeking to buy

---

[29] The CMS Final Rule changes regulatory text that establishes a formula used to calculate cost-sharing in private health insurance. IRS, through separate guidance, applies the formula to calculations for Marketplace financial assistance. In the regulatory impact analysis for the final rule, CMS unambiguously treats its policy change as affecting financial assistance and net premiums. Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074, 27,206-27,207 (June 25, 2025), https://www.federalregister.gov/documents/2025/06/25/2025-11606/patient-protection-and-affordable-care-act-marketplace-integrity-and-affordability ("Net premium increases of approximately $530 million per year for PY 2026 through PY 2030"). Accordingly, it is appropriate to attribute these premium increases to the Final Rule.

[30] *Id.*

non-silver plans with financial assistance.[31]

39.     As with other policies increasing net premiums, this change may reduce Marketplace enrollment.

*Denial of Coverage for Past Non-payment of Premiums*

40.     The Final Rule includes a policy that allows insurers to deny coverage to enrollees for past non-payment of premiums. An individual will not be able to begin enrollment into a new health plan unless she has paid any past-due premium debts associated with prior enrollment with the insurer.

41.     This functions as an increase in net and/or gross premiums for the first month of coverage. Specifically, in order to start her first month of coverage, she must pay an amount larger than her "true" monthly premium. If her prior enrollment was associated with an amount of financial assistance similar to the new enrollment, then she would have to pay roughly double her actual premium to begin coverage. These are the sorts of premium increases that the literature discussed above demonstrates lead to reduced enrollment.

42.     This policy can also function as a particularly confusing sort of administrative obstacle for some consumers, even if they are willing to pay the additional amount. A consumer in this situation may have selected a plan at the website of the Health Insurance Marketplace (i.e., HealthCare.gov) and then visited the insurer's website to make a payment that she believes is the payment for her first month of coverage. The insurance company may *accept* the payment she has provided, but treat some or all of it as payment of the past-due premium debt; therefore, the consumer will have to make an additional, separate payment to the insurer even though she believes she is fully paid. While no literature speaks directly to this precise form of unusual

---

[31] For an explanation of the mechanics of this impact, *see* Young, *supra* note 17.

consumer burden, it is consistent with the broader literature on administrative complexity of a long, multi-step enrollment process to conclude the consumer confusion associated with this policy change is also likely to lead to reduced enrollment.

*Open Enrollment Period*

43.     The Final Rule shortens the annual Open Enrollment Period (OEP) by one month in states that use the federal Marketplace, and by varying amounts in other states.

44.     This is mechanically an increased administrative burden that will decrease enrollment. Consumers will have fewer available weeks, and fewer are expected to enroll as a result.

45.     The risk pool and premium impacts are more complicated, but available data tend to suggest this policy change will worsen risk pools and increase gross premiums. In the Final Rule preamble, the Centers for Medicare & Medicaid Services (CMS) expressed concern about individuals who identified a health concern in late December or early January (e.g., an injury or new symptoms of illness) and decided to enroll in coverage only after the issue emerged. It is likely that some number of people enroll on that basis. These individuals would be expected to have higher health care costs, and so blocking their enrollment with a shorter OEP will improve risk pools. On the other hand, because healthy individuals are less motivated to enroll in coverage, longer enrollment windows provide more time to recruit these marginal consumers. A shorter OEP will also block this group from enrolling, which will worsen risk pools. Data from state-based Marketplaces tend to suggest that there is a much larger set of people in the latter category. Data from California show that in past years, OEP enrollees in January are about 5 percent healthier (as measured by prospective risk scores) than enrollees prior to December 15.[32]

---

[32] Data Snapshot: Covered California Open and Special Enrollment Periods, Covered Cal. (Apr. 3, 2025), https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf.

New York also finds January enrollees to be younger on average than enrollees earlier in OEP.[33] Based on these state findings, it is reasonable to expect this change to worsen risk pools and increase gross premiums.

*Special Enrollment Periods*

46.    The Final Rule also eliminates an existing Special Enrollment Period (SEP) for consumers with incomes below 150 percent of the Federal Poverty Level, and requires most people applying for coverage through an SEP to submit documentation establishing that they meet the criteria for an SEP.

