**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| CITY OF COLUMBUS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:25-cv-2114-BAH |
| ROBERT F. KENNEDY, JR., in his official | ) | |
| capacity as Secretary of the United States | ) | |
| Department of Health and Human Services, *et* | ) | |
| *al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

   I.  The Affordable Care Act ................................................................................... 2

   II.  The Marketplace Integrity and Affordability Rule .......................................... 4

   III. Procedural History ........................................................................................... 6

LEGAL STANDARD ..................................................................................................... 6

ARGUMENT .................................................................................................................. 7

   I.  Plaintiffs Lack Standing and Fail to Establish Irreparable Harm ...................... 7

      A.  Main Street Alliance ................................................................................. 9

      B.  Doctors for America ................................................................................. 11

      C.  The City Plaintiffs .................................................................................... 13

   II.  Plaintiffs Are Not Likely to Succeed on the Merits ........................................ 15

      A.  Past-Due Premium Policy ........................................................................ 16

      B.  Failure to Reconcile Provision ................................................................ 21

      C.  Annual Eligibility Redetermination Provision ........................................ 28

      D.  Income Eligibility Verification Policies ................................................... 32

         1.  Rescission of Automatic 60-Day Extension Regulation ..................... 33

         2.  Provision Requiring Income Verification When Data Sources Indicate Income Less Than 100 Percent of the Federal Poverty Level ............... 36

         3.  Change Requiring Income Verification When Tax Data Is Unavailable ............. 39

      E.  Pause of Low-Income Special Enrollment Period .................................... 41

      F.  SEP Eligibility Verification Policy .......................................................... 43

G.  Premium Adjustment Percentage Methodology ...................................................... 45

H.  Actuarial Value Policy ........................................................................................ 48

III.  The Equities and Public Interest Weigh Against Preliminary Relief ................................ 52

IV.  Any Relief Should Be Appropriately Limited ................................................................ 53

V.  The Court Should Require Plaintiffs to Submit a Bond as Security ................................ 54

CONCLUSION.......................................................................................................................... 54

**INTRODUCTION**

The American health care system is complicated.   The Affordable Care Act is equally so. Its scope is expansive, addressing everything from "essential health benefits" and "medical loss ratios," to required individual contributions and maximum annual limitations on cost sharing, to "premium assistance credit amounts" and the "premium adjustment percentage."   The ACA also grants the Secretary of Health and Human Services broad authority to issue regulations that implement and set standards for its various requirements.   And HHS Secretaries across presidential administrations have routinely exercised that authority by promulgating, adjusting, rescinding, and reinstating such regulations to advance various policy goals.

The 2025 Marketplace Integrity and Affordability Final Rule is the latest iteration of that practice.   The Rule makes several regulatory changes to strengthen the integrity of the health insurance "Exchanges" where consumers purchase health care coverage under the ACA, and to make that coverage more affordable.   In particular, the Rule seeks to address the high levels of improper enrollment in federally subsidized plans by better enforcing compliance with the eligibility requirements for such plans and providing additional safeguards to protect consumers from unwanted changes to their coverage. As HHS explained, this growth in improper enrollments is a consequence of temporary legislative changes related to the COVID-19 pandemic that expanded access to ACA premium subsidies and made those subsidies more generous, which in turn increased the availability of fully subsidized health care coverage and fueled enrollment, some of it improper, in Exchange plans.   Those enhanced premium subsidies are set to expire at the end of the year.   The Rule accordingly implements a number of policies meant to reduce improper enrollments over the short term as Exchanges readjust to a new subsidy environment.   And the Rule also makes permanent reforms to improve the stability of Exchanges, provide premium relief to enrollees who do not qualify for ACA premium subsidies, and protect the public fisc.

The plaintiffs in this case—three cities and two nonprofit organizations—oppose HHS's approach.  They challenge ten separate provisions of the Rule under the Administrative Procedure Act, claiming that three are contrary to law and all ten are arbitrary and capricious.   And they

request preliminary relief from those provisions based on speculative assertions that the Rule will cause them various downstream economic harms, none of which are imminent. Many of Plaintiffs' objections to the Rule—that it pursues certain priorities over others, takes steps that Plaintiffs think are misguided, and implements regulatory changes different from what Plaintiffs would prefer— sound more in policy than law. Yet the APA is not a vehicle through which Plaintiffs can challenge policies and regulations merely because they disagree with them. Nor does the APA give litigants and courts license to flyspeck agency decisionmaking or second-guess reasonable judgments made in the face of competing priorities.

Plaintiffs do not come close to meeting the high bar for obtaining preliminary relief. They fail to clearly show that they have standing, let alone that the Rule will cause them imminent and irreparable harm. They are not likely to succeed on the merits of any of their challenges to the Rule. And the equities and public interest do not weigh in favor of staying a Rule based largely on policy disagreements. Plaintiffs' motion for preliminary relief should therefore be denied.

## BACKGROUND

### I.    The Affordable Care Act

Enacted in 2010, the ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market" and "to make insurance more affordable." *King v. Burwell*, 576 U.S. 473, 478-79 (2015); *see* Pub. L. No. 111-148, 124 Stat. 119 (2010). To "ensure that anyone can buy insurance," *id.* at 493, the ACA generally prohibits health insurance issuers in individual or group markets from denying coverage to applicants because of their health (the "guaranteed availability" requirement). 42 U.S.C. § 300gg-1(a). And to promote continuous coverage, the ACA generally requires issuers to "renew or continue in force" an enrolled customer's coverage "at the option of . . . the individual," provided they pay their premiums. *Id.* § 300gg-2(a), (b)(1).

The ACA also required the creation of an "Exchange" in each State where customers can compare and purchase individual (as opposed to group or employer-sponsored) "qualified health plans," which must cover certain "essential health benefits" and adhere to limits on enrollee cost

sharing (*i.e.*, deductibles, coinsurance, and co-payments). *Id.* §§ 18022(a)-(c), 18031(b)(1). States can elect to operate their own Exchanges ("State-based Exchanges" or "SBEs"). In States that do not do so, HHS operates a federally facilitated Exchange ("FFE").[1] Customers can typically enroll in Exchange plans for the upcoming plan year during an annual "open enrollment period," or for the current plan year during "special enrollment periods" that become available if a certain "triggering event" occurs (*e.g.*, a person loses employer-based coverage). *Id.* § 18031(c)(6). Exchange plans are categorized into different "metal tiers"—bronze, silver, gold, and platinum—based on their "level of coverage"; "silver plans," for instance, must have an actuarial value of 70 percent, meaning the plan is designed such that the issuer will pay, on average, 70 percent of covered medical expenses, and the enrollee will pay the remaining 30 percent of expenses through out-of-pocket spending. *Id.* § 18022(d) (setting the "level of coverage" for the other plan types). Generally speaking, the higher the level of coverage, the higher the premiums.

To help make insurance more affordable, the ACA provides subsidies to eligible Exchange enrollees in the form of "premium tax credits," which enrollees can claim on their annual federal income tax returns. *See* 26 U.S.C. § 36B. The amount of a premium tax credit ("PTC") is based on the enrollee's annual household income and the premium charged for the "benchmark" plan—*i.e.*, the second-lowest cost silver plan—in the enrollee's Exchange. *Id.* Enrollees also have the option of receiving their PTC in advance to lower their monthly insurance payments. These advanced premium tax credits ("APTCs") are paid directly to an enrollee's insurance provider and offset premium costs. *See* 42 U.S.C. § 18082. Because APTCs are based on an enrollee's projected annual household income, however, recipients must file a federal tax return and "reconcile" the APTCs they received with the PTC amount they ultimately qualify for based on their actual income during the applicable tax year. *See* 26 U.S.C. § 36B(f)(1).

Prior to 2021, PTCs and APTCs were available only to Exchange enrollees with household incomes between 100 percent and 400 percent of the Federal Poverty Level ("FPL"). *See* 26

---

[1] As few States, including Illinois, operate a State-based Exchange on the federal Exchange platform ("SBE-FP").

U.S.C. § 36B(c)(1)(A).[2]  During the COVID-19 pandemic, Congress temporarily increased the generosity of the ACA's premium subsidies and expanded subsidy eligibility to enrollees with household incomes above 400 percent of the FPL via the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ("ARPA").  The 2022 Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 ("IRA"), extended these enhanced subsides through 2025.  The enhanced subsidies are currently set to expire at the end of the year.

The HHS Secretary has broad authority under the ACA to issue regulations implementing and "setting standards for" the ACA's requirements, including those regarding the "establishment and operation of Exchanges," the "offering of qualified health plans through such Exchanges," and "such other requirements as the Secretary determines appropriate."  42 U.S.C. § 18041(a)(1). Since the ACA's enactment, HHS has accordingly engaged in numerous rulemakings in order to implement various aspects of the ACA.  *See, e.g.*, 77 Fed. Reg. 18,310 (Mar. 27, 2012) ("Exchange Establishment Rule"); 82 Fed. Reg. 18,346 (Apr. 18, 2017) ("Market Stabilization Rule"); *see also* 90 Fed. Reg. at 27,080-27,084 (summarizing past rulemakings).  Since 2013, HHS has also issued annual "Payment Notices" that set standards for, and make adjustments to, different facets of Exchanges and ACA coverage for the upcoming plan year.  *See, e.g.*, 90 Fed. Reg. 4,424 (Jan. 15, 2025) ("2026 Payment Notice").

## II.    The Marketplace Integrity and Affordability Rule

On March 19, 2025, the Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS, issued a Notice of Proposed Rulemaking for a proposed rule that would implement "several regulatory actions aimed at strengthening the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse."  90 Fed. Reg. 12,942 (Mar. 19, 2025) ("NPRM").  CMS further explained that it "expect[ed] these actions would provide premium relief to families who do not qualify for [ACA] subsidies and reduce the burden of . . . [ACA] subsidy expenditures on the Federal taxpayer."  *Id.*  CMS received more than 26,000 comments, some

---

[2] The ACA set the lower FPL threshold with the expectation that individuals with an income below 100 percent of the FPL would generally be eligible for Medicaid.

supporting and others opposing different aspects of the proposed rule.  After reviewing those comments and revising certain provisions of the proposed rule in response, HHS issued and publicly released the Final Rule on June 20, 2025, and it was published in the Federal Register on June 25.  90 Fed. Reg. 27,074 ("the Rule").

HHS explained in the Rule's preamble that, "[b]ased on [its] review of enrollment data and [its] experience fielding consumer complaints," it believes that the "temporary expansion of ACA premium subsidies" via the ARPA and IRA "resulted in conditions that were exploited to improperly gain access to fully-subsidized coverage" on Exchanges.  *Id.*  More specifically, "the widespread availability" of fully subsidized plans—*i.e.*, plans with post-subsidy net premiums of $0—"created the incentive and opportunity for fraudulent and improper enrollments at scale," either by enrollees wanting no-cost Exchange coverage or by third-party brokers that collected commissions on improper enrollments that were made without customers' knowledge.  *Id.*  The Rule accordingly "takes a carefully curated set of temporary actions" to reduce these high levels of improper enrollment "over the short-term," which will then sunset after the Exchange marketplace "readjusts to" a new environment in which the soon-to-expire enhanced premium subsidies provided by the ARPA and IRA (and, by extension, fully subsidized Exchange plans) "are no longer available."  *Id.*  The Rule also implements a number of "permanent reforms to help" Exchanges "reset to the changing subsidy environment to improve affordability and stability over the long-term."  *Id.*

As relevant here, the Rule implements policies concerning the effectuation of new Exchange coverage when a customer owes past-due premiums to an issuer, *id.* at 27,084-91; the requirement that recipients of APTCs file a federal tax return and reconcile those APTCs with the recipient's PTC amount, *id.* at 27,113-17; and the procedures HHS uses to annually redetermine Exchange enrollees' eligibility to receive APTCs, *id.* at 27,102-10.  The Rule additionally makes changes to the procedures that HHS uses to verify enrollees' eligibility for APTCs, *id.* at 27,118-32; pauses an income-based special enrollment period, *id.* at 27,140-48; and amends certain verification procedures that apply to special enrollment periods, *id.* at 27,148-52.  The Rule also

updates the methodology used to calculate the "premium adjustment percentage," *id.* at 27,166-74, and makes adjustments to the allowable ranges of actuarial values applicable to the different plan types sold on Exchanges, *id.* at 27,174-78.

The Rule is set to take effect on August 25, 2025, *id.* at 27,075, but many of its provisions will apply to Exchange plans that will take effect in 2026, *see id.* at 27178-79.

## III.    Procedural History

Plaintiffs in this case are three city governments—the City of Columbus, Ohio; the Mayor and City Council of Baltimore, Maryland; and the City of Chicago, Illinois—and two nonprofit organizations, one of which is a "national network of small businesses," and the other an advocacy organization consisting of "member physicians and medical trainees . . . in all 50 states." Complaint ¶¶ 8-12, ECF No. 1.  They allege that the Rule violates the APA, claiming that three of its provisions are contrary to law (Count I), and that those same three provisions plus seven others are arbitrary and capricious (Count II).  *Id.* ¶¶ 74-82.  On July 2, 2025, Plaintiffs filed a motion for preliminary relief, in which they seek a stay of the August 25, 2025 effective date of the challenged Rule provisions under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction.  ECF No. 11; ECF No. 11-1 ("Stay Motion").

## LEGAL STANDARD

5 U.S.C. § 705, a provision of the APA, provides that a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of . . . review proceedings" where "required and to the extent necessary to prevent irreparable injury."  "The standard[] for granting" a § 705 stay is "essentially the same" as that for granting a preliminary injunction.  *Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. Social Sec. Admin.*, 771 F. Supp. 3d 717, 792 (D. Md. 2025); *see Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020).  Both forms of relief are "extraordinary remed[ies]" that can be granted "only if the moving party clearly establishes entitlement to the relief sought."  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  And such relief is warranted "only if it is clear" that (1) the movant is "likely to succeed on the merits," (2) they are "likely to suffer

irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [their] favor," and (4) "an injunction is in the public interest." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (citation omitted).

## ARGUMENT

### I.    Plaintiffs Lack Standing and Fail to Establish Irreparable Harm

Plaintiffs' request for a § 705 stay should be denied at the threshold because they fail to show that they have Article III standing—much less that emergency relief is needed to forestall irreparable harm they would suffer before this case is decided on the merits.

