## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CITY OF COLUMBUS ET AL., | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. 25-2114-BAH |
| ROBERT F. KENNEDY, JR. ET AL., | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs filed suit under the Administrative Procedure Act ("APA") seeking to prevent Defendants from implementing changes to federal regulations enforcing the Patient Protection and Affordable Care Act (the "ACA," or the "Act"). ECF 1 (complaint). These changes, embodied in the Marketplace Integrity and Affordability Rule (the "Rule"), are set to take effect on August 25, 2025. *See* Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025). Plaintiffs—three cities, a coalition of doctors, and an interest group representing small business owners—allege they will shoulder increased costs or see their members lose health insurance coverage if these changes are implemented. *See generally* ECF 1; ECF 11 (motion for preliminary relief). Defendants, the Secretary of the Department of Health and Human Services ("HHS") and many in his employ charged with crafting and implementing the Rule, counter that changes to ACA-related regulations are needed to prevent fraud and to readjust the cost of health insurance. *See* ECF 28 (opposition to preliminary relief motion).

This matter is currently before the Court on Plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the alternative, for a preliminary injunction (the "Motion"). ECF 11. Upon consideration of the parties' filings and after a robust oral argument on the Motion, the Court **GRANTS** in part and **DENIES** in part Plaintiffs' Motion and enters a **STAY** enjoining certain provisions of the Rule from taking effect on August 25, 2025.

The Court finds that Plaintiffs have met their burden of showing that there is a strong likelihood that they will succeed on the merits of their challenges to seven provisions of the Rule. Plaintiffs have failed to show likelihood of success on the merits sufficient to warrant preliminary relief on the remaining challenges to two other provisions of the Rule. As to the seven provisions in which Plaintiffs have shown a likelihood of success on the merits, Plaintiffs have also shown they will face irreparable harm if the challenged portions of the Rule are not enjoined. Finally, the balance of equities and the public interest weigh in favor of a stay. This memorandum opinion is offered to explain the Court's reasoning.

## I.    BACKGROUND

### A.    The Affordable Care Act

In 2010, Congress enacted the ACA "to increase the number of Americans covered by health insurance and decrease the cost of health care." *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012). "Prior to the enactment of the ACA, individual health insurance markets were dysfunctional." *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 778 (D. Md. 2020).[1]  The ACA "adopts a series of interlocking reforms designed to expand coverage in the individual

---

[1] The Court frequently cites two prior opinions by Judge Chasanow, which included the same City Plaintiffs involved in this case. One opinion is from 2020 and addresses a motion to dismiss. *See City of Columbus*, 453 F. Supp. 3d at 770. The other opinion, from the same case, addresses the parties' cross-motions for summary judgment. *See City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021).

health insurance market."[2]  *King v. Burwell*, 576 U.S. 473, 478–79 (2015).  Individual market health plans are referred to as qualified health plans ("QHPs").  Individuals primarily enroll in QHPs for a given benefit year during an annual open enrollment period, or under specified special enrollment periods.  42 U.S.C. § 18031(c)(6).  Ultimately, the ACA "aims to achieve systemic improvements in the individual health insurance market by means of certain key reforms[.]"  *City of Columbus*, 453 F. Supp. 3d at 778.

First, the Act's "guaranteed issue" requirement specifies that every "health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), subject to exceptions specified in the statute, such as limiting sign-ups to the aforementioned enrollment periods, *id.* § 300gg-1(b); *see Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020).  "In other words, the Act 'ensure[s] that anyone can buy insurance.'"  *Me. Cmty. Health Options*, 590 U.S. at 301 (quoting *King*, 576 U.S. at 493).

Second, the Act's "guaranteed renewability" provision requires issuers to renew or continue in force such coverage.  42 U.S.C. § 300gg-2(a).  This provision, too, is subject to statutory exceptions, including an exception for persons who have failed to pay premiums owed on their policy.  *Id.* § 300gg-2(b)(1); *see also id.* §§ 300gg-12, 300gg-42.

Third, the Act requires all QHPs to cover "essential health benefits" and limits cost-sharing (in the form of deductibles and co-pays) by enrollees for these essential health benefits. 42 U.S.C. § 300gg-6(a); *id.* § 18022(a)(2).  The limitation on cost-sharing is adjusted each year by a "premium adjustment percentage," which is "the percentage (if any) by which the average

---

[2] "Individual health insurance is insurance that individuals purchase themselves, in contrast to, for example, joining employer-sponsored group health plans."  *City of Columbus*, 453 F. Supp. 3d at 778 (citation omitted).

3

per capita premium for health insurance coverage in the United States for the preceding calendar year [] exceeds such average per capita premium for 2013," the year before the Act's reforms to the individual health insurance market went into effect. *Id.* § 18022(c)(1),(4).

Fourth, the Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 479 (quoting 42 U.S.C. § 18031(b)(1)); *see also Me. Cmty. Health Options*, 590 U.S. at 301. The Act "gives each State the opportunity to establish its own Exchange, but provides that the Federal Government will establish the Exchange if the State does not." *King*, 576 U.S. at 479; *see also* 42 U.S.C. §§ 18031, 18041. The purpose of the Exchange is to serve as a "marketplace that allows people to compare and purchase" ACA-compliant plans.[3] *Id.*

Fifth, exchange plans are categorized into different "metal tiers"—bronze, silver, gold, and platinum—based on their "level of coverage." 42 U.S.C. § 18022(d) (setting the "level of coverage" for each of the plan types). For example, "silver plans," must have an actuarial value of 70%, meaning the plan is designed such that the issuer will pay around 70% of covered medical expenses, and the enrollee will pay the remaining 30% of expenses through out-of-pocket spending.[4] *Id.* Because actuarial predictions may be imprecise, the Act specifies that the

---

[3] As Plaintiffs describe, "[s]ome states have elected to create Exchanges themselves (state-based Exchanges or SBEs), as is the case in Maryland, while others have created Exchanges that operate on the federal Healthcare.gov platform (state-based Exchanges on the federal platform, or SBE-FPs), such as the Exchange currently in use in Illinois while it transitions to an SBE. The Exchange in other states, including Ohio, is operated by the Centers for Medicare & Medicaid Services ("CMS") (federally facilitated Exchange, or the FFE)." ECF 11-1, at 6 (citing CMS, Consumer Info. & Ins. Oversight, *State-Based Exchanges*, https://perma.cc/JFT3-6EAK).

[4] Bronze, gold, and platinum plans are designed to provide benefits that are actuarially equivalent to 60%, 80%, and 90%, respectively, of the full value of benefits under the plan. 42 U.S.C. § 18022(d)(1).

4

Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS, may "provide for a de minimis variation . ... to account for differences in actuarial estimates." *Id.* § 18022(d)(3).

Sixth, the Act "seeks to make insurance more affordable by giving refundable tax credits to individuals[.]" *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits" ("PTCs") vary depending on an individual's income—individuals who earn more must pay more toward the cost of their monthly premium—but are generally pegged to the cost of the so-called "benchmark silver plan," or the second-lowest-cost silver plan offered within a market. *See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)–(C). The Act initially made these tax credits available to individuals with incomes between 100% and 400% of the federal poverty level ("FPL"). 26 U.S.C. § 36B(c)(1)(A). During the COVID-19 pandemic, Congress—via the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ("ARPA")—temporarily increased the generosity of the ACA's premium subsidies and expanded subsidy eligibility to enrollees with household incomes above 400% of the FPL. The 2022 Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 ("IRA"), extended these enhanced subsides through 2025. The enhanced subsidies are set to expire at the end of 2025.

PTCs are claimed on an individual's tax return after the end of the year, and are paid by the Internal Revenue Service ("IRS"). 26 U.S.C. § 36B(h). Rather than an enrollee paying the entire insurance premium up front and then later claiming a credit toward that amount on the taxpayer's tax return, the Department of Health and Human Services ("HHS"), the federal agency that largely administers the ACA, may also make an advance payment of the premium tax credit amount directly to the enrollee's insurance provider. 42 U.S.C. §§ 18081, 18082. Such credits are known as advance premium tax credits ("APTCs"). "APTCs act as a subsidy for low-income individuals who could not afford to purchase insurance outright." *City of Columbus*, 523

F. Supp. 3d at 741. CMS is responsible for determining whether individuals meet the statutory eligibility requirements for APTCs, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B). The amount of the APTC owed ultimately depends on the individual's income at the end of the year. Thus, individuals must file a federal tax return each year to "reconcile" the APTCs they received with the PTC amount they ultimately qualify for based on their actual income during the applicable tax year. *See* 26 U.S.C. § 36B(f)(1).

"Each year, HHS promulgates rules pursuant to its rulemaking authority under the ACA and the Public Health Service Act ("PHS Act"). Such rules are the mechanisms by which HHS makes ongoing adjustments to the regulations and processes surrounding ACA insurance markets." *City of Columbus*, 523 F. Supp. 3d at 741.

### B.    The Marketplace Integrity and Affordability Rule

On March 19, 2025, CMS issued a Notice of Proposed Rulemaking for a proposed rule that would implement "several regulatory actions aimed at strengthening the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." 90 Fed. Reg. 12,942 (Mar. 19, 2025) ("NPRM"). CMS further explained that it "expect[ed] these actions would provide premium relief to families who do not qualify for [ACA] subsidies and reduce the burden of . . . [ACA] subsidy expenditures on the Federal taxpayer." *Id.* CMS received more than 26,000 comments on the proposed rule. After reviewing those comments and revising certain provisions of the proposed rule, HHS issued (and publicly released) the Rule on June 20, 2025, and it was published in the Federal Register on June 25. 90 Fed. Reg. 27,074.

As relevant here, the Rule implements policies concerning the effectuation of new Exchange coverage when a customer owes past-due premiums to an issuer, *id.* at 27,084–91; the

6

requirement that recipients of APTCs file a federal tax return and reconcile those APTCs with the recipient's PTC amount, *id.* at 27,113–17; and the procedures HHS uses to annually redetermine Exchange enrollees' eligibility to receive APTCs, *id.* at 27,102–10. The Rule additionally makes changes to the procedures that HHS uses to verify enrollees' eligibility for APTCs, *id.* at 27,118–32; pauses an income-based special enrollment period ("SEP"), *id.* at 27,140–48; and amends certain verification procedures that apply to SEPs, *id.* at 27,148–52. The Rule also updates the methodology used to calculate the "premium adjustment percentage," *id.* at 27,166–74, and makes adjustments to the allowable ranges of actuarial values applicable to the different plan types sold on Exchanges, *id.* at 27,174–78.

HHS explained in the Rule's preamble that, "[b]ased on [its] review of enrollment data and [its] experience fielding consumer complaints," it believes that the "temporary expansion of ACA premium subsidies" via the ARPA and IRA "resulted in conditions that were exploited to improperly gain access to fully-subsidized coverage" on Exchanges. *Id.* at 27,074. More specifically, "the widespread availability" of fully subsidized plans—*i.e.*, plans with post-subsidy net premiums of $0—"created the incentive and opportunity for fraudulent and improper enrollments at scale," either by individual enrollees wanting no-cost Exchange coverage or by third-party brokers that collected commissions on improper enrollments that were made without customers' knowledge. *Id.* The Rule purports to "take[] a carefully curated set of temporary actions to immediately reduce the crisis-levels of improper enrollments over the short-term as the market readjusts to the new subsidy environment in which enhanced subsidies are no longer available." *Id.* The Rule also implements a number of "permanent reforms to help the markets reset to the changing subsidy environment to improve affordability and stability over the long-term" *Id.*

7

Plaintiffs contend that the Rule "contains a number of provisions that, in their individual and collective effect, will raise consumers' premiums for plans on the Exchanges, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers of last resort." ECF 11-1, at 8. According to Plaintiffs, "the [R]ule will lead to at least 1.8 million fewer people enrolling on the Exchanges." *Id.* (citing ECF 11-2, at 2 ¶ 4). Plaintiffs argue that "[t]he [R]ule accomplishes this result through measures that erode the value of coverage obtained through the Exchanges, impose barriers designed to depress enrollment in the Exchanges, and impose further barriers limiting the availability of subsidized insurance even for those enrollees that do successfully enroll." *Id.*

The Rule is set to take effect next week, on August 25, 2025, 90 Fed. Reg. 27,074, but many of its provisions will apply to Exchange plans that will first be available in 2026, *see id.* at 27,178–79.

## C.    Procedural History

Plaintiffs are three city governments—the City of Columbus, Ohio; the Mayor and City Council of Baltimore, Maryland; and the City of Chicago, Illinois (collectively the "City Plaintiffs")—and two nonprofit organizations, Main Street Alliance ("MSA"), a "national network of small businesses," and Doctors for America ("DFA"), an advocacy organization consisting of "member physicians and medical trainees . . . in all 50 states." ECF 1, at 5–6 ¶¶ 8–12. Plaintiffs seek review of agency action under the APA, claiming that three of the Rule's provisions are contrary to law (Count I), and that those same three provisions plus seven others are arbitrary and capricious (Count II).[5] *Id.* at 26 ¶¶ 74–82. On July 2, 2025, Plaintiffs filed a

---

[5] While the Complaint and the initial Motion sought relief on the revocation of the low-income SEP, Plaintiffs clarified in their Reply brief that they are no longer seeking a stay of that provision given the enactment of Pub. L. No. 119-21 §§ 71301–71305. ECF 30, at 15 n.7.

motion for preliminary relief, in which they seek a stay of the August 25, 2025 effective date of the challenged Rule provisions under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. *See* ECF 11. Defendants filed an opposition arguing that Plaintiffs lack standing to bring suit and the provisions at issue are lawful. *See* ECF 28. Plaintiffs filed a reply brief. *See* ECF 30. The Court held a hearing on the Motion on August 14, 2025. *See* ECF 34 (Tr. of Hearing). The Motion is now ripe for decision.

## II.    LEGAL STANDARDS

### A.    Preliminary Injunction / Section 705 Stay

A preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). Where the government is a party the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant must establish all four elements to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013). A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances." *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).

Section 705 of the APA permits a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction

9

also govern issuance of a § 705 stay." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)).

## B.    Review Under the APA

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Previously, "[w]hen a challenger assert[ed] that an agency action conflicts with the language of a statute, [the reviewing court] generally appl[ied] the two-step analytical framework set forth in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)." *City of Columbus*, 523 F. Supp. 3d at 744. However, *Loper Bright* overturned *Chevron* and changed this Court's role in reviewing an administrative agency's interpretation of a statute. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Section 706 of the APA requires courts to decide "'all relevant questions of law' arising on review of agency action." *Id.* at 392 (quoting 5 U.S.C. § 706). "A court may give weight to an agency's authoritative interpretation but ultimately must rule on matters of law." *Molina-Diaz v. Bondi*, 128 F.4th 568, 574–75 (4th Cir. 2025) (first citing *Loper Bright*, 603 U.S. at 2262; and then citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Loper Bright*, 603 U.S. at 400–01 ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do.").

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Agency action is generally considered arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## III.    ANALYSIS

### A.    Standing

Standing is an "irreducible constitutional minimum" of federal jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing" that it has standing. *Id.* Where a plaintiff lacks standing, "there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). Standing "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982). Thus, "[f]or a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *TransUnion*, 594 U.S. at 423).

