UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CITY OF COLUMBUS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-2114-BAH |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A STAY PENDING APPEAL**

Defendants respectfully request that this Court stay, pending appeal, paragraph 2(f) of this Court's August 25, 2025 Order, ECF No. 38 ("Stay Order"). That Order stayed the effective date of seven provisions of the Final Rule at issue in this case pursuant to 5 U.S.C. § 705, pending a final ruling on the merits. *See id.* Paragraph 2(f) of the Order specifically stayed a Rule provision that adjusts the allowable ranges of actuarial values applicable to the different health care plan types offered on Exchanges under the Affordable Care Act. *Id.* at 2.

While the Court's Stay Order will undoubtedly hamstring the Department of Health and Human Services' efforts to address legitimate concerns about improper enrollments in Exchange plans that are subsidized by taxpayers, the Court's preliminary stay of the Rule's actuarial value policy will be especially harmful to the government and to the millions of consumers who obtain health care coverage through Exchanges. Indeed, HHS estimates that roughly 80 percent of issuers participating in federally facilitated Exchanges took advantage of that policy by designing health plans that fall within the expanded "de minimis" ranges of allowable actuarial values. Yet as a result of the Court's Stay Order, all of those issuers will now need to revise those plans to comport with the narrower "de minimis" ranges that applied under the pre-Rule regulatory scheme. HHS

1

and State agencies will then need to review and approve those revised plans before open enrollment for 2026 begins on November 1, 2025. And if issuers are unable to comply with this abrupt regulatory change, or if their plans are not approved in time, Exchange customers will have fewer plan options to choose from. Such a sudden and severe disruption to the Exchange marketplace could have a devastating effect on the availability of Exchange coverage. This prospect of irreparable harm to the government and the public interest thus weighs in favor of granting Defendants' motion to stay this Court's Stay Order pending appeal.

Defendants are also likely to succeed on the merits with respect to the Rule's actuarial value policy. Plaintiffs have not established their standing to challenge that policy. Moreover, contrary to what the Court concluded in its August 22, 2025 Memorandum Opinion, ECF No. 35 ("Opinion"), HHS clearly has the authority to consider factors like issuer participation in Exchanges when it determines the applicable "de minimis" ranges. And in revising those "de minimis" ranges via the Rule, HHS considered the evidence before it, balanced competing priorities, and made a predictive policy judgment that was reasonable and reasonably explained. That is all that the Administrative Procedure Act requires.

Defendants' motion for a stay pending appeal should accordingly be granted. In light of the urgency of the harms Defendants face as a result of the Court's Stay Order, Defendants respectfully request that the Court rule on this motion expeditiously. If upon reviewing this motion the Court does not believe Defendants have met the requirements for a stay pending appeal, Defendants request that the Court summarily deny this motion without awaiting a response from Plaintiffs. Defendants further note that, given the intense time pressure for obtaining relief, they intend to also seek relief in the Fourth Circuit today (*i.e.*, August 29, 2025).

## BACKGROUND

This case concerns a Final Rule promulgated by HHS in June 2025 that makes several regulatory changes to strengthen the integrity of the Exchanges where consumers purchase health care coverage under the ACA and to make that coverage more affordable. As relevant here, one of those changes concerns the allowable ranges of actuarial values applicable to the different plan

types sold on Exchanges.

Under the ACA, health insurance plans offered on Exchanges must adhere to certain "level[s] of coverage," or actuarial values, specified in the statute. 42 U.S.C. § 18022(a). "Silver plans," for instance, must have an actuarial value of 70 percent, meaning that such plans are designed to pay, on average, 70 percent of covered medical expenses, and the enrollee will pay the remaining 30 percent through a combination of deductibles, coinsurance, co-payments, and maximum out-of-pocket limits. *Id.* (setting the "level of coverage" for bronze, gold, and platinum plans as well). As a general matter, plans that have a higher actuarial value also have higher premiums. The actuarial values of Exchange plans are calculated pursuant to regulations issued by the HHS Secretary. *Id.* § 18022(d)(2). The ACA also instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." *Id.* § 18022(d)(3). The Rule changes the allowable "de minimis" ranges applicable to silver, gold, and platinum plans to two percentage points above and four percentage points below each plan type's respective benchmark actuarial value (*i.e.*, +2/-4 percentage points). *See* 90 Fed. Reg. at 27,074. And it changes the allowable "de minimis" range for bronze plans to +5/-4. *Id.*

