UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CITY OF COLUMBUS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 1:25-cv-2114-BAH <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### DECLARATION OF JEFF WU

Pursuant to 28 U.S.C. § 1746, I, Jeff Wu, make the following declaration based on my personal knowledge, information contained in the records of the U.S. Department of Health and Human Services ("HHS") and its subsidiary agencies, and information provided to me by HHS employees:

1. I am the Deputy Director for Policy at the Center for Consumer Information and Insurance Oversight ("CCIIO"), one of the centers within the Centers for Medicare & Medicaid Services ("CMS"), a component of HHS. CCIIO is charged with operating HealthCare.gov, including the Federally-facilitated Exchanges and certain State-based Exchanges that use the federal HealthCare.gov infrastructure, as well as overseeing State-based Exchanges to ensure they comply with federal requirements. CCIIO is also responsible for administering the program for enrollment in qualified health plans offered through Exchanges, including advance payment of the premium tax credit and cost-sharing reductions created by the Patient Protection and Affordable Care Act ("ACA"). In addition, CCIIO enforces federal health insurance regulations

1

covering the individual, small group, and insured large group health insurance markets, and non-federal governmental plans.

2.  I graduated from Harvard College in 1992 with a bachelor's degree in economics, and from Stanford Business School and Stanford Law School in 2001 with a master's degree in business administration and a juris doctor degree, respectively.

3.  In 2011, I joined CCIIO as a health insurance specialist, and I have served in various policy roles at CCIIO since then.  I am currently the senior member of the career staff responsible for overseeing CCIIO's policy and regulatory activities, including policymaking with respect to the Exchanges, the advance payment of the premium tax credit and cost-sharing reductions, as well as our payment policies.

4.  I am providing this declaration testimony for use in *City of Columbus v. Kennedy*, No. 1:25-cv-2114-BAH (D. Md.).  I am testifying to the best of my knowledge and recollection.

5.  My role at CCIIO encompasses policy matters pertaining to the recently promulgated final rule entitled "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability," 90 Fed. Reg. 27,074 (June 25, 2025), which contains the disputed policies at issue in *City of Columbus*.

6.  I also understand that the District Court in this case recently issued a stay order under 5 U.S.C. § 705, prohibiting CMS from implementing a number of provisions of the Marketplace Integrity and Affordability final rule pending a final ruling on the merits of the case. One of those provisions concerns changes the final rule made to the *de minimis* ranges for actuarial value calculations, as codified at 45 C.F.R. §§ 156.140(c), 156.200(b)(3), and 156.400 (the "AV Policy").  If the court's stay of those provisions remains in effect, consumers, insurance plans, and states will be at significant risk of harm, as I describe in more detail below.

**Rate-Setting and Certification Process**

7.     Section 2707 of the Public Health Service Act, added by the ACA, requires health insurance issuers that offer non-grandfathered health insurance coverage in the individual or small group markets, irrespective of whether the plan is a qualified health plan, to include the essential health benefits package required under § 1302(a) of the ACA.  Section 1301(a)(1)(B) of the ACA also specifically requires qualified health plans to provide the essential health benefits package at § 1302(a).

8.     The essential health benefits package includes, among other things, a requirement at §§ 1302(a)(3) and (d) for these plans to provide either the bronze, silver, gold, or platinum level of coverage, or actuarial value (except for the catastrophic plans described at § 1302(e)).  The level of coverage refers to the percentage of costs that the plan is projected to pay for essential health benefits.  For example, to qualify as a gold plan, it must be designed such that the issuer will pay, on average, 80 percent of essential health benefits, with the enrollee paying the remaining 20 percent.

9.     A plan's actuarial value is calculated pursuant to the actuarial methods specified in regulation at 45 C.F.R. § 156.135.  Specifically, issuers must use an Actuarial Value Calculator tool developed and made available by HHS for a given benefit year to calculate a plan's actuarial value.  Pursuant to § 156.135(b), issuers may utilize an independent methodology to assess a plan's actuarial value only to the extent that a particular plan design does not fit into the parameters of the Actuarial Value Calculator.

10.    Section 1302(d)(3) delegates to the Secretary the authority to develop guidelines to provide for a *de minimis* variation in the actuarial variations used in determining the actuarial value of a plan to account for differences in actuarial estimates.  45 C.F.R. § 156.140(c) describes

the acceptable de minimis variations.  In addition to calculating a plan's actuarial value, the Actuarial Value Calculator also automatically verifies that the plan's actuarial value fits within the applicable de minimis range for a particular level of coverage.  The Marketplace Integrity and Affordability final rule made changes to the permissible *de minimis* ranges at 45 C.F.R. §§ 156.140(c), 156.200(b)(3), and 156.400.

11. Each year, issuers spend months designing their plans so that they will be profitable and competitive in the market.  A great deal of design effort goes into establishing a plan's cost-sharing structure—that is, the plan's coinsurance rates, co-pays, deductible, and maximum out-of-pocket limits—to manage the plan's liability, meet regulatory requirements, and appeal to consumers.

