UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CITY OF COLUMBUS, *et al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>ROBERT F. KENNEDY, JR., in his official )<br>capacity as Secretary of the United States )<br>Department of Health and Human Services, *et* )<br>*al.*, )<br>)<br>Defendants. )<br>) | Civil Action No. 1:25-cv-2114-BAH |

### DEFENDANTS' REPLY IN SUPPORT OF THEIR
### MOTION FOR A STAY PENDING APPEAL

In their Opposition to Defendants' Motion for a Stay Pending Appeal, ECF No. 44, Plaintiffs do not contest that the Court's Stay Order in this case, ECF No. 38 ("Order"); *see* ECF No. 35, will force issuers to completely overhaul many of their health insurance plans, or that it will require States and the Department of Health and Human Services ("HHS") to review and approve those revised plans on an unprecedently compressed timeline. That process will inject chaos into the Exchange marketplace in the lead up to open enrollment. And that chaos itself constitutes irreparable harm, regardless of whether every single issuer manages to comply with the narrower actuarial value de minimis ranges required by the Court's Order in time for their Exchange plans to be made available on November 1. As Defendants have explained, however, there is good reason to doubt that all issuers will meet their new deadlines. The Court's Order thus risks significant harm to consumers when they go to purchase health insurance for next year.

Plaintiffs' attempts to bolster their standing arguments only underscore how much they rely on speculation and guesswork as to how changes to a multifaceted health care system might affect choices made by third parties. That speculation falls well short of the clear showing of injury and causation required for obtaining preliminary relief. And on the merits, Plaintiffs abandon the

1

statutory argument they convinced the Court to adopt, describing it as a "straw man," ECF No. 44 at 7, and now acknowledge that in setting de minimis ranges, HHS may consider many factors, including differences in actuarial estimates. Plaintiffs attempt to salvage their challenge to the Final Rule's actuarial value policy by reading the statutory obligation to consider "differences in actuarial estimates" to be practically meaningless. Given a natural reading, however, the statute confirms that HHS satisfied its obligation when it explained that it was broadening the de minimis ranges to offer issuers more flexibility in designing Exchange plans to meet consumer needs.

Since Defendants filed their Stay Motion, *see* ECF No. 42, HHS has issued guidance to issuers and States about how to refile and review necessary documents to offer Exchange plans that comport with the allowable de minimis ranges under the Court's Stay Order. Center for Consumer Information & Insurance Oversight, *Qualified Health Plan Certification Updates* (Sept. 5, 2025), https://perma.cc/WY7T-LY7K ("Notice"). HHS has instructed issuers to submit updated plan documents, but for the moment, the agency still maintains the ability to give effect to issuers' prior submissions. After September 19, however, "to avoid confusion and ensure an orderly open enrollment period," HHS "do[es] not anticipate allowing issuers to revert to [their originally submitted] de minimis actuarial value ranges." *Id.* at 4. Accordingly, Defendants respectfully request that the Court resolve this motion as promptly as possible, and no later than September 19.[1]

## ARGUMENT

I.  **The Court's Stay Order Still Leaves Significant Uncertainty In the Availability of Exchange Plans Leading Up To Open Enrollment.**

HHS had to issue guidance to States and issuers on September 5 to ensure that issuers have a chance of revising their affected Exchange plans to comply with the Court's Stay Order in time for those plans to be approved and posted before open enrollment begins on November 1. *See* Notice at 1-9. Consequently, some of the disruption caused by the Court's Stay Order can no

---

[1] As Defendants noted in their Stay Motion, they have also filed an Emergency Motion for Stay Pending Appeal in the Fourth Circuit. *See City of Columbus v. Kennedy*, No. 25-2012 (4th Cir. Aug. 29, 2025), Dkt. No. 4-1. That motion has been fully briefed and remains pending as of the filing of this reply.

2

longer be avoided. Issuers must now scramble to begin revising their Exchange plans, and consumer confusion still may ensue. But if the Court grants a stay by September 19, that relief will avoid the risk of consumers having fewer Exchange plans to choose from as a result of some subset of issuers failing to submit updated plan documents and obtain State or federal approval before the start of open enrollment on November 1. *See* Notice at 4.

Plaintiffs do not contest that issuers will need to revise their affected plans to comply with the Court's Stay Order. *See, e.g.*, ECF No. 44-2 ¶ 13. Nor do they contest that issuers risk being unable to update their plans and obtain the necessary approvals in time for open enrollment. *See id.* ¶ 20. Instead, they quibble about how significant the burden on issuers, States, and HHS will be. *See, e.g., id.* ¶ 16 (suggesting that roughly one quarter of plans will need to be revised to comport with the narrower de minimis ranges). But HHS is best positioned to understand the scope of the immense undertaking required to facilitate the redesign and reapproval of plans weeks before open enrollment commences. And Plaintiffs cannot defeat the government's showing of irreparable harm merely by hypothesizing that some "well-advised" issuers may have made contingency plans or that some issuers may be able to update earlier iterations of their plans. *See* ECF No. 44 at 11. Even Plaintiffs do not suggest that all issuers have made such preparations. Moreover, even if some issuers' preparations may ameliorate some of the burden caused by the Court's Stay Order, all issuers still must submit revised plans on incredibly compressed timelines, which leave no margin for error.

