**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CITY OF COLUMBUS, *et al.*,

        *Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., *et al.*,

        *Defendants*.

Case No. 1:25-cv-2114

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................2

I.      Statutory Background ..................................................................................................2

II.     The 2025 Marketplace Rule .......................................................................................6

        A.      The Final Rule Erodes the Value of Coverage ...................................................7

        B.      The Final Rule Imposes Barriers on Enrollment ................................................8

        C.      The Final Rule Limits the Availability of Subsidized Coverage .........................10

III.    The Disastrous Effects of the Final Rule ...................................................................15

IV.     Plaintiffs' Challenge to the Final Rule ......................................................................18

STANDARD OF REVIEW ....................................................................................................20

ARGUMENT .........................................................................................................................21

I.      The Final Rule's Provisions That Erode the Value of Coverage Are Unlawful and
        Arbitrary ....................................................................................................................21

        A.      The Rule's Imposition of a Junk Fee on Certain Plans Is Unlawful and
                Arbitrary ............................................................................................................21

                1.      The Imposition of the Junk Fee Is Unlawful ...............................................21

                2.      The Imposition of the Junk Fee Is Arbitrary ...............................................23

        B.      The Revised Premium Adjustment Methodology Is Unlawful and
                Arbitrary ............................................................................................................25

        C.      The New Actuarial Value Policy Is Arbitrary ....................................................29

II.     The Final Rule's Provisions That Impose Barriers on Enrollment Are Unlawful
        and Arbitrary .............................................................................................................31

        A.      The Rule Unlawfully and Arbitrarily Revokes the Act's Guarantee That
                Anyone Can Buy Insurance ...............................................................................31

        B.      The Shortened Open Enrollment Period Is Arbitrary .........................................34

        C.      The Verification Requirements for SEP Enrollments Are Arbitrary ...................36

III.    The Final Rule's Provisions That Limit the Availability of Subsidized Coverage
        Are Unlawful and Arbitrary ......................................................................................38

        A.      The Failure-to-Reconcile Policy Is Unlawful and Arbitrary ...............................38

        B.      The New Data-Matching Policies Are Arbitrary ................................................40

CONCLUSION ......................................................................................................................45

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ANR Storage Co. v. FERC,*
    904 F.3d 1020 (D.C. Cir. 2018).........................................................................33

*Appalachian Voices v. Dep't of Interior,*
    25 F.4th 259 (4th Cir. 2022)......................................................................24, 40

*Azar v. Allina Health Servs.,*
    587 U.S. 566 (2019) ...........................................................................................32

*Barton v. Barr,*
    590 U.S. 222 (2020) ...........................................................................................41

*Bittner v. United States,*
    598 U.S. 85 (2023) .............................................................................................32

*Bonumose, Inc. v. FDA,*
    747 F. Supp. 3d 211 (D.D.C. 2024)...................................................................20

*Chamber of Com. of U.S. v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006)...........................................................................34

*Children's Hosp. Ass'n of Tex. v. Azar,*
    933 F.3d 764 (D.C. Cir. 2019)...........................................................................42

*Chocolate Mfrs. Ass'n of U.S. v. Block,*
    755 F.2d 1098 (4th Cir. 1985) ...............................................................24, 25, 40

*City of Columbus v. Cochran,*
    523 F. Supp. 3d 731 (D. Md. 2021)...........................................................*passim*

*City of Columbus v. Kennedy,*
    796 F. Supp. 3d 123 (D. Md. 2025)...........................................................*passim*

*City of Columbus v. Trump,*
    453 F. Supp. 3d 770 (D. Md. 2020)....................................................................18

*Conner v. Cleveland Cnty.,*
    22 F.4th 412 (4th Cir. 2022)..............................................................................31

*Ctr. for Sci. in the Pub. Int. v. Perdue,*
    438 F. Supp. 3d 546 (D. Md. 2020)..............................................................20, 21

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ........................................................................................37

*DHS v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020) ...........................................................................................24

*Fishermen's Dock Co-op. v. Brown*,
  75 F.3d 164, 172 (4th Cir. 1996) ...................................................................37

*Judulang v. Holder*,
  565 U.S. 42 (2011) .........................................................................................27

*King v. Burwell*,
  576 U.S. 473 (2015) ..................................................................................*passim*

*Kravitz v. Dep't of Com.*,
  366 F. Supp. 3d 681, 750 (D. Md. 2019).................................................29, 31

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .......................................................................................28

*Marshall Cnty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993)......................................................................20

*Me. Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ....................................................................................3, 22

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023) ........................................................................42

*Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy*,
  654 F.3d 496 (4th Cir. 2011) ..........................................................................39

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  595 U.S. 109 (2022) .......................................................................................22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .........................................................................................2

*Neumann v. Prudential Ins. Co. of Am.*,
  367 F. Supp. 2d 969 (E.D. Va. 2005) .............................................................22

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017) .......................................................................................42

*Ohio v. EPA*,
  603 U.S. 292 (2024) ...................................................................24, 30, 34, 37

*Perez v. Cuccinelli,*
  949 F.3d 865 (4th Cir. 2020) ........................................................................42

*Perez v. Mountaire Farms, Inc.,*
  650 F.3d 350 (4th Cir. 2011) ........................................................................30

*Polselli v. IRS,*
  598 U.S. 432 (2023) ......................................................................................32

*Sierra Club v. Dep't of Interior,*
  899 F.3d 260, 293 (4th Cir. 2018) ..........................................................31, 43

*TRW, Inc. v. Andrews,*
  534 U.S. 19 (2001) ........................................................................................32

*United States v. Hawley,*
  919 F.3d 252 (4th Cir. 2019) ........................................................................42

*Wisc. Dep't of Revenue v. William Wrigley, Jr., Co.,*
  505 U.S. 214 (1992) ......................................................................................30

*Wild Va. v. U.S. Forest Serv.,*
  24 F.4th 915 (4th Cir. 2022) ........................................................................34

## STATUTES

5 U.S.C.
    § 705 ..............................................................................................................19
    § 706 ..........................................................................................................2, 21

26 U.S.C.
    § 24(*l*) ...........................................................................................................39
    § 32(k) ...........................................................................................................39
    § 36B .........................................................................................................5, 10
    § 36B(b) ...........................................................................................5, 8, 21, 29
    § 36B(c) ..................................................................................................21, 38
    § 36B(f) .........................................................................................................38
    § 36B(h) ..........................................................................................................5

42 U.S.C.
    § 300gg .........................................................................................................27
    § 300gg-1 ....................................................................................................9, 31
    § 300gg-1(a) ......................................................................................3, 31, 32
    § 300gg-1(b) ....................................................................................................3
    § 300gg-2(a) ....................................................................................................3
    § 300gg-2(b) ....................................................................................................3
    § 300gg-6(a) ..............................................................................................3, 25

§ 300gg-6(b) ...................................................................................................25
§ 300gg-12 ......................................................................................................3
§ 300gg-42 ......................................................................................................3
§ 300gg-91(b) .................................................................................................37
§ 18021(b) .....................................................................................................27
§ 18022(a) ........................................................................................................3
§ 18022(c) .......................................................................................3, 25, 26, 27
§ 18022(d) ..............................................................................................4, 8, 30
§ 18031(b) ........................................................................................................3
§ 18031(c) ........................................................................................................4
§ 18031(i) .........................................................................................................4
§ 18032(a) ......................................................................................................31
§ 18032(d) ......................................................................................................31
§ 18081 ............................................................................................................5
§ 18081(a) ............................................................................................21, 22, 38
§ 18081(c) ............................................................................................10, 41, 42
§ 18081(e) ............................................................................................10, 41, 42
§ 18081(f) ..............................................................................................5, 7, 22, 38
§ 18082 .......................................................................................................5, 10
§ 18082(c) ......................................................................................................22
§ 18091 ............................................................................................................5
§ 18114 ..........................................................................................................27

Pub. L. No. 111-148, 124 Stat. 119 (2010) ........................................................3
Pub. L. No. 111-152, 124 Stat. 1029 (2010) ......................................................3
Pub. L. No. 119-21, 139 Stat. 72 (2025) ..........................................................39

# REGULATIONS

26 C.F.R.
§ 1.6011-8 ......................................................................................................39

45 C.F.R.
§ 147.104(i) ..................................................................................................9, 31
§ 155.305(f) .........................................................................................10, 14, 38
§ 155.315(f) ................................................................................................11, 41
§ 155.320(c) ...................................................................................................11
§ 155.335(j) ......................................................................................................7
§ 155.335(n) .....................................................................................................7
§ 155.340(c) ...................................................................................................38
§ 155.410(e) .................................................................................................9, 34
§ 155.420(g) ..............................................................................................10, 36
§ 156.140(c) .................................................................................................8, 29

77 Fed. Reg. 70,584 (Nov. 26, 2012) ...............................................................32
79 Fed. Reg. 13,744 (Mar. 11, 2014) ...............................................................25
86 Fed. Reg. 24,140 (May 5, 2021) ..................................................................26
87 Fed. Reg. 27,208 (May 6, 2022) ..................................................................33

87 Fed. Reg. 78,206 (Dec. 21, 2022)............................................................................................40

90 Fed. Reg. 12,942 (Mar. 19, 2025) ……………………………………………………27, 28, 41

90 Fed. Reg. 4424 (Jan. 15, 2025)................................................................................................6

90 Fed. Reg. 27,074 (June 25, 2025)...................................................................................*passim*

**INTRODUCTION**

The Affordable Care Act (ACA) extends a promise: all Americans are guaranteed access to insurance coverage that will pay for their health needs.  One of the ways that the ACA seeks to fulfill that promise is by establishing health insurance Exchanges, through which individuals can shop for and buy an affordable policy that covers a set of essential health benefits.  The Act aims to keep the costs of these policies down by subsidizing the cost of coverage, which attracts younger and healthier people into the market, improving the risk pool and lowering premiums for everyone.  When the Act is implemented as Congress intended, it succeeds at this goal.

New policymakers at the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS), however, do not share this vision.  They prefer policies that would reduce federal subsidy spending by driving people off coverage on the Exchanges.  CMS sought to accomplish this result through a final rule governing policies for enrollment in subsidized coverage on the Exchanges.  90 Fed. Reg. 27,074 (June 25, 2025).  Through a combination of measures, the agency aims to drive up consumers' cost of coverage on the Exchanges, make it harder for people to enroll in policies through the Exchanges, and impose barriers on obtaining subsidies even for those people who do successfully enroll.  Many of the policies in this rule are unlawful, contrary to the ACA, and exceed CMS's statutory authority.  All of the policies at issue are arbitrary, violating the Administrative Procedure Act (APA)'s requirements for reasoned decisionmaking.  The new Administration was not free to undermine the purposes of the Act simply because they disagree with it.

These new policies would impose grave and irreparable harm on Plaintiffs.  Municipalities like the cities of Columbus, Baltimore, and Chicago are providers of last resort.  Because they operate clinics and other facilities that treat all comers without regard to their insurance status, when more people are driven off insurance coverage, these cities are left to foot

the bill.  Main Street Alliance's members are small business owners and entrepreneurs, many of whom rely on the Act's promise of affordable insurance coverage through the Exchanges to keep employees healthy and their businesses afloat.  And Doctors for America's members are clinicians across the nation, many of whose patients would have their health coverage limited or lost as a result of the final rule.  This would lead to greater administrative hurdles and less compensation for clinicians, who would be hindered from providing their patients with adequate care.  To avoid these harms, and to vindicate the promise of the Affordable Care Act, Plaintiffs respectfully request that the challenged provisions of the final rule be set aside pursuant to 5 U.S.C. § 706.