47.    As with a shorter OEP, eliminating the low-income SEP will mechanically reduce the number of people enrolled because there are fewer available opportunities. There is limited nationwide data available about use of the low-income SEP, but available information suggests it has been a major source of enrollment. For example, CMS reported that in an 11-month period ending in mid-2023, 1.3 million enrollees selected a plan through the low-income SEP.[34] While some of these individuals may have otherwise obtained coverage through another SEP or during the OEP for a past or subsequent year, these results are suggestive that eliminating the low-income SEP will result in a large reduction in enrollment and increase in the uninsured.

48.    The administrative obstacles associated with documenting eligibility for an SEP are also expected to reduce enrollment. Affected individuals must obtain some specific document (like a letter from their former employer about the loss of employer-based coverage or a

---

[33] Letter from N.Y. State of Health to Ctrs. for Medicare & Medicaid Servs., Comments on the Patient Protection and Affordable Care Act; Market Stabilization [CMS-9929-P] (Mar. 7, 2017), https://info.nystateofhealth.ny.gov/sites/default/files/Comments%20on%20Proposed%20Market%20Stabilization%20Regulations%203.7.17.pdf

[34] Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2025; Updating Section 1332 Waiver Public Notice Procedures; Medicaid; Consumer Operated and Oriented Plan (CO-OP) Program; and Basic Health Program, 88 Fed. Reg. 82,510 (Nov. 24, 2023), https://www.federalregister.gov/documents/2023/11/24/2023-25576/patient-protection-and-affordable-care-act-hhs-notice-of-benefit-and-payment-parameters-for-2025#p-655

marriage certificate) and upload or mail that information. These documents are not the sort of information that consumers tend to keep readily available; this is substantially more complicated than simply removing one's driver's license from a purse or wallet. Consumers will need to set aside time and attention to complete the process and some will fail to do so. Consistent with the literature above, this will decrease enrollment.

49.    Some economic theory suggests these changes to SEP policies could improve the risk pool, while other theory suggests the opposite. Empirical data provided by states, however, indicates that it is more likely that these policies would worsen the risk pool.

50.    With respect to the low-income SEP, in the preamble to the Final Rule, CMS discusses their concern that individuals with low incomes could opt not to enroll during the usual OEP, and wait until they had some reason to be concerned about their health to enroll through the SEP. Alternatively, individuals may only begin seeking information about health insurance, which ultimately leads to an enrollment through the SEP, when they have some sort of health concern. It is likely that these factors explain some enrollment through the low-income SEP, and eliminating the associated enrollment would improve risk pools. On the other hand, overall uptake of coverage is fairly low, especially for people who become eligible mid-year. For example, in the early years of the Marketplaces, one group of researchers estimated that less than 15 percent of people who were eligible to enroll through an SEP did in fact do so, and the people who did enroll were likely to be less healthy than the 85 percent that did not.[35] Low-income people may be especially likely to forego the opportunity to enroll. Therefore, policies that increase take-up among eligible people would likely bring healthier people into the

---

[35] Matthew Buettgens, Stan Dorn & Hannah Recht, More than 10 Million Uninsured Could Obtain Marketplace Coverage Through Special Enrollment Periods, Urban Inst. (Nov. 2015), https://www.urban.org/sites/default/files/publication/74561/2000522-More-than-10-Million-Uninsured-Could-Obtain-Marketplace-Coverage-through-Special-Enrollment-Periods.pdf

Marketplaces, and blocking these enrollments would worsen risk pools.

51.    The same basic dynamic applies to additional document submission requirements for SEP enrollments. To the extent individuals are improperly claiming eligibility for an SEP because they need health care services, blocking these enrollments will improve risk pools; to the extent that healthy people are deterred by additional submission requirements, the deterred enrollments will tend to be among healthier people and will worsen risk pools.