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "For there to be a case or controversy . . . , the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380.

An alleged injury confers standing only if it is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 153 (4th Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). And a party seeking prospective relief—as Plaintiffs do here—"must establish a sufficient likelihood of future injury." *All. for Hippocratic Med.*, 602 U.S. at 381. That is, a "threatened injury must be *certainly impending* to constitute [an] injury in fact," and "[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). The causation element of standing, moreover, requires a plaintiff to show a "causal connection" between the alleged injury and the specific "'conduct' complained of' by the plaintiff." *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020) (citation omitted). The "links in th[at] chain of causation" cannot be "too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383. A causal chain is too speculative if it is not "sufficiently predictable how third parties

would react to the government action" in question or "cause downstream injury to plaintiffs." *Id.* And it is too attenuated if the challenged government action "is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id.*; *Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017) (explaining that an "attenuated chain of possibilities" cannot confer standing).

Plaintiffs, of course, "bear[] the burden of establishing [their] standing" to seek the preliminary relief they demand here. *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). Because preliminary relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), Plaintiffs must accordingly "make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *see Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation."). Absent that clear showing, the Court "lack[s] jurisdiction to reach the merits of" any of Plaintiffs' claims. *Murthy*, 603 U.S. at 56; *see Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Fisheries Comm'n*, 127 F.4th 509, 514 (4th Cir. 2025) (explaining that absent standing, "the federal courts lack jurisdiction to consider [a] request for a preliminary injunction").

Because they seek preliminary relief, Plaintiffs have the added burden of showing that they are "likely to suffer irreparable harm in the absence of" such relief. *Pierce*, 97 F.4th at 209. It is not enough to "simply show[] some 'possibility of irreparable injury.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009). Rather, Plaintiffs "must make a 'clear showing' that [they] will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019); *see Ass'n of Am. Publishers v. Frosh*, 586 F. Supp. 3d 379, 393 (D. Md. 2022) ("The harm . . . must be more than a mere possibility; it must be likely."). And preliminary relief is warranted only if the plaintiff is "likely to suffer the harm 'before a decision on the merits can be rendered.'" *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 726 (D. Md. 2018) (quoting *Winter*, 555 U.S. at 22); *see Di Biase*, 872 F.3d at 230

("A preliminary injunction is an extraordinary remedy intended to . . . prevent irreparable harm during the pendency of a lawsuit.).

None of the Plaintiffs has made the requisite showings here. They all assert that the Rule will cause them downstream economic harm, but each of their alleged injuries rests on speculative predictions about the Rule's potential effects on a complex health insurance market and a multi-step chain of possibilities that is unlikely to materialize any time soon.

### A.    Main Street Alliance

Plaintiff Main Street Alliance ("MSA") is a nonprofit organization that describes itself as a "national network of small businesses, with approximately 30,000 small business members throughout the United States." Phetteplace Decl. ¶¶ 1-2, ECF No. 11-3. MSA brings suit on behalf of the unknown minority of its members who "rely on the ACA marketplace for health insurance," claiming that the "financial and health impact" of the Rule will "create additional costs" for those members. *Id.* ¶¶ 3-4; *see id.* ¶ 3 (stating that only 45 percent of MSA members "access health insurance through" either "the [ACA] marketplace *or Medicaid*" (emphasis added)). Yet to have such associational standing to sue "as a representative of its [allegedly] harmed members," MSA must establish "that one of its members would have standing to sue in his or her own right." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 397 (4th Cir. 2011); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (explaining that associational standing "require[s] plaintiff-organizations to make specific allegations establishing that at least one identified member" has suffered or will suffer harm). It fails to satisfy that essential requirement here.

MSA attempts to base its associational standing on a single declaration from a member who owns a small business in Wisconsin and is enrolled in a health plan through the ACA's individual marketplace. *See* Legler Decl. ¶¶ 1-4, ECF No. 11-4. And that member's theory of standing hinges on (1) the challenged Rule provisions causing "cost increases" in individual marketplaces generally and (2) an attendant (yet wholly indeterminate) increase in the monthly premium the member pays post-subsidies, (3) which the member would categorically be unable to

9

afford, (4) thus "mak[ing] it impossible" for her to continue running her business and (5) requiring her to "find different employment with employer-sponsored insurance." *Id.* ¶¶ 1, 11-12. But merely describing this attenuated chain of contingencies refutes it as an adequate basis for standing. *See Beck*, 848 F.3d at 275. For one, the member does not claim that any of the challenged Rule provisions would impact her directly or otherwise interfere with her eligibility to remain enrolled in her current Exchange plan. The member's assertion that the Rule's impact on insurance markets more broadly will necessarily cause *her* particular insurance premium to increase is likewise wholly speculative. *See All. for Hippocratic Med.*, 602 U.S. at 381 ("[T]he injury must be actual or imminent, not speculative . . ."). The member also provides no factual basis for assuming that, even if there were *some* increase in her premium (whether caused by the Rule or not), she would ineluctably decide to drop her Exchange coverage, close down her business, and seek insurance elsewhere, notwithstanding her satisfaction with her current Exchange plan, *see* Legler Decl. ¶ 9 (noting that the plan "provides [the member] access to [her] critical medications"); her desire to run her own business, *id.* ¶ 8 ("[T]he ACA g[ives] me the freedom to operate my own small business . . . ."); and the uncertainty of finding alternative coverage that is both adequate and affordable. The member has thus failed to establish that the future economic injury she claims she will suffer as a result of the Rule is "sufficient[ly] likel[y]" to materialize, let alone imminently so. *All. for Hippocratic Med.*, 602 U.S. at 381; *see South Carolina*, 912 F.3d at 726 ("The requirement that an alleged injury be palpable and imminent ensures that the injury 'is not too speculative for Article III purposes.'"). And she has certainly failed to establish that any such injury would occur before Plaintiffs' claims could be resolved in the regular course of litigation—an essential feature of irreparable harm. *See M.A.B.*, 286 F. Supp. 3d at 726 (quoting *Winter*, 555 U.S. at 22). Indeed, the challenged Rule provisions will apply to Exchange plans that will not take effect until 2026 at the earliest, meaning that the Rule will have no immediate impact on the member's current coverage.

Furthermore, the central premise of MSA's theory of harm is that future increases in premiums for Exchange plans will necessarily be traceable to the Rule provisions Plaintiffs

challenge. That premise is flawed. In fact, CMS attributes the estimated increase in 2026 premiums to the expiration of the enhanced subsidies that were enacted during the COVID-19 pandemic—a statutory change that Plaintiffs do not challenge. *See* 90 Fed. Reg. at 27,212 (estimating that the expiration of enhanced subsidies will result in "approximately 42 percent of recent enrollment growth" to "discontinue coverage," leading to "higher overall premiums on a per member per month (PMPM) basis" in 2026 due to the fact that the "discontinuing enrollees are likely to be healthier than those remaining in the risk pool"). Indeed, CMS "anticipates" that the Rule will actually cause premiums to be *lower than* they would be otherwise in that post-expiration environment. *See id.* at 27,212-13 (comparing post-expiration premiums with and without the Rule); *id.* at 27,213 ("[W]e anticipate that premiums will decrease as a result of this final rule."); *see also id.* at 27,208-09 (explaining that CMS's estimates of the Rule's impact "use a baseline of current law such that a reduction in enrollment attributable to the expiration of enhanced PTCs in the IRA . . . is generally accounted for"). The injury in fact on which MSA's theory of standing turns—*i.e.*, an expected increase in its members' "health insurance coverage costs," Legler Decl. ¶ 11; *see* Stay Motion at 40 (contending that the Rule "will create burdensome additional costs for MSA members")—is therefore not traceable to the Rule provisions Plaintiffs challenge. *See Lane v. Holder*, 703 F.3d 668, 673 (4th Cir. 2012) ("[The plaintiffs] must still establish that their alleged injury is traceable to the challenged laws.").

The MSA member-declarant, in short, fails to establish her standing on multiple fronts. Because she lacks standing to challenge the Rule in her own right, "it follows," then, that MSA "does not have associational standing" to challenge the Rule either, *id.* at 674 n.6, and it certainly has failed to make the requisite clear showing of irreparable harm.

### B.    Doctors for America

Plaintiff Doctors for America ("DFA") is a nonprofit organization "of over 27,000 physician[] and medical trainee[]" members "in all 50 states." Krommes Decl. ¶ 3, ECF No. 11-5. Like MSA, DFA is challenging the Rule on behalf of its members. *See, e.g.*, Stay Motion at 40 ("DFA's members . . . will also be irreparably harmed by the [Rule]."). And like MSA, DFA

attempts to establish its associational standing with a declaration from a single member, this one a primary care provider in a Kansas county health center. *See* Oller Decl. ¶ 4, ECF No. 11-6.

That member asserts that the Rule "would have a devastating effect on [her] practice and [her] community" because "many" of her roughly 800 patients would allegedly "lose their insurance or have their coverage limited as a result of the [R]ule." *Id.* ¶¶ 6-7. This, she claims, would cause those newly uninsured or underinsured patients to be "more likely to opt out of critical preventative care services," which would "hinder[]" the member's ability "to provide optimal care to [her] patients" and "jeopardize[]" the patients' "long-term health," and result in her providing more uncompensated or unreimbursed care. *Id.* ¶¶ 7,9.

Yet the Rule's alleged effects on the "long-term health" of the DFA member's *patients* is largely irrelevant to whether *the member* would have standing to challenge the Rule (and, by extension, whether DFA has associational standing to do so), or whether *the member* will be irreparably harmed by the Rule in some way. *See All. for Hippocratic Med.*, 602 U.S. at 381 ("[T]he injury must affect '*the plaintiff* in a personal and individual way.'" (emphasis added)); *New Mexico v. Musk*, 769 F. Supp. 3d 1, 7 (D.D.C. 2025) ("[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." (citation omitted)). As for the alleged increase in "uncompensated and undercompensated care," Oller Decl. ¶ 9, the member does not explain how an uninsured patient's inability to pay for certain care, or how the member providing health care services that go unreimbursed by an insurance provider, affects *her* compensation directly. Nor does the member attempt to explain how any increase in uncompensated care that she might encounter could reasonably be attributed to the Rule rather than to the myriad other factors that affect the ACA marketplace, including the upcoming expiration of the COVID-era enhanced subsidies. And to the extent the member tries to base her standing on the prospect of the alleged increase in uncompensated care being so substantial that hospitals and clinics will eventually be "force[d] . . . to close," *id.* ¶ 9, such an injury is far too speculative and attenuated to confer standing, *see All. for Hippocratic Med.*, 602 U.S. at 381

("[T]he injury must have already occurred or be likely to occur soon."); *Clapper*, 568 U.S. at 422 ("[R]espondents' theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'"), and undoubtedly far too distant to constitute imminent irreparable harm.

DFA's lone member-declarant thus falls well short of making the requisite "clear showing" that she will be imminently and concretely harmed by the Rule. *Murthy*, 603 U.S. at 58. And that shortcoming is fatal to both DFA's claim to associational standing and its demand for preliminary relief.

### C.    The City Plaintiffs

That leaves the three city Plaintiffs—the City of Columbus, the Mayor and City Council of Baltimore, and the City of Chicago. All three contend that the Rule will harm them in the same way—namely, "[b]y driving up the rate of uninsured or underinsured individuals within the city Plaintiffs' jurisdictions," thus "forc[ing]" the cities "to devote additional funding, personnel, and other resources to subsidizing and providing uncompensated care" as providers of last resort. Stay Motion at 2, 42; *See* Johnson Decl. ¶¶ 9-11, 14, ECF No. 11-7; Leach Decl. ¶¶ 9, 12-13, ECF No. 11-8; Ige Decl. ¶¶ 6, 8-9, 14, ECF No. 11-9. And all three contend that this budgetary injury amounts to irreparable harm requiring preliminary relief. *See* Stay Motion at 42.

As with the two organizational plaintiffs, however, the injury in fact that the city Plaintiffs assert here "lies at the end of a 'highly attenuated chain of possibilities.'" *South Carolina*, 912 F.3d at 727. Indeed, the budgetary harms they fear could materialize only if (1) the Rule provisions Plaintiffs challenge cause a certain number of individuals currently enrolled in Exchange plans to disenroll or otherwise lose coverage, and (2) a portion of that recently uninsured group—which, Plaintiffs note, is likely to be "relatively young[] and health[y]," Young Decl. ¶ 5, ECF No. 11-2—seeks medical care (3) in the city Plaintiffs' jurisdictions (4) specifically at city-run health care facilities (rather than privately operated ones) or through a city-funded emergency medical service and (5) receives services at such a rate that the cities (6) are required to increase the budgets for their respective public health departments to cover that increase in potentially uncompensated care.

Such a remote harm built on "a lengthy chain of assumptions," *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 569 (D. Md. 2016), simply "does not satisfy the requirement that threatened injury must be certainly impending" to confer standing, *Clapper*, 568 U.S. at 410. And that remote harm is certainly not imminent enough to qualify as the sort of irreparable injury that warrants extraordinary preliminary relief.[3]

Finally, the city Plaintiffs make the additional assertion that they will be irreparably harmed by the Rule because, by purportedly making it harder for city residents to "get the medical care they need," the Rule will cause those residents to be "less healthy, less productive, and less able to participate in city life," which would "have cascading negative . . . effects on city programs and communities." Stay Motion at 43. The "cascading negative . . . effects on city programs" that the city Plaintiffs purportedly fear, however, *id.*, are just as speculative and remote as their alleged budgetary harms and thus fail to warrant preliminary relief for the same reasons. Plaintiffs also point to no legal authority suggesting that such amorphous "negative effects" can amount to a sufficiently concrete injury for standing purposes. *See All. for Hippocratic Med.*, 602 U.S. at 381 ("An injury in fact . . . must be real and not abstract."). And the city Plaintiffs' assumptions about their residents' future medical decisions and productivity also rest entirely on "guesswork as to

---

[3] The city Plaintiffs cite a prior case in this District in which a court concluded that they were found to have standing to challenge a 2019 final rule involving the ACA because, in the court's view, the city Plaintiffs had shown that the rule would "predictably increase the uninsured rate" and thus cause them to bear the costs of providing health care services to a greater number of uninsured residents. *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 744 (D. Md. 2021); *see City of Columbus v. Trump*, 453 F. Sup. 3d 770, 787-92 (D. Md. 2020); *see also* Stay Motion at 42-43. That court never addressed the city Plaintiffs' standing at the preliminary relief stage, however. *See Murthy*, 603 U.S. at 58 (confirming that a plaintiff seeking a preliminary injunction "must make a 'clear showing' that she is 'likely' to establish each element of standing). And several Supreme Court decisions addressing Article III standing doctrine have been issued in the years since. *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 383 ("'[T]he links in the chain of causation,' must not be too speculative or too attenuated." (internal citation omitted)); *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023) ("[F]ederal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated."). Accordingly, the conclusions reached in that earlier case, concerning a different rule, have little bearing on the city Plaintiffs' claim to standing here.

how independent decisionmakers will exercise their judgment" in response to the Rule, which is likewise not a viable basis for standing. *Murthy*, 603 U.S. at 57 (citation omitted).