A plaintiff seeking relief in federal court must establish standing by showing: (1) that it suffered an injury in fact, which is a concrete and particularized harm that is actual or imminent, rather than hypothetical, (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions, and (3) a non-speculative likelihood that the

injury will be redressed by a decision in the plaintiff's favor. *See Lujan*, 504 U.S. at 560–61. Only one Plaintiff must have standing for the case to proceed. *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

Defendants argue that each of Plaintiffs' "alleged injuries rests on speculative predictions about the Rule's potential effects on a complex health insurance market and a multistep chain of possibilities that is unlikely to materialize any time soon." ECF 28, at 12. Plaintiffs maintain that they "may challenge the rule to protect themselves from [uncompensated care costs and higher premiums], just as other providers of last resort were able to challenge other actions by CMS that predictably increased the cost of health care." ECF 30, at 7 (citing *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 225 (1st Cir. 2019); *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018); *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 807 (E.D. Pa. 2019), *aff'd*, 930 F.3d 543 (3d Cir. 2019), *rev'd on other grounds*, 591 U.S. 657 (2020); *U.S. House of Representatives v. Price*, Civ. No. 16-5202, 2017 WL 3271445, at *1 (D.C. Cir. 2017) (per curiam)). For the reasons stated below, the Court finds that Plaintiffs have established standing as to MSA and the City Plaintiffs based on the increased premiums and uncompensated care costs that are "predictable results" of the challenged provisions of the Rule. *City of Columbus*, 453 F. Supp. 3d at 791. As noted at the hearing, the Court has some doubt as to the extent of the injury to DFA, *see* ECF 34, at 7:12–17, but the Court need not reach the question of standing for DFA because only one Plaintiff must have standing for the case to proceed. *See Outdoor Amusement Bus. Ass'n,* 983 F.3d at 681. Because the Court has found that the other Plaintiffs have standing to sue, the Court defers judgment on the question of DFA's standing.

       *i.*     *Main Street Alliance*

Main Street Alliance is a "national association of approximately 30,000 small businesses." ECF 11-4 (Legler Decl.), at 1 ¶ 2. "[A]n association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *see also Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members."). This is often called "associational" standing, which is a type of representational standing. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 n.3 (4th Cir. 2005). Here, as to MSA, Plaintiffs claim associational standing. For associational standing to exist, an organization must demonstrate that (a) "'its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt*, 432 U.S. at 343).

### 1.    Member Standing to Sue

As noted, the first element of associational standing requires that at least one member of each plaintiff organization has standing to sue in his or her own right. *Id.* Defendants argue that because Brooke Legler, the MSA member-declarant, ECF 11-4, fails to establish standing in her own right, MSA does not have associational standing to challenge the Rule. ECF 28, at 14. Defendants aver that "MSA attempts to base its associational standing on a single declaration from a member who owns a small business in Wisconsin and is enrolled in a health plan through the ACA's individual marketplace. ECF 28, at 12 (citing ECF 11-4, at 1 ¶¶ 1–4). According to Defendants, Legler "does not claim that any of the challenged Rule provisions would impact her directly or otherwise interfere with her eligibility to remain enrolled in her current Exchange plan." *Id.* at 13 (citation omitted). Further, Defendants maintain that Legler's "assertion that the Rule's impact on insurance markets more broadly will necessarily cause *her* particular insurance

13

premium to increase is likewise wholly speculative." *Id.* (emphasis in original) (citation omitted). Accordingly, Defendants conclude that Legler has "failed to establish that the future economic injury she claims she will suffer as a result of the Rule is sufficiently likely to materialize, let alone imminently so." *Id.* (cleaned up).

Plaintiffs respond that the Rule will "increase the cost of coverage," and "leav[e] members of [MSA] with the Hobson's choice of retaining less generous but costlier coverage or dropping out of coverage altogether." ECF 30, at 4. Plaintiffs point to the declaration of Christen Linke Young, a visiting fellow with the Brookings Center on Health Policy, ECF 11-2, at 1 ¶ 2, to show that "each of the challenged provisions will increase coverage costs by disproportionately driving younger and healthier people out of the Exchanges, worsening the risk pool for those who remain, increasing costs, and adding to existing headwinds for the individual insurance market." ECF 30, at 5 (citations omitted). According to Plaintiffs, MSA's "small business members [] can't opt out of the higher costs that will result from CMS's rule." *Id.* at 7.

Defendants' objection to Legler's standing on the basis that she "does not claim that any of the challenged Rule provisions would impact her directly or otherwise interfere with her eligibility to remain enrolled in her current Exchange plan," ECF 28, at 13, appears to be based on an incomplete reading of her declaration. Legler explains in detail her significant underlying condition, the cost of essential medication to treat that condition, and the freedom the ACA gave her to operate her small business while still maintaining affordable health insurance despite her condition. ECF 11-4, at 2 ¶¶ 6, 8. She goes on to explain that she "operate[s] [her] business on narrow margins" and the new Rule will "cause [her] health insurance coverage costs to increase to a level that [she] cannot afford." *Id.* at 3 ¶ 11. Legler explicitly affirms that "continuing [her]

business would not be an option" because the Rule will "cause [her] health insurance coverage costs to increase to a level that [she] cannot afford." *Id.* at 3 ¶¶ 11, 12. Legler attests that she would be "forced either to find different employment with employer-sponsored insurance, or to terminate [her] business and explore other coverage options through Wisconsin's BadgerCare system." *Id.* ¶ 11. Thus, Legler states with precision how the regulation change will directly impact her.

Defendants further argue that Legler "provides no factual basis for assuming that, even if there were some increase in her premium (whether caused by the Rule or not), she would ineluctably decide to drop her Exchange coverage, close down her business, and seek insurance elsewhere, notwithstanding her satisfaction with her current Exchange plan and the uncertainty of finding alternative coverage that is both adequate and affordable." ECF 28, at 13. This reading of Legler's declaration is inaccurate. Legler affirms that she "take[s] a biologic" which costs about $10,000 per month, ECF 11-4, at 2 ¶ 6, and she "would not be able to afford this medication without health insurance, or with a less comprehensive insurance plan," *id.* She emphasizes that the new Rule will "cause [her] health insurance coverage costs to increase to a level that [she] cannot afford." *Id.* at 3 ¶ 11. According to Legler, "[c]ontinuing [her] business would not be an option in this circumstance, because [she] need[s] to have access to affordable insurance that will cover the medications [she] need[s]." *Id.* ¶ 12. An "increase in premiums constitutes economic harm and is [] 'a classic and paradigmatic form of injury in fact[.]'" *City of Columbus*, 453 F. Supp. 3d at 787 (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018)). Legler's attestations are thus sufficient to establish injury-in-fact for Article III standing purposes.

15

Further, the Court is satisfied that this injury is sufficiently likely to materialize, given the conclusions reached by independent experts on the effects of the Rule and the fact that at least one QHP insurer has already raised rates for 2026. *See* ECF 11-2, at 11 ¶ 29 (explaining that the Rule is expected "to increase net premiums for people receiving financial assistance, increase gross premiums for at least some plans, and impose additional administrative obstacles"); *see also* United Healthcare, *Optimum Choice, Inc., Part III: Actuarial Memorandum: PUBLIC; Maryland 2026 Individual Exchange Rates* 7 (May 22, 2025), https://perma.cc/35L2-M49D (increasing premiums to account for impact of Rule). Legler is not required to prove that she has suffered *actual* injury before filing suit. *See Adams v. Watson*, 10 F.3d 915, 921 (1st Cir. 1993) ("[I]t could hardly be thought that administrative action likely to cause harm cannot be challenged until it is too late." (quoting *Rental Hous. Ass'n of Greater Lynn v. Hills*, 548 F.2d 388, 389 (1st Cir. 1977))). Rather, Legler has shown enough to establish that there is a "'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409, 414 n.5 (2013)). Accordingly, Legler has suffered a concrete injury sufficient for Article III standing.

Separately, Defendants argue that the claimed harm is not traceable to the Rule provisions. ECF 28, at 13. "For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of' by the plaintiff." *Air Evac EMS, Inc.*, 910 F.3d at 760 (quoting *Lujan*, 504 U.S. at 560). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (citing *Allen v. Wright*, 468 U.S. 737, 757–59 (1984)). Although a plaintiff's theory of standing may "not rest on mere speculation about the decisions of third parties[,]" it may "rel[y] instead

on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). In short, to establish causation, a plaintiff must show "a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *All. for Hippocratic Med.*, 602 U.S. at 385. Here, Plaintiffs have clearly articulated this "predictable chain of events." *Id.*

According to Defendants, "CMS attributes the estimated increase in 2026 premiums" not to the changes embodied in the Rule, but "to the expiration of the enhanced subsidies that were enacted during the COVID-19 pandemic—a statutory change that Plaintiffs do not challenge." ECF 28, at 14 (citing 90 Fed. Reg. at 27,212). Defendants posit that "the Rule will actually cause premiums to be *lower than* they would be otherwise in that post-expiration environment." *Id.* (emphasis in original) (citations omitted). In response, Plaintiffs argue that "CMS cites to the rule's regulatory impact analysis, which projects that it will lead to lowered premiums . . . [b]ut this was based entirely on a projected decrease from the termination of the low-income special enrollment period."[6] ECF 30, at 5 n.1. Plaintiffs point out that "CMS acknowledges that the remaining challenged provisions will increase premiums and net costs for consumers, and indeed the agency repeatedly points to these acknowledgements to defend the rationality of its rulemaking." *Id.* (citations omitted).

The Court is unpersuaded by Defendants' attempt to blame the increased cost of premiums on the expiration of subsidies alone. First, CMS itself has acknowledged in various sections of the challenged provisions that there will be increased premiums and costs for

---

[6] Plaintiffs clarify that the "projection was never credible, but any dispute on this score is now immaterial, as Plaintiffs no longer challenge" the Rule's provision addressing termination of the low-income special enrollment period. ECF 30, at 5 n.1.

consumers as a result of the implementation of the Rule. *See* 90 Fed. Reg. at 27,212; *see also id.* at 27,107 (reconfirming eligibility rule); *id.* at 27,171 (premium adjustment percentage); *id.* at 27,176–77 (actuarial value calculations); *id.* at 27,192 (guaranteed issue); *id.* at 27,116 (failure-to-reconcile policy); *id.* at 27,119, 27,131 (data matching policies). And as Plaintiffs point out, the Court "[need not] guess how the market will respond to the rule; insurers have already begun to increase their rates in response to the rule." ECF 30, at 6. In issuing 2026 Individual Exchange Rates in Maryland, UnitedHealthcare issued the following statement: "An adjustment of 1.009 was applied to account for the impact of the CMS 2025 Marketplace Integrity and Affordability Proposed Rule. We believe that the changes in the proposed rule, including shortening of the open enrollment period and stricter verification requirements, will lead to healthier enrollees leaving the market and an overall worsening of the risk pool." United Healthcare, *Optimum Choice, Inc., Part III: Actuarial Memorandum: PUBLIC; Maryland 2026 Individual Exchange Rates* 7 (May 22, 2025), https://perma.cc/35L2-M49D. Thus, the Court finds that Plaintiffs have offered "independent analyses and issuers' explanations [to] confirm . . . that Defendants' actions [will] cause[] price increases." *City of Columbus*, 453 F. Supp. 3d at 789. Finally, while the expiration of subsidies will plausibly cause an increase in premiums, that fact does not defeat causation, as Defendants' actions need not be "the sole or even immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). Accordingly, the injury is fairly traceable to Defendants' conduct because Plaintiffs have established that "insureds and issuers reacted in predictable ways to Defendants' actions." *City of Columbus*, 453 F. Supp. 3d at 789.

Defendants do not appear to directly challenge redressability. *See* ECF 28. The Court is satisfied that the relief sought here—a stay enjoining the agency from enforcing the challenged

provisions—would redress Plaintiffs' injuries by "ameliorating the predictable results of Defendants' challenged actions." *City of Columbus*, 453 F. Supp. 3d at 792. As such, Legler has established standing to sue in her own right, and therefore MSA also has associational standing to sue, so long as the organization can satisfy the second and third prongs of associational standing.

### 2.    Interests Germane to Organization's Purpose

As discussed, the second element of associational standing requires that the interests the organization "seeks to protect are germane to the organization's purpose." *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (quotation marks and citation omitted). Shawn Phetteplace, the National Campaigns Director at MSA, indicates that "MSA [] seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed." ECF 11-3, at 1 ¶ 2. According to Phetteplace, "MSA's founding was directly focused on the passage of the [ACA], and the organization has remained focused on the subsequent strengthening of the law over the past 15 years." *Id.* at 2 ¶ 6. "According to a recent survey, over 45% of MSA members access health insurance either through the marketplace or Medicaid." *Id.* ¶ 3. Defendants do not contend that the interests of Plaintiffs in protecting their members' ability to operate their businesses with affordable health insurance are not germane to MSA's purpose. The Court is therefore satisfied that the interests MSA seeks to protect are "germane" to MSA's organizational purposes.

### 3.    Individual Member Participation

The third element of associational standing requires that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (quotation marks and citation omitted). "'[I]ndividual

participation' is not normally necessary when an association seeks prospective or injunctive relief for its members . . . ." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (quoting *Hunt*, 432 U.S. at 343).

Plaintiffs seek a stay under § 705 of the APA, not monetary damages. If MSA's members were to each bring suit on their own behalf, the challenged conduct would generally implicate the same facts, the same defendants, and the same arguments regarding rulemaking procedure.[7] The Court is thus satisfied that the participation of individual members is not necessary. In sum, MSA has established associational standing to sue.

*ii.    City Plaintiffs*

The Court now turns to standing for the City Plaintiffs. As noted, to establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). A future injury must be "certainly impending." *Clapper*, 568 U.S. at 409. "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 381.

Plaintiffs argue that "[b]y driving up the rate of uninsured or underinsured individuals within the city Plaintiffs' jurisdictions, the rule would force these cities to devote additional funding, personnel, and other resources to subsidizing and providing uncompensated care for their residents." ECF 11-1, at 44. The City Plaintiffs will "have no choice but to take on increased costs as a direct result of the rule's impact on the healthcare marketplace." ECF 30, at

---

[7] Additionally, Defendants have not asserted that individual member participation is required for the relief requested.

7. According to Plaintiffs, the cities "must provide care whether or not [residents] are compensated by insurance," thus as "providers of last resort," they are able to challenge the actions by CMS that "predictably increase[] the cost of health care." *Id.* The Court finds that this is sufficient to show injury-in-fact, as the City Plaintiffs will bear additional economic costs that come with treating people left uninsured by the implementation of the Rule. *See City of Columbus*, 453 F. Supp. 3d at 787–88 (finding plaintiffs had standing to sue where policies shifted costs onto city governments to provide uncompensated healthcare); *see also Massachusetts*, 923 F.3d at 223 (finding injury-in-fact where "the Commonwealth has demonstrated that there is a substantial risk of fiscal injury to itself").

Defendants maintain that the injury claimed by City Plaintiffs "lies at the end of a highly attenuated chain of possibilities." ECF 28, at 16 (citation omitted). Defendants argue that "the budgetary harms they fear could materialize only if (1) the Rule provisions Plaintiffs challenge cause a certain number of individuals currently enrolled in Exchange plans to disenroll or otherwise lose coverage, and (2) a portion of that recently uninsured group—which, Plaintiffs note, is likely to be 'relatively young[] and health[y],'—seeks medical care (3) in the city Plaintiffs' jurisdictions (4) specifically at city-run health care facilities (rather than privately operated ones) or through a city-funded emergency medical service and (5) receives services at such a rate that the cities (6) are required to increase the budgets for their respective public health departments to cover that increase in potentially uncompensated care." ECF 28, at 16 (citing ECF 11-2, at 2 ¶ 5). Defendants aver that standing cannot derive from such a "lengthy chain of assumptions." ECF 28, at 17 (citing *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 569 (D. Md. 2016)).