On July 1, 2025, Plaintiffs filed a complaint challenging several provisions of the Rule under the APA. *See* ECF No. 1 ¶¶ 74-82. As relevant here, they alleged that the Rule's actuarial value policy was arbitrary and capricious. *Id.* ¶ 80(j). Plaintiffs moved for preliminary relief the following day, *see* ECF No. 11, which Defendants opposed, *see* ECF No. 28 ("Opposition Brief"). And on August 22, 2025, the Court granted Plaintiffs' motion in part and stayed the effective date of the actuarial value policy and six other Rule provisions pursuant to 5 U.S.C. § 705. *See* Opinion at 35-39; *see also* ECF No. 38.[1]

In its Opinion, the Court first concluded that Plaintiff Main Street Alliance ("MSA") and the three municipal Plaintiffs had standing to sue. *See* Opinion at 11-24. As relevant here, the

---

[1] The Court initially issued an Order in conjunction with its August 22, 2025 Opinion. *See* ECF No. 36. On August 25, 2025, Plaintiffs filed an unopposed motion to clarify that Order, which the Court granted the same day. ECF Nos. 37, 38. The operative stay order is thus the amended one the Court issued on August 25, 2025. ECF No. 38.

Court then concluded that the Rule's actuarial value policy was likely arbitrary and capricious for two reasons. First, the Court concluded that HHS relied on factors other than those Congress intended it to consider because the agency did not justify the "de minimis" ranges it selected based solely on "uncertainties in differences in actuarial estimates." *Id.* at 36. Second, the Court concluded that HHS's reasoning in support of the Rule's actuarial value policy was "conclusory and unsupported by evidence." *Id.* at 38. According to the Court, HHS failed to offer data "back[ing] up the claim and reasoning that coverage would become 'more affordable' over time" as a result of the policy and "provided an insufficient and conclusory rationale for altering the de minimis variation." *Id.* at 38-39. The Court then concluded that the balance of equities weighed in Plaintiffs' favor, based largely on the "strong public interest in Americans maintaining affordable healthcare coverage." *Id.*

## ARGUMENT

"There are four factors relevant to the issuance of a stay pending appeal: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 768 F. Supp. 3d 735, 737-38 (D. Md. 2025) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Here, the significant and irreparable disruption the Court's preliminary stay of the Rule's actuarial value policy will cause within the Exchange marketplace, combined with the public's strong interest in having access to a robust range of Exchange plan options and the substantiality of Defendants' arguments regarding the lawfulness of the actuarial value policy, weigh in favor of granting a stay pending appeal.

### I. The Government and the Public Will Be Irreparably Injured Absent a Stay

The detrimental impact that the Court's preliminary stay of the actuarial value policy will have on the Exchange marketplace cannot be overstated: 80 percent of issuers participating in federally facilitated Exchanges will need to redo their plans to come into compliance with the

narrower pre-Rule "de minimis" ranges, which would affect 99.6 percent of the consumers who obtain coverage through those Exchanges. Wu Decl. ¶ 24.[2] State-run Exchanges will likely face disruptions of a similar scale (although HHS does not have ready access to data for those Exchanges). *Id.* ¶¶ 22, 24. And such Exchange-wide changes would need to be made on a timeline that is more compressed than any HHS has ever required. *See id.* ¶¶ 17-18, 21; *see also id.* ¶¶ 11, 14-16.

Indeed, open enrollment for plan year 2026 begins on November 1, and before a plan can be made available on an Exchange, HHS (or the state agency tasked with administering a State-run Exchange) must certify that the plan offers an acceptable actuarial value under the ACA and its implementing regulations. *See id.* ¶ 12. HHS believes that issuers affected by the Court's stay of the actuarial value provision would need to be given at least one month to revise their plans and to redo their plan rates, filings, and Exchange-related forms. *Id.* ¶ 20. HHS (or the relevant State agency) would then need to review and approve these changes. *See id.* ¶¶ 17-21. To be ready for the start of open enrollment, HHS therefore believes it must receive issuers' proposals to bring their plans into compliance with the narrower "de minimis" ranges by October 1. *Id.* ¶ 20.