12. Once a plan's cost-sharing structure is established, the issuer calculates the actuarial value of the plan in accordance with 45 C.F.R. § 156.135, and the applicable regulatory entity reviews the issuer's data and calculations and determines whether the plan complies with essential health benefits requirements and whether to certify the plan as a qualified health plan permitted to be offered on that Exchange, pursuant to § 1301(a)(1)(B).  In the case of plans offered on the Federally-facilitated Exchanges, CMS performs the certification review.  For plans listed on a State-based Exchange, the State performs the review.

13. For CMS, this qualified health plan certification process takes about six months beginning when issuers first submit their plan design and rates to the agency.  It is an iterative review process, with fewer and fewer changes and corrections being made during each subsequent round.  CMS also endeavors to identify and have issuers correct any particularly significant deficiencies with certification requirements as early as possible in this process.  State-based Exchanges follow similar processes.

14. For the 2026 plan year, the process began in January 2025. On January 15, CMS wrote to issuers that offer plans on the Federally-facilitated Exchanges or State-based Exchanges on the Federal Platform with instructions on how to work with their state health insurance regulator to certify their plans as qualified health plans for the 2026 plan year. Issuers began submitting initial applications and plan data for proposed qualified health plans to CMS for review in April, 2025, with a deadline to submit such an initial application of June 11, 2025.

15. After receiving them, in May, June, and July, CMS reviewed the applications and data it received and provided feedback to issuers and states to inform them of any errors CMS identified in that preliminary review. Issuers were then required to submit corrected qualified health plan application data by mid-July to CMS to correct the errors CMS identified in its first round of review. CMS reviewed those resubmissions between mid-July and early August and provided another round of feedback to states and issuers for their review.

16. Issuers then had until mid-August to submit any further changes to their qualified health plan application and finalize their applications. Finally, CMS reviewed those final applications and issued Qualified Health Plan Certification Agreements to qualifying issuers for signature by early September. CMS will issue certifications for those plans that CMS determines to be compliant with the statute and regulations to issuers and states in early October.

17. The 2026 plan year will be CMS's 13th year facilitating the certification of health plans as qualified health plans for the Federally-facilitated Exchanges, and this stay will impose an unprecedented burden on CMS and State Exchanges well past our established deadlines for the finalization of plan data for 2026. Requiring such significant changes so late in the process will require CMS, State Exchanges, State insurance regulators, and issuers to make significant corrections to a large number of plans across the country, creating the likelihood of significant

5

plan errors requiring corrections and consumer disenrollments or re-enrollments throughout the year, or of issuers, States, and Exchanges simply being unable to complete these processes for plans, reducing consumers' ability to enroll in the plans of their choice and harming those issuers' businesses. Some issuers may choose to leave the Exchanges altogether because of perceived market instability. These conclusions are based on our knowledge of how long the certification process takes, gleaned from 13 years of experience with this process, and our knowledge of market sensitivities.

**Consequences of the District Court's Stay of the Actuarial Value Policy**

18. Issuers, states, State-based Exchanges, and CMS have completed the certification process for the upcoming 2026 plan year using the ranges set forth in the AV Policy. Open enrollment for the 2026 plan year begins on November 1, 2025. This stay order will impose an unprecedented burden on CMS and State-based Exchanges well past our established deadlines for the finalization of plan data for 2026. Requiring such significant changes so late in the process will increase the likelihood that issuers leave the Exchanges altogether, out of an inability to complete the required changes on time or perceived market instability. This is based on our knowledge of how long the certification process takes, gleaned from 13 years of experience with this process, and our knowledge of market sensitivities.

19. If the Court's order remains in effect beyond September 5, 2025, CMS will endeavor to comply to the best of its ability. To do that, CMS will need to notify states and issuers of the change to the 2026 plan year compliance standard and identify specific plans that are out of compliance with the extant Actuarial Value Policy. To help issuers through this process, CMS will update and re-release a revised Actuarial Value Calculator. CMS will also provide technical direction to plans about how to meet the revised standard and a timeline for plans to submit revised plan data. Issuers that are unable to provide compliant plan designs on

6

this timeline will be considered non-compliant and any plans CMS had previously certified to be included on the Federally-Facilitated Exchange will be removed from the Exchange and unavailable for sale during the open enrollment period unless and until the issues we identified can be corrected.

20. CMS will provide states and issuers as much time as possible to successfully implement these changes that will allow the Exchanges to begin open enrollment as planned on November 1. We believe we can accept changes in plan design, cost sharing, rates and benefits data until around October 1 in order to be able to ingest this data, perform some superficial quality control, and display it in time for November 1. To give issuers sufficient time to meet that October 1 deadline, we would need to notify issuers and states of this re-certification process by the end of the first week in September.