Plaintiffs' core argument—that issuers and the relevant agencies may yet be able to revise and approve plans in time—fails to address the concrete harms the Court's Stay Order imposes. Plaintiffs seem to assume that any level of chaos and uncertainty in the Exchanges is acceptable as long as issuers actually succeed in revising and obtaining approval of their plans in time to be posted for the start of open enrollment. Plaintiffs note that in 2017, issuers had to scramble to revise rates for their plans on a short timeline, and they presume in turn that because HHS once succeeded in managing a last-minute change, it will do so again this time around. *See* ECF No. 44 at 11. But that argument would not be logically sound even if the scope of the changes required

3

in 2017 and the scope of the changes required by the Court's Stay Order were analogous. They are not. To comply with narrower de minimis ranges, issuers will need to do more than just "adopt revised premiums for their plan offerings," ECF No. 44-2 ¶ 8; they will also need to revise their benefit structures, plan designs, and all consumer facing materials. That is a far more onerous undertaking. And Plaintiffs' argument is ultimately irrelevant because the chaos, confusion, and instability resulting from the Court's Stay Order itself constitutes irreparable harm. The Court should accordingly grant a stay to avoid the disruption associated with significant last-minute changes to Exchange plans.

## II.     Defendants Are Likely to Succeed on the Merits

### A.     Plaintiffs' Asserted Injuries Are Too Speculative and Attenuated to Confer Standing

Plaintiffs have sought to backfill their support for Main Street Alliance's ("MSA") standing with a revised declaration from the member on which MSA bases its claim to associational standing. *See* ECF No. 44-1. This belated effort falls short. The MSA member now asserts that she will rely on premium tax credits next year to subsidize her purchase of a silver Exchange plan. *Id.* ¶ 7. But what the member still fails to establish is that *her* premiums or cost sharing will increase as a result of the Final Rule's actuarial value policy. She provides no information about the actuarial value of her current plan or whether her issuer plans to take advantage of the wider de minimis ranges permitted under the Rule. And even if the member ends up with a plan with a lower actuarial value, she has not shown that such a change will harm her in any concrete way. Actuarial values derive from a complex balancing of benefits, premiums, and cost sharing. If the member's issuer decreases the projected actuarial value of her current plan from 70 percent to 69 percent, it is entirely possible that there would be no attendant effect at all on the member's total health care costs. For example, the member's insurer might achieve that reduction in actuarial value by increasing the copay for a service the member never uses; if so, the member's total out-of-pocket expenses would remain the same. And as for the member's premiums, she has not provided any evidence about the benchmark silver plan in her county, meaning she has not shown

4

that her net premiums will actually increase. The member has therefore failed to meet her burden of clearly showing a certainly impending injury in fact. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

The municipal plaintiffs fare no better. The starting point for their theory of injury is that the Rule's actuarial value policy will allow issuers to offer plans with lower actuarial values. *See* ECF No. 44 at 5. From there, the municipal plaintiffs allege that they will be injured when (1) some issuers offer such plans in their respective counties; (2) some Exchange enrollees consequently become underinsured or choose not to enroll in coverage at all as a result of the lower actuarial values; (3) some of those newly uninsured and underinsured people seek medical treatment in the municipalities; (4) a subset of those people obtain care provided by the municipal governments specifically; (5) those patients lack coverage or have coverage that reimburses the municipalities less than they otherwise would have been paid; and (6) the patients ultimately fail to pay the balance they owe the cities. *See* ECF No. 44 at 5.

This speculative chain of causation is insufficient to establish standing. Every single link in the causal chain relies on speculation about what third parties may or may not do. As Plaintiffs themselves point out, some issuers will not have taken advantage of the actuarial value policy adopted in the Final Rule. *See* ECF No. 44-2 ¶¶ 16-17. Plaintiffs offer no basis to conclude that the plans available in Columbus, Chicago, or Baltimore will differ at all as a result of the actuarial value policy. They then speculate about how potential enrollees will respond to different plan offerings. But mere statistical probabilities are not enough to establish standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). These flaws alone defeat Plaintiffs' theory of standing here.