## BACKGROUND

### I.  Statutory Background

In 2010, Congress enacted the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119 (2010) (as amended by Pub. L. No. 111-152, 124 Stat. 1029 (2010)). "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012); *see also King v. Burwell*, 576 U.S. 473, 479 (2015).

Before the Act's market reforms went into effect in 2014, "individual health insurance markets were dysfunctional." *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 740 (D. Md. 2021) (*City of Columbus II*).  Insurers were free to deny coverage for people with pre-existing conditions, to refuse to renew such coverage, or even to revoke such coverage after it had been issued.  Now, however, the Act's "guaranteed issue" requirement specifies that every "health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage,"

42 U.S.C. § 300gg-1(a), subject to exceptions specified in the statute, such as the restriction of new enrollments to an annual open enrollment period or specified special enrollment periods, *id*. § 300gg-1(b); *see Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020). "In other words, the Act 'ensure[s] that anyone can buy insurance.'" *Me. Cmty. Health Options*, 590 U.S. at 301 (quoting *King*, 576 U.S. at 493).

Separately, the Act's "guaranteed renewability" provision requires issuers to renew or continue in force such coverage, 42 U.S.C. § 300gg-2(a), again subject to statutory exceptions, including an exception for persons who have failed to pay premiums owed on their policy, *id*. § 300gg-2(b)(1); *see also id.* §§ 300gg-12, 300gg-42.

Health insurance plans must cover a set of "essential health benefits," such as prescription drugs. *Id*. § 300gg-6(a). And to protect patients from devastating costs when a medical condition exhausts their coverage, the Act limits so-called "cost-sharing"—like, deductibles and copayments—for these essential health benefits. *See id.* § 18022(a)(2). The limitation on cost-sharing is adjusted each year by a "premium adjustment percentage," which compares average premiums for "health insurance coverage" in the current year with the same average for 2013, before the Act's marketplace reforms went into effect. *Id.* § 18022(c)(1), (4).

To help individuals learn about and enroll in health insurance, the Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 482 (quoting 42 U.S.C. § 18031(b)(1)); *see Me. Cmty. Health Options*, 590 U.S. at 301. These Exchanges, also known as health insurance Marketplaces, enable people not eligible for Medicare or Medicaid to obtain adequate, affordable insurance independent of their jobs. The Exchanges therefore serve as "marketplace[s] that allow[] people to compare and purchase" ACA-compliant plans. *King*, 576 U.S. at 479.

There are several different types of Exchanges.  Some states have elected to create Exchanges themselves (state-based Exchanges or SBEs), as is the case in Maryland, while others have created Exchanges that operate on the federal Healthcare.gov platform (state-based Exchanges on the federal platform, or SBE-FPs), such as the Exchange that Illinois used in 2025 while it transitioned to an SBE.  The Exchange in other states, including Ohio, is operated by the Centers for Medicare & Medicaid Services (CMS) (federally facilitated Exchange, or the FFE).  *See* CMS, Consumer Info. & Ins. Oversight, *State-Based Exchanges* (updated Aug. 28, 2024), https://perma.cc/JFT3-6EAK.

Plans that meet the requirements described above and that are offered on the Exchanges are known as "qualified health plans."  Individuals primarily enroll in qualified health plans for a given benefit year during an annual open enrollment period, or under specified special enrollment periods.  42 U.S.C. § 18031(c)(6).  To assist with enrollment, the Act requires Exchanges to award grants to healthcare "Navigators" that conduct public education and awareness campaigns, help consumers understand their choices, facilitate their enrollment, and help ensure their access to consumer protections.  *Id.* § 18031(i)(1), (3).

Plans on the Exchanges offer various levels of generosity: a "bronze" plan is designed to provide benefits that are actuarially equivalent to 60% of the full value of benefits to the plan (meaning that premiums are calculated in the expectation that 40% of the cost of coverage would be paid for through enrollee out-of-pocket spending), and "silver," "gold," and "platinum" plans are designed to provide benefits that are actuarially equivalent to 70%, 80%, and 90%, respectively, of the full value of benefits under the plan.  *Id*. § 18022(d)(1).  Because actuarial predictions may be imprecise, the Act specifies that CMS may "provide for a de minimis variation . . . to account for differences in actuarial estimates."  *Id.* § 18022(d)(3).

The Act also "seeks to make insurance more affordable by giving refundable tax credits to individuals." *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits" (PTCs) vary depending on an individual's income—individuals who earn more must pay more toward the cost of their monthly premium—and are generally pegged to the cost of the so-called "benchmark silver plan," which is the second-lowest-cost silver plan offered within a market. *See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)–(C). The Act initially made these tax credits available to individuals with incomes between 100% and 400% of the federal poverty level. *Id.* § 36B(b)(3)(A). There was no income cap on these tax credits from 2021 through 2025, *see id.* § 36B(b)(3)(A)(iii), but the income cap has been reinstated for 2026.

PTCs are claimed on an individual's tax return after the end of the year, and are paid by the IRS. *Id.* § 36B(h). Rather than waiting to recover their costs the next year, enrollees may claim "advance premium tax credits" (APTCs) up front so that the value of the tax credits may be applied directly to the purchase of insurance. 42 U.S.C. §§ 18081, 18082; *City of Columbus II*, 523 F. Supp. 3d at 741. CMS is responsible for determining whether individuals meet the statutory eligibility requirements for APTCs, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B).

In sum, the Act requires that insurers generally offer only quality health insurance and aims to lower the cost of coverage to encourage individuals to enroll. This coverage improves access to care and overall health and reduces financial burdens on consumers as well as institutions that pay for uncompensated care. Decl. of Christen Linke Young ¶¶ 6–10, ECF No. 11-2.

Increasing enrollment in quality health insurance coverage is not only the ACA's immediate goal; it is also key to the Act's long-term success. Insurance market stability requires robust enrollment, particularly by relatively healthy individuals. *Id.* ¶ 9; 42 U.S.C. § 18091(2)(I)

5

(finding that "broaden[ing] the health insurance risk pool to include healthy individuals . . . will lower health insurance premiums"); *King*, 576 U.S. at 480.  Limiting the cost of health insurance is, in turn, essential to promoting enrollment.  Young Decl. ¶ 10; *King*, 576 U.S. at 480–81.  By driving costs down and insured rates up, the Act ensures that insurance markets function smoothly.

When faithfully implemented, the Act's reforms successfully meet Congress's goal of enabling more individuals to enroll in health insurance coverage.  *See* Young Decl. ¶ 7.  More than 24 million individuals were enrolled in Marketplace coverage in 2025.  CMS, Press Release, Over 24 Million Consumers Selected Affordable Health Coverage in ACA Marketplace for 2025 (Jan. 17, 2025), AR36997.

## II.  The 2025 Marketplace Rule

CMS ordinarily announces its policies for the Exchanges through annual rulemakings, which are typically completed before insurers are required to submit their plan designs to state regulators.  Vanessa C. Forsberg, Cong. Res. Serv., R44065, Health Insurance Exchanges and Qualified Health Plans: Overview and Policy Updates 57–58 (May 6, 2025).  In keeping with that practice, CMS published a final rule in early 2025 that addressed the operation of the Exchanges for the 2026 plan year.  90 Fed. Reg. 4424 (Jan. 15, 2025).  Although insurers had already begun their preparations for 2026 in reliance in that rule, CMS then departed from its ordinary annual regulatory cycle by issuing a second rulemaking in the middle of the year that dramatically changed the agency's approach on numerous issues.

CMS's second final rule, 90 Fed. Reg. 27,074, contains a number of provisions that, in their individual and collective effect, would raise consumers' premiums for plans on the Exchanges, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers of last resort.  Independent

experts project that the rule will lead to at least 1.8 million fewer people enrolling on the Exchanges.  Young Decl. ¶ 4.  The rule accomplishes this result through measures that erode the value of coverage obtained through the Exchanges, impose barriers designed to depress enrollment in the Exchanges, and impose further barriers limiting the availability of subsidized insurance even for those enrollees that do successfully enroll.

### A.  The Final Rule Erodes the Value of Coverage

*Imposition of a Junk Charge on Certain Enrollees*.  Under regulations that have been in place since the ACA was first implemented, 45 C.F.R. § 155.335(j), enrollees that remain eligible for a Marketplace plan from one year to the next are automatically re-enrolled in the same plan unless they terminate coverage or actively enroll in a different plan.  Depending on an enrollee's income level and the level of coverage selected, an enrollee may be eligible for a zero-premium plan, that is, a plan in which the entire cost of the premium is covered by the enrollee's APTCs.  The new rule adds 45 C.F.R. § 155.335(n), only for the 2026 plan year, to require the federally facilitated Exchange to impose a monthly surcharge of $5 on each such enrollee until the enrollee confirms his or her intent and eligibility to remain on the zero-premium plan.  CMS invokes 42 U.S.C. § 18081(f)(1)(B) as authority for this surcharge, 90 Fed. Reg. at 27,109, but that authority is limited to the establishment of procedures to redetermine an applicant's eligibility for APTCs, not to reduce the amount of the APTC that is awarded under the statutory formula.  CMS acknowledges that research demonstrates this provision would reduce enrollment among enrollees who used to have access to a zero-premium plan by 14% to 33%.  90 Fed. Reg. at 27,195.

*Increased Costs through Revisions to the Premium Adjustment Methodology*.  As noted above, the maximum annual limit on cost-sharing is adjusted annually by a "premium adjustment percentage," which measures the rate of premium growth.  The IRS also uses the premium

7

adjustment percentage to adjust the value of PTCs.  CMS has historically used data from premiums for employer-sponsored insurance to calculate this percentage, because individual insurance market premiums have been more volatile.  The final rule incorporates individual insurance market data into this measure, resulting in a 15% increase in the maximum annual out-of-pocket limit on cost sharing and a 4.5% increase in average premiums, which will lead to lost coverage, a worsened risk pool, and higher levels of uncompensated care.

*Eroding the Actuarial Value of Coverage*.  As noted above, the Act sets targets for the actuarial value of bronze, silver, gold, and platinum plans on the Exchanges, subject to permissible range of "de minimis" variation to "account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3).  The final rule expands the range of de minimis variation to permit bronze plans to range from 5 points above to 4 points below the statutory target (that is, bronze plans may offer coverage ranging from 56% to 65% of anticipated expenditures) and silver, gold, and premium plans to fall 4 points below the target (that is, silver plans may cover as little as 66% of anticipated expenditures).  45 C.F.R. § 156.140(c)(1).  By eroding the value of silver plan coverage, the final rule would also reduce PTCs, which are calculated based on silver plan premiums.  26 U.S.C. § 36B(b)(2)(B).  Overall, net premiums on the Exchange would increase by up to $714 per year for a typical family as a result of this provision, as the rule acknowledges. 90 Fed. Reg. at 27,208.