52.    Across both policies, data from California tend to suggest that the risk pool worsening effects of these policy changes may be more pronounced. Specifically, California has shared information about the relative health, as measured by prospective risk scores, of SEP and OEP enrollees. They find that the overall health profile of SEP enrollees is consistently slightly better than those enrolling during the OEP.[36] Similarly, other state Marketplaces have indicated they do not find their SEP enrollee population to be sicker than OEP enrollees.[37] Note that these data generally look at all SEP enrollees together, not just those enrolling through the low-income SEP, and they do not specifically identify who would be deterred from enrollment by administrative barriers, so they are not a perfect predictor. Nonetheless, they suggest that eliminating the low-income SEP and creating additional verification burden would worsen risk pools.[38]

---

[36] Data Snapshot: Covered California Open and Special Enrollment Periods, Covered Cal. (Apr. 3, 2025), https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf.

[37] *See, e.g.,* Letter from Audrey Morse Gasteier, Chief of Policy & Strategy, Mass. Health Connector, to Ctrs. for Medicare & Medicaid Servs., Notice of Proposed Rulemaking, "Patient Protection and Affordable Care Act; Updating Payment Parameters, Section 1332 Waiver Implementing Regulations, and Improving Health Insurance Markets for 2022 and Beyond" (July 28, 2021), https://www.regulations.gov/comment/CMS-2021-0113-0240; Letter from Jason Levitis, Sabrina Corlette & Christen Linke Young to Ctrs. for Medicare & Medicaid Servs., Re: Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (Apr. 11, 2025).

[38] Because this policy is likely to reduce the share of enrollment attributable to low-income people, gross silver plan premiums will likely fall, separate from any risk pool effects, but this will not translate to consumers facing lower costs as described above.

*Failure to Reconcile*

53.     The Final Rule makes changes to a Marketplace administrative process known as Failure to Reconcile. Marketplace consumers cannot receive financial assistance if data from the IRS show that they received financial assistance in a prior year and have not "reconciled" on their tax return. Consumers are blocked from financial assistance until they correct the issue with the IRS. The prior policy required two years of IRS demonstrating a failure to reconcile before financial assistance was denied; the Final Rule changes that to one year.

54.     This process operates as a complicated administrative obstacle for some consumers. Because whether or not an individual has reconciled their tax credit is considered Federal Tax Information (FTI), that information must be protected from disclosure and handled consistently with federal tax privacy laws. Specifically, rules around the handling of FTI limit the ways in which Marketplaces are able to display in their computer systems (for enrollees and for customer service representatives) the notation that an individual is affected by a failure to reconcile blocking their financial assistance. A consumer may find himself blocked from financial assistance, but the explanation for this block and information on how to correct it may not be accessible outside of specialized channels that he does not know he needs to access.

55.     The literature described above generally shows that even simple administrative obstacles like the submission of a single form deter enrollment, especially by healthier people. The Kafka-esque circumstances of the failure to reconcile block are likely to have even greater effects. The existence of the process and the expansion of the number of affected enrollees is expected to decrease enrollment and worsen risk pools.

*Data Matching Issues*

56.     The ACA and Marketplace rules require that consumers submit documentation to prove their eligibility for enrollment and financial assistance if their eligibility cannot be

established through trusted data sources. The document submission requirement is known as a

"data-matching issue." The Final Rule changes Marketplace policies so that income information

that was treated as adequately verified under prior rules will no longer be designated as such,

thus triggering a data-matching issue and requiring affected consumers to submit documentation.

If consumers fail to submit adequate documentation, they will generally lose their financial

assistance, and generally drop from Marketplace coverage as a result.[39]

57.     Consumers generally will need to submit information like paystubs, invoices, or a

narrative explaining their income situation. Similar to the information required for SEP

verification, obtaining and submitting the needed documents requires time and attention from

consumers, and these are the sorts of burdens that the literature above demonstrates lead to

reduced enrollment in coverage.

58.     CMS estimates in the Final Rule that 488,000 people will fail to successfully

resolve a data-matching issue triggered under the rule[40] and will have their financial assistance

reduced—generally to $0. Most of this group can be reasonably expected to lose coverage.

59.     As with other policies, this coverage loss is likely to affect disproportionately

healthy consumers, worsening risk pools.