## II.    Plaintiffs Are Not Likely to Succeed on the Merits

Plaintiffs' failure to establish standing and irreparable harm is sufficient on its own to warrant a denial of their Stay Motion. *See Maryland v. U.S. Dep't of Agric.*, -- F. Supp. 3d --, 2025 WL 973159, at *7 (D. Md. Apr. 1, 2025) (noting that "'[a] plaintiff unlikely to have standing is *ipso facto* unlikely to succeed' in its cause" for purposes of preliminary relief); *Bethel Ministries, Inc. v. Salmon*, No. 19-cv-1853, 2020 WL 292055, at *7 (D. Md. Jan. 21, 2020) ("[S]ince [the plaintiff] has not met its burden to establish irreparable harm, its Motion [for a preliminary injunction] fails on this basis alone."). But even if the Court were to conclude otherwise, Plaintiffs are not likely to succeed on the merits of any of their claims.

Plaintiffs challenge ten of the Rule's provisions under the APA, claiming that three are contrary to law and that all ten are arbitrary and capricious. *See* Compl. ¶¶ 74-82. The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing a contrary-to-law claim, "courts must exercise independent judgment in determining the meaning of statutory provisions" and "set aside" any action that is "inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 394 (2024). "In determining whether agency action was arbitrary or capricious, [a] court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Review under" the arbitrary-and-capricious standard "is highly deferential, with a presumption in favor of finding the agency action valid." *Id.* A court accordingly "may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, "[s]o long as the agency 'provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made,'" its decision must be upheld. *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297-98 (4th Cir. 2018) (citation

omitted); *see Prometheus*, 592 U.S. at 423 ("A court simply ensures that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision."). Agencies are also "free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Plaintiffs level various scattershot arguments against the ten Rule provisions they challenge, all of which lack merit. Defendants will address each challenged provision in turn.

### A.    Past-Due Premium Policy

To promote continuous health insurance coverage and improve customer accountability, the Rule will allow issuers on Exchanges to require, subject to applicable state law, a customer seeking new insurance coverage to pay any past-due premiums owed to the issuer for prior coverage before that customer can pay the initial premium required to effectuate new coverage. *See* 90 Fed. Reg. at 27,084, 27,220. Put another way, the Rule will allow issuers to require a customer to pay (1) any past-due premiums the customer owes the issuer (or related issuers) for prior coverage *and* (2) the initial premium amount (also known as a "binder payment") required for new coverage before the latter coverage is effectuated. *Id.* at 27,084, 27,088.[4] And if the customer fails to pay that combined amount in full, the issuer can decline to effectuate the new coverage. *Id.* at 27,084. Plaintiffs argue that this Rule provision is both contrary to the ACA and arbitrary and capricious, *see* Stay Motion at 26-28, but it is neither.

The Rule's past-due premium policy is similar to one that CMS implemented in 2017, which was later replaced in 2022 with the current regulation regarding past-due premiums and new coverage. *See* NPRM, 90 Fed. Reg. at 12,951.[5] The current regulation bars a health insurance issuer from denying coverage to an individual "due to the individual's . . . failure to pay premium[s]

---

[4] The Rule provides that an issuer "may require a consumer to pay past-due premiums owed to that issuer, or owed to another issuer in the same controlled group." 90 Fed. Reg. at 27,089; *see* 45 C.F.R. § 147.106(d)(4) (defining "controlled group"). The Rule also provides that "[t]he amount of the past-due premium an issuer may require" before effectuating new coverage "is subject to any premium payment threshold the issuer has adopted pursuant to [45 C.F.R.] § 155.400(g)." 90 Fed. Reg. at 27,089.

[5] HHS explains in the Rule that unlike the 2017 policy, the Rule's past-due premium policy will not (1) "limit the policy to past-due premium amounts accruing over the prior 12 months" only or (2) "require the issuer to provide any notice of" any past-due premium policy the issuer adopts consistent with the Rule. 90 Fed. Reg. at 27,084.

owed under a prior policy," including by attributing payment made for a new policy to past-due premiums. 45 C.F.R. § 147.104(i); *see id.* (providing that denying coverage in such a way violates the ACA's guaranteed availability requirement, 42 U.S.C. § 300gg-1(a)). As noted in the NPRM, however, the current regulation creates "perverse incentives" that can potentially undermine the stability of Exchange marketplaces. 90 Fed. Reg. at 12,953. For instance, the current regulation allows Exchange customers to potentially "gam[e]" the ACA's guaranteed-availability requirement, given that a customer (likely a comparatively healthy one) can decide to stop making premium payments under his current plan if he anticipates not needing health services for the rest of the plan year and then enroll in a new plan with the same issuer knowing that he cannot be denied coverage because of his past-due premium debt. *Id.* at 12,952-53; *see id.* at 12,952 (noting that "[a]ctions by issuers to require enrollees to pay initial and past-due premiums" between 2017 and 2020 "may have contributed to an improved risk pool by keeping healthier people enrolled who may have otherwise stopped payment"). Notably, the 2017 rule cited third-party research and an internal CMS analysis showing that among Exchange enrollees whose coverage had been terminated because of non-payment of premiums, "a large portion repurchased plans the following plan year from the same issuer." *Id.* at 12,951. Moreover, the current regulation incentivizes enrollees wanting to keep Exchange coverage to simply switch to new coverage if they incur premium debt. *See id.* at 12,953. For example, if such an enrollee were to renew her same coverage while still owing past-due premiums at the start of the plan year, under the current regulation, the enrollee must pay that past-due amount within a certain amount of time, or her renewed coverage will be terminated. In contrast, if that same enrollee simply switched to new coverage rather than renew her current plan, she could start that new coverage without first having to pay her past-due premium debt. *Id.*; *see* 90 Fed. Reg. at 27,086 (reiterating HHS's concerns about enrollees "taking advantage of grace period and guaranteed availability rules").

Under the Rule, issuers will instead be allowed—subject to applicable state law—(1) to attribute payments made for an initial premium to effectuate new coverage to past-due premium amounts owed to the issuer, and (2) to then refuse to effectuate the new coverage if both the past-

due and initial premium amounts are not paid in full. 90 Fed. Reg. at 27,084. An issuer must apply any such past-due premium policy "uniformly to all individuals . . . in similar circumstances in the applicable market and State regardless of health status" and "consistent with applicable nondiscrimination requirements." *Id.* at 27,220. States also have the flexibility to choose whether to permit issuers in their State exchanges to adopt such past-due premium policies and to "apply additional parameters governing issuers' premium payment policies, to the extent permitted under Federal law." 90 Fed. Reg. at 27,084; *see id.* at 27,085 ("We agree that States are in the best position to decide whether it is appropriate to permit or prohibit this policy.").[6]

As explained in the Rule's preamble, CMS anticipates that the Rule's past-due premium policy will "help to promote continuous coverage, reduce gaming and adverse selection, ensure that ACA subsidies are targeted to those who are eligible, and allow issuers to more accurately predict costs and prices." *Id.* at 27,084. Indeed, CMS predicts that Exchange enrollees, including healthier ones who improve the risk pool, will likely "be more inclined to remain in their coverage" if they know that they would have to pay any past-due premiums before effectuating new coverage, which would in turn encourage continuous coverage more broadly. *Id.* at 27,086. And CMS notes that this expectation is consistent with data indicating that when the 2017 past-due premium policy was in effect, the percentage of Exchange enrollees who had their coverage terminated for non-payment of premiums "dropped substantially," from 17.3 percent in 2017 to 7.8 percent in 2020. *Id.* at 27,087; *see* NPRM, 90 Fed. Reg. at 12,951-52. Although CMS acknowledges that "there could have been other reasons for this substantial drop," the agency notes that it is nonetheless "reasonable to conclude" that the earlier past-due premium policy contributed to the drop "at least in part . . . by encouraging more people to maintain continuous coverage." 90 Fed. Reg. at 27,087. The Rule also eliminates the perverse incentives created by the current regulation, given that an enrollee's obligation to pay past-due premium debt "[will] not change" based on whether the enrollee renews a current plan or enrolls in new coverage. NPRM, 90 Fed. Reg. at 12,953.

---

[6] The Rule notes that the past-due premium policy, unlike other Rule provisions discussed below, "will not sunset." 90 Fed. Reg. at 27,084.

Plaintiffs contend that the Rule's past-due premium policy "runs flatly contrary to" the ACA's guaranteed-availability provision, Stay Motion at 26 (citing 42 U.S.C. § 300gg-1(a)), by allowing issuers to deny coverage for a reason not permitted by the ACA—namely, an enrollee's failure to pay past-due premiums plus the initial premium for new coverage. Stay Motion at 26. Not so. While it is true that the ACA requires an issuer that offers health insurance coverage on an Exchange to "accept every . . . individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), an issuer's provision of coverage is of course contingent on the enrollee's payment of premiums, *see id.* § 300gg-2(b)(1) (providing that an issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums"). Accordingly, the ACA cannot be sensibly read to "require issuers to provide coverage to applicants who have not paid for such coverage." 90 Fed. Reg. at 27,087. And that principle applies with equal force to individuals who fail to pay the initial premium required to effectuate a new policy. *See* 45 C.F.R. § 155.400(e) (providing that federally facilitated Exchanges and State-based Exchanges on the federal platform "will[] require payment of a binder payment" equivalent to "the first month's premium" to "effectuate an enrollment" in an Exchange plan). If an individual applies for a new Exchange plan but fails to pay the full amount of the initial premium, that plan never goes into effect.[7] The Rule simply allows an issuer who is owed past-due premiums from a particular customer to lawfully credit any payments made by that customer for new coverage to the past-due balance before crediting any payments to the initial premium amount for the new coverage. And if, as a result of such a lawful allocation policy, the consumer still has an outstanding balance on the initial premium amount, then the issuer can decline to effectuate the new policy for failure to pay the requisite initial premium. *See* 45 C.F.R. § 155.400(e)(1)(i); *see* 90 Fed. Reg. at 27,087 (explaining that if an issuer "lawfully credits all or part of" a payment made for new coverage "toward past-due premiums," the customer "has not made sufficient initial payment for the new coverage"). The Rule's past-due premium policy is thus entirely consistent with the APA and regulations

---

[7] *See* CMS, *Health Coverage Effectuation, Grace Periods, and Terminations* at 2 (June 2024), https://www.cms.gov/files/document/coverage-effectuation-job-aid.pdf ("Consumers must pay their binder payment (often the first month's premium) for enrollment to be effectuated (i.e., the policy is active)").

governing the effectuation of a new plan via an initial premium.

Plaintiffs separately contend that the past-due premium policy is arbitrary and capricious, but their arguments largely amount to policy disagreements and otherwise lack merit. For one, Plaintiffs accuse CMS of "derid[ing]" the possibility that the policy could lead to "widespread coverage losses." Stay Motion at 27. But CMS expressly acknowledged such concerns about potential coverage losses; it just reasonably concluded that, given (1) the importance of health coverage," (2) limits on the amount of past-due premium debt that a typical Exchange enrollee could potentially accrue, and (3) the intuitive expectation that customers are "accustomed to paying in full for one contract before they are allowed to enter another with the same contracting party," any effects the past-due premium policy might have on enrollment would likely "be minimal." 90 Fed. Reg. at 27,087; *see id.* (noting that "rules regarding grace periods and termination of coverage" ensure that customers receiving APTCs "generally ow[e] no more than 1 to 3 months of past-due premium amounts per year"). As for Plaintiffs' concern that individuals "might fail to pay a premium" for "many legitimate reasons," Stay Motion at 27, that concern does not require CMS to abandon the sensible expectation that "all individuals who enroll for coverage" on an Exchange "are required to pay their share of the premium for every month of coverage" or preclude the agency from implementing lawful regulations to that effect. 90 Fed. Reg. at 27,085.

CMS also considered Plaintiffs' concern about whether to require issuers to give enrollees notice of any past-due premium policies an issuer adopts, *see* Stay Motion at 28, but the agency decided to instead "defer to States on any additional parameters or standards that issuers must satisfy," including "provid[ing] advance notice" of past-due premium policies to customers, "as States are best positioned to set and oversee parameters of th[at] nature." 90 Fed. Reg. at 27,085. And while CMS could not offer conclusive evidence of "widespread gaming" of the ACA's guaranteed-availability requirement, as Plaintiffs seem to demand, Stay Motion at 28, CMS nonetheless cited to evidence that was consistent with the agency's expectation that a past-due premium policy "encourag[es] more people to maintain continuous coverage" and, relatedly, discourages enrollees from "taking advantage of . . . guaranteed availability rules." 90 Fed. Reg.

at 27,086-87.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009) ("But even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense.").

Plaintiffs may disagree with CMS's reasoning and conclusions on policy grounds, but that in no way renders the past-due premium provision arbitrary and capricious.  *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004) (rejecting an arbitrary-and-capricious challenge that "boil[ed] down to a policy disagreement with" an agency).