Importantly, however, "[a] causal chain does not fail simply because it has several 'links,' provided those links are not hypothetical or tenuous." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (internal quotation marks and citation omitted); *see also California*, 911 F.3d at 571 (finding standing where the interim final rules "first le[]d to women losing employer-sponsored contraceptive coverage, which [] then result[ed] in economic harm to the states"). In *City of Columbus v. Trump*, Judge Chasanow, in evaluating a nearly identical fact pattern involving the same plaintiffs, held that the plaintiffs had standing to challenge the provisions at issue in that case. 453 F. Supp. 3d at 788. There, defendants lodged a similar argument to the one advanced here, namely that the alleged injury to the plaintiffs was founded on a "number of uncertain links in the causal chain, which are either premised on invalid assumptions or are attributable to the City Plaintiffs themselves." *Id.* Judge Chasanow noted that "this challenge does not dispute that budgetary outlays constitute injury in fact but rather focuses on traceability." *Id.* Ultimately, Judge Chasanow held that Plaintiffs "tie[d] . . . the challenged provisions of the 2019 Rule to increased costs, inaccessibility of quality coverage, and rises in the uninsured and underinsured rates." *Id.* at 790–91. The holding was based on numerous "allegations outlin[ing] the predictable results of the 2019 Rule." *Id.* at 791.

Here, the City Plaintiffs have adequately "outline[d] the predictable results" of the challenged provisions of the Rule. *Id.* First, Plaintiffs have pointed to sufficient record evidence to establish that the rate of uninsured people will go up as a direct result of the implementation of the Rule, a fact confirmed in the Rule itself. *See* ECF 11-2, at 2 ¶ 4 (estimating 1.8 million more people will be insured as a result of the Rule); *see also* 90 Fed. Reg. at 27,074, 27,213 (acknowledging that the Rule will cause at least 800,000 Americans to lose coverage). As Young explains, "[t]he decrease in Marketplace enrollment and increase in the uninsured will result in

[an] increased burden of uncompensated care, especially for safety net providers." ECF 11-2, at 3 ¶ 6. Dr. Olusimbo Ige, the Commissioner of Chicago's Department of Public Health, explains that "[i]n Chicago's experience, the uninsured and underinsured disproportionately rely on ambulance services for transport to the emergency department." ECF 11-9, at 5–6 ¶ 14. Because such individuals are "more likely to wait until their conditions become more severe and then use ambulance services to receive necessary care . . . [a] higher number of uninsured and underinsured individuals will therefore result in more ambulance transports for which Chicago does not receive reimbursement and thus must make up for the shortfall in its budget." *Id.* Additionally, Ige affirmed that "[t]he Rule would significantly increase barriers to coverage and the number of uninsured residents, increase health care costs for residents, and further burden the City's health care safety net." *Id.* at 3 ¶ 6.

Similarly, Edward Johnson, the Assistant Public Health Commissioner for External Affairs for the Columbus Department of Public Health, and Faith Leach, the Chief Administrative Officer of the City of Baltimore, outlined the same effects on the cities of Columbus and Baltimore. *See* ECF 11-7 (Johnson Decl.), at 2–3 ¶¶ 9–11 (noting that if the rate of uninsured individuals increases, the health care system designed to serve the uninsured residents within the community "will necessarily see even more patients, and either Columbus will have to provide them with additional funding or they will have to decrease the range of services or patients they are able to cover"); ECF 11-8 (Leach Decl.), at 3–4 ¶¶ 12, 13 (explaining that an increased uninsured rate will cause "further strain on a system that is already overstretched," and more ambulance calls for which Baltimore does not receive reimbursement and must make up for in its budget). What is more, the Rule itself acknowledged that if enrollees become uninsured as a result of the Rule, they "may face higher costs for care and medical debt

if care is needed," and that "[t]hese costs may, in turn, be incurred by hospitals and municipalities in the form of uncompensated care." 90 Fed Reg. at 27,192; *see also* 90 Fed. Reg. at 27,213 (acknowledging that an "increase in the rate of uninsurance may impose greater burdens on the health care system through strain on emergency departments").

Accordingly, the Court finds that the City Plaintiffs have sufficiently shown that they are likely to suffer financial injury because the Rule will directly lead to increased costs incurred by the City Plaintiffs in the form of shouldering the expense of uncompensated care. Further, the asserted imminent fiscal injury is clearly "fairly traceable" to the Defendants' actions. *Lujan*, 504 U.S. at 560–61. As to redressability, a stay preventing the challenged provisions from going into effect would unquestionably stop the alleged fiscal injury from occurring. Therefore, the City Plaintiffs have established standing.[8]

### B.    Motion to Stay

As noted above, Plaintiffs challenge nine provisions as either contrary to law, arbitrary and capricious, or both. Plaintiffs initially challenged the revocation of the low-income SEP in their opening brief but abandoned that claim on Reply. *See* ECF 30, at 15 n.7 ("Given the enactment of Pub. L. No. 119-21 §§ 71301–71305, Plaintiffs no longer seek a Section 705 stay with respect to the revocation of the low-income special enrollment period."). Plaintiffs separate their challenges into three categories: challenges to provisions that erode the value of coverage, challenges to provisions that impose barriers on enrollment, and challenges to provisions that limit the availability of subsidized coverage. ECF 11-1, at 2.

Plaintiffs' first three challenges under the "erosion of the value coverage" section seek relief from a provision imposing a monthly surcharge of $5 on enrollees to reconfirm eligibility,

---

[8] As previously described, the Court need not reach the question of standing for DFA at this time.

a provision revising the premium adjustment methodology, and a provision revising the actuarial value policy. *See generally* ECF 11-1. Plaintiffs' next two challenges under the "barriers to enrollment" section seek relief from a provision requiring enrollees to pay past-due premiums before receiving new coverage and a provision adding verification requirements for SEP enrollments. *Id.* Plaintiffs' final three challenges under the "limiting the availability of subsidized· coverage" section seek relief from a provision re-instituting a policy regarding failure-to-reconcile tax data and two provisions requiring heightened income verification when a person's projected annual income does not match IRS data or when tax data is unavailable. *Id.* The Court will address each challenge in turn.

        1.    <u>Likelihood of Success on the Merits</u>

            *i.*    *Eligibility Redetermination / Imposition of a "Junk Fee"*

As noted, a taxpayer is eligible for tax credits to cover the cost of premiums if he or she enrolls in coverage through the Exchange, falls within the specified income thresholds, and lacks an offer for other affordable health insurance. 26 U.S.C. § 36B(c)(1), (2). As Plaintiffs describe, "[t]he amount of the tax credit is determined by the taxpayer's income and the cost of a benchmark plan offered through the Exchange." ECF 11-1, at 20 (citing 26 U.S.C. § 36B(b)). Additionally, "[e]ligibility for, and the amount of, APTCs turn on the same statutory criteria." *Id.* (first citing 42 U.S.C. § 18081(a)(2), and then citing *id.* § 18082(a)(1)). The Rule provides that (1) if an enrollee does not submit an application for an updated APTC eligibility determination for plan year 2026 on or before the deadline to select Exchange coverage and (2) that enrollee's post-APTC premium will be zero dollars (*i.e.*, the enrollee's coverage will be fully subsidized), then (3) the Exchange "must decrease the amount of" the APTC "applied to the [enrollee's] policy such that the remaining monthly premium owed for the policy equals $5."

90 Fed. Reg. at 13,031. Plaintiffs colorfully describe this requirement to reduce the value of the APTC by at least $5.00 a month as a "junk fee." ECF 11-1, at 20.

To justify the fee, Defendants argue that "many consumers are unknowingly enrolled in [subsidized Exchange] plans or in multiple forms of coverage" because brokers allegedly improperly enroll consumers in fully subsidized plans to earn commission payments. ECF 28, at 32. According to Defendants, these "improper enrollments can persist due to enrollees being continuously reenrolled in fully subsidized Exchange plans from year to year without having to take any action." *Id.* Defendants maintain that "[t]he Rule [] addresses this enrollment issue by 'prompt[ing]' individuals enrolled in fully subsidized Exchange plans 'to update or confirm' their eligibility for such plans 'or else pay a $5 monthly premium' until they do so." *Id.* at 33 (first quoting 90 Fed. Reg. at 27,103; and then citing *id.* at 27,102).[9]

As the basis for the agency's authority, Defendants argue that the "ACA grants the HHS Secretary the authority to 'establish a program' for making [APTC] eligibility determinations and to 'establish procedures' for 'redetermin[ing] eligibility on a periodic basis in appropriate circumstances.'" ECF 28, at 34 (first quoting 42 U.S.C. § 18081(a)(1); and then quoting *id.* § 18081(f)(1)(B)). Plaintiffs acknowledge the agency's obligation to redetermine eligibility on a periodic basis in appropriate circumstances. ECF 11-1, at 20 (citations omitted). However, they argue that "CMS's authority under the statute is to determine *whether* the statutory criteria for APTC eligibility are met, not to *alter* those criteria." *Id.* (emphasis added) (citing *Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 975 (E.D. Va. 2005)). Plaintiffs contend that "[n]othing in section 18081 or the remainder of the Act grants CMS the power to change the

---

[9] The Rule states that "the full amount of" an enrollee's APTC will be "reinstate[d]" once the enrollee submits an application "confirm[ing] [their] eligibility for APTC that covers the entire monthly premium." 90 Fed. Reg. at 27,102.

statutory calculation" to reduce APTCs by $5 per month for applicants who automatically re-enroll in a plan that would otherwise be fully subsidized. *Id.*

Relying on 42 U.S.C. § 18081(a)(2), Defendants counter that the "ACA tasks HHS with 'determining' whether individuals enrolled in Exchange plans 'meet[] the income and coverage requirements' for claiming PTCs, and with determining 'the amount' of those tax credits." ECF 28, at 34 (quoting 42 U.S.C. § 18081(a)(2)).[10]  Defendants further argue that it is "likewise HHS's responsibility to determine an Exchange enrollee's eligibility for APTCs and to calculate the amount of those APTCs (which mirror the applicable PTC amount)." *Id.* (first citing 42 U.S.C. § 18082(a)(1), (3); and then citing 45 C.F.R. § 155.305(f)(5)).  Importantly, however, 26 U.S.C. § 36B provides a formula for calculation of tax credits, which is determined by income and the cost of a benchmark plan offered through the Exchange.  That statutory provision states:

> The premium assistance amount determined under this subsection with respect to any coverage month is the amount equal to the lesser of—
>
> (A) the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer and which were enrolled in through an Exchange established by the State under 1311 of the Patient Protection and Affordable Care Act, or
>
> (B) the excess (if any) of—
>
>> (i) the adjusted monthly premium for such month for the applicable second lowest cost silver plan with respect to the taxpayer, over
>> (ii) an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income for the taxable year.

---

[10] Under 42 U.S.C. § 18081(a)(2), the Secretary "shall establish a program meeting the requirements of this section for determining . . . in the case of an individual claiming a premium tax credit or reduced cost-sharing under section 36B of title 26 or section 18071 of this title— (A) whether the individual meets the income and coverage requirements of such sections; and (B) the amount of the tax credit or reduced cost-sharing."

26 U.S.C. § 36B. The agency cannot utilize its general rulemaking authority to override explicit statutory provisions. *See Air All. Hous. v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[I]t is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority."). As such, CMS lacks authority to tinker with the premium cost structure outlined in 26 U.S.C. § 36B.

Relatedly, CMS does not have the authority to change the statutory formula for APTCs under 42 U.S.C. § 18081(f)(1)(B). That section provides that the Secretary of HHS "shall establish procedures by which the Secretary or one of such other Federal officers—redetermines eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B). The Court finds that the relatively limited grant of authority to "redetermine[] eligibility" for APTCs under "appropriate circumstances" does not encompass broad power to adjust the amount of APTCs, which are set according to a statutory formula. *Id.* According to Defendants, "the provision's very purpose is to facilitate HHS's ability to *redetermine* enrollees' *eligibility* to remain enrolled in fully subsidized Exchange plans, and the 'procedure[]' HHS opted for in the Rule is the assessment of a nominal premium that is designed to prompt certain enrollees to affirmatively reconfirm their eligibility." ECF 28, at 34 (emphasis in original) (quoting 42 U.S.C. § 18081(f)(1)(B)). But "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Merely stating that the purpose of the provision comports with the agency's general rulemaking authority to "redetermine eligibility" does nothing to address Plaintiffs' argument that Defendants were not free to choose a procedure that "change[d] the statutory calculation in this way." ECF 11-1, at 20. Defendants' interpretation of its authority stretches the "redetermine eligibility" language beyond its plausible meaning and scope. *See Util. Air Regul. Grp.*, 573

28

U.S. at 328 ("Agencies are not free to "adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." (quotation marks and citation omitted)).  In short, the authority to verify eligibility does not infuse the agency with authority to re-write Congress's unambiguous statutory formulas.  Indeed, even Defendants, in a separate section of their brief, explicitly acknowledge that tax credits are based on a statutory formula:

> Eligibility to claim such a premium tax credit [] is governed by the Internal Revenue Code [], which provides that an 'applicable taxpayer' whose annual household income is below a certain level can claim on his federal return a PTC amount that turns on (1) the percentage of annual household income that the individual is required to contribute to monthly health insurance premiums (as prescribed by statute) and (2) the monthly premium cost of a "benchmark" silver plan on the relevant Exchange.[11]

ECF 28, at 24 (citing 26 U.S.C. § 36B(b)(2)–(3)).[12]

The Court finds that HHS lacks the authority to impose a fee on plans that would otherwise be fully subsidized through APTCs via the formula prescribed by Congress.  There are explicit formulas in the statutes for calculating APTCs, and Defendants do not have authority to re-write those formulas by reading broad authority into the limited statutory directive allowing HHS to "redetermine[] eligibility" for enrollment under "appropriate circumstances."  42 U.S.C. § 18081(f)(1)(B).  Additionally, the Court agrees that the "Treasury's obligation is to pay the

---

[11] Defendants further acknowledge that "[a]n individual's eligibility for these APTCs is tied to his or her eligibility for PTCs[.]"  ECF 28, at 25 (citing 42 U.S.C. § 18082(c)).

[12] Though certainly not conceding the point, Defendants at least acknowledged at the hearing that there exists an incongruity between the imposition of the $5.00 charge and the statutory framework for setting APTCs.  *See* ECF 34, at 72:9–15 ("And I think, Your Honor, if I were to concede of the three contrary to law claims here, this one [the "junk fee"], I think, is a little bit less clear-cut for us in that [the question] does amount to, is this Agency's authority to re-determine eligibility, does that encapsulate its ability to -- or its obligation, also, to determine eligibility for a set amount of an advanced premium tax credit?").

amount that would be owed under the section 36B formula, not a different amount arbitrarily selected by CMS." ECF 11-1, at 21.