Issuers faced with this compressed timeline will thus be presented with two undesirable options. On the one hand, they could rush to redesign and submit fully compliant plans in time for HHS (or the relevant State agency) to approve those plans ahead of the start of open enrollment. *Id.* ¶¶ 19-21. But if this unprecedently quick turnaround causes those issuers to make errors in their plan design, those plans would then not be available for purchase on Exchanges until such errors are fixed. *Id.* ¶¶ 21, 27. Or, if HHS (or the relevant State agency) errs in approving a plan, then the agency must go through a complicated process to remedy those mistakes and offer enrollees the option to switch to another plan, which could cause consumer confusion. *Id.* ¶ 28. On the other hand, HHS predicts that some issuers may simply withdraw from Exchanges altogether rather than go through the rate-setting and approval process all over again on a rushed

---

[2] The Declaration of Jeff Wu is attached as an exhibit to this memorandum.

timeline. *Id.* ¶¶ 17-18, 25-26. In either case, Exchange enrollees face an imminent risk of fewer plan options and confusion stemming from hurried plan revisions that fail to comport with the abrupt change in applicable regulations.

The Court's stay of the actuarial value policy, in short, will inject instability and uncertainty into the Exchange marketplace, which will harm the government (which administers federally facilitated Exchanges) and members of the public (many of whom purchase health insurance on Exchanges) in turn. Defendants and the public have a strong interest in preventing this substantial and irreparable harm from occurring, which a stay pending appeal would ensure. Such relief would allow this litigation to proceed in the ordinary course without causing severe disruptions to Exchanges in the interim. And if the Court ultimately concludes that the Rule's actuarial value policy is unlawful, issuers can revert back to the narrower pre-Rule "de minimis" ranges for 2027 in an orderly manner. The risk of irreparable harm and the balance of the equities thus strongly weigh in favor of granting Defendants' motion for a stay pending appeal here.

## II.     Defendants Are Likely to Prevail on the Merits

The standard for obtaining a stay pending appeal "does not require the trial court to change its mind or conclude that its determination on the merits was erroneous." *St. Agnes Hosp. of City of Baltimore, Inc. v. Riddick*, 751 F. Supp. 75, 76 (D. Md. 1990). Rather, "a stay may be appropriate in a case where the threat of irreparable injury to the applicant is immediate and substantial," and "the appeal raises serious and difficult questions of law." *Id.* (quoting *Goldstein v. Miller*, 488 F. Supp. 156, 173 (D. Md. 1980)); *see Maryland v. U.S. Dep't of Agric.*, 777 F. Supp. 3d 496, 500 (D. Md. 2025) ("The Court agrees that this approach makes good sense; otherwise, a district court would *never* stay an order pending appeal, as 'every court that renders a judgment does so in the belief that its judgment is the correct one.'"). And here, because Defendants' appeal will raise "serious" questions concerning Plaintiffs' standing to challenge the Rule's actuarial value policy as well as HHS's compliance with the APA's deferential arbitrary-and-capricious standard in issuing that policy, a stay pending appeal is warranted.

### A. Plaintiffs Lack Standing to Challenge the Actuarial Value Policy

To obtain preliminary relief, Plaintiffs were required to "make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Otherwise, the Court "lack[s] jurisdiction to reach the merits of" Plaintiffs' claims. *Id.* at 56. As Defendants amply explained in their Opposition Brief, none of the Plaintiffs established that they had standing to challenge the Rule because the injuries in fact they asserted all rested on speculative predictions about the Rule's potential effects on a complex health insurance market and attenuated chains of contingencies that were unlikely to materialize. *See* Opposition Br. at 8. And Plaintiffs certainly failed to establish that they will suffer an injury in fact traceable to the Rule's actuarial value policy specifically. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2024) ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ."). Defendants recognize that the Court rejected their arguments. Accordingly, they refrain from reiterating each of those arguments in detail here; incorporate those previously asserted arguments by reference, *see* Opposition Br. at 8-15; and respectfully submit that those arguments raise questions that are serious enough to warrant a stay pending review by the Fourth Circuit.