21. This timeline, however, is far more aggressive than our usual process and consequently presents significant risk. Issuers would be required to make changes and conduct analysis to restructure their plans to make them compliant with the narrower permissible actuarial value ranges. State regulators will also have to re-review these plan submissions for compliance with federal and State rules. There is significant risk that issuers or States will decide that they do not have sufficient time to make those changes and conduct the necessary analysis. If a plan or State were not able to implement required actuarial value changes, the plan would need to be removed from the Exchange, potentially harming the availability of health care coverage for consumers. And for plans that do elect to go through this recertification process, there is risk that there will be errors in their calculations, resulting in confusion and harm to consumers. Although we hope that the aggressively accelerated timeline outlined above will enable many issuers and States to meet these deadlines, it is likely that a number will not.

22. Accordingly, we anticipate substantial instability in the ACA Marketplace if the court's order remains in effect for the Actuarial Value Policy.

23. This will create substantial burden not just for CMS, but also for States that operate their own Exchanges and conduct their own oversight and certification processes. While CMS may be able to effectuate the court's order with respect to the actuarial value ranges in time for open enrollment, we cannot speak to whether State officials will be able to do so on such an accelerated timeline.

24. Of the 185 qualified-health-plan issuers participating in the Healthcare.gov Exchanges for plan year 2026, 80%, or 148 issuers in 28 States, designed plans with actuarial value percentages that fall within expanded *de minimis* ranges in the Actuarial Value Policy. Thus, if this Court's stay order remains in effect past September 5, approximately 99.6% of consumers shopping for plans on HealthCare.gov during open enrollment in those areas will potentially have fewer options than they would have had absent the stay order. Many other plans on State-based Exchanges would be impacted as well, though we do not have the data on the extent of that impact presently available. All these plans would no longer be compliant with the Actuarial Value Policy, and all of those plan's issuers would need to decide which of its plans that fall within the expanded range they want to remove from certification, and which ones they want to try to salvage by adjusting cost-sharing parameters to bring them into compliance with the legacy *de minimis* range.

25. If issuers leave the Exchanges by withdrawing plans from consideration, there is a risk of having counties in States without any plans at all, or counties in States with an insufficient number of plans (e.g., where there is only one issuer offering plans, or there are no plans at a certain metal tier). And counties in States with an insufficient number of plans as a result of the

Court's stay are likely to experience higher premiums in future plan years. Accordingly, the Court's stay of the Actuarial Value Policy presents the following risks to consumers and the Marketplace generally:

26. **Consumer harm resulting from issuer withdrawals**. 2026 has already seen a higher than typical number of issuer withdrawals and contractions from the Marketplace. Additional instability at the federal level risks additional incentive for issuers to increase rates or to withdraw from the Marketplace altogether.

27. **Consumer harm resulting from plan data errors resulting in suppressions**. If issuers are required to suddenly make major changes to their plan designs and are given about a month to do so, there is substantial risk that issuers submissions will contain significant errors. If an issuer is not able to correct those errors before open enrollment begins, CMS would likely not certify the plan, meaning it would not be available to consumers on HealthCare.gov until the issuer corrects those errors. This means that consumers could have fewer plans from which to choose during open enrollment. It also means that any consumers that are currently enrolled in any such plans for 2025 could not be automatically re-enrolled in the plans for 2026, throwing them off of their coverage.

28. **Consumer harm leading to special enrollment period**s. This compressed timeline also increases the risk that CMS fails to identify errors in issuers' submissions, resulting in plans that contain data errors being displayed on HealthCare.gov. Consumers may erroneously rely on this data and select a plan that is more expensive than advertised. When CMS eventually identifies significant data errors, it gives consumers a special enrollment period as a remedy, allowing them to choose a different plan outside of open enrollment. However this remedy does not alleviate the risk to consumers because CMS may never identify those errors

and, in any event, such a mid-plan-year special enrollment period is likely to cause consumer confusion and potentially result in disruptions to medical care.

29. **Inconsistent nationwide application of court rulings**. We anticipate that the Court's stay order will also harm States that run their own Exchanges, as well as issuers of non-grandfathered, non-qualified health plans offered in the individual or small group markets that are also required to comply with the actuarial value requirement. While CMS will operationalize the court order for the FFEs, State officials will do so for State-based Exchanges and non-grandfathered, non-qualified health plans offered in the individual or small group markets. Those States will have even less time to come into compliance with the Court's order than CMS, since they would have to wait for CMS to issue guidance before implementing their own processes. Moreover, States often have fewer resources available to conduct a certification process in such a short amount of time.

30. **Further market instability and uncertainty**. Premiums for 2026 are already projected to be significantly higher due to the expiration of enhanced American Rescue Plan Act subsidies at the end of 2025. We expect that the Court's stay order will cause premiums to increase even more than they already have for the reasons stated above.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 29th day of August, 2025.

_____
JEFF WU