Plaintiffs continue to insist that the chain of contingencies they allege is nonetheless sufficiently "predictable" to establish standing. ECF No. 44 at 5. But they overlook the clear similarities between their theory of injury and the downstream financial injuries that the Supreme Court unanimously rejected as "too speculative or otherwise too attenuated" for standing purposes in *FDA v. Alliance for Hippocratic Medicine*. 602 U.S. 367, 390 (2024). Indeed, Plaintiffs fail to

explain how the uncompensated care the municipal plaintiffs will allegedly be required to provide to uninsured and underinsured patients "as providers of last resort," ECF No. 44 at 5, is materially different from the care-related costs that the provider-plaintiffs in *Alliance for Hippocratic Medicine* asserted (unsuccessfully) as a basis for their standing to challenge a federal regulatory change. *See id.; cf. id.* at 392 ("But doctors have never had standing to challenge FDA's drug approvals simply on the theory that use of the drugs by others may cause more visits to doctors."). That similarity defeats the municipal plaintiffs' theory of standing as well.

### B. HHS Lawfully Expanded the Permissible Range for Actuarial Values

On the merits, Plaintiffs decline to defend the Court's reasoning and the argument they advanced at the preliminary relief stage regarding the Rule's actuarial value policy. *See* ECF No. 44 at 7-8. The Court held that HHS "is . . . constrained to rely only on factors which Congress has intended it to consider." ECF No. 35 at 37 (cleaned up). Accordingly, the Court accepted Plaintiffs' argument that "'the purpose of the standard is set forth in [42 U.S.C. §] 18022(d)(3) itself [and] the *only* permissible 'de minimis' variations are those that account for uncertainties in 'differences in actuarial estimates.'" *Id.* (emphasis added) (quoting ECF No. 11-1 at 27).[2] As Plaintiffs seem to recognize, however, such an interpretation of the statute makes no sense.

Plaintiffs also miss the mark when they assert that HHS failed to consider "differences in actuarial estimates" at all. *See* ECF No. 44 at 7. Plaintiffs apparently interpret that phrase to mean technical differences in how an issuer prepares its actuarial value calculation. But every issuer calculates actuarial value with HHS's actuarial value calculator.[3] *See* 90 Fed. Reg. at 27,174 & n.242; *see also* CMS, Updated Revised Final 2026 Actuarial Value (AV) Calculator Methodology (Sept. 5, 2025), https://perma.cc/JN7J-9VHB (describing the methodology). So, under Plaintiffs' reading, the de minimis variation that the statute expressly allows for need not exist at all. *But see Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (explaining that the rule against superfluity has

---

[2] Plaintiffs add "uncertainties" to their recounting of HHS's statutory obligation, ECF No. 44 at 6; ECF No. 11-1 at 27, but that word appears nowhere in 42 U.S.C. § 18022.
[3] All issuers must use the actuarial value calculator developed and made available by HHS for the given benefit year. 45 C.F.R. § 156.135(a). A limited exception is available for issuers whose plan design is not compatible with the calculator. *See id.* § 156.135(b).

"special force" where an interpretation would negate an entire provision of a statute).

A much more reasonable way to interpret "differences in actuarial estimates" is that it allows HHS to consider differences between plans with respect to elements like cost-sharing. As a result, issuers may take advantage of a degree of flexibility to design plans to serve consumers better. And that is precisely the rationale HHS gave when it adopted the wider de minimis ranges in the Final Rule. *See* 90 Fed. Reg. at 27,176. Plaintiffs wholly fail to engage with this rationale, and nothing about HHS's decision was arbitrary or capricious.

Finally, recognizing that they are not free to disagree with HHS's policy judgments, Plaintiffs argue that the actuarial value policy adopted in the Final Rule will leave everyone worse off. *See* ECF No. 44 at 8-9. But Plaintiffs' own expert witness refutes that conclusion; she explained that under the Rule's actuarial value policy, gross premiums for silver plans will decrease. *See* ECF No. 11-2 ¶ 38. HHS has the discretion to choose that outcome, based on its understanding that lower gross premiums will attract more unsubsidized consumers into the Exchange risk pool. As Plaintiffs themselves acknowledge, "[i]nsurance market stability requires robust enrollment." ECF No. 11-1 at 5-6. And one way to boost enrollment is to lower unsubsidized premiums. Beyond that policy choice, the agency has discretion to prioritize "promot[ing] competition" by allowing issuers to be more responsive to consumer needs, allowing "greater continuity for consumers," and encouraging issuers to continue participating in the Exchanges. 90 Fed. Reg. at 27,176. HHS need not maximize subsidies over all other concerns.

## CONCLUSION

For the foregoing reasons, the Court should stay its Stay Order with respect to the Final Rule's actuarial value policy pending final resolution of Defendants' appeal of that Order. Defendants respectfully request a decision by September 19.

DATED: September 11, 2025                    Respectfully submitted,

                                                              BRETT A. SHUMATE
                                                              Assistant Attorney General

Civil Division

ERIC B. BECKENHAUER
Assistant Director
Federal Programs Branch

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
Indiana Bar No. 37147-49
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Counsel for Defendants*