**B.  The Final Rule Imposes Barriers on Enrollment**

*Revocation of the Act's Guarantee That Anyone Can Buy Insurance*.  In some instances, enrollees may incur debts for premiums owed without realizing it.  For instance, some enrollees may believe that they may terminate their coverage simply by stopping premium payments, without realizing (or being informed) that the coverage remains in effect and they continue to owe payments to their insurer.  In other instances, consumers may appear to owe premium debt

through no fault of their own due to insurer accounting errors or Exchange recordkeeping mistakes. The final rule permits insurers to refuse to enroll these individuals and to apply any payments that these individuals make to the outstanding debt rather than to the premium for new coverage, without prior notice to that enrollee. 45 C.F.R. § 147.104(i). In other words, an individual might complete all of the steps to enroll in coverage, including making the payment they understand to be needed to complete the transaction, only to learn at the end of the process that they have not been enrolled. This rule is contrary to the "guaranteed issue" requirement of 42 U.S.C. § 300gg-1. CMS makes no attempt to quantify the impact of this change, but commenters offered analysis of data from the 2026 payment notice showing that 180,000 people owed debts for premiums as low as $10, all of whom would be denied coverage under the 2025 rule. 90 Fed. Reg. at 27,085. Indeed, CMS noted that more than 135,000 policies were terminated for the 2023 plan year for unpaid premiums of $10 or less—and this provision in the final rule could have an even bigger impact because it would allow insurers to cover debts from *any time* in the past, not just the prior 12 months. *See id.* at 27,133.

*Changes to Enrollment Periods.* Under current policy, the open enrollment period for the Exchanges begins on November 1 and runs at least to January 15. This two-and-a-half-month period has been beneficial for the health of the Exchanges, as younger and healthier people tend to enroll later in the process, and are particularly prone to enroll, if given the opportunity, after the end-of-the-year holiday period, when people face unusual financial distress. The final rule prohibits open enrollment in January (beginning with the 2027 plan year) by requiring all Exchanges to hold open enrollment periods that begin no later than November 1, end no later than December 31, and are no more than nine weeks in duration. 45 C.F.R. § 155.410(e).

The final rule also requires the federally facilitated Exchange to conduct pre-enrollment verification for at least 75% of new enrollments through special enrollment periods (SEPs). 45

C.F.R. § 155.420(g).  Commenters noted that the addition of this paperwork burden would depress coverage on the Exchanges, and CMS itself estimated that it would cost consumers more than $7 million in 2026.  90 Fed. Reg. at 27,186–87, 27,204.  CMS declined to make this policy permanent but would require it for the 2026 plan year.

### C.  The Final Rule Limits the Availability of Subsidized Coverage

*Failure to Reconcile Penalty*.  The amount of APTCs that an enrollee receives over the course of a year and the amount of PTCs that the enrollee receives on his or her tax return depend on the same statutory formula; APTCs are intended to be a substitute for the tax credit. 26 U.S.C. § 36B; 42 U.S.C. § 18082.  But APTCs are calculated based on the enrollee's projected income, so if the enrollee provides an incorrect estimate (because, for example, he or she works more hours than expected), the enrollee might owe a tax payment at the end of the year without realizing that any such debt is owed.  Under current policy, any such enrollee must be given a notice of the tax debt in the first year of enrollment in coverage after the debt is incurred, so that the debt can be repaid; if the enrollee does not do so, eligibility for APTCs may be revoked in the second year.  45 C.F.R. § 155.305(f)(4)(i), (ii).  The final rule would revoke that grace period, for 2026 only, and requires the Exchanges to determine the enrollee to be ineligible for APTCs in the first year, *id.* § 155.305(f)(4)(iii), even though CMS lacks any authority to alter the statutory formula for eligibility for APTCs.

*Changes to Data-Matching Policies*.  When an Exchange attempts to verify an applicant's income for purposes of determining his or her eligibility for, and the amount of, APTCs, and it finds an inconsistency in that applicant's data, it notifies the applicant and provides him or her with an opportunity to respond.  42 U.S.C. § 18081(e)(4).  The statute provides a default period of 90 days for that response, subject to CMS's authority to modify the procedures for this verification process.  *Id.* §§ 18081(c)(4), (e)(1), (e)(4).  In many cases, 90

days is not enough time for an applicant to track down the proof of income needed to verify APTC eligibility. The current regulations accordingly provide for an additional 60 days where necessary. 45 C.F.R. § 155.315(f)(7). The final rule revokes that 60-day extension. 90 Fed. Reg. at 27,120.

The final rule further reinstates a 2017 policy that required Exchanges to audit enrollees who project that their household income for the upcoming year will be greater than 100% of the federal poverty level, if the IRS reports data indicating that the enrollee's current income is below that threshold. Because this policy created "immense administrative burdens" for low-income enrollees, this Court held in a prior case that it "defie[d] logic" and vacated it as arbitrary and capricious under the APA. *City of Columbus II*, 523 F. Supp. 3d at 763. CMS did not appeal that judgment, and it again acknowledges that this policy would cause tens of thousands of enrollees to lose their coverage. 90 Fed. Reg. at 27,200. The final rule nevertheless attempts to reinstate this policy for the 2026 plan year, forthrightly asserting its disagreement with this Court's prior decision. *Id.* at 27,121.

Under current policy, an Exchange must accept an applicant's attestation of his or her projected annual income if the IRS reports that there is no tax return data available. 45 C.F.R. § 155.320(c)(5). The final rule revokes that policy, and for the 2026 plan year would require Exchanges to verify income with other data sources and to require applicants to submit documentary evidence or otherwise resolve the income inconsistency; if no such evidence is available, the applicant would lose eligibility for APTCs. 90 Fed. Reg. at 27,131. These new data-matching policies are projected to cause more than 400,000 people to lose coverage for the upcoming plan year. 90 Fed. Reg. at 27,199–200.

*    *    *

11

The final rule acknowledges that these provisions would cause many people to lose access to affordable coverage through the Exchange.  Nonetheless, it asserts that these provisions are needed to address the problem of unscrupulous brokers enrolling people on the Exchanges without their knowledge or consent.  The final rule cites a report from the Paragon Health Institute that purports to find a high rate of fraudulent enrollments.  90 Fed. Reg. at 27,025; Brian Blase & Drew Gonshorowski, *The Great Obamacare Enrollment Fraud*, Paragon Health Inst. (June 2024), AR39294 (Paragon Report).  This report, however, suffers from numerous methodological errors that render its conclusions useless.  It predates, and thus does not account for, numerous efforts that CMS put in place in the second half of 2024 to address the issue of improper enrollments.  And, even if the report's conclusions were accurate, there is a fundamental disconnect between the problem described in that report and the measures adopted in the final rule.

First, Paragon estimates that as many as 5 million low-income people were improperly enrolled in coverage in the Exchanges, based on a comparison of the number of people who applied for APTCs (which, as noted above, is based on the enrollee's projection of their anticipated income for the coming year) with the number of people whose income ended up falling within the range entitling them to subsidies.  *See* Paragon Report at 15, AR39311; 90 Fed. Reg. at 27,122.  But this is the wrong comparison; there are many legitimate reasons why an enrollee might not accurately estimate his or her future income.  Lower-income people in particular tend to have incomes that fluctuate widely, and these amounts are "hard to estimate, especially for households whose members may work part-time or seasonally, expect to change jobs, or are self-employed."  Urban Institute comment at 2 (Apr. 11, 2025), AR31663.  Moreover, the Paragon report compared apples to oranges by including children in its estimated number of applicants but not in its count of eligible persons; by mismatching 2023 data to

estimate improper enrollments for 2024, when many more people gained eligibility for the Exchanges in light of changes in Medicaid enrollment standards; and by using fundamentally different measures of income for its two data sets. *See id.* at 2–3; *see also* Jason Levitis et al. comment at 28–31 (Apr. 11, 2025), AR33768–33771; Ctr. on Budget & Policy Priorities comment at 4–5 (Apr. 11, 2025), AR31755–31756; Matthew Fiedler comment at 4-5 (Apr. 11, 2025), AR33449–33450. These flaws in the Paragon analysis were pointed out to CMS by commenters, but CMS did not explain why it chose to ignore them.

Second, both the Paragon report and the final rule itself relied on estimates of fraudulent enrollments from early in 2024, without acknowledging that since that time CMS had put in place enforcement efforts against unscrupulous brokers, and those measures have since borne fruit. *See* 90 Fed. Reg. at 27,074 n.2 (citing data from January through August 2024); Paragon Report at 25 & n.40, AR39321. CMS itself has recited, "Marketplace system changes that were implemented in July 2024 are having the desired effect of successfully preventing consumers from being switched to different plans or enrolled in coverage without their informed consent." CMS, *Update on Actions to Prevent Unauthorized Agent and Broker Marketplace Activity* (Oct. 17, 2024), AR35377. These measures include new documentation requirements for brokers to show that individuals have consented to enroll, enhanced IT systems to detect suspicious activity, and regulatory changes strengthening CMS's enforcement authority against brokers. Levitis comment at 30–31, AR33770–33771. And these measures are working; indicators of potentially improper enrollments have dropped by as much as 90% since they were put into place. *Id.* at 31, AR33771. Yet the final rule dismisses the success of these recent efforts, asserting implausibly that these measures must have been unsuccessful because the number of complaints in December 2024 remained slightly elevated over the number from the previous December. 90 Fed. Reg. at 27,133.

13

Third, even if the Paragon analysis were accurate or reflective of current circumstances, it could not justify the provisions of the final rule. The final rule attempts to justify many measures as efforts to combat the phenomenon of brokers fraudulently enrolling consumers without their consent. 90 Fed. Reg. at 27,091–92. But there is a basic disconnect between that rationale and the measures that the final rule adopts. Many of its provisions are targeted at enrollees who are attempting to gain subsidized coverage for themselves and for their families, and not at brokers. For example, the revocation of the 60-day grace period for individuals to document their incomes wouldn't matter to an unscrupulous broker, but it could matter immensely to an actual enrollee who has difficulty documenting his or her income. Moreover, the Paragon analysis finds excess enrollment in only nine states, all of which use the federally facilitated Exchange, and all but one of which have not adopted the ACA's Medicaid expansion. The report did not identify any systematic issues with enrollment on the state-based Exchanges. *See* Levitis comment at 30–32, AR33770–33772. Yet the final rule imposes many of its policies on a nationwide basis. *See, e.g.*, 45 C.F.R. § 155.305(f)(4)(iii). It would have made more sense for CMS to target its efforts against practices unique to the federally facilitated Exchange states, such as the practice of permitting enhanced direct enrollment entities to submit enrollment paperwork on an enrollee's behalf. *See* Levitis comment at 32–33, AR33772–33773. What's more, even by CMS's own telling, the problem of improper enrollments has been driven by the enhanced subsidies available through the end of 2025. 90 Fed. Reg. at 27,091. CMS assumed that those subsidies would expire this year, which "will substantially mitigate the threat of future improper enrollments," *id.* at 27,075, but CMS imposed new policies to be effective in 2026 (and, in some cases, for 2026 only) when the purported incentive for unscrupulous broker behavior will no longer be in place.