**Conclusion**

60.     The challenged provisions of the Final Rule each operate to increase gross

premiums, increase net premiums, impose administrative burdens, worsen Marketplace risk

---

[39] Marketplace rules specify that if a data-matching issue cannot be successfully resolved, financial assistance is to be recalculated based on available information; the circumstances of these new data-matching issues mean that in most cases the Marketplace will not have information or the information it has will result in no financial assistance being available. Loss of financial assistance will mean that, on average, premiums increase from $113 to $619. *See* Health Insurance Exchanges 2025 Open Enrollment Report, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/files/document/health-insurance-exchanges-2025-open-enrollment-report.pdf. These very large cost increases mean that people will generally drop coverage if they cannot restart their financial assistance.
[40] Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025), https://www.federalregister.gov/documents/2025/06/25/2025-11606/patient-protection-and-affordable-care-act-marketplace-integrity-and-affordability.

pools, or some combination of those effects. They are expected to decrease Marketplace enrollment and increase the number of uninsured.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: June 28, 2025

Washington, D.C.

_____
CHRISTEN LINKE YOUNG

# APPENDIX

## CHRISTEN LINKE YOUNG

**Career**

Brookings Institution, 2025-Present
Visiting Fellow, Center on Health Policy

White House Domestic Policy Council, 2021-2025
Deputy Director and Deputy Assistant to the President for Health and Veterans

Biden-Harris Transition Team, 2020
Director of Health Policy

Brookings Institution, 2018-2021
Fellow, Schaeffer Initiative for Health Policy

NC Department of Health and Human Services, 2017-2018
Deputy Secretary

Centers for Medicare & Medicaid Services, 2015-2017
Principal Deputy Director of the Center for Consumer Information and Insurance Oversight

White House Domestic Policy Council, 2013-2015
Senior Policy Advisor for Health Reform

U.S. Department of Health and Human Services, 2013
Director of Coverage Policy, Office of Health Reform

**Education**

Yale Law School
Juris Doctor, 2009
Editor-in-Chief, Yale Journal of Health Policy, Law, and Ethics
Senior Editor & Admissions Committee, Yale Law Journal

Stanford University
Bachelor of Science with Honors and with Distinction, Biological Sciences, 2004
Phi Beta Kappa

**Publications**

Jason Levitis, Christen Linke Young, Sabrina Corlette, Ellen Montz, and Claire O'Brien, "The Reconciliation Bill Eliminates Long-Standing State Flexibility to Operate Marketplaces and Regulate Private Health Insurance" *Georgetown Center for Health Insurance Reforms* (June 13, 2025).

Christen Linke Young, "New CBO Estimates Show 2025 Reconciliation Bill Would Have Impacts Similar in Magnitude to 2017 ACA Repeal Bills," *Brookings Institution* (June 4, 2025).

Christen Linke Young and Jason Levitis, "The Sleeper Provision in the Reconciliation Bill That Could Hobble the ACA Marketplaces," *Georgetown Center for Health Insurance Reforms* (May 19, 2025).

Christen Linke Young, "The Inflation Rebate for Medicare Part B-Covered Drugs Should Apply to Medicare Advantage," *Brookings Institution* (May 14, 2025).

Christen Linke Young, "Understanding Marketplace Silver-Loading," *Brookings Institution* (May 9, 2025).

Jason Levitis, Sabrina Corlette & Christen Linke Young, "Comments on the Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability Rule" (Apr. 11, 2025).

Christen Linke Young, "Medicare's Recent Actions To Promote Access to Lower Cost Drugs," *Brookings Institution* (March 28, 2025).

Christen Linke Young and Matthew Fiedler, "Federal Policy Options To Realize the Potential of APCDs," *Brookings Institution* (October 23, 2020).

Aviva Aron-Dine and Christen Linke Young, "Silver-Loading Likely To Continue Following Federal Circuit Decision On CSRs," *Health Affairs* (October 13, 2020).

Christen Linke Young, "A Supreme Court Decision To Strike Down the ACA Would Create Chaos in the Health Care System," *Brookings Institution* (October 13, 2020).

Christen Linke Young and Jason Levitis, "Georgia's Latest 1332 Proposal Continues to Violate the ACA," *Brookings Institution* (September 1, 2020).