### B.    Failure to Reconcile Provision

Plaintiffs also challenge a Rule provision that reinstates a prior policy that requires an Exchange to determine that a "tax filer" is ineligible for advanced premium tax credits ("APTC") under the ACA if he (1) received APTCs the prior year and (2) failed to comply with the statutory requirement to file a tax return and "reconcile APTC" for that year.  *See* 90 Fed. Reg. at 27,113, 27,221.  This provision—which will apply only through the end of 2026, *see id.* at 27,115— amends the current requirement that such a determination be made only after a tax filer fails to reconcile for two consecutive tax years.  *See* 45 C.F.R. § 155.305(f)(4).  Plaintiffs argue that the Rule's failure-to-reconcile provision is contrary to law and arbitrary and capricious, Stay Motion at 32-35, but both claims lack merit.

As explained above, the ACA provides that certain individuals who purchase qualified health plans on an Exchange are eligible for premium subsidies, in the form of a credit against federal income tax.  *See King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B).  Eligibility to claim such a premium tax credit ("PTC") is governed by the Internal Revenue Code ("IRC"), which provides that an "applicable taxpayer" whose annual household income is below a certain level can claim on his federal return a PTC amount that turns on (1) the percentage of annual household income that the individual is required to contribute to monthly health insurance premiums (as prescribed by statute) and (2) the monthly premium cost of a "benchmark" silver plan on the relevant Exchange.  26 U.S.C. § 36B(b)(2)-(3).  The ACA directs the HHS Secretary to "establish a program . . . for determining" whether individuals claiming PTCs meet the applicable income- and

coverage-based eligibility requirements.  42 U.S.C. § 18081(a).  And the statute sets forth (1) the information that such individuals must provide as part of that eligibility determination, (2) the means by which HHS must verify an applicant's information, and (3) the actions that HHS can take to resolve inconsistencies related to that information, *Id.* § 18081(a)-(e).  If the information provided by an applicant is properly verified, then that individual's "eligibility . . . to apply for [PTCs] shall be satisfied."  *Id.* § 18081(e)(2)(A)(i).

The ACA further directs the HHS Secretary to "establish a program under which" the PTC that an individual qualifies for can be paid to that individual in advance—that is, before the individual claims the credit on his or her federal tax return—to help offset the cost of the individual's monthly insurance premiums.  42 U.S.C. § 18082(a).  An individual's eligibility for these APTCs is tied to his or her eligibility for PTCs, *see id.* § 18082(c); if HHS determines that an individual is eligible for the latter, then the Treasury Secretary must make "an advance payment" (*i.e.*, an APTC) to that person that is equivalent to the PTC "allowed" under the IRC, *id.* § 18082(c)(2)(A).  The IRS requires taxpayers who receive APTCs—which are typically scaled to the recipient's *projected* annual household income—to reconcile those advanced payments with the PTC amount they otherwise qualify in the applicable tax year, as determined by their *actual* annual household income in that year.  *See* 26 U.S.C. § 36B(f).  If the APTCs the taxpayer received exceed that allowable PTC amount, then the taxpayer may incur a tax liability, subject to certain income-based caps.  *Id.* § 36B(f)(2).

Although HHS does not directly enforce the requirement that taxpayers reconcile their APTCs on their annual federal tax returns, it does condition APTC eligibility on an applicant's compliance with the IRC's reconciliation requirement.  Indeed, since 2012, HHS—pursuant to the HHS Secretary's authority to "issue regulations setting standards for meeting the [ACA's] requirements" with respect to "the establishment and operation of Exchanges," "the offering of qualified health plans through such Exchanges," and "such other requirements as the Secretary determines appropriate," 42 U.S.C. § 18041(a)—has prohibited an Exchange from "determin[ing] a tax filer eligible for" APTCs if the filer (1) received APTCs the prior year and (2) failed to comply

with the requirement to file a federal income tax return and reconcile those APTCs for that year. 45 C.F.R. § 155.305(f)(4); *see* 90 Fed. Reg. at 27081-82.[8]  Crucially, though, taxpayers who are determined ineligible for APTCs due to their failure to reconcile can still claim on their tax returns the full amount of the PTC they are otherwise eligible for; such taxpayers just would not be able to receive that PTC amount in advance.  *See* 45 C.F.R. § 155.305(f)(4).

In 2023, CMS amended the failure-to-reconcile regulations such that a taxpayer becomes ineligible for APTCs only after failing to file a federal income tax return and reconcile their APTCs for two consecutive tax years.  *See* 90 Fed. Reg. at 27,113.  The Rule simply reverts back to the requirement that a taxpayer be deemed ineligible for APTCs after one year of failing to reconcile, and that change applies only through plan year 2026.  *Id.*  CMS made this change to "align" its regulations with the statutory reconciliation requirement, to "protect" APTC recipients "from accumulating additional Federal tax liabilities," and to "reduce" federal expenditures on APTCs paid to "ineligible enrollees."  *Id.* at 27,115.  As explained in the Rule's preamble, CMS's review of enrollment and tax filing data suggests that the current two-year failure-to-reconcile policy has resulted in federal Exchanges having "a substantially higher than normal number of enrollees who have not filed and reconciled as compared to the previous 1-year [policy]," a disparity that could be explained by the fact that under the two-year policy, a tax filer who failed to reconcile in one year can do so again and still "keep APTC eligibility."  *Id.* at 27,113-14.  Failure-to-reconcile "status" may also serve as a "strong indicator that a current enrollee . . . has income that makes the household ineligible for APTC." *Id.* at 27,114.  More specifically, individuals with incomes below a certain threshold are not required to file a federal income tax return, and because that income threshold often aligns with the income-based eligibility threshold for APTCs, a taxpayer who receives APTCs but then does not file a tax return (and also reconcile those APTCs) may, in fact, have an income that does not qualify the taxpayer for APTCs in the first place.  *Id.*

---

[8] Due to the COVID-19 pandemic's impact on "the processing of federal income tax returns", CMS "did not act on" data indicating an enrollee had failed to comply with the ACA's reconciliation requirement in plan years 2021 through 2023.  Ctrs. for Medicare & Medicaid Servs., "Failure to File and Reconcile (FTR) Operations Frequently Asked Questions (FAQ)" (Apr. 19, 2024), https://www.cms.gov/files/document/failure-file-and-reconcile-faq.pdf

Based on this and other information, CMS concluded that a two-year failure-to-reconcile policy "could impede Exchange efforts to mitigate unauthorized enrollments" and, by extension, burden the public fisc.  *Id.* at 27,113.  The agency accordingly decided to readopt a one-year failure-to-reconcile policy, which, according to CMS, "should act as a backstop to ensure that an enrollee who is improperly enrolled loses APTC after 1 year of failing to file and reconcile," rather than being allowed to "stay enrolled for another year undetected."  *Id.* at 27,114-15.  The upcoming expiration of enhanced subsidies—which CMS anticipates will lead to a sizeable decrease in improper enrollments—and competing concerns about potential coverage losses led CMS to decide, however, that the Rule's one-year failure-to-reconcile provision will apply only through plan year 2026.  *Id.* at 27,116; *see id.* ("[O]nce the excess improper enrollments have been shed and the expanded subsidies are no longer shielding enrollees from all costs associated with coverage, the efficiency of maintaining the 1-year [failure-to-reconcile] policy is less clear.").

Plaintiffs challenge the Rule's failure-to-reconcile provision as contrary to law.  Crucially, though, they do not challenge the lawfulness of replacing a two-year failure-to-reconcile policy with a one-year policy.  They instead challenge the lawfulness of conditioning APTC eligibility on compliance with the statutory reconciliation requirements to any extent.  *See* Stay Motion at 33 ("Both the current [two-year] rule and the new rule are unlawful.").  Yet the regulation precluding a taxpayer from being eligible for APTCs because of a failure to reconcile, 45 C.F.R. § 155.305(f)(4), was promulgated back in 2012, and the Rule will not change that aspect of the regulation.  Consequently, because Plaintiffs' contrary-to-law claim against the Rule's failure-to-reconcile provision is effectively a challenge to a regulation that has been in force for over a decade, that claim is barred by the six-year statute of limitations applicable to suits against the United States.  28 U.S.C. § 2401(a).[9]

---

[9] According to their respective websites, both MSA and DFA were founded before 2012, and the three city Plaintiffs were founded well before that year as well.  Plaintiffs could have thus challenged CMS's failure-to-reconcile regulation at or nearer to the time it was promulgated.  They otherwise offer no basis for concluding that the applicable six-year statute of limitations for doing

Plaintiffs' contrary-to-law claim fails on the merits in any event. The ACA authorizes the HHS Secretary to "issue regulations setting standards for" compliance with ACA requirements concerning the "operation of Exchanges" and "such other requirements as the Secretary determines appropriate." 42 U.S.C. § 18041(a)(1). The Rule's one-year failure-to-reconcile provision is designed to ensure compliance with the ACA's express requirement that recipients of APTCs file a federal income tax return and reconcile those APTCs. *See* 26 U.S.C. § 36B(f). The Rule provision is thus well within HHS's broad rulemaking authority under the ACA. *See Loper Bright*, 603 U.S. at 395 (recognizing that some statutes "empower an agency . . . to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" (internal citation omitted)).

Additionally, an individual's eligibility for APTCs is tied to their eligibility for PTCs. 42 U.S.C. § 18082(a). And to be eligible for PTCs, an applicant typically must provide tax return information, which HHS must then verify pursuant to certain procedures prescribed in statute and regulations. *See, e.g.*, *id.* § 18081(c)(3). If an applicant's annual household income is so verified, including through tax information, "the individual's eligibility . . . to apply for" a PTC "shall be satisfied," making the individual potentially eligible for APTCs as well. *Id.* § 18081(e)(2)(A). But if an applicant's household income cannot be properly verified in a certain amount of time, whether through tax return information or other means, the applicant will generally be deemed ineligible for APTCs. *See, e.g.*, 45 C.F.R. § 155.320(c)(3)(iii)(F), (vi)(G). The Rule's failure-to-reconcile provision, which is typically implicated when an APTC recipient does not file a federal income tax return, is likewise consistent with the various statutory and regulatory income-verification requirements for determining PTC and APTC eligibility.

Plaintiffs separately argue that the Rule's one-year failure-to-reconcile provision is arbitrary and capricious. Stay Motion at 34-35. But that claim fails too. The "'Kafka-esque' scenario" that Plaintiffs concoct with respect to enrollees not receiving adequate notice of their

---

so started to run at a later date. *See Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 804 (2024).

failure-to-reconcile status, *id.* at 34, does not comport with reality.  The Rule will simply reinstate the notice procedures that CMS used before the current two-year policy was adopted in 2023, under which enrollees received their first failure-to-reconcile notice approximately six months before their APTC eligibility was impacted, and additional notices after that.  90 Fed. Reg. at 27,118.  Moreover, CMS provided data suggesting that notices sent during the open enrollment period for Exchange plan enrollment "were relatively effective" in resolving failure-to-reconcile issues.  *Id.* at 27,114.  Plaintiffs also invoke potential delays in the IRS reporting applicants' tax information to Exchanges.  Stay Motion at 34.  But CMS made the reasonable policy judgment that the potential for "long IRS processing times" in some cases is "unlikely a sufficient reason to maintain" the current two-year policy over the Rule's one-year policy in light of "imminent program integrity concerns."  90 Fed. Reg. at 27,116.  The effect of any such reporting delays will be mitigated in any event by CMS's "FTR Recheck process," under which enrollees who file their federal tax returns by the October 15 extended filing date can attest to doing so and thus maintain their APTC eligibility for the following coverage year while their failure-to-reconcile status is verified.  *Id.*  Lastly, Plaintiffs claim that there is a "fundamental mismatch" between the Rule's failure-to-reconcile provision and "the problem that CMS claims it is trying to solve" because the former does not address "the conduct of brokers" in any way.  Stay Motion at 35.  But a major problem the failure-to-reconcile provision aims to address is the improper receipt of APTCs by enrollees who do not comply with the ACA's reconciliation requirement, and CMS explained that a one-year failure-to-reconcile policy will address that very problem by ensuring that individuals who are improperly enrolled in subsidized Exchange coverage "lose[] APTC after 1 year of failing to file and reconcile instead of 2 years."  90 Fed. Reg. at 27,115.

Finally, unrelated to their contrary-to-law and arbitrary-and-capricious claims, Plaintiffs maintain that CMS ran afoul of the APA's notice-and-comment requirements by "fail[ing] to provide adequate notice" of the agency's ultimate decision to have the Rule's failure-to-reconcile provision sunset at the end of 2026.  Stay Motion at 35.  Plaintiffs level a similar charge against other Rule provisions with the same one-year duration, *see, e.g.*, *id.* at 21, 31-32, claiming that this

"unexpected" approach contravenes the requirement that "an agency's final action" be a "logical outgrowth of its proposed rule." *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 508 (D.C. Cir. 2019). But this argument too lacks merit.

In the NPRM, CMS proposed to implement the one-year failure-to-reconcile policy during the open enrollment period for plan year 2026. 90 Fed. Reg. at 12,961. And in response to concerns from commenters about the policy potentially resulting in coverage losses, CMS decided in the Final Rule to implement the one-year failure-to-reconcile policy only for plan year 2026. 90 Fed. Reg. at 27,115. CMS explained that this one-year duration would mitigate commenters' concerns about the Rule's effect on coverage, while also allowing CMS to better address improper APTCs payments within Exchanges. *Id.* Furthermore, CMS acknowledged more generally that the need for policies targeting improper enrollment will be less acute once the IRA's enhanced subsidies expire at the end of 2025, and fully-subsidized coverage (and the attendant incentives to obtain such coverage, even if improperly) becomes less available. *Id.*; *see id.* at 27,091 (explaining that "after the market has purged" the large amounts of "improper and fraudulent enrollments it is currently experiencing," it "would be reasonable to accept the risk that some improper enrollments will come back after the policies sunset"). The one-year duration of the Rule's failure-to-reconcile provision thus strikes a balance between Defendants' policy objectives and "competing concerns" about access to coverage. *Id.* at 27,116.