In short, Plaintiffs are likely to succeed in showing that the "junk fee" provision is contrary to law because applicants cannot be compelled to pay a fee that is untethered to the statutory formula.[13]

### ii.    Revised Premium Adjustment Percentage Methodology

The ACA directs the HHS Secretary to determine an annual "premium adjustment percentage" based on "the average per capita premium for health insurance coverage in the United States for the preceding calendar year." 42 U.S.C. § 18022(c)(4). This measure of premium growth is then used to set the rate of increase for a number of parameters defined in the ACA, such as the maximum annual limitation on cost sharing under Exchange plans, *see* 45 C.F.R. 156.130(a). Because the IRS traditionally adopts the same premium growth indexing methodology as HHS, the methodology used to calculate the premium adjustment percentage also affects how PTC and APTC amounts are calculated and, by extension, the cost of health care coverage on Exchanges.[14] *See* 90 Fed. Reg. at 27,171. HHS presently only considers premiums for *employer*-sponsored coverage in the premium adjustment percentage calculation, not insurance purchased by *individuals* on the marketplace. The Rule, however, incorporates

---

[13] Because the Court finds that Plaintiffs are likely to succeed on their argument that this provision of the Rule is contrary to law, the Court need not reach Plaintiffs' alternative argument that adopting the provision was arbitrary and capricious.

[14] In the reply brief, Plaintiffs confirmed: "[a]s expected, after we filed our opening brief, the IRS followed its ordinary practice of deferring to CMS's calculation, thereby confirming that tax credits will be lower for Exchange enrollees across the board." ECF 30, at 12 (first citing Rev. Proc. 2025-25, https://perma.cc/SZ5A-LDBG; and then citing Gideon Lukens and Elizabeth Zhang, Centers for Budget & Policy Priorities, *Administration's ACA Marketplace Rule Will Raise Health Care Costs for Millions of Families* (Aug. 1, 2025), https://perma.cc/VZ43-SNJY).

individual insurance market data into this measure. *Id.* at 27,169. Section 1302(c)(4) of the ACA and § 156.130(e) provide that the premium adjustment percentage is the percentage (if any) by which the average per capita premium for health insurance coverage for the preceding calendar year exceeds such average per capita premium for health insurance for 2013. *Id.* at 27,166. In response to the proposed rule, commenters expressed concern that "individual market premiums should not be used to measure premium growth since 2013 because premiums in the early years of ACA were volatile[.]" *Id.* at 27,173.

Plaintiffs contend that "[a]s a result" of the Rule's incorporation of individual plan prices into the premium growth indexing methodology, "the maximum out-of-pocket limit in 2026 will be about $450 higher for an individual and $900 higher for a family than it otherwise would have been." ECF 11-1, at 24 (citing 90 Fed. Reg. at 27,206). According to Plaintiffs, "[t]his will lead to increased premiums across the board and 80,000 fewer enrollments in the Exchanges under CMS's own estimates, running the risk of a spiral of a worsening risk pool and increased premiums, as well as higher volumes of uninsured patients being seen by health centers." *Id.* (internal quotation marks and citations omitted). Plaintiffs argue that "CMS acknowledged that its choice ran contrary to the Act's goals, but it brushed this concern aside, reasoning that it didn't need to take these issues into account when it exercised its discretion under section 18022(c)(4) to adopt an 'appropriate' methodology." ECF 11-1, at 25 (first citing 90 Fed. Reg. at 27,172, then citing 90 Fed. Reg. 12,942, 12,990 (Mar. 19, 2025)). Plaintiffs conclude that "CMS was not free to disregard the costs it was imposing on Exchange enrollees." *Id.*

Defendants do not dispute that the new Rule will affect the cost of Exchange plans. *See* ECF 28, at 50 ("HHS acknowledges that the new methodology will increase the maximum annual limitation on cost sharing and net premiums for enrollees with incomes under 400 percent

of the FPL, which could in turn negatively impact the cost of Exchange coverage and enrollment." (citing 90 Fed. Reg. at 27,171, 27,206–07)). However, Defendants maintain that "any such impact would be a consequence of *Congress's* decision to tie the value of certain forms of financial assistance under the ACA to the premium adjustment percentage." ECF 28, at 50 (emphasis in original). Defendants also argue that "HHS [] concluded—and reasonably so—that a premium adjustment percentage methodology that considers 'all private health insurance premiums' is 'more consistent with' that congressional intent and the ACA's text." ECF 28, at 50 (quoting 90 Fed. Reg. at 27,172). In the Rule, CMS explained that "[b]ecause the role of the premium adjustment percentage is to appropriately index various parameters defined in the ACA, the primary consideration for setting the value of the premium adjustment percentage should be whether it accurately and comprehensively captures the rate of premium growth in the United States rather than the impact of the indexing methodology on net premiums, enrollment, access to health care, health outcomes, or out-of-pocket costs for those who receive non-covered or out-of-network care." 90 Fed. Reg. at 27,172. According to the agency, "[c]onsidering these other impacts when setting the premium adjustment percentage may result in a measure of premium growth that does not accurately reflect actual premium growth in the United States, artificially inflating the generosity of provisions of the ACA beyond the intent of Congress." *Id.*

That the agency changed its view on how to set the premium adjustment percentage does not mean its position was not substantially justified. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for

disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). "We defer to the agency's new position no less than the old, so long as we are satisfied that the agency's change in position was intentional and considered." *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 290 (4th Cir. 2013).

Here, the agency's change in position was not arbitrary and capricious because it provided the necessary reasoned explanation for the change. In the Rule, HHS clarified that premiums from the individual market were previously excluded because they were "most affected by the significant changes in benefit design and market composition in the early years of implementation of the ACA market rules and were most likely to be subject to risk premium pricing," and later, in 2022, the agency "anticipated that these premiums would be more volatile in response to the COVID-19 PHE than employer-sponsored premiums." 90 Fed. Reg. at 27,173. However, the agency reasoned that "the ACA is now past the initial years of implementation and issuers have had the opportunity to collect data on the risk composition of the individual market and adjust pricing accordingly . . . [a]dditionally . . . premiums in the employer-sponsored market increased more rapidly than premiums in the individual market during the COVID-19 PHE, the impact of which has led to a decreasing gap in premium growth between the individual market and employer-sponsored market." *Id.* In light of those findings, the agency determined that "a comprehensive measure incorporating both individual market and employer-sponsored premiums will more accurately reflect true premium growth going forward." *Id.*

While Plaintiffs argue that the agency "entirely failed to engage with the point raised by commenters that the new methodology was *less* accurate, since it incorporated data from individual insurance premiums in 2013 that wouldn't provide an apples-to-apples measure of

growth in health care costs, but that would inevitably inflate the premium adjustment percentage," ECF 30, at 13, the Rule reflects that the agency explicitly responded to this concern by commenters:

> We acknowledge that the premium adjustment percentage is a cumulative measure and, as such, the market fluctuations in the early years of ACA implementation are included in the calculation when using private health insurance premiums (excluding Medigap and property and casualty insurance) as the data source for indexing. However, because it is a cumulative measure, the impact of these early years decreases as more time elapses between the applicable plan year and the benchmark year (2013). For example, for PY 2018, PY 2014 was 1 of 4 years of growth included in the premium adjustment percentage measure and therefore the weight of PY 2014 premium growth was approximately one quarter of the overall measure. For PY 2026, PY 2014 is 1 of 12 years of growth included in the measure. Therefore, for PY 2026, the weight of PY 2014 is only one twelfth of the overall measure. As such, the greater time between the benchmark year and the applicable plan year reduces the impacts of any individual year, even if the premium growth in that year is unusual.

90 Fed. Reg. at 27,173. HHS both explained the reasoning behind the policy change and addressed commenters' concerns that the new methodology would lead to less accurate measures of premium growth. While this policy change will undoubtedly have effects on the broader insurance market, including, as HHS concedes, an increase in premiums and a worsening risk pool, the Court is constrained to conclude that HHS did not act without explanation or rationale in making this decision. In fact, the agency took these negative effects into account when responding to comments in the final Rule, but ultimately concluded that the new methodology was more closely aligned with Congressional intent and the text of the ACA, and therefore should nonetheless be adopted. *See id.* at 27,172 (acknowledging commenters' concern that healthy enrollees "may be less likely to enroll due to the higher net premiums that result from the change in the premium adjustment methodology" but ultimately finding "consideration of the impact of this proposal on the risk pool to be outside the scope of the indexing provisions of

34

the ACA because the purpose of the premium adjustment percentage is to accurately index program parameters against the growth in premiums, not to control the growth of those premiums"). Accordingly, the Court is satisfied that "such a change in course was made as a genuine exercise of the agency's judgment." *Philip Morris*, 736 F.3d at 290; *see also City of Columbus*, 523 F. Supp. 3d at 758 ("The court may not supplant the agency's view that the new policy is better than the old one simply because Plaintiffs prefer the old policy.").[15] Consequently, Plaintiffs have not shown likelihood of success on the merits on their claim that the provision was arbitrary and capricious.

### iii.    Actuarial Value Policy

Under the ACA, health insurance plans offered on Exchanges must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute. 42 U.S.C. § 18022(a). A plan's "level of coverage," or actuarial value, reflects the estimated average percentage of covered health care expenses that will be paid by the insurance plan. For example, under a plan with an actuarial value of 80%, the insurer will pay, on average, 80% of covered medical expenses, and the enrollee will pay the remaining 20% of expenses through a combination of deductibles, coinsurance, co-payments, and maximum out-of-pocket limits. Consequently, the higher a plan's actuarial value, the lower an enrollee's out-of-pocket costs, on average. Plans that have a higher actuarial value also have higher premiums.

---

[15] In light of the Court's finding on this point, the Court is unconvinced that Plaintiffs' argument that the agency had an "unalterably closed mind" during rulemaking could provide an independent basis for relief on this claim. ECF 11-1, at 25. The examples put forth by Plaintiffs, *see id.*, are insufficient to show that Defendants were "unwilling or unable to rationally consider arguments." *Mississippi Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 183 (D.C. Cir. 2015) (quotation marks and citations omitted).

The statute instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). As relevant here, current regulations provide that the "allowable variation" in the actuarial value of silver, gold, and platinum plans is two percentage points above and below their respective benchmark actuarial values (*i.e.*, +2/-2 percentage points). 45 C.F.R. § 156.140(c)(2). The Rule will change this range to +2/-4 percentage points. *See* 90 Fed. Reg. at 27,174. And for bronze plans, current regulations allow for a +5/-2 percentage point range, which the Rule will change to +5/-4 percentage points. *Id.*

Plaintiffs explain that "[t]he formula for PTCs turns on the cost of the second-lowest-cost silver plans available on the Exchange." ECF 11-1, at 26 (citing 26 U.S.C. § 36B(b)(2)(B)). Thus, "[b]y permitting insurers to sell cheaper, but less comprehensive, silver plans, CMS will therefore decrease the value of the tax credits for all enrollees, leading to a reduction in PTCs by $1.22 billion overall for 2026 alone, by CMS's own calculation." *Id.* (citing 90 Fed. Reg. at 27,208). Plaintiffs argue that "[t]he rule does not even attempt to justify the new policy as an effort to account for differences in actuarial estimates." *Id.* at 27 (citation omitted). Defendants counter that "CMS [] made the reasoned judgment that such 'short-term' concerns about how wider ranges would affect subsidized enrollees should not necessarily take priority over the longer-term prospect of plans with lower premiums and competitive cost-sharing structures drawing unsubsidized consumers to Exchanges, 'potentially improv[ing] the risk pool as coverage becomes more affordable for generally healthy people who currently may opt to forgo coverage altogether.'" ECF 28, at 54 (quoting 90 Fed. Reg. at 27,175).

Generally, "an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club*, 899 F.3d at 293 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Defendants posit that "HHS [] made the reasonable observation that consumers considering different plan options typically care less about marginal differences in the actuarial values of plans than they do about more 'meaningful differences' that they can 'understand and appreciate,' such as whether a high-deductible plan with no coinsurance is a better value than a plan with a lower deductible but more co-payments." ECF 28, at 53 (quoting 90 Fed. Reg. at 27,177). That may well be true, but the agency is nonetheless constrained to rely only "on factors which Congress has [] intended it to consider" when exercising its authority under the statute. *Sierra Club*, 899 F.3d at 293. Here, as Plaintiffs point out, "[t]he purpose of the standard is set forth in section 18022(d)(3) itself [and] the only permissible 'de minimis' variations are those that account for uncertainties in 'differences in actuarial estimates,' not variations to reflect a new Administration's policy preference for less generous subsidies." ECF 11-1, at 27.

Moreover, the agency was obligated to establish a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The agency stated that it believes that "lower AVs would lead to lower premiums, and in turn potentially improve the risk pool as coverage becomes more affordable for generally healthy people who currently may opt to forgo coverage altogether." 90 Fed. Reg. at 27,175. The agency then acknowledged that "although this may mean that those eligible for APTCs receive less money in tax credits, we believe that in the long term there would be a sufficient choice of affordable plans." *Id.*

37

Similarly, in response to commenters' concerns that the provision would "lead to increased out-of-pocket consumer costs as plan cost-sharing generosity decreases and higher overall premiums for some consumers given a potential impact on the generosity of the SLCSP, the benchmark plan used to determine an individual's PTC," *id.* at 27,176, the agency merely stated that the "change is essential to restoring greater balance between access and affordability in the long term," and "the overall benefits to the risk pool as a result of this change will better incentivize unsubsidized enrollees to enroll in coverage, which we expect to lower overall costs and further drive down premiums as the risk pool improves," *id.* at 27,176–77.

This reasoning is conclusory and unsupported by evidence. Defendants cannot merely label something a "short-term" trade-off to avoid engaging with data and justifying the change during the rulemaking process. There is no data to back up the claim and reasoning that coverage would become "more affordable" over time when *even CMS itself* estimates that the policy widening the de minims range will reduce aggregate PTCs by $1.2 billion in 2026. *See* 90 Fed. Reg. at 27,208. And, as Plaintiffs note, data shows that "[a] typical family of four would see their subsidies decrease, and their cost of coverage rise, by up to $714 for the year." ECF 11-1, at 26 (citing Ctr. for Budget & Policy Priorities comment at 34–35 (Apr. 11, 2025), https://perma.cc/KP9W-J63N). Plaintiffs argue, and the Court agrees, that the "relationship between subsidies and the strength of the risk pool is well established by empirical research, but CMS simply stated that it 'expect[ed]' its rule to have the opposite effect, without citing any evidence to support this subjective belief or engaging with the record." *Id.* (quoting 90 Fed. Reg. at 27,107). Such "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). Thus, the Court finds that Defendants provided an insufficient and

conclusory rationale for altering the de minims variation, and Plaintiffs are likely to succeed on their claim that the agency acted in an arbitrary and capricious manner.

*iv.*     *Revocation of Guaranteed-Issue / Past Due Premium*

The next challenged provision will allow issuers to require a customer to pay (1) any past-due premiums the customer owes the issuer (or related issuers) for prior coverage *and* (2) the initial premium amount (also known as a "binder payment") required for new coverage before the latter coverage is effectuated. *See* 90 Fed. Reg. at 27,084, 27,220. If the customer fails to pay that combined amount in full, the issuer can decline to effectuate the new coverage. *Id.* at 27,084.