In its Opinion, the Court found that MSA and the three municipal Plaintiffs established their standing to challenge the Rule. *See* Opinion at 12. Defendants respectfully disagree with the Court's reasoning and conclusions. With respect to MSA—which asserted associational standing based on a single declaration from a member who owns a small business in Wisconsin and is enrolled in an Exchange plan—the Court concluded that the MSA member had "state[d] with precision how the [Rule] will directly impact her." *Id.* at 15. Yet the Court, respectfully, treated the unsubstantiated assertions in the member's declaration—*e.g.*, that the Rule will cause the member's monthly premium to increase post-APTCs, that the member would categorically be unable to afford that indeterminate premium increase, that such an increase would somehow result in her losing coverage for "critical medications," *etc.*—as if they were allegations that must be accepted as true. That is not the proper standard at the preliminary-relief stage. *See Lujan v. Defs.*

7

*of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation."). Beyond conclusory assertions, the MSA member offered no record evidence demonstrating that the Rule would cause *her* insurance premium to increase, or that such an increase would ineluctably prompt her to drop her current Exchange coverage, close down her business, and seek insurance elsewhere.

As relevant here, moreover, the MSA member certainly did not demonstrate that any alleged premium increase would be attributable to the Rule's actuarial value policy. Indeed, if the member will no longer be eligible for subsidized coverage after the enhanced premium subsidy regime expires at the end of the year, her premium would likely *decrease*, given that, as the Court noted, the actuarial value policy is expected to make plans cheaper. *See* Opinion at 36. And even if the member will still be eligible for premium subsidies—a critical fact that her declaration leaves unaddressed—the record contains no information about the particular plan in which the member is enrolled; the issuer of that plan; and whether that issuer has modified that plan in response to the Rule's actuarial value policy. The MSA member thus provides no basis for concluding that the actuarial value policy will impact her in any concrete and particularized way.

The Court separately concluded that the three municipal Plaintiffs had sufficiently shown that they will "bear additional economic costs that come with treating people left uninsured by the implementation of the Rule." Opinion at 21. And the Court rejected Defendants' argument that such alleged downstream economic harms were too speculative and non-imminent to confer standing. *See id.* at 22 ("Here, the City Plaintiffs have adequately 'outline[d] the predictable results' of the challenged provisions of the Rule."). But in reaching its conclusions, the Court relied on authorities that predated the several recent Supreme Court decisions addressing Article III standing, *see id.* at 22-23, which make clear that a plaintiff fails to satisfy the "causation requirement" for standing if a challenged government action is "too speculative" and too "far removed from its distant (*even if predictable*) ripple effects." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (emphasis added). The municipal Plaintiffs' theory of injury here— which hinges on the Rule's actuarial value policy causing a net increase in premiums for at least

some subsidized Exchange customers, some of those affected customers dropping Exchange coverage altogether, and some of those newly uninsured customers eventually seeking medical care in Columbus, Baltimore, or Chicago that ultimately goes uncompensated—depends on precisely the sort of elaborate "chain of causation" that is "simply too attenuated" to establish standing. *Id.* (rejecting the proposition that doctors can establish standing based on monetary injuries purportedly stemming from changes to "general public safety requirements" that potentially result in "more individuals . . . show[ing] up at emergency rooms or in doctor's offices with follow-on injuries"). Like MSA, the municipal Plaintiffs thus failed to satisfy their standing burden here.

   **B.**  **The Actuarial Value Policy Is Not Arbitrary and Capricious**

  After finding that Plaintiffs had sufficiently established their standing to sue, the Court then concluded, as relevant here, that the Rule's actuarial value policy was arbitrary and capricious under the APA. *See* Opinion at 35-38. Defendants respectfully disagree for the reasons provided in their Opposition Brief, which they incorporate by reference here. *See* Opposition Br. at 48-51. As Defendants explained, HHS, in adopting the actuarial value policy, considered several factors that are implicated by "differences in actuarial estimates" of the value of Exchange plans, *see* 42 U.S.C. § 18022(d)(3), including issuers' "flexibility" to "create more differentiated combinations of premiums and cost-sharing structures," as well as the value of those diverse plan options to Exchange consumers who, as a practical matter, care less about a "1-point separation between a 65 percent AV bronze plan and a 66 percent AV silver plan" than they do about more "meaningful differences" like deductible and premium amounts. 90 Fed. Reg. at 27,176-77. HHS also reasonably considered the effect of "de minimis" ranges on other Exchange-related factors, including "robust issuer participation." *Id.* at 27,177. And after acknowledging that adopting wider "de minimis" ranges would have tradeoffs, HHS made the reasonable predictive judgment that, while the amount of premium subsidies received by certain Exchange customers would likely decrease as a result of the Rule's actuarial value policy, that outcome would be a consequence of cheaper premiums, which would increase the affordability of Exchange coverage for unsubsidized