14

### III. The Disastrous Effects of the Final Rule

As noted above, the 2025 rule contains numerous provisions that would worsen the barriers to coverage on the Exchanges by making coverage more expensive or by heightening the administrative obstacles consumers face.  Young Decl. ¶ 29.  If they were to go into effect, these provisions would decrease the number of people with coverage by nearly 2 million; some of these people would find other coverage, but overall, 1.8 million more people would be uninsured.  *Id.* ¶ 4.  Younger and healthier people are more likely to drop from coverage, worsening the risk pool and leading to higher health insurance premiums, further exacerbating the problem of high costs, which in turn can cause additional people to become uninsured.  *Id.* ¶ 5.  This would lead to increased burdens of uncompensated care, especially for safety net providers.  *Id.* ¶ 6.

These predictions are not merely hypothetical.  Insurers prepared rates for the 2026 plan year after CMS issued the final rule, and incorporated substantial premium increases in their models to account for the possibility that the rule would go into effect.  As one Maryland insurer noted, it needed to raise its premiums substantially because the rule "will lead to healthier enrollees leaving the market and an overall worsening of the risk pool."  United Healthcare, *Optimum Choice, Inc.*, *Part III: Actuarial Memorandum: PUBLIC; Maryland 2026 Individual Exchange Rates* 7 (May 22, 2025), https://perma.cc/35L2-M49D.  This coverage loss and erosion, and overall increase in health care costs, will cause harms that radiate out from individuals to their businesses, medical providers, and broader communities.

Among many others, Plaintiffs would suffer significant and irreparable harm if the challenged provisions of the rule were to go into effect.  The rule's policies would harm the owners and employees of small businesses like members of Main Street Alliance (MSA), many of whom rely on affordable health coverage through the Exchanges—not only to access the

health care they need but, by extension, to provide them the freedom to operate their own businesses without seeking employer-sponsored insurance elsewhere. *See* Decl. of Shawn Phetteplace ¶¶ 3–6, ECF No. 11-3; Decl. of Brooke Legler ¶ 8, ECF No. 11-4. By eroding the value of their insurance coverage and creating additional administrative barriers, the final rule's provisions would strip that freedom from many small business owners operating on narrow margins, as well as their employees. Legler Decl. ¶ 11.

For example, Brooke Legler is a small business owner and MSA member located in Wisconsin. *Id.* ¶¶ 2–4. She has a chronic condition that requires her to take significant medication, including a biologic that costs approximately $10,000 per month. *Id.* ¶¶ 5–6. By giving her access to affordable and comprehensive health insurance, the ACA gave her the freedom to start and operate her small business, which now employs about 10 individuals. *Id.* ¶ 8. Like many other small business owners, she operates that business on narrow margins. *Id.* ¶ 11. The increase in premiums that will result from the final rule would likely force her to shut down her business, because her current insurance through the ACA would no longer be affordable and comprehensive enough to cover her medications, so she would need to find different employment with employer-sponsored insurance or explore other state-sponsored coverage options. *Id.*

The final rule would also harm medical providers in myriad ways. Because patients with no or inadequate insurance are less likely to seek the medical care they need until conditions become serious, clinicians like members of Doctors for America (DFA) would see patients with more serious or emergency needs; would receive less compensation for many of their patients, even while expending more time navigating the administrative barriers to coverage for their patients; and would lose contact with many of their patients, particularly in low-income and rural communities. Decl. of Janet Krommes ¶¶ 6-7, ECF No. 11-5; Decl. of Dr. Beth Oller ¶¶ 7-9,

16

ECF No. 11-6; Declaration of Dr. Eric D. Fethke ¶¶ 5-9, ECF No. 30-1. This greater expenditure of time and effort, even while seeing decreased compensation, would hinder clinicians' ability to provide their patients with optimal health care.

For example, DFA member Dr. Beth Oller is a family medicine physician in Rooks County, Kansas. Oller Decl. ¶¶ 3–4. She treats a panel of more than 800 patients of all ages for a broad range of health care needs, ranging from wellness checks to treating illnesses and chronic conditions to providing the full range of reproductive health care. *Id.* Sustaining a medical practice is particularly difficult in a rural area like hers, where health care providers are sparse and many residents are low-income and self-employed (for example, as farmers and ranchers). *Id.* ¶ 5. Even after the ACA allowed many of her patients to access affordable health insurance—and thus preventative care and early treatment—for the first time, Dr. Oller was unable to sustain an independent practice, and she now practices as a primary care provider with a county health center. *Id.* ¶ 4. But the continued operation of rural hospitals and health centers would be put at risk if the rule were to go into effect and cause many patients like Dr. Oller's to see the value of their insurance coverage erode or to lose that coverage altogether. *Id.* ¶ 6–7, 9. As a result, Dr. Oller would receive compensation for less of the treatment she provides and would receive compensation for fewer patients overall. *Id.* ¶¶ 7, 8. The increase in administrative burdens would also require Dr. Oller and her practice to spend more time (without compensation) helping patients navigate red tape to determine their coverage. *Id.* ¶ 7. These results would hinder Dr. Oller's ability to provide optimal care to her patients and ultimately jeopardize their long-term health. *Id.*

The harms from the final rule would radiate out further to patients' communities and local governments in cities like Columbus, Baltimore, and Chicago. These cities fund and operate a range of community health centers, general and specialty clinics, and other health care

services, as well as emergency medical transport.  *See* Decl. of Olusimbo Ige ¶ 5, ECF No. 11-9;
Decl. of Edward Johnson ¶ 11, ECF No. 11-7; Decl. of Faith Leach ¶¶ 7–8, ECF No. 11-8.  To
ensure that their residents get the care that they need, they all provide these services to patients
regardless of their insurance coverage or ability to pay.  An increase in the number of uninsured
and underinsured residents resulting from the final rule would create a strain on those services
and, ultimately, the cities' budgets, which must make up the shortfall from decrease
compensation and increased demand for emergency services.  *See* Ige Decl. ¶¶ 6, 14; Johnson
Decl. ¶¶ 9–11; Leach Decl. ¶ 12; *see also City of Columbus v. Trump* (*City of Columbus I*), 453
F. Supp. 3d 770, 787–88 (D. Md. 2020) (recognizing that city plaintiffs challenging CMS's 2019
rule "suffered injury from having to pay greater costs to provide uncompensated care to their
under- and uninsured residents"); *City of Columbus II*, 523 F. Supp. 3d at 74.

    In addition, individuals who lack insurance coverage are more likely to wait until their
conditions are more severe before seeking care, so the increase in the number of such individuals
would lead to an increase in ambulance calls and other emergency medical services.  *See* Ige
Decl. ¶ 8.  This would increase the strain on the city Plaintiffs' often already overstretched
emergency medical services and, again, create budgetary shortfalls that the cities will have to
make up.  *See* Ige Decl. ¶ 9; Johnson Decl. ¶¶ 12–14; Leach Decl. ¶¶ 11–13.

    Moreover, the city Plaintiffs would be irreparably harmed by the increase in uninsured
and underinsured individuals caused by the rule for the additional reason that when individuals
do not get the medical care that they need, they are necessarily less healthy, less productive, and
less able to participate in city life.  *See* Ige Decl. ¶ 14; Johnson Decl. ¶ 15; Leach Decl. ¶ 14.
This would have cascading negative and irreparable effects on city programs and communities.

**IV. Plaintiffs' Challenge to the Final Rule**

On July 1, 2025, Plaintiffs—the City of Columbus, Ohio; the Mayor and City Council of Baltimore, Maryland; the City of Chicago, Illinois; Doctors for America ("DFA"), a nonprofit network of small businesses; and Main Street Alliance ("MSA), a national advocacy nonprofit with physician and medical trainee members across all 50 states—brought suit against HHS, CMS, and the heads of each agency. Compl., ECF No. 1. Plaintiffs sought review of the final rule under the Administrative Procedure Act (APA), asserting that many of the rule's provisions are either contrary to law, arbitrary and capricious, or both. *See id.* at 24-27. The next day, Plaintiffs filed a motion for preliminary relief, seeking a stay of the effective date of eight of the Rule's provisions under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. Pls.' Mot. for Stay, ECF No. 11.

This Court granted Plaintiff's motion in part, and denied it in part, on August 22, 2025, Order, ECF No. 36, and issued a clarifying order the following week, Order, ECF No. 38. The Court found that the cities and MSA had standing to bring suit based on "the increase premiums and uncompensated care costs that are 'predictable results' of the challenged provisions of the Rule." Mem. Op. at 12, ECF No. 35. The Court had "some doubt as to the extent of the injury to DFA," but having found other Plaintiffs' standing sufficient, the Court deferred judgment on the question of DFA's standing. *Id.* The Court then found that Plaintiffs were likely to succeed on the merits in showing that three of Rule's provisions—specifically the "junk fee" provision, the revocation of guaranteed-issue for past due premiums, and the failure-to-reconcile provision—were contrary to law, *id.* at 30, 40, 51, and four of the Rule's provisions—the actuarial value policy, the SEP eligibility verification requirements, and both income verification policies—were arbitrary and capricious. *Id.* at 39, 45, 61, 63. The Court found that Plaintiffs had not shown they were likely to succeed on their challenges to two provisions. *Id.* at 35, 54.

Defendants filed a notice of appeal of this Court's orders granting interim relief. Notice of Appeal, ECF No. 43. Defendants sought a stay pending appeal in this Court and in the Fourth Circuit. *See* Mot. for Stay Pending Appeal, ECF No. 42. Both motions were denied. Order of U.S. Court of Appeals, ECF No. 49; Order Denying Mot. to Stay, ECF No. 52. Defendants' appeal remains pending in the Fourth Circuit; their opening brief is due on February 4, 2026.

Defendants produced the administrative record on December 19, 2025. *See* Notice of Filing of Admin. Rec., ECF No. 62. Plaintiffs now move for summary judgment. As Plaintiffs have noted, Joint Mot. to Enter Briefing Sched. at 2, ECF No. 57, we respectfully request a ruling from the Court on the parties' cross-motions for summary judgment by the end of May 2026 to account for the rate filing season for Exchange plans for 2027.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Bonumose, Inc. v. FDA*, 747 F. Supp. 3d 211, 223 (D.D.C. 2024). "In the unique context of a case brought under the APA, the district court 'sit[s] as an appellate tribunal,'" *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993)), and "[s]ummary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 557 (D. Md. 2020); *see also City of Columbus II*, 523 F. Supp. 3d at 743.

Under the APA, courts shall "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Generally, an agency decision is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for Sci. in the Pub. Int.*, 438 F. Supp. at 557. "Courts will vacate agency action if it is not based on a consideration of the relevant factors or where there has been a clear error of judgment." *Id.* (cleaned up). "Section 706(2)(A) requires federal courts to set aside federal agency action that is not in accordance with law." *City of Columbus II*, 523 F. Supp. 3d at 772 (cleaned up) ("Where agency action is found contrary to law, it is clear that vacatur is required.").

**ARGUMENT**

**I.    The Final Rule's Provisions That Erode the Value of Coverage Are Unlawful and Arbitrary**

**A.    The Rule's Imposition of a Junk Fee on Certain Plans Is Unlawful and Arbitrary**

**1.    The Imposition of the Junk Fee Is Unlawful**

Eligibility for PTCs and APTCs and the calculation of those credits are determined by statutory formula set forth in the ACA. A taxpayer is eligible for tax credits if he or she enrolls in coverage through the Exchange, falls within the specified income thresholds, and lacks an offer for other affordable health insurance. 26 U.S.C. § 36B(c)(1), (2). The amount of the tax credit is determined by the taxpayer's income and the cost of a benchmark plan offered through the Exchange. *Id.* § 36B(b). Eligibility for, and the amount of, APTCs turn on the same statutory criteria. 42 U.S.C. § 18081(a)(2); *see also id.* § 18082(a)(1). CMS is responsible for establishing a program "for determining" an applicant's eligibility for and the amount of APTCs,

*id.* § 18081(a), and for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances," *id.* § 18081(f)(1)(B).