Christen Linke Young and Kathleen Hannick, "GAO Report Sheds Additional Light on Misleading and Deceptive Marketing Practices," *Brookings Institution* (September 25, 2020).

Christen Linke Young, James C. Capretta, Stan Dorn, David Kendall, and Joseph R. Antos, "How To Boost Enrollment: Three Practical Steps That Merit Bipartisan Support," *Health Affairs* (August 17, 2020).

Christen Linke Young and Kathleen Hannick, "Fixed Indemnity Health Coverage is a Problematic Form of 'Junk Insurance'," *Brookings Institution* (August 4, 2020).

Loren Adler and Christen Linke Young, "The Laws Governing COVID Test Payment and How To Improve Them," *Brookings Institution* (July 13, 2020).

Christen Linke Young, "Taking a Broader View of Junk Insurance," *Brookings Institution* (July 6, 2020).

Christen Linke Young and Sobin Lee, "Making ACA Enrollment More Automatic for the Newly Unemployed," *Brookings Institution* (May 28, 2020).

Christen Linke Young and Sobin Lee, "How Well Could Tax-Based Auto-Enrollment Work," *Brookings Institution* (April 14, 2020).

Christen Linke Young, Stan Dorn, Loren Adler, Cheryl Fish-Parcham, Tara Straw, "Responding To COVID-19: Using The CARES Act's Hospital Fund To Help The Uninsured, Achieve Other Goals," *Health Affairs* (April 10, 2020).

Christen Linke Young and Kathleen Hannick, "Misleading Marketing of Short-Term Plans Amid COVID-19," *Brookings Institution* (March 24, 2020).

Erica Turret, Abbe R. Gluck, Adam L. Beckman, Suhas Gondi, Sara Rosenbaum, Ruth J. Katz, Kavita K. Patel, Brendan G. Carr. Christen Linke Young, Elizabeth Fowler, Megan L. Ranney, Timothy Jost, and Howard P. Forman, "The Families First Coronavirus Response Act Is Necessary But Not Sufficient – Here's What Congress Should Do Next," *Health Affairs* (March 18, 2020).

Christen Linke Young, "What Do I Do If I Lose My Job Based Health Insurance?," *Brookings Institution* (March 17, 2020).

Matthew Fiedler, Christen Linke Young, and Loren Adler, "What Are the Health Coverage Provisions in the House Coronavirus Bill?," *Brookings Institution* (March 13, 2020).

Christen Linke Young, "There Are Clear Race-Based Inequalities in Health Insurance and Health Outcomes," *Brookings Institution* (February 19, 2020).

Matthew Fiedler, Loren Adler, and Christen Linke Young, "Health Care in President Trump's Fiscal Year 2021 Budget," *JAMA Health Forum* (February 13, 2020).

Christen Linke Young and Jason Levitis, "Georgia's 1332 Waiver Violates the ACA and Cannot Lawfully Be Approved," *Brookings Institution* (January 23, 2020).

Christen Linke Young, "Remanding Texas V. U.S. to the Lower Court Prolongs Harms to Consumers and the Health Care Industry," *Brookings Institution* (January 3, 2020).

Matthew Fiedler, Christen Linke Young, and Fred Dews, "The Biggest Health Care Issues of the 2020 Election," *Brookings Institution* (November 15, 2019).

Christen Linke Young, "The Supreme Court Will Hear a Health Care Case in December, But Its Decision on Risk Corridors Won't Affect the ACA," *Brookings Institution* (November 4, 2019).

Christen Linke Young and Abigail Durak, "How Do We Tackle the Opioid Crisis," *Brookings Institution* (October 18, 2019).

Christen Linke Young, Matthew Fiedler, Loren Adler, and Sobin Lee, "What Is Surprise Billing for Medical Care?" *Brookings Institution* (October 15, 2019).

Matthew Fiedler and Christen Linke Young, "Current Debates in Health Care Policy: A Brief Overview," *Brookings Institution* (October 15, 2019).