Plaintiffs nonetheless claim that this reasonable response to commenters' concerns is itself unlawful because certain unnamed "stakeholders" were ostensibly not given an opportunity to comment on the effects of implementing a provision for one year versus for a longer duration. *See* Stay Motion at 21. As an initial matter, Plaintiffs—none of whom operate an Exchange or are responsible for determining Exchange or APTC eligibility—do not explain how a one-year regulation harms them more or differently than a regulation with a longer duration. If anything, the temporary nature of the one-year Rule provisions Plaintiffs challenge will make it even less likely that those provisions will cause the downstream economic harms Plaintiffs assert here.

In any event, when an agency proposes to implement a policy, "[o]ne logical outgrowth"

27

of that proposal "is surely . . . to refrain from taking the proposed step." *New York v. EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005). And if not adopting a policy *at all* is a logical and foreseeable outgrowth of an initial proposal, *id.*, then the same is surely true of a decision to adopt a policy for a more limited duration than initially proposed, especially where, like here, that change is made in direct response to concerns raised by commenters. *See Manufactured Hous. Inst. v. EPA*, 467 F.3d 391, 400 (4th Cir. 2006) ("We should not penalize [the agency] simply because the precise contours of its incremental approach did not develop until after the agency had reviewed the comments it sought."); *see also Kennecott v. EPA*, 780 F.2d 445, 452 (4th Cir. 1985) (explaining that an agency "is not required to specify every precise proposal that it may eventually adopt as a rule"). Indeed, "the very premise of agencies' duty to solicit, consider, and respond appropriately to comments is that rules evolve from conception to completion." *Brennan v. Dickson*, 45 F.4th 48, 69 (D.C. Cir. 2022). That is precisely what happened with respect to CMS's ultimate decision to have the Rule's failure-to-reconcile provision sunset after plan year 2026, and Plaintiffs' conclusory "logical outgrowth" argument does not undermine the validity of that reasonable choice.

### C.    Annual Eligibility Redetermination Provision

The third Rule provision that Plaintiffs challenge as both contrary to law and arbitrary and capricious concerns the annual process by which HHS determines a customer's eligibility to enroll in a subsidized health care plan on an Exchange. The eligibility requirements for enrolling in an Exchange plan and for receiving PTCs and APTCs are set forth in the ACA and its implementing regulations. *See* 42 U.S.C. §§ 18081(a), 18082(a); 26 U.S.C. § 36B(a), (c)(1)(A); 45 C.F.R. § 155.305(a), (f). HHS is generally responsible for determining whether a customer satisfies those requirements. If a customer does, then he can enroll in an Exchange plan for the upcoming plan year and receive PTCs and APTCs. And as a general matter, the ACA requires plan issuers to renew an enrollee's coverage the next year, subject to certain statutory exceptions. 42 U.S.C. § 300gg-2(a). Even when an enrollee's plan is subject to that guaranteed-renewability provision, however, an Exchange must still "redetermine" the enrollee's eligibility for subsidized Exchange coverage "on an annual basis" in accordance with HHS regulations. 45 C.F.R. § 155.335(a)(1)

The Rule sets forth procedures that will apply to certain annual eligibility redeterminations for plan year 2026. *See* 90 Fed. Reg. at 27,102; *see* 45 C.F.R. § 155.335(a)(2)(ii) (providing that annual eligibility redeterminations may be conducted pursuant to "[a]lternative procedures specified by the [HHS] Secretary for the applicable benefit year"). The Rule provides that (1) if an enrollee does not submit an application for an updated eligibility determination for plan year 2026 on or before the deadline to select Exchange coverage and (2) that enrollee's post-APTC premium will be zero dollars (*i.e.*, the enrollee's coverage will be fully subsidized), then (3) the Exchange "must decrease the amount of" the APTC "applied to the [enrollee's] policy such that the remaining monthly premium owed for the policy equals $5." 90 Fed. Reg. at 13,031.

As explained in the Rule's preamble, this temporary change to the annual eligibility redetermination process is the product of CMS's increasing concern about "the level of improper enrollments" in zero-premium plans on federal Exchanges. *Id.* at 27,102. CMS attributes that problem in part to agents and brokers improperly enrolling consumers in fully subsidized Exchange plans "without their knowledge" in order to earn commission payments. *Id.* at 27,103; *see id.* ("Because these enrollees do not receive a monthly premium bill requiring action on their part, they may not be aware they are enrolled."). CMS also notes that the recent expansion of premium subsidies via the ARPA and IRA "significantly increased the number of enrollees" who are enrolled in fully subsidized Exchange plans. *See id.* (explaining that 2.68 million enrollees were automatically re-enrolled in fully subsidized plans on federal Exchanges in plan year 2025, compared to 270,000 such enrollees in plan year 2019). CMS concluded that many of those enrollments are likely improper, citing to data indicating, for instance, that actual enrollment in subsidized Exchange plans substantially exceeds the number of such enrollments reported on Census surveys, suggesting that many consumers are unknowingly enrolled in such plans or in multiple forms of coverage. *See id.* at 27,105-06; *see id.* at 27,105 (explaining that the gap between actual and reported enrollment in subsidized Exchange plans doubled between 2021 and 2024). And CMS points out that improper enrollments can persist due to enrollees being continuously re-enrolled in fully subsidized Exchange plans from year to year without having to take any action.

*Id.* at 27,106. The Rule thus addresses this enrollment issue by "prompt[ing]" individuals enrolled in fully subsidized Exchange plans "to update or confirm" their eligibility for such plans "or else pay a $5 monthly premium" until they do so. *Id.* at 27,103; *see id.* at 27,102 (explaining that "the full amount of" an enrollee's APTC will be "reinstate[d]" once the enrollee submits an application "confirm[ing] [their] eligibility for APTC that covers the entire monthly premium").

Plaintiffs claim that CMS "acted arbitrarily" by adopting this eligibility redetermination provision in the Rule because the agency purportedly "ignor[ed] important aspects of the problem," "fail[ed] to reasonably explain its policy," and "fail[ed] to establish a rational connection between the facts found and the policy choice that it made." Stay Motion at 20. But this regurgitation of different facets of the arbitrary-and-capricious standard overlooks CMS's thorough explanation of the problem it is trying to address—*i.e.*, improper enrollments in fully subsidized Exchange plans that persist because of automatic re-enrollment procedures, *see* 90 Fed. Reg. at 27,102—and how the Rule reasonably attempts to address that problem—*i.e.*, by encouraging enrollees in fully subsidized plans to actively confirm their knowledge of and eligibility for such plans, *id.* at 27,104. *See Jimenez-Cedillo*, 885 F.3d at 297-98 (requiring only a "*rational* connection between the facts found and the choice made" (emphasis added)). CMS also acknowledged the potential effect a $5 premium could have on enrollment and the risk pool in Exchanges, as well as on individuals who are accustomed to fully subsidized coverage, *see* 90 Fed. Reg. at 27,108, 27,194-95, and reasonably concluded that the $5 figure will likely encourage consumers to actively confirm their plan eligibility (because they want to avoid paying even this "nominal" cost) without risking "undue financial hardship," *id.* at 27,107. And CMS further highlighted that Exchanges will have "sufficient time" to "educate" enrollees about the Rule's eligibility redetermination provision through "updated notices," and that "training and technical assistance" will be provided to agents, brokers, issuers, and other "interested parties" so that they can "assist enrollees in understanding the proposed change." *Id.* In sum, CMS has "examined the relevant considerations and articulated a satisfactory explanation for its action," and that action cannot be deemed arbitrary and capricious simply because Plaintiffs would prefer a different

approach. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (cleaned up); *see id.* (explaining that arbitrary-and-capricious review does not entail a court "ask[ing] whether a regulatory decision is the best one possible or even whether it is better than the alternatives").

Plaintiffs separately claim that the Rule's eligibility redetermination provision is contrary to law because, they argue, HHS lacks the authority to set a $5 monthly premium for plans that would otherwise be fully subsidized via APTCs. *See* Stay Motion at 18-19. Yet the ACA tasks HHS with "determining" whether individuals enrolled in Exchange plans "meet[] the income and coverage requirements" for claiming PTCs, and with determining "the amount" of those tax credits. 42 U.S.C. § 18081(a)(2). It is likewise HHS's responsibility to determine an Exchange enrollee's eligibility for APTCs and to calculate the amount of those APTCs (which mirror the applicable PTC amount). *See id.* § 18082(a)(1), (3); 45 C.F.R. § 155.305(f)(5). And the ACA grants the HHS Secretary the authority to "establish a program" for making these eligibility determinations, 42 U.S.C. § 18081(a)(1), and to "establish procedures" for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances," *id.* § 18081(f)(1)(B). The Rule's eligibility redetermination provision comports with that grant of authority. Indeed, the provision's very purpose is to facilitate HHS's ability to *redetermine* enrollees' *eligibility* to remain enrolled in fully subsidized Exchange plans, and the "procedure[]" HHS opted for in the Rule is the assessment of a nominal premium that is designed to prompt certain enrollees to affirmatively reconfirm their eligibility. *See id.* The unusually high level of improper enrollment in fully subsidized Exchange coverage stemming from a soon-to-expire enhanced subsidy regime, *see* 90 Fed. Reg. at 27,103, presents the "appropriate circumstance" for implementing this temporary nominal-premium procedure, 42 U.S.C. § 18081(f)(1)(B). Furthermore, that procedure will not necessarily interfere with the Treasury Department's ability to "make" APTC payments to issuers of Exchange plans, *id.* § 18082(c)(2)(A); issuers' ability to apply those APTC payments to the premiums they charge Exchange enrollees, *id.* § 18082(c)(2)(B); or enrollees' ability to claim the full amount of their PTC on their federal income tax return. The Rule instead directs "the Exchange on the Federal platform"—that is, HHS—to apply the $5 monthly premium to enrollees'

plans.  Because HHS has the statutory authority to utilize such a procedure to redetermine eligibility when appropriate, and it reasonably explained its decision to do so, Plaintiffs' challenge to the Rule's eligibility redetermination provision fails.

Lastly, Plaintiffs' "logical outgrowth" argument, *see* Stay Motion at 21, also fails for the same reasons that it does with respect to the Rule's failure-to-reconcile provision.  As a general matter, a logical outgrowth of a proposal to implement a policy indefinitely "is surely" a final decision to "refrain from taking the proposed step" at all or, alternatively, to implement the policy for a limited duration.  *New York*, 413 F.3d at 44.  And it would be particularly perverse to "penalize" CMS here for limiting the eligibility redetermination provision to one year given that CMS adopted that "incremental approach" after taking account of commenters' concerns about the provision's potential impact on enrollment and the Exchange risk pool.  *Manufactured Housing Inst.*, 467 F.3d at 400; *see* 90 Fed. Reg. at 27,107 ("After considering these comments, we believe that an ongoing requirement is likely unnecessary . . . ."); *see also Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 (D.C. Cir. 1973) ("The requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, *partly at least in response to submissions*." (emphasis added)).

### D.    Income Eligibility Verification Policies

Plaintiffs challenge three Rule provisions that concern the processes by which HHS verifies "income eligibility" for APTC and cost-sharing-reduction subsidies.  *See* 90 Fed. Reg. at 27,112; *see also* Stay Motion at 35-39.  These provisions address the "critical balance HHS must achieve between assuring responsible stewardship of taxpayer dollars with protecting access to Federal program[s] for those who qualify for them."  90 Fed. Reg. at 27,113.  Plaintiffs claim that the three provisions are "arbitrary" because "[e]ach . . . will make it harder for people to enroll in coverage." Stay Motion at 35.  But all three provisions are "reasonable and reasonably explained," and thus pass muster under the deferential arbitrary-and-capricious standard.  *Prometheus*, 592 U.S. at 423.

### 1. Rescission of Automatic 60-Day Extension Regulation

Plaintiffs first challenge the Rule's rescission of a 2023 regulation that requires Exchanges to provide an automatic 60-day extension to the 90-day period that, under a separate regulation, applicants for coverage are given to provide documentation to verify their household income for purposes of determining their eligibility for APTCs and cost-sharing reductions. *See* 90 Fed. Reg. at 27,118, 27,221.

The ACA prescribes the income-related information that applicants must provide to establish their eligibility for a PTC and, by extension, APTCs, as well as the means by which HHS must verify that information. *See* 42 U.S.C. § 18081(b)(3)(A) (requiring applicants wanting to claim a PTC to provide tax return information to establish their income); *id.* § 18081(c)(3) (requiring HHS to verify the information relevant to PTC eligibility with the Treasury Department). If inconsistencies or other issues arise during the income verification process, the ACA requires Exchanges to notify an applicant of such issues and to provide the applicant an opportunity "to either present satisfactory documentary evidence or resolve the inconsistency" within 90 days of receiving such notice. *Id.* § 18081(e)(4)(A)(ii). This 90-day window for an applicant to verify their income with "satisfactory documentary evidence" or to "otherwise resolve" an income-related inconsistency is reflected in HHS regulations, 45 C.F.R. § 155.315(f)(2)(ii), and those regulations also allow Exchanges to extend the 90-day window if an applicant "demonstrates that a good faith effort has been made to obtain the required documentation during the period," *id.* § 155.315(f)(3). In 2023, however, HHS issued a regulation providing that Exchanges must automatically extend the 90-day period by an additional 60 days whenever an applicant needs to verify his or her household income with additional documentation. *Id.* § 155.315(f)(7).

The Rule will rescind this automatic 60-day extension, chiefly on the ground that it is incompatible with the statutory language governing the income verification process. *See* 90 Fed. Reg. at 27,120 ("[W]e believe that this change is necessary given that the requirement to

automatically provide a 60-day extension . . . is inconsistent with our statutory authority.").[10]  Yet CMS also explained in the Rule's preamble that even if the ACA allowed for an automatic 60-day extension, CMS's "review of how applicants used" that extension showed that it "largely does not deliver the benefits anticipated." *Id.* at 27,119.  For instance, CMS reviewed data indicating that the automatic 60-day extension did not have a measurable impact on consumers' ability to resolve income-related verification issues compared to the pre-existing regime, under which consumers who needed a 60-day extension could get one by "demonstrat[ing] a good faith effort" to obtain the requisite documentation, 45 C.F.R. § 155.315(f)(3).  *See* 90 Fed. Reg. at 27,119.  CMS accordingly determined that the automatic 60-day extension failed to provide "a meaningful benefit to consumers" while also increasing taxpayer expenditures for APTCs by an estimated $170 million in 2024.  *Id.*; *see id.* ("We stated in the proposed rule . . . that providing a 60-day extension for households with income [data-matching issues] only serves to increase APTC payments and tax liabilities for ineligible enrollees during the extension.").