Defendants argue that "an issuer's provision of coverage is of course contingent on the enrollee's payment of premiums." ECF 28, at 22 (citing 42 U.S.C. § 300gg-2(b)(1) (providing that an issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums")). Defendants also cite 45 C.F.R. § 155.400(e) in support of their argument, which provides that federally facilitated Exchanges and State-based Exchanges on the federal platform "will[] require payment of a binder payment" equivalent to "the first month's premium" to "effectuate an enrollment" in an Exchange plan. *Id.* According to Defendants, "[t]he Rule simply allows an issuer who is owed past-due premiums from a particular customer to lawfully credit any payments made by that customer for new coverage to the past-due balance before crediting any payments to the initial premium amount for the new coverage." *Id.* In doing so, "if, as a result of such a lawful allocation policy, the consumer still has an outstanding balance on the initial premium amount, then the issuer can decline to effectuate the new policy for failure to pay the requisite initial premium." *Id.* (citations omitted). Plaintiffs maintain that "[t]he

39

agency was not free to rewrite the text to carve out a new exception to the statute's categorical [guaranteed-issue] rule." ECF 11-1, at 28 (citation omitted).

The ACA's guaranteed-issue requirement provides that "each health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept *every* employer and individual in the State that applies for such coverage," subject only to specified exceptions. 42 U.S.C. § 300gg-1(a) (emphasis added). Defendants invoke separate statutory provisions that relate to renewability and termination of coverage, rather than issuance, to justify the new past-due premium policy. *See* 42 U.S.C. § 300gg-2(b)(1).

The Court finds no authority in the text of the statute for the agency's decision to "credit any payments made by that customer for new coverage to the past-due balance before crediting any payments to the initial premium amount for the new coverage." ECF 28, at 22. As Plaintiffs point out, "[a]n exception for past-due premiums is not one of the Act's enumerated exceptions to the guaranteed-issue requirement, as CMS itself has long understood." ECF 11-1, at 28 (citing 77 Fed. Reg. 70,584, 70,599 (Nov. 26, 2012)). Plaintiffs clarify that "[t]here is such an exception for past-due premiums in the Act's parallel provision that guarantees the *renewability* of policies. But, [] that exception is absent from the guaranteed-issue provision." ECF 11-1, at 28 (emphasis added) (citing 42 U.S.C. § 300gg-2(b)(1)). This demonstrates "Congress's understanding that an outstanding debt could prevent an enrollee from maintaining the policy he or she currently has, but that the debt wouldn't lock the enrollee out of the market altogether." *Id.* at 29 (citation omitted). Had Congress wanted to condition issuance of a new policy on payment of past premiums, it clearly knew how to do so expressly. *See* 42 U.S.C. § 300gg-2(b)(1) (providing that an issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums"). In the absence of an enumerated exception to the guaranteed-issue

requirement, the agency "has no power to tailor legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regul. Grp.*, 573 U.S. at 325 (internal quotation marks omitted); *see also TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent" (cleaned up)); *Polselli v. IRS*, 598 U.S. 432, 439 (2023) ("We assume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another section of the same Act." (internal quotation marks and citations omitted)).

Defendants put forth various concerns and objections to the current regulation, including the alleged "perverse incentives" it creates. ECF 28, at 21. According to Defendants, the Rule's past-due premium policy will "help to promote continuous coverage, reduce gaming and adverse selection, ensure that ACA subsidies are targeted to those who are eligible, and allow issuers to more accurately predict costs and prices." *Id.* (citing 90 Fed. Reg. at 27,084). Regardless of the merits of those arguments, they are best directed to Congress, as it is only Congress who can add enumerated exceptions to the guaranteed-issue requirement. *See Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*, 153 F.3d 155, 161 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) ("[N]either federal agencies nor the courts can substitute their policy judgments for those of Congress."). The Court is bound by the plain text of the statute in its current form, which contains a guaranteed-issue requirement, subject only to specific, enumerated exceptions. The exceptions do not include a provision permitting insurers to deny issuance of coverage based on

failure to pay a past-due premium. Accordingly, Plaintiffs are likely to succeed in challenging the provision as contrary to law.[16]

v.    *SEP Eligibility Verification Requirements*

The ACA requires Exchanges to provide for SEPs during which qualifying individuals may enroll for coverage in between the annual open enrollment periods. 42 U.S.C. § 18031(c)(6)(C). Under current regulations, federally facilitated Exchanges are required to conduct pre-enrollment eligibility verification only for applicants seeking to enroll in an Exchange plan under the loss-of-minimum-essential-coverage SEP; they are not permitted to conduct such pre-enrollment eligibility verification in conjunction with any other category of SEP. *See* 45 C.F.R. § 155.420(g). Under the Rule, federally facilitated Exchanges will instead be required to conduct pre-enrollment eligibility verification for other categories of SEPs as well (*e.g.*, permanent move, marriage, etc.), which is consistent with the eligibility verification policy that was in place between 2017 and 2022. *See* 90 Fed. Reg. at 27,148–49. The Rule further requires those federal Exchanges to conduct pre-enrollment eligibility verification "for at least 75 percent of new enrollments through SEPs." *Id.* at 27,148, 27,223. The Rule is time-limited and will sunset at the end of 2026, and the eligibility verification requirements do not apply to State Exchanges.[17] *Id.* at 27,151.

---

[16] Because the Court finds that Plaintiffs are likely to succeed on their argument that this provision of the Rule is contrary to law, the Court need not reach Plaintiffs' alternative argument that the agency's adoption of this provision was arbitrary and capricious.

[17] States are given the "option" to conduct pre-enrollment eligibility verification for SEP enrollment, but they are not required to do so, a policy unchanged by the Rule. *See* 90 Fed. Reg. at 27,151 ("[T]he program integrity issues are largely concentrated in Exchanges utilizing the Federal platform.").

Plaintiffs maintain that "[t]his rule will generate 293,000 verification issues to resolve in the coming year, resulting in a further barrier to coverage, through additional paperwork and administrative burdens, and costing consumers more than $7 million in 2026." ECF 11-1, at 33 (citing 90 Fed. Reg. at 27,186). According to Plaintiffs, "[y]ounger and healthier people are more likely to drop coverage as a result, leading to a worsening of the risk pool, as CMS itself realized the last time it considered (and rejected) a similar policy." *Id.* (citations omitted). Plaintiffs argue that Defendants failed to provide "an adequate explanation for why the agency acted at all," and there was a "fundamental mismatch between the agency's policy and the problem it claimed it was trying to solve." *Id.* at 34. Specifically, "CMS attempted to justify this policy as a response to the problem of improper enrollments by brokers," but according to Plaintiffs, "the agency fundamentally misconceived the scope of that problem and ignored the success of recent efforts to address broker misconduct." *Id.* (citing 90 Fed. Reg. at 27,150).

Defendants respond that "because of their limited scope, the regulations 'do not provide enough protection against misuse and abuse' of SEPs, which enables otherwise ineligible individuals to enroll in Exchange plans 'only after they become sick or . . . need expensive health care services,' which in turn 'negatively impacts both the risk pool and program integrity around determining eligibility for' APTCs and other subsidies." ECF 28, at 47 (quoting 90 Fed. Reg. at 27,148). According to the Rule, requiring pre-enrollment eligibility verification for all SEP categories "improves the risk pool by restricting people from gaming SEPs to wait to enroll until they need health care services."[18] 90 Fed. Reg. at 27,150. Additionally, CMS reasons that "pre-

---

[18] The agency suggested that pre-enrollment verification requirements that previously applied to SEPs did not create substantial barriers to Exchange enrollment, and that such requirements had the effect of "encourag[ing] continuous enrollment by making it more difficult to engage in strategic enrollment and disenrollment" based on customers' changing health status. 90 Fed. Reg. at 27,149.

enrollment verification for SEPs strengthens program integrity by denying ineligible enrollments and discouraging ineligible enrollees who know they cannot meet verification standards from attempting to enroll which, in turn, reduces Federal subsidies to ineligible consumers who would otherwise enroll and receive APTC and CSR subsidies." *Id.*

While an agency "is not required to choose the best solution, only a reasonable one," *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007), it is required to "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made," *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021). Importantly, courts are not free to "ignore the disconnect between the decision made and the explanation given." *Dep't of Com.*, 588 U.S. at 785. "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.*

Here, the Court finds that the agency's chosen solution is unmoored from the problem it seeks to address. The provision purports to address "urgent program integrity concerns," 90 Fed. Reg. at 27,151, and alleged "gaming" of SEPs through enrollees waiting until they are sick to enroll in coverage, *id.* at 27,150, in an effort to "discourag[e] ineligible enrollees who know they cannot meet verification standards from attempting to enroll," *id.* But the agency offers no current data, reports, or evidence establishing that the "misuse and abuse" of SEPs, 90 Fed Reg. at 27,148, stems from SEP enrollment *in particular*. In the Rule, the agency cites to a "GAO undercover testing study of SEPs" from 2016, which found that "9 of 12 of GAO's fictitious applicants were approved for coverage on the Federal and selected State Exchanges." *Id.* But as noted, that study was from 2016, and the parties have not identified, nor can the Court locate, any evidence in the Rule to corroborate Defendants' conclusory assertion that abuse of SEPs is

*currently* contributing to the "program integrity concerns" the agency seeks to address through this provision. Accordingly, it remains merely a theory that the "temporary policy will help stabilize the marketplace in [Plan Year] 2026 as the subsidy environment normalizes and the high levels of improper enrollments are reduced before reverting back in PY 2027." 90 Fed. Reg. at 27,152. Further, the agency's conclusion that "the additional burden [on enrollees] is not significant enough to outweigh the merits of SEP verification and the increases in program integrity that it provides," *id.* at 27,151, is insufficient to address the very real concern raised by numerous commenters that the Rule change will improperly hinder the enrollment of eligible individuals.[19] Defendants similarly fail to articulate how an audit of 75% of new enrollments will curb the alleged problem.

After reviewing the record, the Court finds that Plaintiffs' disagreement with CMS is more than a mere policy debate on the merits of the provision, as Plaintiffs have established that Defendants' rationale was not indicative of reasoned decision-making. In short, the hypothesis that such "gaming" and "abuse" of subsidized coverage stems from enrollees and brokers fabricating events triggering SEPs is without support. *See Dep't of Com.*, 588 U.S. at 783 (remanding rule to agency where the record "reveal[ed] a significant mismatch between the decision the Secretary made and the rationale he provided"). The Court agrees with Plaintiffs' principal argument that "CMS offered no good reason to impose this burden on enrollees." ECF 30, at 18. As such, the Court finds that Plaintiffs have shown a likelihood of success on the

---

[19] Indeed, one commenter noted that "a study published by the American Economic Association found that adding one single additional step to the enrollment process prompted a 33 percent decline in enrollment, predominantly among young, healthy, and economically disadvantaged people." *See* Ctr. for Budget & Policy Priorities comment at 29 (Apr. 11, 2025), https://perma.cc/KP9W-J63N (citing Mark Shepard & Myles Wagner, *Do Ordeals Work for Selection Markets? Evidence from Health Insurance Auto-Enrollment*, 115 Am. Econ. Rev. 772 (2025), doi: 10.1257/aer.20231133).

merits on their claim that instituting SEP pre-enrollment verification procedures was arbitrary and capricious.

### vi.    Failure-to-Reconcile Provision

This provision reinstates a prior Failure to File and Reconcile ("FTR") policy that requires an Exchange to determine that a "tax filer" is ineligible for APTCs under the ACA if the applicant (1) received APTCs the prior year and (2) failed to comply with the statutory requirement to file a tax return and "reconcile APTC" for that year. *See* 90 Fed. Reg. at 27,113, at 27,221. This provision, which will apply only through the end of 2026, *see id.* at 27,115, amends the current requirement that such a determination be made only after a tax filer fails to reconcile for two consecutive tax years. *See* 45 C.F.R. § 155.305(f)(4).

The IRS requires taxpayers who receive APTCs—which are typically scaled to the recipient's projected annual household income—to reconcile those advanced payments with the PTC amount they otherwise qualify for in the applicable tax year, as determined by their actual annual household income in that year. *See* 26 U.S.C. § 36B(f). If the APTCs the taxpayer received exceed that allowable PTC amount, then the taxpayer may incur a tax liability, subject to certain income-based caps. *Id.* § 36B(f)(2). Since 2012, HHS has prohibited an Exchange from "determin[ing] a tax filer eligible for" APTCs if the filer (1) received APTCs the prior year and (2) failed to comply with the requirement to file a federal income tax return and reconcile those APTCs for that year. 45 C.F.R. § 155.305(f)(4). Taxpayers who are determined ineligible for APTCs due to their failure to reconcile can still claim on their tax returns the full amount of the PTC they are otherwise eligible for; such taxpayers just would not be able to receive that PTC amount in advance. *Id.*

In 2023, CMS amended the failure-to-reconcile regulations such that a taxpayer becomes ineligible for APTCs only after failing to file a federal income tax return and reconcile their APTCs for *two* consecutive tax years. *See* 90 Fed. Reg. at 27,113. The current Rule provision reverts back to the requirement that a taxpayer be deemed ineligible for APTCs after one year of failing to reconcile, and that change applies only through plan year 2026. *Id.*

In their contrary to law claim, Plaintiffs challenge the agency's authority to "condition eligibility for a tax credit on the reconciliation of old tax debts." ECF 11-1, at 35. Plaintiffs posit that "while CMS may establish procedures to determine whether the statutory standards for APTC eligibility are met, it may not use that procedural authority to change the substantive standards for eligibility." ECF 30, at 20 (first citing 42 U.S.C. § 18081(a), (f); and then citing *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020)). According to Plaintiffs, "[n]othing in the statute conditions eligibility for tax credits or APTC on reconciliation of debts shown on a prior year's tax return." *Id.*

Defendants rightly point out that "the regulation precluding a taxpayer from being eligible for APTCs because of a failure to reconcile, 45 C.F.R. § 155.305(f)(4), was promulgated back in 2012, and the Rule will not change that aspect of the regulation." ECF 28, at 27. According to Defendants, "because Plaintiffs' contrary-to-law claim against the Rule's failure-to-reconcile provision is effectively a challenge to a regulation that has been in force for over a decade, that claim is barred by the six-year statute of limitations applicable to suits against the United States." ECF 28, at 27 (citing 28 U.S.C. § 2401(a)). Plaintiffs respond that "commenters on this year's rule asked the agency to 'fully repeal' the failure-to-reconcile rule on the ground that even the older version of the rule was unlawful," and "CMS understood that these comments were within the scope of the rulemaking and engaged with them on the merits, invoking

47

(incorrectly) its Section 18041 rulemaking authority." ECF 30, at 20 (quoting 90 Fed. Reg. at 27,117). Plaintiffs continue that, even if the rule were time-barred, they "may nonetheless challenge the new rule, because an agency 'cannot take by adverse possession the authority to impose [a rule] in a way that shields the devaluation of statutory language from judicial review.'" *Id.* at 21 (quoting *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020)).

Plaintiffs' first argument appears to invoke the "reopening doctrine," which "allows an otherwise stale challenge to proceed because the agency opened the issue up anew, and then reexamined and reaffirmed its prior decision." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 346 (D.C. Cir. 2018) (internal quotation marks and citation omitted). Specifically, the "doctrine arises where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision." *CTIA–Wireless Ass'n v. FCC*, 466 F.3d 105, 110 (D.C. Cir. 2006) (internal quotation and alterations omitted). "The doctrine only applies, however, where the entire context demonstrates that the agency has undertaken a serious, substantive reconsideration of the existing rule." *All. for Safe, Efficient & Competitive Truck Transp. v. Fed. Motor Carrier Safety Admin.*, 755 F.3d 946, 954 (D.C. Cir. 2014) (internal quotation marks and citation omitted). In 2017, another trial court in this Circuit noted that it "[could not] find [any] Supreme Court or Fourth Circuit precedent recognizing the reopening doctrine." *Indep. Cmty. Bankers of Am. v. Nat'l Credit Union Admin.*, No. 16-cv-1141, 2017 WL 346136, at *4 (E.D. Va. Jan. 24, 2017). This Court has similarly not been able to find, and the parties have not provided, any in-circuit case law addressing this doctrine. However, the reopening doctrine is well-established in the D.C. Circuit, which regularly hears APA claims. *See, e.g.*, *Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021) ("When a later proceeding

48

explicitly or implicitly shows that the agency actually reconsidered the rule, the matter has been reopened and the time period for seeking judicial review begins anew." (internal quotation marks and citations omitted)). As such, despite the lack of in-circuit precedent, the Court cannot identify a reason the reopening doctrine would not apply.