consumers and likely improve Exchange risk pools. *See id.* at 27,176-77. HHS thus made a policy decision that was both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The Court instead concluded that the Rule's actuarial value policy is arbitrary and capricious for two reasons. First, the Court read the ACA to provide that HHS can consider *only* "differences in actuarial estimates" when setting "de minimis" ranges. Opinion at 35. But respectfully, that reading of the statute would mean that HHS could permissibly adopt exceedingly narrow "de minimis" ranges without considering the effect that such an overly restrictive policy would have on issuer participation in Exchanges and, by extension, the availability of Exchange coverage. Indeed, under the Court's reading, HHS would be *prohibited* from taking those considerations into account. It simply cannot be true that hyper-technical concerns about "differences" in "actuarial valuations" must take precedence, and exclusively so, over all other factors when HHS sets "de minimis" ranges. *Cf. Timms v. U.S. Attorney General*, 93 F.4th 187, 191 (4th Cir. 2024) ("[W]hen possible, we construe statutes to avoid absurd results.").

Second, the Court determined that HHS's rationale for, and policy balancing related to, the actuarial value policy were "conclusory" and "unsupported" by evidence. Opinion at 38-39. In reaching that determination, however, the Court incorrectly assumed that the reduction in aggregate premium subsidies that the policy would likely cause would necessarily make recipients of such subsidies worse off. *See id.* at 38. By way of example, consider an individual who is required to pay no more than $3,000 per year in premiums. *See* 26 U.S.C. § 36B(b)(3)(A). If that individual's benchmark silver plan currently costs $6,000 annually, he would be entitled to a premium tax credit equivalent to $3,000—*i.e.*, the cost of the annual premium minus the individual's maximum contribution to premium payments. If the actuarial value policy were to make that same benchmark silver plan cheaper, however—say, by reducing the annual premium to $5,000—the individual would still only be required to pay a maximum of $3,000 in premiums, but the amount of that individual's premium subsidies would fall to $2,000 (*i.e.*, $5,000 minus $3,000). As this example illustrates, a decrease in the amount of premium subsidies does not

10

necessarily translate into more expensive plans for consumers enrolled in subsidized coverage. Moreover, even if some subsidized customers who elect to purchase more expensive non-benchmark plans might see the cost of those plans increase due to a reduction in premium subsidy amounts, that does not necessarily mean that Exchange coverage writ large will become less affordable. To the contrary, neither the parties nor the Court dispute that the Rule's actuarial value policy is expected to reduce premiums for various Exchange plans. *See* Opinion at 36 (accepting Plaintiffs' argument that the policy will permit issuers to sell "cheaper" silver plans). And cheaper premiums are, by definition, more affordable to consumers who are not eligible for ACA premium subsidies. HHS explained that, in adopting the actuarial value policy, it was prioritizing the long-term health of the risk pool that would flow from more unsubsidized consumers buying Exchange coverage over a short-term increase in subsidies that only benefitted a subset of health insurance purchasers. Respectfully, the deferential arbitrary-and-capricious standard did not give the Court license to second-guess that policy decision. *See Prometheus*, 592 U.S. at 423 ("[A] court may not substitute its own policy judgment for that of the agency.").

## CONCLUSION

For the foregoing reasons, and all the reasons provided in Defendants' Opposition Brief, the Court should stay its Stay Order with respect to the Rule's actuarial value policy pending final resolution of Defendants' appeal of that Order. Defendants also respectfully request that the Court rule on this motion as soon as possible.

DATED: August 29, 2025               Respectfully submitted,

                                     BRETT A. SHUMATE
                                     Assistant Attorney General
                                     Civil Division

                                     ERIC B. BECKENHAUER
                                     Assistant Director
                                     Federal Programs Branch

11

<u>/s/ Zachary W. Sherwood</u>
ZACHARY W. SHERWOOD
Indiana Bar No. 37147-49
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Counsel for Defendants*