CMS's authority under the statute is to determine whether the statutory criteria for APTC eligibility are met, not to alter those criteria. *See Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 975 (E.D. Va. 2005) (ERISA plan administrator's authority to "determine" eligibility under the plan is not a discretionary power to alter the plan terms). Yet CMS invoked its redetermination authority under section 18081(f)(1)(B) to change the statutory formula for APTCs. In particular, the final rule requires the federally facilitated Exchange to reduce APTCs by $5 per month for applicants who automatically re-enroll in a plan that would otherwise be fully subsidized. Nothing in section 18081 or the remainder of the Act grants CMS the "authority to tinker with the premium cost structure outlined in 26 U.S.C. § 36B." *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 150 (D. Md. 2025) (*City of Columbus III*); *see also Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies . . . possess only the authority that Congress has provided.").

Moreover, the authority and obligation to pay APTCs lies with the Treasury, not with CMS. Once CMS applies the statutory criteria to determine eligibility and the amount of APTCs, it reports that information to the Treasury, which then "shall make the advance payment . . . under this section of any premium tax credit allowed under section 36B of title 26" to the enrollee's insurer. 42 U.S.C. § 18082(c)(2)(A). The statute's use of the word "shall" "creates an obligation impervious to discretion," *Me. Cmty. Health Options*, 590 U.S. at 310, and Treasury's obligation is to pay the amount that would be owed under the section 36B formula, not a different amount arbitrarily selected by CMS. CMS accordingly lacks authority to require enrollees to pay a junk fee where the statutory formula would otherwise entitle them to a payment that fully covers their premiums.

## 2.    The Imposition of the Junk Fee Is Arbitrary

CMS describes the $5 per month junk fee as a "nominal" amount that will not impose "undue financial hardship" on enrollees.  90 Fed. Reg. at 27,107.  But a wealth of empirical evidence shows that the addition of even nominal charges can profoundly depress coverage for low-income enrollees. When Massachusetts introduced a nominal payment for zero-premium plans, "1 in 7 enrollees lost coverage as a result of new monthly premiums," Adrianna McIntrye comment at 10 (Apr. 11, 2025), AR30427 (citing Adrianna McIntyre et al., *Small Marketplace Premiums Pose Financial and Administrative Burdens: Evidence from Massachusetts, 2016-17*, 43 Health Affairs 80, 80 (2024)), demonstrating that "even small premium burdens act to depress enrollment, particularly by healthy consumers."  Partnership to Protect Coverage comment at 7, AR34875.  Moreover, younger and healthier enrollees are more likely not to notice that they now owe a payment, while sicker enrollees will be more likely to resolve paperwork issues more quickly.  As a result, this policy will worsen the risk pool and raise premiums for other participants.  *See id.* at 6; *see also* National Health Law Program comment at 12 (Apr. 10, 2025), AR24775 (citing Avalere Health, *HHS Proposed Changes Could Reduce ACA Coverage and Increase Premiums* (Feb. 18, 2019), https://perma.cc/48GB-HBT3) (projecting a 5.7% increase in premiums from a proposal to end auto-enrollment); David Anderson and Colman Drake comment at 2 (Apr. 8, 2025), AR21550.

CMS acknowledged that "even small premium increases may affect enrollment patterns and risk pool composition," but still finalized this provision, asserting that it would be helpful to combat improper enrollments.  90 Fed. Reg. at 27,195.  But, as discussed above, the agency has inflated the problem of improper enrollments, has ignored the effect of its own efforts over the past year to address that problem, and has adopted a policy that is at best tangentially related to the problem the agency claims it is aiming to address.  CMS has thus acted arbitrarily by

ignoring important aspects of the problem, by failing to reasonably explain its policy, and by failing to establish a rational connection between the facts found and the policy choice that it made.  *See Ohio v. EPA*, 603 U.S. 279, 292–93 (2024).

Moreover, Exchanges, insurers, and individuals would all incur costs in responding to the confusion that the new policy would cause, given that many individuals will not understand why they suddenly owe a payment that is not connected with the value of their policy.  *See* Nat'l Ass'n of Cmty. Health Ctrs. comment at 5–6 (Apr. 11, 2025), AR30498–30499; Nat'l Ass'n of Ins. Comm'rs comment at 2 (Apr. 10, 2025), AR24569.  CMS recognized this possibility, but it asserted without evidence that education efforts should suffice to address it.  90 Fed. Reg. at 27,196.  Yet CMS has also virtually eliminated funding for the Act's Navigators, cutting funding by 90% for the organizations that would provide these public education efforts.  *See* Governing for Impact comment at 10 (Apr. 11, 2015), AR34267 (citing CMS, *CMS Announcement on Federal Navigator Program Funding* (Feb. 14, 2025), https://perma.cc/ZYC8-54YZ).  It is implausible that the remaining Navigators would be able to fully handle the increased workload that CMS's new policy creates.  CMS ignored this "important aspect of the problem," *Appalachian Voices v. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022), and so acted arbitrarily.  CMS also ignored the reliance interests of consumers who have come to expect that they will be able to continue in zero-premium coverage without unexpected fees, and the rule is arbitrary for this reason as well.  *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 29 (2020).

In addition, the final rule's provision departs from the proposed rule significantly by sunsetting this provision after 2026.  This departure fails to accord with the APA's "require[ment] that the notice in the Federal Register of a proposed rulemaking contain 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1102 (4th Cir. 1985).  Numerous

commenters asked CMS, at a minimum, to delay the imposition of the junk fee until 2027, given the sizable administrative costs that stakeholders would incur if they were required to implement this rule on short notice for 2026. CMS acknowledged this concern but responded by imposing the rule for 2026 only. 90 Fed. Reg. at 27,108. Thus, CMS would impose these costs on stakeholders for one year, and then require them to incur even greater costs to switch back to the original system for 2027. Commenters could have pointed out the absurdity of this approach if it had been described in the proposed rule. The final provision is therefore not "a 'logical outgrowth' of the notice and comments already given." *Chocolate Mfrs. Ass'n*, 755 F.2d at 1105. By adopting this unexpected policy, CMS "substantially depart[ed] from the terms or substance of the proposed rule," rendering the notice-and-comment process "inadequate." *Id.* (cleaned up).

### B. The Revised Premium Adjustment Methodology Is Unlawful and Arbitrary

As noted above, the Act requires CMS to calculate an annual "premium adjustment percentage," which is used both to update the maximum limits on cost-sharing that an enrollee in the Exchanges will owe and to adjust the value of PTCs that these enrollees receive. This percentage also has effects beyond Exchange coverage and is used to set the maximum limits on cost-sharing for most individual and employer-based coverage. *See* 42 U.S.C. § 300gg-6(a), (b); *id.* § 18022(c)(1). The percentage is based on a comparison of the current "average per capita premium for health insurance coverage in the United States" with "such average per capita premium" for 2013, before the Act's reforms to the health insurance market took effect. *Id.* § 18022(c)(4). CMS initially used data from the market for employer-sponsored insurance to perform this comparison, because data from the individual insurance market was too volatile to provide a useful measure. 79 Fed. Reg. 13,744, 13,802 (Mar. 11, 2014). Although CMS briefly experimented with a different measure, it reverted to its original methodology, given continued

volatility in individual insurance market data and the fact that premiums in this market are more likely to be influenced by risk premium pricing.  86 Fed. Reg. 24,140, 24,234 (May 5, 2021). CMS reasoned at that time that its original methodology was more in keeping with the Act's purpose to lower health care costs for individuals and families.  *Id.*  The rule, however, now incorporates individual insurance market data into this measure, 90 Fed. Reg. at 27,169, even though individual insurance premiums from 2013, before the Act's market reforms went into effect, could not provide an apples-to-apples measure to the present-day market.

As a result, the maximum out-of-pocket limit in 2026 will be about $450 higher for an individual and $900 higher for a family than it otherwise would have been.  90 Fed. Reg. at 27,206.  Moreover—as was expected—after CMS issued its final rule, the IRS followed its ordinary practice of deferring to CMS's calculation, thereby confirming that tax credits will be lower for Exchange enrollees across the board.  Rev. Proc. 2025-25, https://perma.cc/SZ5A-LDBG ; *see* Gideon Lukens and Elizabeth Zhang, Ctr. on Budget & Policy Priorities, *Administration's ACA Marketplace Rule Will Raise Health Care Costs for Millions of Families* (Aug. 1, 2025), https://perma.cc/VZ43-SNJY.  This will lead to about a 4.5% increase in premiums across the board and 80,000 fewer enrollments in the Exchanges under CMS's own estimates, *id.*, running the risk of "a spiral of a worsening risk pool and increased premiums," Ass'n of Cmty. Affiliated Plans comment at 21 (Apr. 11, 2025), AR34403, as well as "higher volumes of uninsured patients being seen by health centers," Nat'l Ass'n of Cmty. Health Ctrs. comment at 2, AR30495.

The new rule was unlawful.  The statute requires the agency to compare the most recent "average per capita premium for health insurance coverage" with "such average per capita premium for 2013," the year before the Act's reforms to the individual health insurance market went into effect.  42 U.S.C. § 18022(c)(4).  By using the term "such," Congress directed the

agency to compare average premiums in the two years for the "same," or "equivalent," coverage. *King v. Burwell*, 576 U.S. at 487.  But premiums on the individual market in 2013 were not premiums for policies that met the Act's standards for "health insurance coverage."  *See* 42 U.S.C. §§ 300gg-91(b), 18021(b)(2) (defining this phrase); *see also* 42 U.S.C. § 300gg *et seq.* (setting standards, as of 2014, for health insurance coverage in the individual market).  So any measurements of premiums for individual policies in 2013 wouldn't capture the cost of "health insurance coverage," as the Affordable Care Act uses that phrase.  Because the coverage available on the individual market in a 2013 "differ[ed] in [a] meaningful way," *King*, 576 U.S. at 487, from the coverage available on that market now, CMS has historically, and correctly, calculated the premium adjustment using growth rates in the group market, so as to allow for an apples-to-apples comparison.

The new rule was also arbitrary.  CMS pronounced that its goal in the new rule was to develop a more accurate measure of premium growth, 90 Fed. Reg. at 27,171, yet it disregarded commenters who noted that the new measure would be less accurate if it included the volatility of the individual insurance market in the early years of the ACA's implementation.  *See* Ctr. on Budget & Policy Priorities comment at 34, AR31785.  Further, CMS acknowledged that its choice ran contrary to the Act's goals, but it brushed this concern aside, reasoning that it didn't need to take these issues into account when it exercised its discretion under section 18022(c)(4) to adopt an "appropriate" methodology.  90 Fed. Reg. at 27,172; *see also* 90 Fed. Reg. 12,942, 12,990 (Mar. 19, 2025) (proposed rule).  This was error.  It is black-letter law that an agency's rationale for a rule cannot be "unmoored from the purposes and concerns" of the statute as a whole.  *Judulang v. Holder*, 565 U.S. 42, 64 (2011).  And the central purpose of the Act is to lower health care costs for Americans.  *See King*, 576 U.S. at 479.  *See also* 42 U.S.C. § 18114(1) (prohibiting CMS from adopting rules that create "unreasonable barriers" to

obtaining health care); Cal., Mass., and N.J. Att'ys Gen. comment at 11 (Apr. 11, 2025), AR31362.  CMS, then, was not free to disregard the costs it was imposing on Exchange enrollees.