Christen Linke Young, "Retroactive Enrollment: A Feasible Way To Bring Auto-Enrollment To The Individual Market," *Health Affairs* (October 10, 2019).

Christen Linke Young, "The Trump DOJ Has Taken an Unexpected and Unworkable Position on the ACA," *Brookings Institution* (September 18, 2019).

Loren Adler, Steven M. Lieberman, Christen Linke Young, and Paul B. Ginsburg, "Considerations for Expanding International Reference Pricing Beyond Medicare Part B," *Brookings Institution* (September 9, 2019).

Christen Linke Young, Matthew Fiedler, Loren Adler, and Sobin Lee, "What Is Surprise Billing?" *Brookings Institution* (August 1, 2019).

Loren Adler, Erin Duffy, Paul B. Ginsburg, Mark Hall, Erin Trish, and Christen Linke Young, "Rep. Ruiz's Arbitration Proposal For Surprise Billing (H.R. 3502) Would Lead To Much Higher Costs And Deficits," *Brookings Institution* (July 16, 2019).

Christen Linke Young, "Federal Surprise Billing Legislation Does Not Violate the Constitution," *Brookings Institution* (July 1, 2019).

Sobin Lee and Christen Linke Young, "Insurance Status Churn and Auto-Enrollment," *Brookings Institution* (June 19, 2019).

Christen Linke Young, Matthew Fiedler, and Jason Levitis, "The Trump Administration's Final HRA Rule: Similar to the Proposed but Some Notable Choices," *Brookings Institution* (June 14, 2019).

Christen Linke Young, "Three Ways To Make Auto-Enrollment Work," *Brookings Institution* (June 13, 2019).

Matthew Fiedler, Henry J. Aaron, Loren Adler, Paul B. Ginsburg, and Christen Linke Young, *Building on the ACA To Achieve Universal Coverage*, 380 N. ENG. J. MED. 1685 (2019).

Loren Adler, Matthew Fiedler, Paul B. Ginsburg, and Christen Linke Young, "Comments on the Lower Health Care Costs Act Of 2019," *Brookings Institution* (June 6, 2019).

Loren Adler, Matthew Fiedler, Paul B. Ginsburg, and Christen Linke Young, "Comments On The No Surprises Act," *Brookings Institution* (May 29, 2019).

Christen Linke Young, Loren Adler, Paul B. Ginsburg, and Mark Hall, "The Relationship Between Network Adequacy and Surprise Billing," *Brookings Institution* (May 10, 2019).

Christen Linke Young, "Examining Surprise Billing: Protecting Patients from Financial Pain," *Brookings Institution* (April 3, 2019).

Christen Linke Young, "The Trump Administration's New Challenge to the Affordable Care Act," *Brookings Institution* (March 27, 2019).

Loren Adler, Matthew Fiedler, Paul B. Ginsburg, Mark Hall, Erin Trish, Christen Linke Young, and Erin Duffy, "State Approaches To Mitigating Surprise Out-Of-Network Billing," *Brookings Institution* (February 19, 2019).

Christen Linke Young, "Testimony on Texas V. U.S.: The Republican Lawsuit and its Impacts On Americans With Pre-Existing Conditions," *Brookings Institution* (February 6, 2019).

Christen Linke Young, Jason Levitis, and Matthew Fiedler, "Evaluating the Administration's Health Reimbursement Arrangement Proposal," *Brookings Institution* (December 11, 2018).

Christen Linke Young, "The Trump Administration Side-Stepped Rulemaking Processes On The ACA's State Innovation Waivers—And It Could Make Their New Section 1332 Guidance Invalid," *Brookings Institution* (November 28, 2018).

Christen Linke Young, Note, *Pay or Play and ERISA Section 514*, 10 YALE J. HEALTH POL'Y, L. & ETHICS 197 (2009)

Christen Linke Young, Note, *Childbearing, Childrearing, and Title VII*, 118 YALE L.J. 1182 (2009)

Christen Linke Young, *FDA Preemption Inputs in* Riegel v. Medtronic, 118 YALE L.J. POCKET PART 22 (2008)

Christen Linke Young, *State Based Environmentalism*, 117 YALE L.J. POCKET PART 218 (2007)