Plaintiffs principally argue that CMS's rescission of the automatic 60-day extension regulation is arbitrary because the agency "wrongly reasoned" that such a change was "compelled by . . . statute."  Stay Motion at 35.  They claim that two provisions in the ACA give HHS the requisite authority to adopt an automatic 60-day extension to the time period for applicants to resolve inconsistencies with their income verification.  But one of those provisions expressly states that the HHS Secretary "may extend the 90-day period" for resolving income-related inconsistencies "for enrollments *occurring during 2014*," 42 U.S.C. § 18081(e)(4)(A)(ii) (emphasis added), and makes no mention of extensions being available during any other year.  Plaintiffs offer nothing in response to this unambiguous statutory limitation other than a conclusory assertion that the provision is a "redundanc[y]."  Stay Motion at 36.  And while the other provision Plaintiffs cite provides that the HHS Secretary "may modify" the "methods" for verifying information prescribed by the ACA, 42 U.S.C. § 18081(c)(4)(B), that provision plainly limits such

---

[10] Because CMS concluded that the automatic 60-day extension regulation "falls outside of" its statutory authority, it further concluded that the Rule's rescission of the automatic extension must be made permanent.  90 Fed. Reg. at 27,119

34

modifications to the methods by which HHS verifies information with trusted data sources and other federal agencies, not the methods by which Exchanges must try to resolve income-related inconsistencies *with applicants*.    Indeed, § 18081(c)(4)(B) falls under a subsection titled "Verification of information contained in records of specific Federal officials," and the example of a permissible modification that the provision provides concerns the transfer of tax return information from a federal official (*i.e.*, the Treasury Secretary) directly to another trusted data source (*i.e.*, an Exchange or the HHS Secretary).  *Id.*  Plaintiffs instead read this limited provision as granting the HHS Secretary "the power to modify any of" the verification methods set forth in § 18081, including the 90-day timeline for resolving income-related inconsistencies found in § 18081(e)(4).  Stay Motion at 36.  But even taking that argument at face value, any authority the HHS Secretary might have to "*modify*" a statutorily prescribed timeline in order to "reduce the administrative costs and burdens" faced by a particular "*applicant*," 42 U.S.C. § 18081(c)(4)(B) (emphasis added), cannot be reasonably understood to include the authority to promulgate a regulation that categorically *replaces* a statutorily prescribed timeline (90 days) with a different one (90 days plus an automatic 60-day extension) for *all applicants*, *see* 45 C.F.R. § 155.315(f)(7).  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").  It is Plaintiffs' flawed reading of the ACA's plain text that is arbitrary, not the Rule.

Plaintiffs' other critiques of the rescission of the automatic 60-day extension fare no better. They claim that CMS did not "engage[] with the evidence showing the need for a 150-day verification period."  Stay Motion at 36.  But CMS very much engaged with relevant evidence suggesting that an *automatic* 150-day verification period provided no "meaningful benefit to consumers" compared to a process in which extensions can be granted on a case-by-case basis as appropriate.  90 Fed. Reg. at 27,119; *see also id.* at 27,120 (explaining that a review of "income inconsistency resolution data" indicates that "under most conditions[,] consumers across all income data matching issue scenarios . . . can verify their data matching issues in the provided timeframe").  Contrary to Plaintiffs' assertions, CMS also "address[ed]" other "relevant factors,"

Stay Motion at 36, including the potential effects that rescinding the automatic 60-day extension might have on enrollment and the risk pool within Exchanges, as well as on federal expenditures for APTCs given to ineligible enrollees. 90 Fed. Reg. at 27,119; *see id.* (noting that CMS identified a "substantial increase in APTC expenditures" on "ineligible people who stay enrolled and receive APTC for an additional 60 days"). CMS ultimately concluded that "the cost" of the automatic 60-day extension "outweighs the benefits," *id.*, and Plaintiffs offer "no basis . . . for overruling" that "considered judgment" under "the deferential arbitrary and capricious test." *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).

### 2. Provision Requiring Income Verification When Data Sources Indicate Income Less Than 100 Percent of the Federal Poverty Level

The second income eligibility verification provision that Plaintiffs challenge as arbitrary and capricious will require Exchanges to flag and further verify income-related information in certain circumstances when (1) a tax filer's attested projected annual household income is between 100 and 400 percent of the federal poverty line ("FPL") and (2) the income amounts returned by the IRS and other data sources with respect to that tax filer are less than 100 percent of the FPL. 90 Fed. Reg. at 27,121. As part of the process for verifying an applicant's household income for purposes of determining their eligibility for APTCs, an Exchange typically must consider the applicant's tax return information, as well as the enrollee's attestation regarding their "projected annual household income." 45 C.F.R. § 155.320(c)(3)(ii). Under current regulations, if an applicant's attestation regarding their projected annual household income reflects a higher household income than that reflected in income data provided by the IRS or certain other sources, an Exchange generally "must accept the applicant's attestation . . . without further verification." *Id.* § 155.320(c)(3)(iii)(A). The Rule amends this provision by requiring an Exchange to instead further verify an applicant's household income if (1) an applicant attests to income that is between 100 and 400 percent of the FPL, (2) income data from the IRS indicates household income below 100 percent of the FPL, and (3) the former income amount exceeds the latter amount by a "reasonable threshold." 90 Fed. Reg. at 27,123. The applicant would then be given an opportunity

to resolve the inconsistency by providing additional documentation and taking other steps to verify their household income.  *See* 45 C.F.R. § 155.315(f)(1)-(4).[11]

This Rule provision parallels a provision from a 2018 rule that was vacated in *City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021).  Both then and now, the reasons for HHS wanting to take additional steps to verify an applicant's income when data from sources like the IRS indicate that the applicant's household income is less than 100 percent of the FPL are straightforward.  Because individuals with household incomes below that threshold are generally not eligible for PTCs or, by extension, APTCs, *see* 26 U.S.C. § 36B(a), (c)(1), an applicant who attests to having a projected household income that is equal to or above 100 percent of the FPL might be deemed eligible for APTCs despite income data from other sources showing otherwise. 90 Fed. Reg. at 27,121.  And given that such a discrepancy could be a consequence of an applicant overestimating his or her projected household income in order to obtain APTCs for which the applicant is not otherwise eligible—an incentive that is especially strong in states that did not expand their Medicaid programs under the ACA—it is reasonable, HHS explains, to request additional documentation verifying an applicant's actual income in such circumstances, so as to protect against overpayment of APTCs.  *Id.*; *see id.* at 27,123 ("[W]e believe it would be reasonable, prudent, and even necessary in light of the program integrity weaknesses just outlined to request additional documentation, since the consumer's attested household income could make the consumer eligible for APTC that would not be available using income data from electronic data sources.").  That additional verification is precisely what the Rule will require.

The court in *City of Columbus* deemed the 2018 version of this additional verification provision arbitrary and capricious in large part because, at the time, HHS "failed to point to any actual or anecdotal evidence" of Exchange consumers inflating their income to obtain APTCs for which they were not otherwise eligible.  523 F. Supp. 3d at 762; *see id.* (describing HHS's stated rationale of "prevent[ing] fraud in states that did not expand Medicaid" as "unfounded").  And

---

[11] The Rule's revision to 45 C.F.R. § 155.320(c)(3)(iii) will sunset at the end of plan year 2026.  *See* 90 Fed. Reg. at 27,123-24.  Plaintiffs do not challenge this facet of the revision.

Plaintiffs claim that the additional verification provision in the Rule "is arbitrary for precisely the same reasons that" the *City of Columbus* court "vacated the same policy four years ago." Stay Motion at 37. But HHS's justification for the provision this time around does not suffer from the same flaws that were fatal to the 2018 provision. HHS now points to data that "provide substantial evidence that applicants with household incomes below the APTC income eligibility threshold"— that is, 100 percent of the FPL—"are strategically inflating their household incomes," or are "getting assistance from" agents and brokers that have a "financial incentive" to maximize Exchange enrollments, in order to obtain subsidized coverage in an Exchange despite their actual household incomes rendering them ineligible for such coverage. 90 Fed. Reg. at 27,122. HHS cites one study, for instance, that compared estimated potential enrollment in Exchanges based on income data reported in census surveys to actual enrollment by enrollees who reported household income above the FPL-based eligibility threshold and found that actual enrollment was 136 percent higher than the total population of potential enrollments. *Id.* That same study also found that a far higher number of enrollees reported household income that was just above the Exchange-eligibility threshold in non-Medicaid expansion States compared to those in States that did expand Medicaid. *Id.* And a separate analysis of 2024 open enrollment data showed that plan selections on federal Exchanges among individuals who reported household income between 100 percent and 150 percent of the FPL in non-Medicaid expansion States were 70 percent higher than potential enrollments estimated from census data at that same income level, which provides another strong indicator that enrollees are overestimating their income to obtain subsidized health coverage. *Id.*; *see id.* (estimating that between four and five million people improperly enrolled in Exchange coverage subsidized by APTCs in 2024 at a cost of $15 to $20 million).

Plaintiffs may disagree with this data and the conclusions that HHS draws from it. *See* Stay Motion at 37-38. They may likewise disagree with HHS's determination that any burdens caused by additional verification requirements will be "significantly outweighed by" the benefits of protecting APTC expenditures for eligible enrollees and reducing improper enrollments in subsidized Exchange plans. 90 Fed. Reg. at 27,123; *see id.* at 27,124-25 (describing the procedures

in place for resolving income inconsistencies); *id.* at 27,125 (noting that new Exchange enrollees who may not have tax data available would not be affected because Exchanges would be required to generate an income-based inconsistency only when the IRS returns data indicating an applicant's household income is below 100 percent of the FPL). And they might also disagree with HHS's commitment to enforcing Exchange- and APTC-eligibility requirements that are set by statute, even if that results in some people not being eligible for certain types of health care coverage. Nevertheless, HHS "examined the relevant data," "provided an explanation for its decision," and established with data a "rational connection between the facts found and the choice made." *Ohio Valley Env't Coal.*, 556 F.3d at 192 (citation omitted). That comports with the APA's arbitrary-and-capricious standard.

### 3.    Change Requiring Income Verification When Tax Data Is Unavailable

Plaintiffs also challenge the Rule's recission of a regulation that requires an Exchange to accept an applicant's self-attestation of projected annual household income "without further verification" whenever (1) the Exchange requests tax return data from the IRS to verify the applicant's attested income, but (2) the IRS confirms that there is no such data available, 45 C.F.R. § 155.320(c)(5). *See* 90 Fed. Reg. at 27,130. The current regulation, which was adopted in 2023, creates an exception to the general requirement that an Exchange must verify an applicant's annual household income with certain trusted data sources, 45 C.F.R. § 155.320(c)(1)(ii), and otherwise follow an alternative verification process if tax return data for an applicant is unavailable, *id.* § 155.320(c)(3)(vi). The Rule simply removes this exception and requires Exchanges to follow standard verification and data-matching procedures "when tax return data is unavailable to immediately verify a consumer's attestation of annual household income." 90 Fed. Reg. at 27,132.[12]

Plaintiffs' lone objection to this revised verification policy appears to be that CMS did not

---

[12] This policy requiring Exchanges to verify an applicant's attested annual household income when tax return data is unavailable will sunset at the end of program year 2026, and the current verification policy under 45 C.F.R. § 155.320(c)(5) will become effective again. *See* 90 Fed. Reg. at 27,131. Plaintiffs do not challenge this face of the policy.

adequately consider the policy's potential effects on access to subsidized coverage on Exchanges. *See* Stay Motion at 38-39. But CMS did, in fact, consider commenters' concerns about the burden that extra verification steps might place on enrollees. *See* 90 Fed. Reg. at 27,131. The agency made the reasonable observation that applicants without tax return data will likely have documentation verifying their household income (*e.g.*, pay stubs) "readily available" to them and that the burden of submitting that documentation, by extension, would be relatively minimal. *Id.* at 27,131-32; *see also id.* at 27,132 ("[HHS] is of the view that th[e] 90-day period provided under statute [for resolving data inconsistencies] provides ample time for applicants to provide proof of their household income before their APTC is reduced."). And the agency ultimately concluded that the "administrative burden" of requiring applicants with no tax return data "to provide documentation to verify [their] income" would be "more than offset by the program integrity benefits" related to addressing improper enrollments in subsidized Exchange coverage. *Id.* at 27,130; *see id.* at 27,131 (noting that the level of improper enrollments that CMS "believe[s] to be driven by the incentives and opportunities created by the expanded subsidy regime[] call for immediate action to improve program integrity").

Beyond these policy concerns, Plaintiffs do not dispute that annual household income is a crucial metric in determining eligibility for subsidized coverage on Exchanges, *see* 26 U.S.C. § 36B(a), (c)(1)(A), and the unavailability of tax return data does not relieve HHS of its statutory obligation to ensure compliance with such eligibility requirements, *see, e.g.*, 42 U.S.C. § 18081(a)(2) (tasking HHS with determining "whether [an] individual meets the income and coverage requirements" for claiming a PTC and "the amount of" that credit); *id.* § 18081(e)(4)(A) (prescribing procedures Exchanges must follow when an applicant's information cannot be verified with certain data sources). HHS, in short, provided the very sort of "reasoned explanation" for its policy change that the APA requires, *Encino Motorcars*, 579 U.S. at 221 (citation omitted), and Plaintiffs' conclusory arguments to the contrary are meritless.

E.    Pause of Low-Income Special Enrollment Period

Individuals and families wanting to enroll in health care coverage through an ACA Exchange typically do so during an annual "open enrollment period" ("OEP") that takes place at the end of the calendar year.[13]  *See* 45 C.F.R. § 155.410(a).  The ACA also requires Exchanges to provide "special enrollment periods" ("SEP"), during which applicants may enroll in an Exchange plan outside of the OEP if a certain "triggering event" occurs.  *See* 42 U.S.C. § 18031(c)(6) (requiring Exchanges "to provide for" certain "special enrollment periods"); *see also* 45 C.F.R. § 155.420(a), (d).  Common "triggering events" include losing non-Exchange health coverage, getting married, having a child, or moving to a different state.  *See id.* § 155.420(d)(1)(i), (2)(i), (7).  In 2021, HHS created a monthly SEP for APTC-eligible individuals with a projected annual household income at or below 150 percent of the FPL in order to provide low-income consumers with additional opportunities to enroll in free or low-cost coverage made available during the COVID-19 pandemic via the ARPA and IRA.  90 Fed. Reg. at 27,140; *see* 45 C.F.R. § 155.420(d)(16).