Assuming the doctrine does apply, Plaintiffs have shown it likely cures the statute of limitations issue Defendants identify here. By explicitly re-evaluating and subsequently affirming its statutory authority to issue the failure-to-reconcile provision during the notice and comment rulemaking process, CMS reopened the issue of Congressional authorization for the provision. According to the Rule, "commenters stated that HHS should fully repeal [the failure-to-reconcile] processes because there is no statutory authority for it." 90 Fed. Reg. at 27,117. The agency responded to the comment by evaluating, and then confirming, the purported statutory authority for its action:

> We disagree with commenters that there is no statutory authority for Exchanges to conduct FTR. Consumers who receive APTC are required to file income taxes pursuant to section 6011(a) of the Code and regulations prescribed by the Secretary of Treasury. Section 36B(f) of the Code requires taxpayers to reconcile their APTC under section 1412 of the ACA with their PTC allowed under section 36B of the Code. FTR regulations, implemented pursuant to the Secretary of HHS' general rulemaking authority under section 1321(a) of the ACA, facilitate compliance with those requirements and were implemented as part of the original Exchange Establishment Rule.

*Id.* In the Court's view, this constitutes a "serious, substantive reconsideration of the existing rule." *All. for Safe, Efficient & Competitive Truck Transp.*, 755 F.3d at 954. Even though conditioning APTC eligibility on tax return reconciliation existed in the prior provision, and the Rule re-affirms it, "the [agency] opened its (previous) decisions up to legal challenge when [it] promulgated the Rule through notice and comment rulemaking." *Doe v. U.S. Dep't of Just.*, 650 F. Supp. 3d 957, 984 (C.D. Cal. 2023). The agency explicitly engaged with the statutory

authority for its action in response to targeted comments claiming the full provision must be repealed. Thus, the Court finds that Plaintiffs are likely to succeed in showing that CMS's re-evaluation and subsequent affirmance of its statutory authority to issue the provision during rulemaking falls within the reopening doctrine, thereby curing the statute of limitations issue.

As to the merits, the Court agrees with Plaintiffs that, "[t]he statute does not contemplate that the existence of a prior tax debt affects an applicant's eligibility for APTCs in any way. And if Congress intended to condition eligibility for a tax credit on the reconciliation of old tax debts, it knew how to do so." ECF 11-1, at 35 (first citing 26 U.S.C. §§ 24(*l*), 32(k); and then citing *Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy*, 654 F.3d 496, 507 (4th Cir. 2011)). Once again, Defendants' invocation of its general rulemaking authority under 42 U.S.C. § 18041(a)(1) does not authorize it to flout separate, express provisions of the statute. ECF 28, at 28; *see NRDC v. Reilly*, 976 F.2d 36, 40 (D.C. Cir. 1992) (explaining that a "general grant of rulemaking power . . . [cannot] trump the specific provisions of the act"); *see also Air All. Hous.*, 906 F.3d at 1061 ("[I]t is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority."). CMS is not free to re-write the statutory formula to accomplish its policy goals, irrespective of the efficacy of such a policy. As the Court previously described in evaluating the provision addressing the $5 fee, even Defendants acknowledge that PTCs (and thus, by extension, APTCs) are prescribed by statutory formula. *See* ECF 28, at 24 (citing 26 U.S.C. § 36B(b)(2)-(3)). Thus, the agency's decision to condition APTC eligibility on reconciling tax information reads an exception into the statutory formula that is simply not there. Because the plain text of the statute contradicts the agency's

provision, Plaintiffs have shown they are likely to succeed on their claim that the failure-to-reconcile provision is contrary to law.[20]

### vii.   *Data-Matching Policies / Income Eligibility Verification*

#### (1)   Recission of Automatic 60-Day Extension

When an Exchange attempts to verify an applicant's income for purposes of determining an applicant's eligibility for APTCs, and it finds an inconsistency in that applicant's data, it notifies the applicant and provides the applicant with an opportunity to respond.  42 U.S.C. § 18081(e)(4).  The statute provides a default period of 90 days for that response.  *Id.* §§ 18081(c)(4), (e)(1), (e)(4).  The current regulations provide for an additional 60 days where necessary.  45 C.F.R. § 155.315(f)(7).  The final Rule revokes that 60-day extension.  90 Fed. Reg. at 27,120.  Plaintiffs argue that "CMS wrongly reasoned that it was compelled by the statute to impose a 90-day policy."  ECF 11-1, at 37.  Defendants respond that "[i]t is Plaintiffs' flawed reading of the ACA's plain text that is arbitrary, not the Rule."  ECF 28, at 38.

The Supreme Court recently held that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.  The Court explained that "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry," however, "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."  *Id.* at 412–13.  "If a statute is ambiguous, courts exercise their independent judgment to determine the single, best meaning, but do so with the agency's body of experience

---

[20] Because the Court finds that Plaintiffs are likely to succeed on their argument that this provision of the Rule is contrary to law, the Court need not reach Plaintiffs' alternative argument that the agency's adoption of this provision of the Rule was arbitrary and capricious.

and informed judgment . . . at [their] disposal." *Valladares v. Ray*, 130 F.4th 74, 83–84 (4th Cir. 2025) (alterations in original) (internal quotation marks and citations omitted).

According to Plaintiffs, 42 U.S.C. § 18081(e)(4)(A)(ii) and 42 U.S.C. § 18081(c)(4)(B) grant the agency power to modify the timeline described in paragraph (e)(4)(A). *Id.* at 37–38. However, according to Defendants, "one of those provisions expressly states that the HHS Secretary 'may extend the 90-day period' for resolving income-related inconsistencies 'for enrollments *occurring during 2014*,' and makes no mention of extensions being available during any other year." ECF 28, at 37 (emphasis in original) (citing 42 U.S.C. § 18081(e)(4)(A)(ii)). Further, Defendants argue that while the other provision "provides that the HHS Secretary 'may modify' the 'methods' for verifying information prescribed by the ACA, that provision plainly limits such modifications to the methods by which HHS verifies information with trusted data sources and other federal agencies, not the methods by which Exchanges must try to resolve income-related inconsistencies *with applicants*." *Id.* at 37–38 (emphasis in original) (citing 42 U.S.C. § 18081(c)(4)(B)). Defendants further point out that "§ 18081(c)(4)(B) falls under a subsection titled 'Verification of information contained in records of specific Federal officials,' and the example of a permissible modification that the provision provides concerns the transfer of tax return information from a federal official (*i.e.*, the Treasury Secretary) directly to another trusted data source (*i.e.*, an Exchange or the HHS Secretary)." *Id.* at 38. Plaintiffs respond that "section headings cannot limit the plain meaning of a statutory text." ECF 30, at 22 (citing *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018)). Additionally, Plaintiffs argue "[t]he subsection heading is further beside the point here, given that the relevant statute gives the authority to modify procedures anywhere in the 'section' (not just the subsection)." *Id.* at 22–23 (citation omitted).

The Court begins, as it must, with the statutory text. 42 U.S.C. § 18081(c)(4)(B) provides that "[t]he Secretary may modify the methods used under the program established by this section for the Exchange and verification of information if the Secretary determines such modifications would reduce the administrative costs and burdens on the applicant." 42 U.S.C. § 18081(e)(4)(A)(ii) provides that the Exchange, in the case of an inconsistency or inability to verify, shall "provide the applicant an opportunity to either present satisfactory documentary evidence or resolve the inconsistency with the person verifying the information under subsection (c) or (d) during the 90-day period beginning the date on which the notice required under subclause (I) is sent to the applicant." The section also states that "[t]he Secretary may extend the 90-day period under subclause (II) for enrollments occurring *during 2014*." 42 U.S.C. § 18081(e)(4)(A)(ii) (emphasis added).

It is not clear to the Court that Plaintiffs are likely succeed on their argument that "the agency misunderstood the scope of its authority on this score." ECF 30, at 23. In short, Plaintiffs assert that the 2014 limiting provision in 42 U.S.C. § 18081(e)(4)(A)(ii) is merely a redundancy, ECF 11-1, at 38, and the heading of Section 18081(c) should be ignored because the plain meaning of the text prevails, and the authority to modify is granted anywhere in the "section," not just the subsection, ECF 30, at 22–23. As to 42 U.S.C. § 18081(c)(4)(B), the Court agrees with Plaintiffs that the mere title of the subsection cannot alter the otherwise unambiguous meaning of the language in its text. And the Court further agrees that CMS's reading of 42 U.S.C. § 18081(c)(4)(B) is unreasonable given that the Section "authorizes modification of methods in order to reduce administrative burdens on the applicant, and this language would make little sense if the statute permitted the agency only to modify the procedures it used with other federal agencies without the applicant's involvement." ECF 30, at 23.

53

However, the 2014 limiting provision gives the Court pause. In 42 U.S.C. § 18081(e)(4)(A)(ii), Congress expressly indicated that the agency could extend the 90-day deadline for enrollments occurring *in 2014*. Thus, the Court is inclined to find that this time-limited extension provision prevents the Court from interpreting the statute as allowing blanket modifications for enrollments *at any time*. "When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000).

The Court notes, however, that the matter is further complicated by the agency's internal inconsistency in applying its own modification authority. Curiously, the agency claims that its modification power is limited, but simultaneously uses that modification authority to allow extensions on a case-by-case basis to individual applicants in years other than 2014. In an attempt to reconcile this inconsistency, Defendants argue that "any authority the HHS Secretary might have to '*modify*' a statutorily prescribed timeline in order to 'reduce the administrative costs and burdens' faced by a particular '*applicant*' cannot be reasonably understood to include the authority to promulgate a regulation that categorically *replaces* a statutorily prescribed timeline (90 days) with a different one (90 days plus an automatic 60-day extension) for *all applicants*." ECF 28, at 38 (emphasis in original) (first quoting 42 U.S.C. § 18081(c)(4)(B); then citing 45 C.F.R. § 155.315(f)(7); and then citing *Util. Air Regul. Grp.*, 573 U.S. at 328). Plaintiffs insist "[t]his is a distinction without a difference under the statutory text, which permits the agency to modify its methods if doing so 'would reduce the administrative costs and burdens on the applicant.'" ECF 30, at 23 (citing 42 U.S.C. § 18081(c)(4)). According to Plaintiffs, "CMS could permissibly (and at one point did) find that it would be less burdensome on

applicants to permit a blanket extension rather than requiring each applicant to jump through a paperwork hoop to request one." *Id.* (citing 88 Fed. Reg. 25,740, 25,819 (Apr. 27, 2023)). And as Plaintiffs point out, even CMS must understand its authority with respect to modification to operate in this way, as the agency has "used this authority to modify the 90-day time limit in other contexts." *Id.* (citing 45 C.F.R. § 155.315(f)(3)).

While this is a close call, the Court finds, at least at this preliminary stage, that Plaintiffs have not shown a likelihood of success on the merits on their argument that CMS misunderstood the scope of its authority in revoking the 60-day extension. Nonetheless, the Court invites further briefing on this claim at subsequent stages of the litigation, as this determination in the preliminary relief context is not dispositive on the merits.

Further, Plaintiffs' complaints about the agency's failure to engage with the evidence fails to provide an independent basis for relief. Plaintiffs claim that CMS did not "engage[] with the evidence showing the need for a 150-day verification period." ECF 11-1, at 38. However, CMS explained that a 150-day stay provided no "meaningful benefit to consumers" compared to a process in which extensions can be granted on a case-by-case basis as appropriate. 90 Fed. Reg. at 27,119; *see also id.* at 27,120 (explaining that a review of "income inconsistency resolution data" indicates that "under most conditions[,] consumers across all income data matching issue scenarios . . . can verify their data matching issues in the provided timeframe").[21] Additionally, in response to commenters' concerns that the reported metrics did not "sufficiently demonstrate[] evidence of widespread fraudulent behavior," the agency clarified that "this change [was] determined to be necessary on the grounds of statutory alignment and thus is

---

[21] Additionally, CMS "estimated this increased APTC expenditures by $170 million in 2024," and therefore, "the automatic 60-day extension did not provide a meaningful benefit to consumers and weakened program integrity." 90 Fed. Reg. at 27,119.

independent of the identified data concerns." 90 Fed. Reg. at 27,120. In sum, on this record, Plaintiffs have failed to show likelihood of success on their arbitrary and capricious claim because Plaintiffs have not sufficiently shown that the agency misinterpreted its modification authority.

(1)    <u>Income Verification When Data Shows Income Below 100 Percent of FPL</u>

Under current regulations, if an applicant's attestation regarding their projected annual household income reflects a higher household income than that reflected in income data provided by the IRS or certain other sources, an Exchange generally "must accept the applicant's attestation . . . without further verification." 45 C.F.R. § 155.320(c)(3)(iii)(A). The Rule amends this provision by requiring an Exchange to instead further verify an applicant's household income if (1) an applicant attests to income that is between 100% and 400% of the FPL, (2) income data from the IRS indicates household income below 100% of the FPL, and (3) the former income amount exceeds the latter amount by a "reasonable threshold." 90 Fed. Reg. at 27,123. The applicant would then be given an opportunity to resolve the inconsistency by providing additional documentation and taking other steps to verify their household income. *See* 45 C.F.R. § 155.315(f)(1)-(4).

Plaintiffs argue that "the mandatory audit policy is arbitrary for precisely the same reasons that this Court vacated the same policy four years ago." ECF 11-1, at 39 (citing *City of Columbus*, 523 F. Supp. 3d at 731). According to Plaintiffs, "CMS improperly assumed that these enrollees must have been attempting to defraud the Exchanges," even though "[t]here are many reasons why an individual could, in good faith, project that he or she will have income next year higher than the federal poverty level even if current-year IRS data shows a lower income." *Id.* Plaintiffs further argue that the additional verification will cause significant

56

obstacles to enrollment, as "[m]any such people are self-employed, or may have difficulty obtaining documentation to support their projections." *Id.*

Defendants acknowledge that the Rule "parallels a provision from a 2018 rule that was vacated in *City of Columbus v. Cochran* []." ECF 28, at 40. Defendants maintain that the verification measures are necessary because an applicant may be "overestimating his or her projected household income in order to obtain APTCs for which the applicant is not otherwise eligible—an incentive that is especially strong in states that did not expand their Medicaid programs under the ACA." *Id.* According to Defendants, "it is reasonable [] to request additional documentation verifying an applicant's actual income in such circumstances, so as to protect against overpayment of APTCs." *Id.*; *see also* 90 Fed. Reg. at 27,123 ("[W]e believe it would be reasonable, prudent, and even necessary in light of the program integrity weaknesses just outlined to request additional documentation, since the consumer's attested household income could make the consumer eligible for APTC that would not be available using income data from electronic data sources.").