CMS did explain that it believed that the effect of its error was limited, because its calculation would now incorporate data from multiple years after 2014.  90 Fed. Reg. at 27,173. It may be true that its rule would have had an even more pronounced negative effect if it had been adopted in prior years, but it remains the case that, even for 2026, the rule will result in a $900 increase in out-of-pocket costs for families, along with higher premiums and dropped coverage for hundreds of thousands of enrollees.  *See supra*, p. 26.  CMS's explanation that its rule could have been even worse under different circumstances is not a reasoned response to this point.  And, to the extent that the agency meant to say that it believed it was compelled by the statutory language to adopt a rule that would make insurance coverage unaffordable for hundreds of thousands of people (a proposition of law on which the agency would be accorded no special deference, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)), it was simply mistaken in that belief.

CMS might have avoided these errors had it not had an unalterably closed mind on this matter.  The proposed rule candidly declared that CMS would disregard "special interests" if they asked it to retain the original methodology.  90 Fed. Reg. at 12,989–90.  Since it would ignore these commenters anyway, it provided only a 23-day period for them to offer evidence on its complex proposal.  *Id.* at 12,942.  And seven days after it published the proposed rule, it published a calculator that instructed insurers to assume that its proposal would be finalized.  Ctr. on Budget & Policy Priorities comment at 3, AR31754 (citing CMS, *Revised Final 2026 Actuarial Value (AV) Calculator Methodology* (Mar. 26, 2025), https://perma.cc/S4QQ-9W7D). It is thus no surprise that CMS finalized this provision without change, even in the face of

28

comments showing the harms it would cause to enrollees. By arriving at a "predetermined answer," *Kravitz v. Dep't of Com.*, 366 F. Supp. 3d 681, 750 (D. Md. 2019), CMS rendered the notice-and-comment process to be an empty formality. The new methodology should be vacated on this ground as well.

### C. The New Actuarial Value Policy Is Arbitrary

An individual shopping for health insurance on the Exchange would expect to buy a plan with a certain level of generosity. For example, someone shopping for a silver plan would expect coverage for 70% of expected health costs, leaving 30% to be covered by cost-sharing. The rule permits insurers to engage in a bait-and-switch by allowing plans to be marketed as silver plans that cover as low as 66% of anticipated expenditures. 45 C.F.R. § 156.140(c)(1).

The formula for PTCs turns on the cost of the second-lowest-cost silver plans available on the Exchange. 26 U.S.C. § 36B(b)(2)(B)(i)-(ii). By permitting insurers to sell cheaper, but less comprehensive, silver plans, CMS will therefore decrease the value of the tax credits for all enrollees, leading to a reduction in PTCs by $1.22 billion overall for 2026 alone, by CMS's own calculation. 90 Fed. Reg. at 27,208. A typical family of four would see their subsidies decrease, and their cost of coverage rise, by up to $714 for the year. Ctr. on Budget & Policy Priorities comment at 34–35, AR31785–31786. And, because healthier people are more likely to drop out of coverage when premiums rise, the result will be a weaker risk pool, leading to even higher premiums for those who remain in the market. *Id.* at 35, AR31786 (citing Am. Acad. of Actuaries, *Issue Brief: Ensuring Access, Affordability, Choice, and Competition in the Individual Health Insurance Market* at 5 (Mar. 2025), https://perma.cc/Z8L2-ECXH); Anderson and Drake comment at 3, AR21551. For this reason, the National Association of Insurance Commissioners warned that the proposal "would compromise the integrity and health of the risk pool, discourage

carrier participation, lead to higher premiums, and destabilize state insurance markets." Nat'l Ass'n of Ins. Comm'rs comment at 2, AR24569.

This relationship between subsidies and the strength of the risk pool is well established by empirical research, but CMS simply stated that it "expect[ed]" its rule to have the opposite effect, 90 Fed. Reg. at 27,107, without citing any evidence to support this subjective belief or engaging with the record. "Such nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *City of Columbus III*, 796 F. Supp. 3d at 156 (internal quotation and alteration omitted); *see also Ohio v. EPA*, 603 U.S. at 292.

CMS permitted this erosion in the value of coverage by invoking 42 U.S.C. § 18022(d)(3), which instructs the agency to develop guidelines to "provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). But the rule permits far more than a "de minimis" variation. "Whether a particular activity is a de minimis deviation from a prescribed standard must, of course, be determined with reference to the purpose of the standard." *Wisc. Dep't of Revenue v. William Wrigley, Jr., Co*., 505 U.S. 214, 232 (1992); *see also Perez v. Mountaire Farms, Inc*., 650 F.3d 350, 378 (4th Cir. 2011) (Wilkinson, J., concurring in part and concurring in the judgment) ("to give the de minimis rule too broad a reach would contradict congressional intent by denying proper effect to a statute"). "The purpose of the standard is set forth in section 18022(d)(3) itself and the only permissible 'de minimis' variations are those that account for uncertainties in 'differences in actuarial estimates,' not variations to reflect a new Administration's policy preference for less generous subsidies." *City of Columbus III*, 796 F. Supp. 3d at 155 (internal quotation and alteration omitted). The rule does not even attempt to justify the new policy as an effort to account for

differences in actuarial estimates. *See* 90 Fed. Reg. at 27,175. By "rel[ying] on factors which

Congress has not intended it to consider," *Sierra Club v. Dep't of Interior*, 899 F.3d 260, 293

(4th Cir. 2018), CMS acted arbitrarily.

CMS also displayed an unalterably closed mind with respect to this proposal. The

calculator mentioned above informed insurers that they should assume that the agency would

finalize its proposal to permit less valuable coverage. *See supra*, pp. 28-29. Again, by treating

its rule as a foregone conclusion, CMS rendered the notice-and-comment process to be

meaningless. *See Kravitz*, 366 F. Supp. 3d at 750.

## II.  The Final Rule's Provisions That Impose Barriers on Enrollment Are Unlawful and Arbitrary

### A.  The Rule Unlawfully and Arbitrarily Revokes the Act's Guarantee That Anyone Can Buy Insurance

The 2025 rule permits any insurer (within the same controlled group as an insurer that

previously extended coverage to the enrollee) to deny coverage to any person who might owe a

premium on an old policy, 45 C.F.R. § 147.104(i), which could cause hundreds of thousands of

people to lose coverage for old debts as low as $10 that they might not even know about, 90 Fed.

Reg. at 27,085. This runs flatly contrary to one of the core provisions of the ACA. The statute

uses absolute terms to guarantee the availability of health insurance coverage: "each health

insurance issuer that offers health insurance coverage in the individual or group market in a State

must accept *every* employer and individual in the State that applies for such coverage," subject

only to specified exceptions. 42 U.S.C. § 300gg-1(a) (emphasis added); *see also id.*

§§ 18032(a)(1), (d)(3)(C). By requiring insurers to accept "every" individual, the statute does

not admit of any exceptions, apart from those listed in section 300gg-1 itself. *See Conner v.*

*Cleveland Cnty.*, 22 F.4th 412, 425 (4th Cir. 2022) ("Simply put, all means all."). "An exception

for past-due premiums is not one of the Act's enumerated exceptions to the guaranteed-issue

requirement, as CMS itself has long understood." *City of Columbus III*, 796 F. Supp. 3d at 157

(citing 77 Fed. Reg. 70,584, 70,599 (Nov. 26, 2012)). "Where Congress explicitly enumerates

certain exceptions to a general prohibition, additional exceptions are not to be implied, in the

absence of evidence of a contrary legislative intent." *Id.* (quoting *TRW, Inc. v. Andrews*, 534

U.S. 19, 28 (2001)). The agency therefore was not free to rewrite the text of Section 300gg-1(a)

to carve out a new exception to the statute's categorical rule.

      Notably, there is such an exception for past-due premiums in the Act's parallel provision

that guarantees the renewability of policies. *See* 42 U.S.C. § 300gg-2(b)(1). But, again, that

exception is absent from the guaranteed-issue provision. Courts must "assume that Congress

acts intentionally and purposely when it includes particular language in one section of a statute

and omits it in another section of the same Act." *City of Columbus III*, 796 F. Supp. 3d at 157

(quoting *Polselli v. IRS*, 598 U.S. 432, 439 (2023)). So the difference in language in these two

sections "demonstrates Congress's understanding that an outstanding debt could prevent an

enrollee from maintaining the policy he or she currently has, but that the debt wouldn't lock the

enrollee out of the market altogether." *Id.*; *see also Bittner v. United States*, 598 U.S. 85, 94

(2023).

      CMS's statutory theory is not clear on this point, but it apparently believes that it would

make sense for the guaranteed-renewability exception to apply to the guaranteed-issue provision

as well. 90 Fed. Reg. at 27,087. Simply put, statutory interpretation doesn't work in this way.

Agencies "aren't free to rewrite clear statutes under the banner of [their] own policy concerns."

*Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019).

      In any event, the agency's asserted policy concerns do not justify this rule. Commenters

noted the potential for widespread coverage losses, but CMS derided that possibility by

describing any such losses as "small" or "minimal." 90 Fed. Reg. at 27,087. This is internally

inconsistent with the agency's recognition that even small payment obligations can have outsized effects on enrollment, *see supra*, p. 20, and the rule should be set aside for this reason alone, *see ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).  The rule would have far more than "minimal" effects; commenters submitted empirical evidence based on data in the 2026 payment notice that 180,000 people who owe less than $10 would lose access to insurance on the Exchanges as a result of this trap for the unwary.  90 Fed. Reg. at 27,085.  Lower-income people would be more likely to be cut off from coverage from owing small back debts, as CMS previously recognized.  87 Fed. Reg. 27,208, 27,218 (May 6, 2022).  The result will be more people lacking insurance and greater strains on providers of last resort that are left to shoulder the burden of uncompensated care, as CMS now acknowledges.  90 Fed. Reg. at 27,192.

Moreover, as commenters explained, there are many legitimate reasons why individuals might fail to pay a premium.  Enrollees often don't realize that they need to take steps to terminate their old coverage when they switch to other coverage.  90 Fed. Reg. at 27,088.  The agency acknowledged this point, but responded only that individuals have "the ability to contact their issuer[s]."  *Id.*  This entirely misses the point that many people wouldn't know that they need to do so.  CMS claimed that this provision "is principally intended to prevent the minimum debt in the first instance," *id.* at 27,089, but if CMS's goal is prevention, it makes little sense not to impose an attendant notice requirement to ensure that consumers know of the policy, which would allow them to avoid or resolve that debt before facing the draconian, and unlawful, consequence.  And, to the extent that CMS was motivated by a desire to address enrollees who are somehow gaming the system, it simply failed to engage with the point that there is no evidence of any such widespread gaming, and that this rule is instead far more likely to create a barrier for people who would not know that they owe any back payment.  *See* Ctr. on Budget & Policy Priorities comment at 6, AR31757.  By failing to engage with this important aspect of the

problem, CMS acted arbitrarily. *See Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915, 926 (4th Cir. 2022).