Plaintiffs claim that the Rule's pause of this "150 percent FPL" SEP from August 25, 2025 (*i.e.*, the Rule's effective date) through the end of program year 2026, *see* 90 Fed. Reg. at 27,141, is arbitrary and capricious, but their arguments once again fall short.  They principally contend that HHS "incorrectly believed that it was compelled by statute to adopt" this change.  Stay Motion at 29.  But this argument is both inaccurate and overstated.  HHS acknowledged that the ACA requires Exchanges to provide SEPs "under circumstances similar to" the SEPs that the Social Security Act prescribes for Medicare Part D coverage.  *See* 90 Fed. Reg. at 27,147 (quoting 42 U.S.C. § 18031(c)(6)(C)).  And HHS further acknowledged that the Medicare Part D SEPs enumerated in the Social Security Act do not include one based on an individual's income.  *See id.* ("The Medicare Part D SEPs enumerated in [the Social Security Act] primarily include changes . . . that necessitate

---

[13] The Rule includes a provision that will require the OEP to begin by November 1, end by December 31, and last for a maximum of nine weeks in duration.  90 Fed. Reg. at 27,138.  That provision will go into effect for plan year 2027.  *Id.*  Plaintiffs challenge this OEP provision in their Complaint but note that the provision "is not challenged" in their Stay Motion.  Stay Motion at 9 n.1.

a change in coverage, such as involuntary coverage loss."); *id.* (acknowledging that Medicare Part D "offers a low-income SEP *in regulation* (emphasis added)"); *see also* 42 U.S.C. § 1395w-101(b)(3). HHS accordingly concluded that "the best reading of" the ACA provision addressing SEPs "is that it does not *require* CMS to allow Exchanges to offer income-based SEPs," 90 Fed. Reg. at 27,147 (emphasis added), not that the provision somehow *prohibited* income-based SEPs, such that the Rule's pause of the 150 percent FPL SEP was "compelled" by statute, Stay Motion at 29. Plaintiffs thus misunderstand HHS's view of its statutory authority with respect to income-based SEPs. *See id.* at 30 (claiming mistakenly that CMS "represent[ed] that its hands were tied by the [ACA]").

In any event, HHS offered several other reasons for pausing the 150 percent FPL SEP that, individually and collectively, justify the agency's decision. For instance, HHS pointed to new information suggesting that "the expanded availability of fully-subsidized [Exchange] plans" due to the enhanced subsidies made available under the ARPA and IRA, "combined with easier access to th[ose] fully-subsidized plans through the 150 percent FPL SEP," had led to "a substantial increase in improper enrollments" in such coverage. 90 Fed. Reg. 27,141. HHS added that the 150 percent FPL SEP was "one of the primary mechanisms" that "certain agents, brokers, and web-brokers" used to "improperly enroll consumers in fully-subsidized Exchange plans," as illustrated by recent federal indictments and lawsuits concerning such unscrupulous broker activity. *Id.* The agency further noted that "even if [it] were able to reduce" some of that problematic broker activity, "substantial issues remain with consumers taking advantage of the 150 percent FPL SEP by falsely representing their household income on their Exchange applications." *Id.* at 27,143; *see id.* at 27,141 ("[O]ur own analysis confirms the number of plan selections for people with household incomes between 100 and 150 percent of the FPL exceeds the population of people at that income level based on U.S. Census Bureau surveys."). HHS also raised concerns about the 150 percent FPL SEP facilitating adverse selection within Exchanges, given that the SEP enables individuals with a qualifying annual household income "to wait to enroll" in an Exchange plan until they get sick and need health care services, which can in turn result in higher premiums and increased

federal spending on premium subsidies. *Id.* at 27,142; *see id.* at 27,143 (estimating that "removing" the monthly 150 percent FPL SEP "will result in premiums being 3 to 4 percent lower than they would be if the SEP were to remain place"). At bottom, HHS's decision to pause the 150 percent FPL SEP was motivated by several reasonable concerns and is reasonably explained, which is all that the APA requires. *See Prometheus*, 592 U.S. at 423.

Finally, Plaintiffs once again claim that the pause to the 150 percent FPL SEP must be invalidated because CMS "did not notify the public in its proposed rule that this policy would apply only on a one-year basis." Stay Motion at 31. But this "logical outgrowth" argument fails for the same reasons described above. *See New York*, 413 F.3d at 44 ("One logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step); *Kennecott*, 780 F.2d at 452 (explaining that an agency "is not required to specify every precise proposal that it may eventually adopt as a rule"); *see also* 90 Fed. Reg. at 27,144 (explaining that CMS decided to pause the 150 percent FPL SEP "temporarily" in response to concerns raised by commenters and because individuals' "ability . . . to improperly enroll" in Exchange Plans via the SEP would be "significantly diminished" once the APRA's and IRA's enhanced subsidies expire).

### F.      SEP Eligibility Verification Policy

Plaintiffs separately challenge two changes that the Rule makes to the eligibility verification procedures that apply to Exchange enrollment via SEPs. Under current regulations, federally facilitated Exchanges are required to conduct pre-enrollment eligibility verification only for applicants seeking to enroll in an Exchange plan under the loss-of-minimum-essential-coverage SEP; they are not permitted to conduct such pre-enrollment eligibility verification in conjunction with any other category of SEP. *See* 45 C.F.R. § 155.420(g). Under the Rule, federally facilitated Exchanges will instead be required to conduct pre-enrollment eligibility verification for other categories of SEPs as well (*e.g.*, permanent move, marriage, etc.), which is in line with the eligibility verification policy that was in place between 2017 and 2022. *See* 90 Fed. Reg. at 27,148-49. The Rule further requires those federal Exchanges to conduct pre-enrollment eligibility

verification "for at least 75 percent of new enrollments through SEPs." *Id.* at 27,148, 27,223.[14] And for reasons related to the upcoming expiration of the enhanced APTC regime, the requirements will automatically sunset after program year 2026. *Id.*

Plaintiffs argue that the Rule's changes to the eligibility verification procedures for SEP enrollment are arbitrary and capricious because, in their view, CMS did not provide an "adequate explanation for why [it] acted at all." *See* Stay Motion at 31-32. But CMS clearly identified what it deemed a critical shortcoming of the current SEP eligibility verification regulations—namely that, because of their limited scope, the regulations "do not provide enough protection against misuse and abuse" of SEPs, which enables otherwise ineligible individuals to enroll in Exchange plans "only after they become sick or . . . need expensive health care services," which in turn "negatively impacts both the risk pool and program integrity around determining eligibility for" APTCs and other subsidies. 90 Fed. Reg. at 27,148.

CMS explained that requiring pre-enrollment eligibility verification for all SEP categories would mitigate these problems by "restricting people from gaming SEPs" by enrolling in Exchange plans only when they need health care services, which would improve Exchange risk pools, "make[] health coverage more affordable for unsubsidized enrollees," and reduce federal expenditures on APTC subsidies. *Id.* at 27,150. CMS added that pre-enrollment verification "strengthens program integrity by denying ineligible enrollments" and "discouraging" enrollees "who know they cannot meet" applicable verification standards from attempting to improperly enroll in Exchange plans and claim APTCs for which they are not otherwise eligible. *Id.* The agency then pointed to data suggesting that pre-enrollment verification requirements that previously applied to SEPs did not create substantial barriers to Exchange enrollment, and that such requirements had the effect of "encourag[ing] continuous enrollment by making it more difficult to engage in strategic enrollment and disenrollment" based on customers' changing health

---

[14] These SEP eligibility verification requirements do not apply to State Exchanges; under current regulations, States are given the "option" to conduct pre-enrollment eligibility verification for SEP enrollment, but they are not required to do so, a policy unchanged by the Rule. *See* 90 Fed. Reg. at 27,151 ("[T]he program integrity issues are largely concentrated in Exchanges utilizing the Federal platform.").

status. *Id.* at 27,149. CMS also underscored its general "responsibility to comply with the ACA," *id.* at 27,152, which includes faithfully adhering to statutory and regulatory eligibility requirements. *See, e.g.*, 45 C.F.R. § 155.420(a)(3) (providing that an Exchange "must allow a qualified individual" to enroll via a SEP only if a specified "triggering event[] . . . occur[s]"). It ultimately concluded that the "positive impact" of the more robust SEP eligibility verification requirements in the Rule "far exceeds" any potential negative impacts. *Id.* at 27,148; *see id.* at 27,151 ("[W]e believe that the additional burden is not significant enough to outweigh the merits of SEP verification and the increases in program integrity that it provides . . . .").

CMS's thorough explanation of its reasoning and the reasons for its ultimate decision put to rest Plaintiffs' contention that the agency did not "adequate[ly] expla[in]" itself or otherwise "acted arbitrarily" in adopting SEP eligibility verification requirements. Stay Motion at 32. Plaintiffs' objection to the one-year duration of those requirements is equally meritless. *See New York*, 413 F.3d at 44; *Kennecott*, 780 F.2d at 452. And the fact that Plaintiffs "may disagree with" CMS's "policy balance" with respect to those same verification requirements by no means renders the requirements arbitrary or capricious. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007).

### G.     Premium Adjustment Percentage Methodology

Plaintiffs next challenge a Rule provision that updates the methodology used to calculate what is known as the "premium adjustment percentage" to "capture[] premium changes" in the individual health insurance market in addition to premium changes for employer-sponsored insurance. 90 Fed. Reg. at 27,166; *see* Stay Motion at 21-24. Plaintiffs assert that this change is arbitrary and capricious, but they again miss the mark.

The ACA directs the HHS Secretary to determine an annual "premium adjustment percentage" based on "the average per capita premium for health insurance coverage in the United States for the preceding calendar year." 42 U.S.C. § 18022(c)(4). That measure of premium growth is then used to set the rate of increase for a number of parameters defined in the ACA, such as the maximum annual limitation on cost sharing under Exchange plans, *see* 45 C.F.R. 156.130(a).

Because the IRS traditionally adopts the same premium growth indexing methodology as HHS, the methodology used to calculate the premium adjustment percentage also affects how PTC and APTC amounts are calculated and, by extension, the cost of health care coverage on Exchanges. *See* 90 Fed. Reg. at 27,171. In the early days of the ACA, the premium adjustment percentage was calculated based solely on estimates of average premiums for employer-sponsored health plans because that approach "reflected trends in health care costs without being skewed by . . . premium fluctuations" in the individual insurance market. *Id.* at 27,166. HHS later adopted a methodology that also used estimates of private health insurance premiums, but in 2021, HHS reversed course and presently considers only premiums for employer-sponsored coverage in the premium adjustment percentage calculation. *Id.* at 27,166-67.

In the Rule, HHS once again adopts a premium adjustment percentage methodology that takes account of premium changes in both the individual and group health insurance markets. *See* 90 Fed. Reg. at 27,167. HHS explains in the Rule's preamble that this updated approach will allow it to "better achieve the statutory and regulatory goals of adopting a more comprehensive and accurate measure of premium costs across the private health insurance market," *id.* at 27,171, in keeping with the ACA's command that the premium adjustment percentage reflect the average premium "for health insurance coverage in the United States," 42 U.S.C. § 18022(c)(4). *See* 90 Fed. Reg. at 27,171 ("As the purpose of this index is to measure growth in premiums, we believe it is appropriate to use a premium measure that comprehensively reflects the actual growth in premiums in the related insurance markets."). Plaintiffs do not appear to argue that HHS is somehow prohibited from considering premium changes in the individual insurance market when calculating the premium adjustment percentage, and for good reason. The ACA's text is clear: the premium adjustment percentage measures yearly changes in the "average per capita premium for health insurance coverage in the United States." 42 U.S.C. § 18022(c)(4). And included among the "premium[s] for health insurance coverage in the United States" writ large are those paid by

the several million individuals who purchase their health insurance in the individual marketplace. [15]

Plaintiffs' objection to the new premium adjustment percentage methodology stems almost entirely from its potential effect on the cost of Exchange plans. *See* Stay Motion at 22-23. HHS acknowledges that the new methodology will increase the maximum annual limitation on cost sharing and net premiums for enrollees with incomes under 400 percent of the FPL, which could in turn negatively impact the cost of Exchange coverage and enrollment. 90 Fed. Reg. at 27,171, 27,206-07. Yet contrary to Plaintiffs' assertion that HHS "disregard[ed]" these concerns, Stay Motion at 23, HHS addressed them head on in the Rule's preamble. *See id.* HHS then offered a reasonable (and compelling) explanation for why it was adopting a new premium adjustment percentage methodology nonetheless. Specifically, HHS explained that the premium adjustment percentage reflects Congress's intent to "appropriately index various parameters defined in the ACA." *Id.* at 27,172. Given how the ACA defines that percentage, "the primary consideration for setting [its] value" should be "whether it accurately and comprehensively captures the rate of premium growth in the United States." *See* 42 U.S.C. § 18022(c)(4). HHS acknowledges that the methodology used to calculate the premium adjustment percentage will have an impact on the cost of Exchange coverage, enrollment, and access to health care more broadly. *See* 90 Fed. Reg. at 27,171. But any such impact would be a consequence of *Congress's* decision to tie the value of certain forms of financial assistance under the ACA to the premium adjustment percentage. Placing undue weight on considerations other the rate of premium growth "in the United States" when calculating that percentage, 42 U.S.C. § 18022(c)(4), could thus yield a figure that "artificially inflate[s] the generosity of provisions of the ACA beyond the intent of Congress," 90 Fed. Reg. at 27,172. HHS therefore concluded—and reasonably so—that a premium adjustment percentage methodology that considers "all private health insurance premiums" is "more consistent with" that congressional intent and the ACA's text. *Id.*

In light of this reasoning, Plaintiffs' charge that HHS "brushed . . . aside" concerns about

---

[15] *See, e.g.*, Ctrs. for Medicare & Medicaid Servs., *Over 24 Million Consumers Selected Affordable Health Coverage in ACA Marketplace for 2025* (Jan. 17, 2025), https://www.cms.gov/newsroom/press-releases/over-24-million-consumers-selected-affordable-health-coverage-aca-marketplace-2025.