As noted, a similar challenge to a similar proposed change in the Rule was raised in 2018. *See City of Columbus*, 523 F. Supp. 3d at 762 ("Plaintiffs contend that HHS's decision to impose income verification requirements is arbitrary and capricious because it failed to support its decision with anything more than unsubstantiated conclusions and failed to acknowledge the impracticability of low-income applicants being able to meet this requirement."). There, Judge Chasanow held that "Defendant's stated rationale for imposing income verification requirements—to prevent fraud in states that did not expand Medicaid—[was] unfounded," because "Defendants failed to point to any actual or anecdotal evidence indicating fraud in the record." *Id.* Judge Chasanow reasoned that "HHS improperly elevated the objective of fraud

prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance. *Id.* (citing *King*, 759 F.3d at 373–74). This time around, Defendants posit that their justification "does not suffer from the same flaws that were fatal to the 2018 provision." ECF 28, at 41.

In its current effort to change the regulation, HHS cited to a study that "compared estimated potential enrollment in Exchanges based on income data reported in census surveys to actual enrollment by enrollees who reported household income above the FPL-based eligibility threshold and found that actual enrollment was 136 percent higher than the total population of potential enrollments." *Id.* (citing 90 Fed. Reg. at 27,122). Defendants also point out that the "same study also found that a far higher number of enrollees reported household income that was just above the Exchange eligibility threshold in non-Medicaid expansion States compared to those in States that did expand Medicaid." *Id.* (citing 90 Fed. Reg. at 27,122). However, Plaintiffs respond that "one of the authors of that study submitted a comment to CMS (which the agency ignored) cautioning that the report did not support the agency's conclusions, given the difficulties that low-income people face in estimating their future incomes." ECF 11-1, at 40 (citing Urban Institute comment at 2 (Apr. 11, 2025), https://perma.cc/F5PH-WVN2). It appears that the agency did not directly address the comment by one of the study's authors in the final Rule, and Defendants did not respond directly to Plaintiffs' argument in the response brief.[22] Despite a compelling challenge to HHS's use of the study by one of the study's own authors,

---

[22] At the hearing, the Court asked counsel for Defendants how it could not be considered arbitrary and capricious for the agency to continue to rely on a report to justify its action after the author of that report indicated that the conclusions in the report do not support the agency's action. ECF 34, at 61:1–9. In response, counsel conceded, "[t]hat is something difficult to address," and noted that "[he] [was] not familiar with the precise facts of what the Agency was using, the proposition for which the Agency was using the study compared to what the author was disagreeing with." *Id.* at 61:13–16.

HHS continued to rely on the data in that study to justify the Rule's income verification provision.

The Rule also cites the Paragon Health Report to show that "[a] more recent analysis of 2024 open enrollment data shows plan selections on HealthCare.gov among people ages 19–64 who reported household income between 100 percent and 150 percent of the FPL in non-Medicaid expansion States were 70 percent higher than potential enrollments estimated from Census data at that same income level." 90 Fed. Reg. at 27,122.  The agency thus reasoned that "[b]ased on this mismatch between enrollment and the eligible population, this study estimates four to five million people improperly enrolled in QHP coverage with APTC in 2024 at a cost of $15 to $20 billion." *Id.*  Plaintiffs point out that "the Paragon report compared apples to oranges by including children in its estimated number of applicants but not in its count of eligible persons; by mismatching 2023 data to estimate improper enrollments for 2024, when many more people gained eligibility for the Exchanges in light of changes in Medicaid enrollment standards; and by using fundamentally different measures of income for its two data sets." ECF 11-1, at 15 (first citing Urban Institute comment at 2-3 (Apr. 11, 2025), https://perma.cc/7457-27KN; then citing Jason Levitis et al. comment at 28–31 (Apr. 11, 2025), https://perma.cc/X3KY-KZLW; and then citing Ctr. for Budget & Policy Priorities comment at 4–5 (Apr. 11, 2025), https://perma.cc/KP9W-J63N).  Plaintiffs contend that "[t]hese flaws in the Paragon analysis were pointed out to CMS by commenters, but CMS did not explain why it chose to ignore them." ECF 11-1, at 15.

Against this backdrop, the Court concludes that HHS failed to meaningfully address the comments pointing out potential flaws in the data contained in the Paragon report, despite continuing to rely on such data to justify the provision in the Rule. *See* 90 Fed. Reg. at 27,215

(explaining in response to commenters expressing concerns over unsound data in the Paragon Report that the agency "noted these limitations in the proposed rule and continue to reference them in this final rule. The Paragon report analysis informed our analysis, but we also incorporated Exchange data for a more fulsome analysis."). Defendants have essentially ignored the Paragon Report (and its flaws) during this litigation, as it is not mentioned a single time in their response brief in opposition to Plaintiffs' Motion. Defendants are not free to support a rule change with data of questionable validity and limited relevance, and then refuse to engage with commenters' reasonable concerns that the data fails to support the conclusion the agency drew from that data. This is particularly problematic where, as here, an *author* of one of the studies relied upon timely noted that the study she contributed to "did not support the agency's conclusions, given the difficulties that low-income people face in estimating their future incomes," ECF 11-1, at 40 (citations omitted), which is the issue that purportedly motivated the rule change in the first place. The agency was thus required to meaningfully contend with this comment because it affected a "fundamental premise" of the Rule, namely the very justification for the Rule. *See MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000) ("An agency is not obliged to respond to every comment, only those that can be thought to challenge a fundamental premise."). In short, the agency refused to meaningfully engage with challenges to the data and reports used to justify the Rule, which began at the time of promulgating the final Rule and continues through this litigation. As Judge Chasanow previously (and eloquently) explained, the agency's "decision to prioritize a hypothetical risk of fraud over the substantiated risk that its decision result in immense administrative burdens at best, and a loss of coverage for eligible individuals at worst, defies logic." *City of Columbus*, 523 F. Supp. 3d at 763. Accordingly, Plaintiffs are likely to succeed on the merits of their claim that CMS acted

arbitrarily by instituting additional verification requirements without sufficient data justifying the need to do so.

(2)    Income Verification When Tax Data is Unavailable

This provision of the Rule rescinds a regulation that requires an Exchange to accept an applicant's self-attestation of projected annual household income "without further verification" whenever (1) the Exchange requests tax return data from the IRS to verify the applicant's attested income, but (2) the IRS confirms that there is no such data available, 45 C.F.R. § 155.320(c)(5). *See* 90 Fed. Reg. at 27,130. The current regulation, which was adopted in 2023, creates an exception to the general requirement that an Exchange must verify an applicant's annual household income with certain trusted data sources, 45 C.F.R. § 155.320(c)(1)(ii), and otherwise follow an alternative verification process if tax return data for an applicant is unavailable, *id.* § 155.320(c)(3)(vi). The Rule removes this exception and requires Exchanges to follow standard verification and data-matching procedures "when tax return data is unavailable to immediately verify a consumer's attestation of annual household income." 90 Fed. Reg. at 27,132.

Plaintiffs explain that "[i]t is a relatively common occurrence for tax data to be missing for an applicant, for entirely legitimate reasons," for example, "[a]n individual might have changed his or her name, had a change in family composition, had a change in filing status, or might not have been subject to a filing requirement for the year in question." ECF 11-1, at 40. According to Plaintiffs, "[m]any people, such as self-employed individuals, lack the ability to document their income, so they will necessarily lose access to subsidized coverage under this rule." ECF 30, at 24. Defendants argue that "the agency ultimately concluded that the 'administrative burden' of requiring applicants with no tax return data 'to provide documentation to verify [their] income' would be 'more than offset by the program integrity benefits' related to

addressing improper enrollments in subsidized Exchange coverage." ECF 28, at 43 (first quoting

90 Fed. Reg. at 27,130; and then citing *id.* at 27,131). Plaintiffs argue "the premise of each of

the agency's program integrity measures is undermined by its reliance on the flawed Paragon

methodology, which CMS hasn't even tried to defend here." ECF 30, at 24. Additionally,

Plaintiffs point out that "[t]here would be no way for a broker to know one way or the other if

tax data is unavailable for a particular individual before targeting him or her for an unauthorized

enrollment." *Id.* at 24–25.

The question for the Court is not simply whether Defendants have presented sufficient

evidence of fraudulent enrollment, but also whether there is sufficient evidence of a *nexus*

between fraudulent enrollment and self-attestation to tax data such that it justifies requiring

heightened income verification. Put differently, if the agency cannot point to data showing that

self-attestation meaningfully contributes to increased fraud, then the agency adopted an

incongruent solution to the problem. *See City of Columbus*, 523 F. Supp. 3d at 762 ("HHS

improperly elevated the objective of fraud prevention, for which it had no evidence, above the

ACA's primary purpose of providing health insurance. (citing *King*, 759 F.3d at 373–374)).

After reviewing the agency's reasoning in the Rule, the Court finds that CMS concluded

in a conclusory fashion that program integrity benefits would outweigh the administrative burden

on applicants. The Court agrees with Plaintiffs that CMS "attempted to justify these burdens

and these coverage losses simply by reciting that self-attestation '*may* have played a role in

weakening the Exchange eligibility system,' but it provided no support for this assertion." ECF

11-1, at 40 (emphasis added) (citing 90 Fed. Reg. at 27,130). Additionally, while Defendants

argue "[t]he agency made the reasonable observation that applicants without tax return data will

likely have documentation verifying their household income (*e.g.*, pay stubs) 'readily available'

to them and that the burden of submitting that documentation, by extension, would be relatively minimal," ECF 28, at 43 (quoting 90 Fed. Reg. at 27,131–32), the agency provides no basis for this conclusory statement. In fact, this assertion is not even internally consistent, as CMS separately acknowledges in the Rule that "income verification can be more challenging for lower-income tax filers due to less consistent employment." 90 Fed. Reg. at 27,200. To address this concern, CMS merely stated "our experience with income verifications suggests the process does not impose a substantial burden." *Id.* The agency never explains what this history is or how it led to the conclusion it purportedly supports. The circular reasoning and conclusory statements offered to justify the policy change are not indicative of reasoned decision-making. This is particularly troubling because CMS, by its own estimation, acknowledges that 407,000 people will lose some, or all, of their APTCs as a result of this change. *See id.* Given the lack of sufficient data to justify the rule, and the agency's lack of meaningful explanation for the provision, the Court finds that this provision was not "reasonable and reasonably explained."[23] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### 2.   Irreparable Harm

Having addressed the likelihood of success on the merits of each of the challenged provisions of the Rule, the Court turns to the question of whether Plaintiffs have "demonstrate[d] that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original) (citing cases). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes*

---

[23] This holding is bolstered by the fact that the Rule relied on the Paragon report, which as the Court described above, Defendants do not even attempt to address, let alone defend.

*Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Irreparable harm is harm that "cannot be fully rectified by the final judgment after trial." *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

While "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough," *see Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)), "irreparable harm may still occur in extraordinary circumstances, such as when monetary damages are unavailable or unquantifiable." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017). For instance, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). Similarly, harm that "threaten[s] a party's very existence" can qualify as irreparable. *Mountain Valley Pipeline v. 6.56 Acres of Land*, 915 F.3d at 218. The Fourth Circuit has indicated that where an organizational plaintiff's standing is based on a representation theory (as is the case with respect to MSA), district courts should look at the irreparable harm to its members. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 n.9 (4th Cir. 2020).

Plaintiffs argue that their injuries would be irreparable without a § 705 stay of the Rule's effective date. While Plaintiffs acknowledge that "economic losses generally do not constitute irreparable harm," they clarify that "[g]iven sovereign immunity, Plaintiffs have no vehicle to recover their losses, in the form of uncompensated care costs and higher premiums, from CMS after the fact." ECF 30, at 7. According to Plaintiffs, "open enrollment for 2026 is fast

approaching," and "[a]bsent a stay, the coverage losses and higher costs caused by the rule will be locked in for the coming year, ensuring that Plaintiffs will suffer harm 'before a decision on the merits can be rendered.'" ECF 30, at 7–8 (quoting *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 726 (D. Md. 2018)).

Defendants insist that neither MSA nor the City Plaintiffs have made out irreparable harm sufficient to justify preliminary relief. As for MSA, Defendants argue that "the challenged Rule provisions will apply to Exchange plans that will not take effect until 2026 at the earliest, meaning that the Rule will have no immediate impact on the member's current coverage." ECF 28, at 13. As such, according to Defendants, MSA has "failed to establish that any such injury would occur before Plaintiffs' claims could be resolved in the regular course of litigation—an essential feature of irreparable harm." *Id.* (citations omitted). As for the City Plaintiffs, Defendants maintain that any "remote harm" suffered is "certainly not imminent enough to qualify as the sort of irreparable injury that warrants extraordinary preliminary relief." *Id.* at 17.

The Court finds that Plaintiffs will suffer significant and irreparable harm if the challenged provisions of the Rule go into effect next week. As discussed in the standing analysis, it is reasonably probable that the Plaintiffs will suffer economic injury from the challenged provisions. Of course, economic harm is not normally considered irreparable. *See Mountain Valley Pipeline v. 6.56 Acres of Land*, 915 F.3d at 218. However, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline v. W. Pocahontas Properties*, 918 F.3d at 366 (citation omitted). Moreover, where "a temporary delay in recovery somehow translates to permanent injury— threatening a party's very existence by, for instance, driving it out of business before litigation

concludes—could [] qualify as irreparable." *Mountain Valley Pipeline v. 6.56 Acres of Land*, 915 F.3d at 218 (citation omitted).

Here, Legler affirmed that she "operate[s] [her] business on narrow margins," the Rule will "cause [her] health insurance coverage costs to increase to a level that [she] cannot afford," and as a result, "[t]hese increased costs will likely make it impossible for [her] to continue [her] business, as [she] would be forced either to find different employment with employer-sponsored insurance, or to terminate [her] business and explore other coverage options through Wisconsin's BadgerCare system." ECF 11-4, at 3 ¶ 11. Legler further explains that "[c]ontinuing [her] business would not be an option in this circumstance because [she] need[s] to have access to affordable insurance that will cover the medications [she] need[s]." *Id.* ¶ 12; *see also* United Healthcare, *Optimum Choice, Inc., Part III: Actuarial Memorandum: PUBLIC; Maryland 2026 Individual Exchange Rates* 7 (May 22, 2025), https://perma.cc/35L2-M49D (increasing insurance premiums to account for impact of Rule). Because the final Rule going into effect "threatens a party's very existence," the type of harm Legler, and thus MSA, attests to constitutes irreparable harm sufficient to warrant a stay. *Mountain Valley Pipeline v. 6.56 Acres of Land*, 915 F.3d at 218 (citation omitted).