### B. The Shortened Open Enrollment Period Is Arbitrary

As noted above, under current policy, the open enrollment period for the Exchanges begins on November 1 and ends (at the earliest) on January 15. As of 2027, however, the final rule will prohibit open enrollment in January by requiring all Exchanges to hold an open enrollment period that begins no later than November 1, ends no later than December 31, and is no more than nine weeks in duration. 45 C.F.R. § 155.410(e). In so doing, CMS ignored a wealth of evidence showing that January enrollments have been beneficial both for enrollees and for the financial health of the Exchanges.

CMS opined that it needed to balance the need to allow sufficient time for consumers to enroll in the Exchanges against the possibility that a longer open enrollment period would create a risk of adverse selection. 90 Fed. Reg. at 27,136. But such a trade-off is entirely illusory. All of the available evidence from the state-based Exchanges shows that January enrollees are younger and healthier, and that their enrollments accordingly lower premiums overall. *See* Levitis comment at 7-8, AR33747–33748; Ctr. on Budget & Policy Priorities comment at 24, AR31775; McIntyre comment at 15-16, AR30432–30433. Data from the federally facilitated Exchange is solely in the possession of CMS, but there is no reason to believe (and the agency offered none) that the result would be different in states on that Exchange. *See* Levitis comment at 8, AR33748. (If CMS had contrary data, it would have been obliged to reveal it to the public to allow commenters to respond. *See Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 905–07 (D.C. Cir. 2006). So, by shortening the open enrollment period, the agency exacerbated the problem of adverse selection that it claimed it was trying to solve. This was arbitrary. *See Ohio v. EPA*, 603 U.S. at 292.

Moreover, as commenters explained to the agency, there is a particular advantage to extending the enrollment period into January, because many people experience pronounced financial stress at the end of the calendar year. If open enrollment ends in December, many people will forgo selecting health insurance out of a belief that they cannot afford the options available to them; conversely, if enrollment remains an option in January, many people (particularly including younger people) experience less financial pressure at the beginning of the year and accordingly are more willing to select insurance coverage. *See* Levitis comment at 9, AR33749; Ctr. on Budget & Policy Priorities comment at 25, AR31776. CMS didn't respond to this point at all, other than to speculate that young people are "deadline-driven" and so would sign up at the end of the enrollment period no matter what that date may be. 90 Fed. Reg. at 27,139. This entirely missed the point that commenters were making, and the rule was arbitrary for this reason as well.

In addition, commenters noted that Navigators would face difficulty in providing assistance to consumers during a shortened open enrollment period, especially given the drastic cuts that CMS made to the Navigator program during 2025. *See* Levitis comment at 9, AR33749; Ctr. on Budget & Policy Priorities comment at 25, AR31776. The agency acknowledged that this was a genuine concern, but responded only that it would encourage state-based Exchanges to "work with" interested parties in setting the dates of their open enrollment periods so long as those periods did not exceed nine weeks in length. 90 Fed. Reg. at 27,139. Once again, the agency merely "[n]odd[ed] to concerns raised by commenters" and then "dismiss[ed] them in a conclusory manner," a response that cannot be squared with the APA's requirements for reasoned decisionmaking. *City of Columbus III*, 796 F. Supp. 3d at 156.

Finally, commenters noted that a longer open enrollment period offers an advantage in that enrollees can pressure test the plans they have newly enrolled in at the beginning of January;

if, for example, an enrollee learns that a particular plan has an inadequate provider network, he or she would be able to switch plans before the end of the open enrollment period. CMS's new rule would prevent enrollees from doing so. *See* Ctr. on Budget & Policy Priorities comment at 25, AR31776; Oregon Health Auth. comment at 6 (Apr. 11, 2025), AR34446. CMS acknowledged this concern as well, but it opined that issuers are required to keep their provider directories up to date. 90 Fed. Reg. at 27,140. This conclusory response ignores the point that, in practice, many issuers fail to observe this requirement, leaving enrollees with no meaningful recourse if they learn too late that the plan they have enrolled in does not meet their needs. Because CMS failed to engage meaningfully with this comment, the rule shortening the open enrollment period was arbitrary for this reason as well.

### C. The Verification Requirements for SEP Enrollments Are Arbitrary

CMS imposed two new requirements on the federally facilitated Exchange for 2026. That Exchange must conduct pre-enrollment verification for each of its SEPs, and it must conduct eligibility verification for at least 75% of new enrollments through SEPs. 45 C.F.R. § 155.420(g). If the Exchange cannot complete the verification for an applicant, the enrollment must be cancelled. *Id.* This rule will generate 293,000 verification issues to resolve in the coming year, 90 Fed. Reg. at 27,186, resulting in a further barrier to coverage, through additional paperwork and administrative burdens, and costing consumers more than $7 million in 2026, *id.* at 27,186. Younger and healthier people are more likely to drop coverage as a result, leading to a worsening of the risk pool, as CMS itself realized the last time it considered (and rejected) a similar policy. 87 Fed. Reg. at 27,279; *see* Levitis comment at 14–15, AR33754–33755 (discussing evidence of adverse selection from paperwork burdens); Ctr. on Budget & Policy Priorities comment at 29, AR31780 (citing Mark Shepard & Myles Wagner, *Do Ordeals Work*

*for Selection Markets? Evidence from Health Insurance Auto-Enrollment*, 115 Am. Econ. Review 772 (2025), AR38965); Commonwealth Fund comment at 6, AR31597.

CMS acknowledged the harm that this new policy would cause but reasoned that it had adequately addressed commenters' concerns by applying the rule only for 2026 and only for the federally facilitated Exchange.  90 Fed. Reg. at 27,151.  This may explain why the agency chose not to go farther, but it is not an adequate explanation for why the agency acted at all. CMS attempted to justify this policy as a response to the problem of improper enrollments by brokers. *Id.* at 27,150.  But, for the reasons discussed above, the agency fundamentally misconceived the scope of that problem and ignored the success of recent efforts to address broker misconduct. *See supra*, p. 14.  And there is no evidence that imposing this obstacle for *enrollees* would affect the behavior of *brokers*.  *See* Ctr. on Budget & Policy Priorities comment at 30, AR31781. Moreover, since—even on the agency's own telling—the problem of improper enrollments hasn't arisen on the state-based Exchanges, CMS should have focused its attention on why the federally facilitated Exchange might be different, such as the ability of enhanced direct enrollment entities to submit applications on behalf of enrollees.  The agency's "utter failure to consider obvious alternative actions" that would have directly addressed the problem that it identified, *Fishermen's Dock Co-op. v. Brown*, 75 F.3d 164, 172 (4th Cir. 1996), coupled with the "significant mismatch" between that problem and the measures the agency chose, *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019), demonstrate the irrationality of its approach. Given "that the agency's chosen solution [was] unmoored from the problem [it sought] to address," *City of Columbus III*, 796 F. Supp. 3d at 159, CMS acted arbitrarily in imposing these new burdens for 2026, for which it also did not provide adequate notice.  *See Ohio v. EPA*, 603 U.S. at 292; *supra*, pp. 21–22.

### III. The Final Rule's Provisions That Limit the Availability of Subsidized Coverage Are Unlawful and Arbitrary

#### A. The Failure-to-Reconcile Policy Is Unlawful and Arbitrary

As noted above, enrollees are required to reconcile the APTCs that they claim on the basis of their projected income with the PTCs that they receive on their tax return on the basis of the income they actually received. *See* 26 U.S.C. § 36B(f)(3). CMS has a process that requires applicants for coverage to report whether they have reconciled their tax credits on prior tax returns and that checks that reporting against IRS data. 45 C.F.R. § 155.340(c). But many people are flagged in error, often because the data that the IRS reports to the Exchange lags in time. *See* Ctr. on Budget & Policy Priorities comment at 12, AR31763. This issue is particularly acute for the 3.3 million people who are self-employed, many of whom do not file their tax returns until October, leaving insufficient time for the IRS to update records before the next enrollment season. *See* Families USA comment at 7 (Apr. 11, 2025), AR34799.

Under the current policy, an applicant might lose eligibility for APTCs if they do not reconcile their tax return in a second year, after receiving notice in the first year of the issue. 45 C.F.R. § 155.305(f)(4)(i), (ii). CMS has now revised that policy, for 2026 only, to require the Exchanges to determine the enrollee to be ineligible for APTCs in the first year that the issue arises. *Id.* § 155.305(f)(4)(iii). Enrollees who lose this eligibility become responsible for the full cost of their coverage, which in many cases is prohibitively expensive.

Both the current rule and the new rule are unlawful. As discussed above, *supra*, p. 5, CMS has authority to determine if the statutory standards for APTC eligibility are met, but it does not have authority to alter those standards. *See* 42 U.S.C. §§ 18081(a), (f). Eligibility for APTCs turns on whether an applicant is eligible for tax credits, *id.* § 18081(a)(2), and tax credit eligibility turns on whether one is an "applicable taxpayer," 26 U.S.C. § 36B(c), a term that

depends on the applicant's income.  The statute does not contemplate that a prior tax debt affects an applicant's eligibility for APTCs in any way, and the agency's "invocation of its general rulemaking authority … does not authorize it to flout separate, express provisions of the statute." *City of Columbus III*, 796 F. Supp. 3d at 162-63.  Moreover, if Congress intended to condition eligibility for a tax credit on the reconciliation of old debts, it knew how to do so.  *See* 26 U.S.C. §§ 24(*l*), 32(k) (conditioning eligibility for future child and earned income tax credits); *see also Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy*, 654 F.3d 496, 507 (4th Cir. 2011); *City of Columbus III*, 796 F. Supp. 3d at 162.[1]  So the statute contemplates that the IRS, not CMS, would use its enforcement tools to collect any unresolved debts for old PTCs.  *See* 26 C.F.R. § 1.6011-8.

In any event, CMS has now compounded this error in its new failure-to-reconcile (FTR) policy.  The new rule will trap some consumers in a Catch-22.  Although current policy requires notice in the first year before APTC eligibility may be revoked in a second year, the new policy will require APTCs to be revoked if tax issues aren't resolved immediately.  But an applicant's federal tax information must be handled consistently with federal tax privacy law, and so in many cases an applicant with a failure-to-reconcile issue will learn only that they have been barred from subsidized insurance, but not the reason why.  *See* Levitis comment at 15, AR33755.  This "Kafka-esque" scenario will cause numerous people to lose coverage, worsening the risk pool.  Young Decl. ¶ 55.  And this problem of delayed IRS reporting will only worsen, given the Administration's large-scale staff reductions at the IRS.  *See* Ctr. on Budget & Policy Priorities comment at 12, AR31763; *see also* 90 Fed. Reg. at 27,117 (acknowledging IRS "data constraints" and "error" in FTR data).

---

[1]  Last year, Congress adopted a version of this failure-to-reconcile policy, but pointedly chose to delay the effective date of this policy until 2028, thereby underscoring that the agency lacks authority to impose such a condition on eligibility for tax credits before that date.  Pub. L. No. 119-21, § 71303(a), 139 Stat. 72, 324 (2025).