"health care costs" when adopting this new methodology, Stay Motion at 23, falls flat. As with their other arbitrary-and-capricious claims, Plaintiffs' challenge to the methodology largely "boils down to a policy disagreement." *Pub. Citizen*, 374 F.3d at 1263. But that is "no basis for substituting [their] views for" HHS's. *Id.* Their arbitrary-and-capricious challenge thus fails.

Plaintiffs separately contend that the new premium adjustment percentage methodology must be vacated because HHS "had an unalterably closed mind" when adopting it. Stay Motion at 23. Plaintiffs appear to draw this conclusion from the fact that CMS published an "Actuarial Value Calculator" discussing the new methodology seven days after the proposed rule was published for notice and comment. *Id.*[16] That publication clearly stated, however, that the changes being proposed in the proposed rule were just that—proposals. *See, e.g.*, Updated AV Calculator at 2 ("As a result of these *proposals*, we are revising the [AV Calculator] . . . to accommodate *potential* new de minimis ranges and a *potentially* updated MOOP limit." (emphasis added)). The publication also included a disclaimer stating that the document "accommodates proposed changes" that had been "published for public comment" and directing readers to the website where comments could be submitted. *Id.* at 1. Plaintiffs nonetheless insist that CMS arrived at a "predetermined answer" with respect to the new premium adjustment percentage methodology based on the fact that CMS ultimately adopted the proposed methodology "without change." Stay Motion at 23-24. Yet the Supreme Court has squarely rejected "criticisms of agency closemindedness based on an identity between proposed and final agency action." *Biden v. Texas*, 597 U.S. 785, 788 (2022). The Court should do the same with Plaintiffs' "closed-mindedness" argument here.

### H.    Actuarial Value Policy

Finally, Plaintiffs challenge as arbitrary and capricious the Rule's adjustment to the allowable ranges of actuarial values applicable to the different plan types sold on Exchanges. *See* Stay Motion at 24-25. This claim, like Plaintiffs' others, lacks merit.

---

[16] *See* Ctrs. for Medicare & Medicaid Servs., *Revised Final 2026 Actuarial Value (AV) Calculator Methodology* (Mar. 26, 2025), https://www.cms.gov/files/document/revised-final-2026-av-calculator-methodology-002pdf.pdf ("Updated AV Calculator").

Under the ACA, health insurance plans offered on Exchanges must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute.  42 U.S.C. § 18022(a).  A plan's "level of coverage," or actuarial value, reflects the estimated average percentage of covered health care expenses that will be paid by the insurance plan.  For example, under a plan with an actuarial value of 80 percent, the insurer will pay, on average, 80 percent of covered medical expenses, and the enrollee will pay the remaining 20 percent of expenses through a combination of deductibles, coinsurance, co-payments, and maximum out-of-pocket limits.  Consequently, the higher a plan's actuarial value, the lower an enrollee's out-of-pocket costs, on average.  Of course, plans that have a higher actuarial value also have higher premiums.[17]

Health plans offered on Exchanges are divided into four "metal tiers"—bronze, silver, gold, and platinum—based on their actuarial values.  *See* 42 U.S.C. § 18022(d)(1).  Bronze plans have an actuarial value of 60 percent, meaning they cover, on average, 60 percent of the cost of covered benefits.  *Id.*  Silver plans have an actuarial value of 70 percent, and gold and platinum plans have actuarial values of 80 percent and 90 percent, respectively.  *Id.*  The actuarial values of Exchange plans are calculated pursuant to regulations issued by the HHS Secretary.  *See id.* § 18022(d)(2).  The statute also instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates."  *Id.* § 18022(d)(3).  As relevant here, current regulations provide that the "allowable variation" in the actuarial value of silver, gold, and platinum plans is two percentage points above and below their respective benchmark actuarial values (*i.e.*, +2/-2 percentage points).  45 C.F.R. § 156.140(c)(2).  The Rule will change this range to +2/-4 percentage points.  90 Fed. Reg. at 27,174.  And for bronze plans, current regulations allow for a +5/-2 percentage point range, which the Rule will change to +5/-4 percentage points.  *Id.*

---

[17] It is important to note that plans with the same actuarial value can have very different cost-sharing structures.  For example, one plan with a $4,500 deductible and no coinsurance once that deductible is met could have the same (approximate) actuarial value as a plan with a smaller deductible (*e.g.*, $1,500) but a 30 percent coinsurance rate.  Additionally, irrespective of a plan's actuarial value, the percentage of covered health care costs paid by any given enrollee can vary considerably depending on the cost-sharing structure of their particular plan (*e.g.*, high deductible versus a lower deductible) and the enrollee's health care needs in a given plan year.

Plaintiffs argue that HHS "acted arbitrarily" in setting these new "de minimis" ranges because the agency, in their view, impermissibly based its decision on factors and "policy preference[s]" that "Congress [did] not intend[] it to consider." Stay Motion at 25 (citation omitted). More specifically, Plaintiffs contend that the only such "de minimis" ranges that are "permissible" are "those that account for uncertainties in 'differences in actuarial estimates,'" and they claim that the Rule "does not event attempt to justify" the new ranges "as an effort to account for differences in actuarial estimates." *Id.* (quoting 42 U.S.C. § 18022(d)(3)). But Plaintiffs make no effort to explain what "account[ing] for differences in actuarial estimates," 42 U.S.C. § 18022(d)(3), means as a practical matter. Nor do Plaintiffs explain how past decisions by HHS to alter the "de minimis" ranges, *see, e.g.*, 90 Fed. Reg. at 27,175, and the reasons behind those decisions, comported with the standard Plaintiffs have in mind, but CMS's decision to marginally expand those ranges here does not.

In any event, by allowing for a "de minimis variation in the actuarial valuations" that determine whether a given Exchange plan qualifies as a bronze plan versus a silver one, the ACA implicitly recognizes that the four metal tiers are meant to encompass a range of different cost-sharing structures, some of which might be "less generous," Stay Motion at 26, as an actuarial matter (*e.g.*, a plan with an actuarial value of 67 percent versus 71 percent), but still appealing from consumers' perspective (*e.g.*, because the 67 percent might offer a lower deductible than the 71 percent and have lower premiums). HHS recognized this possibility in electing to adopt wider "de minimis" ranges. *See* 90 Fed. Reg. at 27,176 (explaining that "greater flexibility in adjusting actuarial values" will allow issuers to "create more differentiated combinations of premiums and cost-sharing structures" and "develop innovative plan designs targeting specific consumer needs"). HHS also made the reasonable observation that consumers considering different plan options typically care less about marginal differences in the actuarial values of plans than they do about more "meaningful differences" that they can "understand and appreciate," *id.* at 27,177, such as whether a high-deductible plan with no coinsurance is a better value than a plan with a lower deductible but more co-payments. Plaintiffs do not offer a plausible argument, let alone a

50

persuasive one, as to why Congress did not want HHS to consider such matters when setting the guidelines for Exchange plans that are meant to be understood (and eventually bought) by average consumers.

Plaintiffs mainly focus on the effect these changes to the "de minimis" ranges will have on the value of PTCs that are available to Exchange enrollees. As Plaintiffs note, CMS estimates that the changes will reduce aggregate PTCs by $1.2 billion in 2026, *see* 90 Fed. Reg. at 27,208, which, according to Plaintiffs, will translate into higher premium costs for Exchange enrollees, a decrease in enrollment, and a "weaker risk pool." Stay Motion at 24. But Plaintiffs' vague suggestion that CMS did not adequately consider these effects in its decisionmaking process is belied by Plaintiffs' own citation to the Rule's preamble. CMS squarely considered the "impact" a wider "de minimis" range would have on PTCs and the "burden that increased cost-sharing and decreased PTCs may have on enrollees in the short-term." 90 Fed. Reg. at 27,176, 27,208. CMS just made the reasoned judgment that such "short-term" concerns about how wider ranges would affect subsidized enrollees should not necessarily take priority over the longer-term prospect of plans with lower premiums and competitive cost-sharing structures drawing unsubsidized consumers to Exchanges, "potentially improv[ing] the risk pool as coverage becomes more affordable for generally healthy people who currently may opt to forgo coverage altogether." *Id.* at 27,175. Far from reflecting a failure to consider relevant factors, as Plaintiffs seem to claim, CMS's reasoning represents a paradigmatic "policy balance" between short-term costs and long-term benefits. *Owner-Operator*, 494 F.3d at 211. And Plaintiffs' mere disagreement with that balance does not render it arbitrary and capricious. *Id.*

As for Plaintiffs' claim that HHS had an "unalterably closed mind" with respect to its proposed changes to the "de minimis" ranges, Stay Motion at 25, that argument is indistinguishable from the one they make with respect to the Rule provision that updates the premium adjustment percentage methodology, and it fails for the same reasons. *See Biden*, 597 U.S. at 788.

### III.    The Equities and Public Interest Weigh Against Preliminary Relief

The balance-of-equities and public-interest considerations "merge when the Government is the opposing party," *Nken*, 556 U.S. at 435, and these factors weigh against granting Plaintiffs the extraordinary remedy of a § 705 stay here. As explained above, Plaintiffs fail to clearly show that they will "imminent[ly]" suffer irreparable harm absent the stay they seek. *Mountain Valley Pipeline*, 915 F.3d at 216. Additionally, Plaintiffs' assertion that Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice," Stay Motion at 45 (citation omitted), is just a repackaged version of their unsuccessful merits arguments and cannot serve as an independent basis for relief. *Cf. Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 335 (D.C. Cir. 2018) ("[T]he strength of [the plaintiff's] showing on public interest rises and falls with the strength of its showing on likelihood of success on the merits."). That Plaintiffs' concerns about the Rule's potential impact on current Exchange enrollees do not clearly outweigh the Government's equally weighty concerns about the overall integrity of Exchanges and the public fisc only further tips the balance against granting preliminary relief. *See Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 223 (4th Cir. 2025) ("*[P]laintiffs* bear the burden of demonstrating each of the four preliminary-injunction elements . . . ." (emphasis added)).

Meanwhile, staying the effective date of the Rule would hamstring Defendants' efforts to address legitimate concerns about improper enrollments in Exchange plans that are subsidized by taxpayers, as well as interfere with Defendants' lawful implementation of their policy priorities. Such "[j]udicial management of agency operations offends the Executive Branch's exclusive authority to enforce federal law." *Am. Fed. of Teachers v. Bessent*, No. 25-1282, 2025 WL 1023638, at *3 (4th Cir. Apr. 7, 2025) (Agee, J., concurring). And relatedly, when a law is stayed, "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on" the government that enacted it. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Staying the Rule would inflict that very harm on the federal government here.

## IV.    Any Relief Should Be Appropriately Limited

For the reasons explained above, Plaintiffs are not entitled to the extraordinary preliminary relief they request.  But in the event the Court were to conclude otherwise, any relief it grants should be appropriately limited, consistent with Article III and equitable constraints on the Court's remedial authority.

To start, the Court should preliminarily stay or enjoin only those provisions of the Rule (1) that Plaintiffs specifically challenge and (2) that the Court finds are likely unlawful and will irreparably harm Plaintiffs absent such relief.  HHS makes clear in the Rule's preamble that it "generally intends" for the Rule's provisions "to be severable from each other."  90 Fed. Reg. at 27,180; *see id.* ("In the event a provision is found to be utterly invalid or unenforceable, we intend that provision to be severable.").  Moreover, because each Rule provision addresses distinct facets of the ACA marketplace, they operate independently of each other and would thus "function sensibly" if any one of them were stayed.  *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).  Plaintiffs do not argue to the contrary, and, notably, they ask the Court to preliminarily stay only the specific provisions that they challenge in their Stay Motion.  *See* ECF No. 11-10.  Any relief should therefore encompass only the offending portions of the Rule and leave the remainder intact.

Further, any preliminary injunction or stay should be no broader than necessary to afford relief to those Plaintiffs who have established standing and irreparable harm.  *See TransUnion*, 594 at 431 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff . . . .").  Plaintiffs seek a stay under 5 U.S.C. § 705.  By authorizing relief only "to the extent necessary to prevent irreparable injury" and "to preserve status or rights pending conclusion of the review proceedings," that provision explicitly incorporates traditional equitable principles.  And one such principle of "equity jurisprudence" is that any court-ordered relief "should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (explaining that "[w]hen Congress empowers courts" via statute "to grant

equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity"). Any preliminary relief granted to Plaintiffs here should accord with that clear command. *See Casa de Maryland*, 486 F. Supp. 3d at 971-72 (explaining that courts are "bound to draw . . . preliminary relief, even in the APA context, narrowly" and limiting a § 705 to the plaintiffs that had demonstrated standing).

## V.     The Court Should Require Plaintiffs to Submit a Bond as Security

Finally, to the extent the Court issues any preliminary injunctive relief, it should also order Plaintiffs to "give[] security in an amount that the [C]ourt considers proper to pay the costs and damages" that Defendants would sustain as a result. Fed. R. Civ. P. 65(c). As the Fourth Circuit has directed, "[i]n fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastincs Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). "[I]njunction bonds are generally required," *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam), and "[t]he amount of the bond . . . ordinarily depends on the gravity of the potential harm to the enjoined party." *Hoechst*, 174 F.3d at 421 n.3. Here, Plaintiffs are asking the Court to preliminarily stay a Rule that HHS estimates will reduce federal expenditures on APTCs by at least $10.3 billion in 2026 alone. 90 Fed. Reg. at 27,213. Plaintiffs should therefore be required to post a bond that reflects the gravity of their demand.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary relief should be denied.

DATED: July 25, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BRENNA E. JENNY
Deputy Assistant Attorney General
Commercial Litigation Branch

ERIC B. BECKENHAUER
Assistant Director
Federal Programs Branch

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
Indiana Bar No. 37147-49
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Counsel for Defendants*