Additionally, the harm to the City Plaintiffs is irreparable because money damages are likely not available. *See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) ("The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief '*other than money damages.*'" (emphasis added) (quoting 5 U.S.C. § 702)). As Plaintiffs explain, "[t]hese cities fund and operate a range of community health centers, general and specialty clinics, and other health care services, as well as emergency medical transport." ECF 11-1, at 18–19 (citing

ECF 11-9 (Ige Decl.), at 2 ¶ 5; ECF 11-7 (Johnson Decl.), at 3 ¶ 11; ECF 11-8 (Leach Decl.), at 2–3 ¶¶ 7–8). City Plaintiffs "provide these services to patients regardless of their insurance coverage or ability to pay." *Id.* at 19. An increase in the number of uninsured and underinsured residents resulting from the final Rule would create a strain on those services and, ultimately, the cities' budgets, which must make up the shortfall from decreased compensation and increased demand for emergency services. *See* ECF 11-9, at 3 ¶ 6, at 5–6 ¶ 14; ECF 11-7, at 2–3 ¶¶ 9–11; ECF 11-8, at 3–4 ¶¶ 12, 13. Once the Rule goes into effect, it will be difficult, if not impossible, to unwind the harm Plaintiffs complain of. Young explained that the Congressional Budget Office has concluded that the rule as a whole will "increase the number of uninsured by 1.8 million." ECF 11-2, at 2 ¶ 4. Additionally, "[p]eople who are relatively younger and healthier are more likely to be deterred from enrolling by higher costs or additional administrative obstacles," and therefore the policies in the Rule are "generally [] expected to worsen the Marketplace risk pool." *Id.* ¶ 5. Plus, "[a] worse risk pool will generally lead to higher health insurance premiums, further exacerbating the problem of high costs, which in turn can cause additional people to become insured." *Id.* As Plaintiffs point out, the City Plaintiffs "would necessarily be servicing more individuals with no or inadequate coverage, and the cities would not be able to recoup the costs of those services." ECF 11-1, at 44; *see also Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (explaining that the unavailability of money damages for APA claims counsels in favor of a finding of irreparable harm).

Separately, Defendants argue that "the challenged Rule provisions will apply to Exchange plans that will not take effect until 2026 at the earliest, meaning that the Rule will have no immediate impact on the member's current coverage." ECF 28, at 13. Defendants thus urge

that "there is still time to decide this case on the merits without having to necessarily enjoin the provisions prior to the effective date." ECF 34, at 54:11–13; *see also* ECF 28, at 13. Plaintiffs counter that they "need relief now to allow time for the market to adjust in advance of the opening of open enrollment on November 1st." ECF 34, at 88:10–12.

It is true that the provisions go into effect on January 1, 2026 for the 2026 year and open enrollment begins on November 1 of this year. Thus, there is some surface appeal to Defendants' argument that the Plaintiffs have failed to meet their burden to establish irreparable harm because increased costs, decreased coverage, and uncompensated care costs will not suddenly materialize on August 26, 2025, the day after the Rule goes into effect. But as Plaintiffs explained at the hearing, "insurers' plans and the preparation that the exchanges need to engage in, and all of the underlying machinery, don't spring into effect on October 31st to allow open enrollment to happen [on] November 1st." *Id.* at 88:1–5. Rather, "[i]nsurers *right now* are in the process of finalizing the plan offerings and setting their plan rates in reliance on what the current rule offers, and what they anticipate the market will look like on the basis of this rule." *Id.* at 88:6–9; *see also* United Healthcare, *Optimum Choice, Inc., Part III: Actuarial Memorandum: PUBLIC, Maryland 2026 Individual Exchange Rates* 7 (May 22, 2025), https://perma.cc/35L2-M49D (increasing insurance rates to account for impact of Rule). Moreover, the record evidence shows that at least one insurer has already increased rates as a result of the Rule's anticipated effect on the insurance market, and Plaintiffs have pointed out that "open enrollment for 2026 is fast approaching," and "[a]bsent a stay, the coverage losses and higher costs caused by the rule will be locked in for the coming year, ensuring that Plaintiffs will suffer harm 'before a decision on

the merits can be rendered.'"[24]  ECF 30, at 7–8 (first citing Am. Acad. of Actuaries, *Issue Brief: Drivers of 2026 Premium Changes* 3, 8 (July 21, 2025), https://perma.cc/YP3X-WS74; and then quoting *M.A.B.*, 286 F. Supp. 3d at 726).  So, while it may be true that the harms to Plaintiffs may not be felt until later in time, it is also true that the first domino in the "predictable chain of events leading from the government action to the asserted injury," *All. for Hippocratic Med.*, 602 U.S. at 385, will fall when the regulation goes into effect next week.

Further, despite arguing that preliminary relief is not warranted because the Court has time to decide the case on the merits before open enrollment begins, ECF 28, at 13, Defendants have not addressed whether (or even how) the readjustment of insurance rates can be righted by a later finding that the Rule was promulgated in violation of the APA.[25]  Thus, Plaintiffs have shown irreparable harm, both in terms lack of remedy at the conclusion of litigation and imminence.  *See Habeas Corpus Res. Ctr.*, 2009 WL 185423, at *9 (finding irreparable harm where plaintiff faced a myriad of immediate decisions about how to handle clients' post-conviction claims "even though it would take some amount of time" for the rule to apply to the state because if the rule were to go into effect, it would "thrust [p]laintiff into uncertainty over the legal framework"); *California*, 911 F.3d at 581 (finding irreparable harm where it was "reasonably probable that the states [would] suffer economic harm" from the rule and "the states [would] not be able to recover monetary damages connected to the [rule]").  While Defendants

---

[24] The Court notes that "[a]llowing the rule to go into effect for a time, only later to determine it invalid, would serve no purpose." *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, Civ. No. 08-2649, 2009 WL 185423, at *10 (N.D. Cal. Jan. 20, 2009).  It would waste the resources of the litigants and the Court and cause significant chaos in the insurance market.  This too tips the scales in favor of Plaintiffs in the irreparable harm analysis.

[25] There is no evidence in the record to suggest that insurers can continue to adjust rates up until the eve of the open enrollment period on November 1, 2025.

insist that the harms are too speculative, the Court finds, as it did with respect to standing, that the harm is sufficiently concrete, imminent, and supported by the record. Accordingly, MSA and the City Plaintiffs have demonstrated they will suffer irreparable harm in the absence of a stay.

### 3.    Prejudice and Public Interest

The final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). Logically, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). On the other hand, there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *see also HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020) (same), *aff'd*, 985 F.3d 309 (4th Cir. 2021). The Court is mindful that the Fourth Circuit recently cautioned against collapsing "the first *Winter* factor—likelihood of success on the merits—with the merged balance of equities and public interest factor." *USA Farm Lab. Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025). As such, "[l]ikelihood of success on the merits alone does not suffice." *Am. Fed. of State, Cnty. & Mun. Emps., ALF-CIO et al., v. Soc. Sec. Admin. et al.*, 778 F. Supp. 3d 685, 779 (D. Md. 2025).

Plaintiffs argue that "[t]he rule's harms will not be limited to Plaintiffs and their members, but will extend to the millions of Americans who will lose coverage on the Exchanges

and who will suffer from higher health care costs as a result." ECF 30, at 25. According to

Plaintiffs, "[i]ncreases in uninsured people lead to increases in uncompensated care, putting a

strain on providers of last resort and emergency services and limiting the quality of care that

medical professionals can deliver, with particularly harmful results for lower-income people."

*Id.* Defendants respond that "staying the effective date of the Rule would hamstring Defendants'

efforts to address legitimate concerns about improper enrollments in Exchange plans that are

subsidized by taxpayers, as well as interfere with Defendants' lawful implementation of their

policy priorities." ECF 28, at 55. Additionally, Defendants aver that "when a law is stayed, 'the

inability to enforce its duly enacted plans clearly inflicts irreparable harm on' the government

that enacted it." *Id.* (quoting *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)).

There is a strong public interest in Americans maintaining affordable healthcare

coverage. Indeed, that was the primary purpose of enacting the ACA. *See NFIB*, 567 U.S. at

538 (explaining that the purpose of the ACA is "to increase the number of Americans covered

by health insurance and decrease the cost of health care"). Moreover, eliminating coverage for

an estimated 1.8 million people will drive up costs for the insured and lead to a significant

decrease in the quality of care for the newly uninsured, which is unquestionably not in the public

interest. Defendants concede as much in admitting that the Rule will likely lead to decreased

coverage and increased costs, 90 Fed. Reg. at 27,074, 27,213, but nonetheless maintain that

intervention is warranted based on program integrity concerns, *see, e.g.*, 90 Fed. Reg. at 27,116.

It is of course the case that reducing fraud by both brokers and Exchange applicants, thereby

reducing the burden of subsidy expenditures on taxpayers, is also in the public interest. But the

Court is not convinced that this concern outweighs the damage that will flow from enactment of

the Rule. Further, though the agency no doubt posits a laudable goal it wishes to achieve through

the enactment of the Rule, "that does not mean that the government can flout the law to do so." *Am. Fed. of State, Cnty. & Mun. Emps., AFL-CIO*, 778 F. Supp. 3d at 779.

Defendants' claim that they will suffer irreparable harm is similarly unpersuasive. Beyond its argument that a stay would "hamstring" its efforts to address improper enrollments, ECF 28, at 55, Defendants fail to explain how the stay would cause it irreparable harm. Indeed, as the Court has noted above, many of the provisions purportedly targeting fraud are unsupported by data showing that if enacted, they will, in fact, reduce any such fraud. Plus, simply preventing the government from "enforc[ing] its duly enacted plans," ECF 28, at 55, does not tip the scales in favor of Defendants on the third and fourth factors, particularly given the significant harms suffered by Plaintiffs in the absence of a stay. Accordingly, the Court is satisfied that the balance of equities and the public interest favor the issuance of a stay.

### 4.    Scope of Injunction

CMS asks this Court to limit relief to the Plaintiffs here. *See* ECF 28, at 56 (arguing that any relief should be "no broader than necessary to afford relief to those Plaintiffs who have established standing and irreparable harm"). Plaintiffs respond that "[t]his request can't be squared with the text of Section 705, which instructs that 'the effective date,' in the singular, of the rule should be postponed if the standards for relief are met." ECF 30, at 26. As such, "[e]ach challenged provision of the rule has only one effective date, not different effective dates that apply for plaintiffs and non-plaintiffs." *Id.* (citing *David v. King*, 109 F.4th 653, 661–62 (4th Cir. 2024) (the definite article "the" "normally indicates that the statute refers to only one such object")).

This Court finds that the appropriate course of action here is to temporarily stay the challenged provisions—that is, to postpone its effective date—under 5 U.S.C. § 705 pending a

final resolution in this matter. Under § 705, when "justice so requires" and "to the extent necessary to prevent irreparable injury," a reviewing court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "APA suits ultimately target the rule, and not necessarily the application of it to a particular person." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, --- F. Supp. 3d ---, Civ. No. SAG-25-628, 2025 WL 2374697, at *33 (D. Md. Aug. 14, 2025); *see also Corner Post, Inc. v. Bd. of Governors*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

Here, Plaintiffs' requested relief, to postpone the enforceability of certain provisions in the Rule, is properly within the scope of the APA. *See* 5 U.S.C. § 705 (allowing courts to "postpone the effective date of an agency action"); *see also Loper Bright*, 603 U.S. at 391 (explaining that courts must serve "'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)). Additionally, setting aside an agency action is the standard remedy for APA cases. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

The recent Supreme Court case, *Trump v. CASA*, does not change the outcome. In *CASA*, the Supreme Court held that injunctive relief must be limited to "administer[ing] complete relief between the parties." *Trump v. CASA, Inc.*, 606 U.S. ---, 145 S. Ct. 2540, 2557 (June 27, 2025). However, the Supreme Court explicitly left open "whether the [APA] authorizes federal courts

to vacate federal agency action." *Id.* at 2554 n.10 (citing 5 U.S.C. § 706(2) (authorizing courts to "hold unlawful and set aside agency action")).  Justice Kavanaugh's concurrence highlighted that, even after *CASA*, "plaintiffs may ask a court to preliminarily 'set aside' a new agency rule" "in cases under the Administrative Procedure Act." *Id.* at 2567 (Kavanaugh, J., concurring).

Accordingly, the Court finds, in line with other recent cases addressing the issue, that the limiting principle on universal or national injunctions announced in *CASA* does not apply to APA cases like the one at bar. *See, e.g., Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-cv-322 , 2025 WL 1836009, at *22 (D.D.C. July 3, 2025) ("[A]s this is a case involving APA vacatur, not a universal or national injunction, . . . [*CASA*] does not apply."); *Walker v. Kennedy*, --- F. Supp. 3d ---, No. 20-CV-2834, 2025 WL 1871070, at *7 (E.D.N.Y. July 8, 2025) ("*CASA* does not require the Court to reconsider its stay."); *Ass'n of Am. Univs. v. Dep't of Defense*, --- F. Supp. 3d ---, No. 25-cv-11740, 2025 WL 2022628, at *27 (D. Mass. July 18, 2025) (finding that "a stay under the APA" is not "subject to the same limitations espoused in *CASA*"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, --- F. Supp. 3d ---, Civ. No. 25-306, 2025 WL 1825431, at *51 (D.D.C. July 2, 2025) (noting that binding precedent and the text of the APA plainly authorize vacatur).[26]

Additionally, limiting postponement to Plaintiffs would be impractical.  The complicated interplay between the ACA and numerous market actors would make it exceedingly difficult if

---

[26] The Court is unpersuaded by Defendants' citation to *Casa de Maryland*, 486 F. Supp. 3d at 971–72, a case in which Judge Xinis of this Court limited preliminary relief in the APA context to the plaintiffs.  In making that decision, Judge Xinis explicitly noted that the limited stay was compelled by an earlier decision of the Fourth Circuit on facts that she could not "meaningfully distinguish." *Id.* at 972 (citing *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 236 (4th Cir. 2020)).  Given that just over two months ago the Supreme Court considered the propriety of national injunctions and explicitly left open "whether the [APA] authorizes federal courts to vacate federal agency action," *CASA*, 145 S. Ct. at 2554 n.10, the Court is satisfied that the relief need not be limited to Plaintiffs.

the challenged provisions went into effect for some of the population served by the Exchange but were stayed as to others. Defendants have "failed to identify any plausible manner in which the Court could set the guidance aside as to the individual plaintiffs and the organizational plaintiffs, while leaving it in place as to all others." *Refugee & Immigrant Ctr. for Educ. & Legal Servs.*, 2025 WL 1825431, at *51.

Accordingly, the Court finds the scope of Plaintiffs' relief, requesting a stay of the challenged provisions under the Rule, proper.

### C. Security

The government has requested that, if the Court were to issue a preliminary injunction, it order Plaintiffs to provide an injunction security under Fed. R. Civ. P. 65(c).[27] ECF 28, at 57. This Court is not granting a preliminary injunction. The Supreme Court has explained that "[a]n injunction and a stay have typically been understood to serve different purposes." *Nken*, 556 U.S. at 428. "The APA only authorizes courts to 'set aside' and 'postpone' agency actions—a far narrower authority than the court's equitable power to issue preliminary injunctive relief." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 623 n.14 (D. Md. 2025).

The APA has no bond requirement. *See* 5 U.S.C. § 705; *see also Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, No. 22-cv-11091, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023) ("Unlike a preliminary injunction, a stay under 5 U.S.C. § 705 does not expressly require the movant post a bond."); *Coal. for Humane Immigrant Rights v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *38 (D.D.C. Aug. 1, 2025) (declining to require a bond because "Plaintiffs here seek a stay under APA section 705, which is neither a preliminary injunction nor a temporary

---

[27] Fed. R. Civ. P. 65(c) states, in relevant part: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ."

restraining order"). Because the Court is issuing a stay under § 705, not a preliminary injunction, the Court declines to require a bond.

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the alternative, for a preliminary injunction, ECF 11, construed as a motion for a stay under 5 U.S.C. § 705, is **GRANTED** in part and **DENIED** in part.  A separate implementing Order will issue.


Dated: <u>August 22, 2025</u>                    <u>        /s/            </u>
                                           Brendan A. Hurson
                                           United States District Judge