At one time, CMS acknowledged a one-year FTR policy would be "overly punitive" on enrollees who lose access to subsidies as a result of "delayed data" from IRS, in many cases without knowing why their applications have been rejected.  87 Fed. Reg. 78,206, 78,256 (Dec. 11, 2022).  Now, however, the agency brushes aside this concern, noting simply that rejected applicants may file an appeal if they wish.  90 Fed. Reg. at 27,116.  This ignores the point that many frustrated applicants will drop out of the process altogether, and the loss of these enrollees, who tend to be healthier, will worsen the risk pool for everybody else.  Levitis comment at 16, AR33756.  CMS asserts that its policy is nonetheless worthwhile, albeit only for 2026, to address the "imminent" concern of widespread improper enrollments identified in the Paragon Institute report.  90 Fed. Reg. at 27,116.  But, as discussed above, that report is fatally flawed, for reasons that were identified by commenters but that the agency refused to address. *See supra*, pp. 12–14.  In any event, there is a fundamental mismatch between this rule and the problem that CMS claims it is trying to solve.  The FTR policy does not in any way address the conduct of brokers, but it does deprive enrollees of coverage, oftentimes for reasons that the Exchange cannot even disclose to them.  By failing to draw a "rational connection between the facts found and the choice made," *Appalachian Voices*, 912 F.3d at 753, CMS acted arbitrarily. And by again failing to notify the public in its proposed rule that this policy would be on a one-year basis only, CMS failed to provide adequate notice.  *See Chocolate Mfrs. Ass'n*, 755 F.2d at 1105.

### B.  The New Data-Matching Policies Are Arbitrary

As discussed above, CMS has made it more difficult for applicants to resolve any concerns that the Exchange identifies with their applications for subsidized coverage by (a) shortening the period for an applicant to provide requested information from 150 days to 90 days, 90 Fed. Reg. at 27,120; (b) reinstating a requirement to audit enrollees who project a

household income higher than the poverty level, if IRS data indicates income below that level; and (c) revoking a rule that permitted applicants to self-attest their own income if IRS data is unavailable.  Each of these policies will make it harder for people to enroll in coverage, and each of these policies is arbitrary.

*First*, CMS wrongly reasoned that it was compelled by the statute to impose a 90-day policy.  *Id.* at 27,119; *see also id.* at 12,962 (proposed rule).  It notes that 42 U.S.C. § 18081(e)(4)(A) describes a 90-day period for applicants to verify their information for the Exchanges, and that the provision expressly permits CMS to extend that period for 2014.   From there, it concludes that Congress withheld the authority to grant extensions after 2014.  But the Act also permits CMS to "modify the methods under the program established by [section 18081] for . . . verification of information."  42 U.S.C. § 18081(c)(4)(B).  CMS asserts that this provision addresses only the relationship between the agency and "trusted data sources," 90 Fed. Reg at 27,119, but nothing in the statutory text even hints at this limitation.  Instead, the statute expressly grants the agency the power to modify any of the methods set forth in section 18081, and this includes the power to modify the timeline described in paragraph (e)(4)(A).  Indeed, CMS must itself understand the statute to operate in this way, given that it has allowed for extensions of the 90-day period in other circumstances.  *See* 45 C.F.R. § 155.315(f)(3).

Nor did Congress revoke the modification power that it granted in paragraph (c)(4)(B) by reiterating in the next paragraph that extensions could be granted in 2014.  After all, "redundancies are common in statutory drafting," sometimes due to "a congressional effort to be doubly sure," *Barton v. Barr*, 590 U.S. 222, 239 (2020), an observation that applies with particular force to the ACA, *see King*, 576 U.S. at 491.

This Court has invited further briefing on the interplay between paragraph (e)(4)(A) and paragraph (c)(4)(B), finding the issue to be a "close call" as to whether the *expressio unius* canon

dictates a finding that the agency lacked the authority to extend deadlines after 2014. *City of Columbus III*, 796 F. Supp. 3d at 165. This canon is a "feeble helper in an administrative setting," *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 770–71 (D.C. Cir. 2019), when a statute, such as this one, contains multiple overlapping grants of authority to an agency. Even outside of this setting, "[i]f there are other reasonable explanations for an omission in a statute, *expressio unius* may not be a useful tool." *Id.* at 771; *see also NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017); *United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019). The most logical explanation for the phrasing of paragraph (e)(4)(A) is that Congress wished to remove any doubt as to the scope of CMS's authority in the first year of implementation for the ACA, when time was short and the agency faced numerous interpretive issues to resolve. There was no reason for Congress to proceed further to reiterate the "methods" authority it had already granted the agency under paragraph (c)(4)(B) for later years. That paragraph should accordingly be given its most natural reading, under which CMS retains the authority to modify the statutory methods for the verification of information, including the authority to modify the statutory default deadline for applicants to submit information to the Exchange.

Because CMS wrongly believed that it was required by the statute to adopt this rule, the provision must be vacated. *See Perez v. Cuccinelli*, 949 F.3d 865, 873 (4th Cir. 2020) (en banc); *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597 (D.C. Cir. 2023) ("agency action may not stand if the agency has misconceived the law").

If CMS had correctly understood its statutory authority, it could have engaged with the evidence showing the need for a 150-day verification period. By the agency's own telling, this provision will cause 226,000 enrollees to lose eligibility for tax credits on the Exchanges, 90 Fed. Reg. at 27,199, and these individuals will almost certainly be thrown off coverage altogether. These enrollees tend to be healthier, so if they do not participate in the Exchanges,

the risk pool will worsen, and premiums will increase for remaining enrollees.  *Id*. at 27,119; *see*

Ctr. on Budget & Policy Priorities comment at 13, AR31764.  Apart from incorrectly asserting

that its hands were tied, CMS only briefly averted to "program integrity" needs, without

explaining how those needs would be advanced in any way.  By definition, an enrollee who

demonstrates his or her eligibility to enroll has resolved the agency's "program integrity"

concerns, whether that enrollee does so within 90 days or 150 days; given that the agency's

stated concern is that fraudulent brokers are enrolling consumers without their consent, it defies

logic for CMS to conclude that the appropriate response would be to make it harder for those

consumers to prove their intent, and their eligibility, to enroll in a plan on the Exchange.

Moreover, the agency entirely failed to address the point that other aspects of the 2025 rule

would make it harder for enrollees to prove their eligibility within the 90-day default period.  *See*

Levitis comment at 22-23, AR33762–33763.  CMS, then, acted arbitrarily by failing to address

the relevant factors that should have driven its decision.  *See Sierra Club*, 899 F.3d at 270.

    *Second*, the mandatory audit policy is arbitrary for precisely the same reasons that this

Court vacated the same policy five years ago.  *See City of Columbus II*, 523 F. Supp. 3d at 763.

There are many reasons why an individual could, in good faith, project that he or she will have

income next year higher than the federal poverty level even if current-year IRS data shows a

lower income.  Governing for Impact comment at 12, AR34269; *see also* Center for American

Progress comment at 7 (Apr. 10, 2025), AR27025 (citing Cynthia Cox et al., *Repayments and

Refunds: Estimating the Effects of 2014 Premium Tax Credit Reconciliation*, KFF (Mar. 24,

2015), https://perma.cc/AL3R-C5H5) (roughly half of low-income ACA enrollees experience

year-over-year income changes of 20% or more); Commonwealth Fund comment at 3 (Apr. 11,

2025), AR31594.  Many such people are self-employed, or may have difficulty obtaining

documentation to support their projections.  *See City of Columbus II*, 523 F. Supp. 3d at 762.  As

a result, these people will be more likely to drop out of the market; by CMS's own estimate, 81,000 people will lose coverage.  90 Fed. Reg. at 27,200.  And because these individuals tend to be younger and healthier, their exit from the health insurance market will worsen the risk pool. *See* Ctr. on Budget & Policy Priorities comment at 14–15. AR31765–31766.

As it did before, CMS improperly assumed that these enrollees must have been attempting to defraud the Exchanges.  And CMS again "improperly elevated the objective of fraud prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance."  *City of Columbus II*, 523 F. Supp. 3d at 762.   The agency's "decision to prioritize a hypothetical risk of fraud over the substantiated risk that its decision result in immense administrative burdens at best, and a loss of coverage for eligible individuals at worst, defies logic."  *City of Columbus III*, 796 F. Supp. 3d at 168 (quoting *City of Columbus II*, 523 F. Supp. 3d at 763).

CMS did assert that some new evidence has arisen showing that fraud is prevalent among the individuals that would be subject to its mandatory audit policy.  90 Fed. Reg. at 27,122 (citing Hopkins et al., *How Did Take-Up of Marketplace Plans Vary with Price, Income, and Gender?*, 11 Am. J. Health Econ. 63 (2025), AR36200).  But one of the authors of that study submitted a comment to CMS (which the agency ignored) cautioning that the report did not support this conclusion, given the difficulties that low-income people face in estimating their future incomes.  Urban Institute comment at 2, AR31663; *see supra*, p. 13.  CMS acted arbitrarily by failing to address "a compelling challenge to [its] use of the study by one of the study's own authors."  *City of Columbus III*, 796 F. Supp. 3d at 167.  CMS, then, committed the same errors in this rule as it did before, and this provision should be vacated for the same reason.

*Third*, CMS acted arbitrarily by revoking the option for applicants to attest to their own income where tax data is unavailable.  It is a relatively common occurrence for tax data to be

missing for an applicant, for entirely legitimate reasons.  An individual might have changed his or her name, had a change in family composition, had a change in filing status, or might not have been subject to a filing requirement for the year in question.  *See* Ctr. on Budget & Policy Priorities comment at 15, AR31766.  For this reason, by CMS's own estimate, its rule will generate *more than 2.7 million* instances of data discrepancies that Exchanges and applicants will need to resolve.  90 Fed. Reg. at 27,185.  For many of these people, other documentation might not be readily available to substitute for tax data, which means that if these people are not permitted to attest to their income, they will be deprived of subsidized coverage.  *Id.*  And once again, it is younger and healthier people who are more likely to be deterred from coverage by this paperwork burden, as sicker people will be more motivated to take the needed steps to retain their coverage.  *Id.*  CMS estimates that 407,000 people will lose some or all APTC as a result of this rule.  90 Fed. Reg. at 27,200.

CMS attempted to justify these burdens and these coverage losses simply by reciting that self-attestation "may have played a role in weakening the Exchange eligibility system," but it provided no support for this assertion.  *Id.* at 27,130.  Unscrupulous brokers, after all, would have no way of knowing whether tax data is available for a given person before targeting him or her for an unauthorized enrollment.  Once again, CMS has adopted a rule that is entirely disconnected from the problem it claims it is trying to solve, with hundreds of thousands of people being driven out of coverage as a result.  This fell short of the basic standards for rational decisionmaking that the APA requires.  *See City of Columbus III*, 796 F. Supp. 3d at 170; *see also Appalachian Voices*, 912 F.3d at 753.

## CONCLUSION

For these reasons, the Court should award summary judgment in favor of Plaintiffs.

Dated: January 20, 2026

Respectfully submitted,

*/s/ Joel McElvain*
JOEL MCELVAIN (BAR NO. 31673)
CORTNEY ROBINSON (BAR NO. 31968)
CHRISTINE L. COOGLE (BAR NO. 21846)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 935-2082
jmcelvain@democracyforward.org
crhenderson@democracyfoward.org
ccoogle@democracyfoward.org

*Counsel for Plaintiffs*