**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CITY OF COLUMBUS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) Civil Action No. 1:25-cv-2114-BAH |
| v. | ) Leave to file in excess of page limit granted |
| | ) on Feb. 9, 2026 |
| ROBERT F. KENNEDY, JR., in his official | ) |
| capacity as Secretary of the United States | ) |
| Department of Health and Human Services, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS
CROSS MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

I.       The Affordable Care Act. ........................................................................................ 2

II.      The Marketplace Integrity and Affordability Rule. ............................................... 3

III.     Procedural History. ................................................................................................. 5

LEGAL STANDARD ........................................................................................................... 6

ARGUMENT ........................................................................................................................ 7

I.       The $5 annual eligibility redetermination program is neither unlawful nor
         arbitrary and capricious........................................................................................... 7

         a.       The $5 annual eligibility redetermination program is lawful. ................... 9

         b.       The $5 annual eligibility redetermination program is not arbitrary and
                  capricious. ................................................................................................ 10

II.      The premium adjustment percentage policy is neither unlawful nor arbitrary and
         capricious. .............................................................................................................. 12

         a.       The premium adjustment percentage policy is lawful. ............................. 13

         b.       The premium adjustment percentage policy is not arbitrary and capricious. ....... 15

III.     The actuarial value range policy is not arbitrary and capricious. ....................... 17

IV.      The past-due premium policy is neither unlawful nor arbitrary and capricious. .............. 21

         a.       The past-due premium policy is lawful. .................................................. 23

         b.       The past-due premium policy is not arbitrary and capricious............................ 24

V.       The shortened open enrollment period policy is not arbitrary and capricious.................. 25

VI.      The verification of eligibility for special enrollment periods policy is not arbitrary
         and capricious. ....................................................................................................... 27

VII.     The one-year failure to file and reconcile policy is neither unlawful nor arbitrary
         and capricious. ....................................................................................................... 29

         a.       The one-year failure to file and reconcile policy is lawful. ................................ 29

i

b.    The one-year failure to file and reconcile policy is not arbitrary and capricious. .................................................................................... 31

VIII.   The data matching policy is not arbitrary and capricious. ................................................ 33

a.    Rescission of Automatic 60-Day Extension Regulation. ...................................... 33

b.    Provision Requiring Income Verification When Data Sources Indicate Income Less Than 100 Percent of the Federal Poverty Level. ............................ 37

c.    Change Requiring Income Verification When Tax Data Is Unavailable. ............. 40

IX.    The scope of any relief granted should be narrow to Plaintiffs only……………………….41

CONCLUSION.................................................................................................................... 43

# TABLE OF AUTHORITIES

**CASES**

*Ala. Power Co. v. Costle,*
636 F.2d 323 (D.C. Cir. 1979) ................................................................................... 18

*Am. Hosp. Ass'n v. NLRB,*
499 U.S. 606 (1991) .................................................................................................... 31

*Am. Iron & Steel Inst. v. EPA,*
886 F.2d 390 (D.C. Cir. 1989) ................................................................................... 10

*Biden v. Texas,*
597 U.S. 785 (2022) ............................................................................................... 17, 21

*Bonumose, Inc. v. FDA,*
747 F. Supp. 3d 211 (D.D.C. 2024) .............................................................................. 6

*Cheney R.R. Co. v. Interstate Com. Comm'n,*
902 F.2d 66 (D.C. Cir. 1990) ..................................................................................... 36

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ...................................................................................................... 7

*City of Columbus v. Cochran,*
523 F. Supp. 3d 731 (D. Md. 2021) ............................................................................ 38

*Ctr. for Sci. in the Pub. Int. v. Perdue,*
438 F. Supp. 3d 546 (D. Md. 2020) ......................................................................... 6, 7

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.,*
591 U.S. 1 (2020) ........................................................................................................ 11

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ...................................................................................................... 7

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ................................................................................................. 7, 25

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) .................................................................................................... 33

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ...................................................................................................... 5

*Hollingsworth v. Perry,*
570 U.S. 693 (2013) ...................................................................................................... 5

*Idaho Conservation League v. Wheeler*,
  930 F.3d 494 (D.C. Cir. 2019) ............................................................................ 33

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
  407 F.3d 1250 (D.C. Cir. 2005) .......................................................................... 10

*Jimenez-Cedillo v. Sessions*,
  885 F.3d 292 (4th Cir. 2018) .............................................................................. 11

*Kadi v. Geithner*,
  42 F. Supp. 3d 1 (D.D.C. 2012) ............................................................................ 6

*King v. Burwell*,
  576 U.S. 473 (2015) ............................................................................................. 2

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ........................................................................ *18, 19, 30, 31*

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ............................................................................................. 7

*Marshall Cnty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ........................................................................... 6

*Marx v. Gen. Revenue Corp.*,
  568 U.S. 371 (2013) ........................................................................................... 36

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005) ............................................................................... 10

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) ....................................................................... 12, 39

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
  494 F.3d 188 (D.C. Cir. 2007) ........................................................................... 20

*Reyes-Gaona v. N.C. Growers Ass'n*,
  250 F.3d 861 (4th Cir. 2001) ............................................................................. 36

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ..................................................................................... 19, 30

*United States v. Vonn,*
  535 U.S. 55 (2002) ............................................................................................. 36

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ........................................................................................... 36

*Wayman v. Southard*,
  23 U.S. (10 Wheat.) 1 (1825) .................................................................................................. 31

**STATUTES**

5 U.S.C. § 705............................................................................................................................. 5

5 U.S.C. § 706............................................................................................................................. 7

26 U.S.C. § 36B ................................................................................................................... *passim*

42 U.S.C. § 300gg-1 ............................................................................................................. 2, 23

42 U.S.C. § 300gg-2 ......................................................................................................... 2, 7, 23

42 U.S.C. § 18022 ............................................................................................................... *passim*

42 U.S.C. § 18031 ....................................................................................................................... 2

42 U.S.C. § 18041 ......................................................................................................... 3, 29, 30

42 U.S.C. § 18081 ............................................................................................................... *passim*

42 U.S.C. § 18082 ..................................................................................................... 7, 9, 10, 29, 31

49 U.S.C. § 32902 ..................................................................................................................... 18

Patient Protection and Affordable Care Act,
  Pub. L. No. 111-148, 124 Stat. 119 (2010)......................................................................... 2, 31

**RULES**

Fed. R. Civ. P. 56...................................................................................................................... 6

**REGULATIONS**

26 C.F.R. § 1.36B-4 ............................................................................................................. 29, 30

45 C.F.R. § 147.102 ................................................................................................................. 14

45 C.F.R. § 147.106 ................................................................................................................. 21

45 C.F.R. § 147.116 ................................................................................................................. 14

45 C.F.R. § 147.126 ................................................................................................................. 14

45 C.F.R. § 155.305 ................................................................................................................ 7, 9

45 C.F.R. § 155.315 ................................................................................................... 34, 35, 36, 38

45 C.F.R. § 155.320 ................................................................................................ 37, 38, 40

45 C.F.R. § 155.335 .................................................................................................................. 8

45 C.F.R. § 155.400 ............................................................................................................ 23, 24

45 C.F.R. § 155.420 ...................................................................................................... 2, 27, 28

45 C.F.R. § 156.130 ................................................................................................................ 12

45 C.F.R. § 156.140 ................................................................................................................ 18

Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified
    Health Plans; Exchange Standards for Employers,
    77 Fed. Reg. 18,310 (Mar. 27, 2012) ......................................................................... 3, 29

Patient Protection and Affordable Care Act; Standards Related to Essential Health
    Benefits, Actuarial Value, and Accreditation,
    78 Fed. Reg. 12,834 (Feb. 25, 2013) ............................................................................... 19

Patient Protection and Affordable Care Act; Market Stabilization,
    82 Fed. Reg. 18,346 (Apr. 18, 2017) ........................................................................... 3, 20

Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment
    Parameters for 2023,
    87 Fed. Reg. 27,208 (May 6, 2022 ................................................................................... 20

Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment
    Parameters for 2024,
    88 Fed. Reg. 25,740 (Apr. 27, 2023) ............................................................................... 29

Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability,
    90 Fed. Reg. 12,942 (Mar. 19, 2025) ......................................................................... *passim*

Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability,
    90 Fed. Reg. 27,074 (June 25, 2025) ......................................................................... *passim*

**OTHER AUTHORITIES**

CMS, *Health Coverage Effectuation, Grace Periods, and Terminations* (June 2024),
    https://www.cms.gov/files/document/coverage-effectuation-job-aid.pdf ................................ 23

Ctrs. for Medicare & Medicaid Servs., *Over 24 Million Consumers Selected Affordable Health
    Coverage in ACA Marketplace for 2025* (Jan. 17, 2025),
    https://www.cms.gov/newsroom/press-releases/over-24-million-consumers-selected-
    affordable-health-coverage-aca-marketplace-2025 ................................................................... 12

Ctrs. for Medicare & Medicaid Servs., *Revised Final 2026 Actuarial Value (AV) Calculator Methodology* (Mar. 26, 2025), https://www.cms.gov/files/document/revised-final-2026-av-calculator-methodology-002pdf.pdf .......................................................................................................................... 16, 17

**INTRODUCTION**

The American health care system is complicated. The Affordable Care Act ("ACA") is equally so. The ACA also grants the Secretary of Health and Human Services broad authority to issue regulations that implement and set standards for its various requirements. HHS Secretaries across presidential administrations have routinely exercised that authority by promulgating, adjusting, rescinding, and reinstating such regulations to advance various policy goals.

The 2025 Marketplace Integrity and Affordability Final Rule is the latest iteration of that practice. The Rule makes several regulatory changes to strengthen the integrity of the health insurance "Exchanges" where consumers purchase health care coverage under the ACA, and to make that coverage more affordable. In particular, the Rule seeks to address the high levels of improper enrollment in federally subsidized plans by better enforcing compliance with the eligibility requirements for such plans and providing additional safeguards to protect consumers from unwanted changes to their coverage. As HHS explained, this growth in improper enrollments is a consequence of temporary legislative changes related to the COVID-19 pandemic that expanded access to ACA premium subsidies and made those subsidies more generous, which in turn increased the availability of fully subsidized health care coverage and fueled enrollment, some of it improper, in Exchange plans. Those enhanced subsidies expired at the start of this year. The Rule accordingly implements a number of policies meant to reduce improper enrollments over the short term as Exchanges readjust to a new subsidy environment. And the Rule also makes permanent reforms to improve the stability of Exchanges, provide premium relief to enrollees who do not qualify for ACA premium subsidies, and protect the public fisc.

**BACKGROUND**

**I.   The Affordable Care Act.**

Enacted in 2010, the ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market" and "to make insurance more affordable." *King v. Burwell*, 576 U.S. 473, 478-79 (2015); *see* Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010). To "ensure that anyone can buy insurance," *King*, 576 U.S. at 493, the ACA generally prohibits health insurance issuers in individual or group markets from denying coverage to applicants because of their health (the "guaranteed availability" requirement). 42 U.S.C. § 300gg-1(a). And to promote continuous coverage, the ACA generally requires issuers to "renew or continue in force" an enrolled customer's coverage "at the option of . . . the individual," provided they pay their premiums. *Id.* § 300gg-2(a), (b)(1).

The ACA also required the creation of an "Exchange" in each State where customers can compare and purchase individual "qualified health plans" (as opposed to group or employer-sponsored coverage), which must cover certain "essential health benefits" and adhere to limits on enrollee out-of-pocket costs for such benefits. *Id.* §§ 18022(a)-(c), 18031(b)(1). States can elect to operate their own Exchanges ("State-based Exchanges" or "SBEs"). In States that do not do so, HHS operates a federally facilitated Exchange ("FFE").[1] Customers can typically enroll in Exchange plans for the upcoming plan year during an annual "open enrollment period[]," or for the current plan year during "special enrollment periods" that become available if a certain "triggering event[]" occurs (*e.g.*, a person loses employer-based coverage). *Id.* § 18031(c)(6); 45 C.F.R. § 155.420(a)(3).

The HHS Secretary has broad authority under the ACA to issue regulations implementing

---

[1] As few States, including Illinois, operate a State-based Exchange on the federal Exchange platform ("SBE-FP").

and "setting standards for" the ACA's requirements, including those regarding the "establishment and operation of Exchanges," the "offering of qualified health plans through such Exchanges," and "such other requirements as the Secretary determines appropriate." 42 U.S.C. § 18041(a)(1). Since the ACA's enactment, HHS has accordingly engaged in numerous rulemakings to implement various aspects of the ACA. *See, e.g.*, 77 Fed. Reg. 18,310 (Mar. 27, 2012) ("Exchange Establishment Rule"); 82 Fed. Reg. 18,346 (Apr. 18, 2017) ("Market Stabilization Rule"); *see also* 90 Fed. Reg. 27,074, 27,080-84 (June 25, 2025) (summarizing past rulemakings).

## II. The Marketplace Integrity and Affordability Rule.

On March 19, 2025, the Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS, issued a Notice of Proposed Rulemaking for a proposed rule that would implement "several regulatory actions aimed at strengthening the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." 90 Fed. Reg. 12,942 (Mar. 19, 2025) ("NPRM"). CMS further explained that it "expect[ed] these actions would provide premium relief to families who do not qualify for [ACA] subsidies and reduce the burden of . . . [ACA] subsidy expenditures to the Federal taxpayer." *Id.* CMS received more than 26,000 comments, some supporting and others opposing different aspects of the proposed rule. After reviewing those comments and revising certain provisions of the proposed rule in response, HHS issued and publicly released the Final Rule on June 20, 2025, and it was published in the Federal Register on June 25. 90 Fed. Reg. 27,074 ("the Rule").

HHS explained in the Rule's preamble that, "[b]ased on [its] review of enrollment data and [its] experience fielding consumer complaints," it believes that the "temporary expansion of ACA premium subsidies" via the American Rescue Plan Act (ARPA) and Inflation Reduction Act (IRA) "resulted in conditions that were exploited to improperly gain access to fully-subsidized coverage"

on Exchanges. *Id.* More specifically, "the widespread availability" of fully subsidized plans—*i.e.*, plans with post-subsidy net premiums of $0—"created the incentive and opportunity for fraudulent and improper enrollments at scale," either by enrollees wanting no-cost Exchange coverage or by third-party brokers that collected commissions on improper enrollments that were made without customers' knowledge. *Id.* The Rule accordingly "takes a carefully curated set of temporary actions" to reduce these high levels of improper enrollment "over the short-term," which will then sunset after the Exchange marketplace "readjusts to" a new environment in which the then soon-to-expire enhanced premium subsidies provided by the ARPA and IRA "are no longer available." *Id.* The Rule also implements a number of "permanent reforms to help" Exchanges "reset to the changing subsidy environment to improve affordability and stability over the long-term." *Id.*

The Rule implements eight policies that are challenged here, concerning—in the order presented in Plaintiffs' Motion for Summary Judgment—(1) a nominal $5 annual eligibility redetermination program to encourage certain enrollees to affirmatively reenroll each year, *id.* at 27,107; (2) the methodology used to calculate the "premium adjustment percentage," *id.* at 27,166-74; (3) the allowable ranges of actuarial values applicable to the different plan types sold on Exchanges, *id.* at 27,174-78; (4) the denial of new Exchange coverage when a customer owes past-due premiums to that issuer or an issuer in the same controlled group, *id.* at 27,084-91 (5) a standardized, shorter open enrollment period, *id.* at 27,136; (6) pre-enrollment verification procedures for special enrollment periods and verification of 75% of new enrollments during special enrollment periods, *id.* at 27,148-52; (7) a requirement that advanced premium tax credits (APTC) recipients file a federal tax return and reconcile those APTCs with the recipient's PTC amount, *id.* at 27,113-17; and (8) data matching policies updated to comply with federal law and with income verification procedures, *id.* at 27,119-24.

4

### III. Procedural History.

Plaintiffs in this case are three city governments—the City of Columbus, Ohio; the Mayor and City Council of Baltimore, Maryland; and the City of Chicago, Illinois—and two nonprofit organizations, one of which is a "national network of small businesses," and the other an advocacy organization consisting of "member physicians and medical trainees . . . in all 50 states."[2] Compl. ¶¶ 8-12, ECF No. 1. They alleged that the Rule violates the APA, claiming that three of its provisions are contrary to law (Count I), and that those same three provisions plus seven others are arbitrary and capricious (Count II). *Id.* ¶¶ 74-82. On July 2, 2025, Plaintiffs filed a motion for preliminary relief, in which they sought a stay of the August 25, 2025 effective date of the challenged Rule provisions under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. ECF No. 11; ECF No. 11-1.

The Court then stayed six policies: (1) the $5 annual eligibility redetermination program, (2) the actuarial value policy, (3) the past-due premium policy, (4) the verification of eligibility for special enrollment periods policy, (5) the one-year failure to file and reconcile policy, (6) the income verification components of the data matching policy. The Court found that Plaintiffs had not shown they were likely to succeed on their challenges to two policies: (1) the recission of the automatic 60-day extension component of the data matching policy, and (2) the premium adjustment percentage policy. Mem. Op. at 35, 54-55, ECF No. 35. Defendants' appeal of that

---

[2] Defendants continue to argue Plaintiff Doctors for America ("DFA") does not have standing. DFA's attempt to establish standing relies on an attenuated chain of speculation. The organization submitted declarations from two physician members, neither of whom asserts any cognizable injuries to themselves. They mostly rely on asserted injuries to their patients, but they cannot raise claims on behalf of third parties. *See Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013). Neither physician directly asserts a personal loss of income as a result of the Final Rule, much less because of any of the challenged policies. Finally, while one of the physicians asserts that he will need to spend more time counseling his patients about paying for care, *see* JA93, the Supreme Court has decisively rejected diversion-of-resources theories as grounds for standing, *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

decision remains pending in the Fourth Circuit.

Plaintiffs now move for summary judgment, and Defendants cross move for summary judgment. As Plaintiffs have noted, Joint Mot. to Enter Briefing Schedule at 2, ECF No. 57, the parties respectfully request a ruling from the Court on their cross-motions for summary judgment by the end of May 2026 to account for the rate filing season for Exchange plans for 2027.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), typically "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Bonumose, Inc. v. FDA*, 747 F. Supp. 3d 211, 223 (D.D.C. 2024) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012)). "In the unique context of a case brought under the APA, the district court 'sit[s] as an appellate tribunal,'" *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993)), and "[s]ummary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 557 (D. Md. 2020).

Under the APA, courts shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 763 (2004); *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 375–76 (1989). "This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh,* 490 U.S. at

378 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)). Under this "narrow standard of review, . . . a court is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citations omitted), but instead to assess only whether the agency relied on factors which Congress has not intended it to consider, *entirely failed* to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is *so implausible* that it could not be ascribed to a difference in view or the product of agency expertise. *See Ctr. for Sci. in the Pub. Int.*, 438 F. Supp. 3d at 557. Likewise, a court must "hold unlawful and set aside agency action . . . not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)).

## ARGUMENT

### I. The $5 annual eligibility redetermination program is neither unlawful nor arbitrary and capricious.

The eligibility requirements for enrolling in an Exchange plan and for receiving PTCs and APTCs are set forth in the ACA and its implementing regulations. *See* 42 U.S.C. §§ 18081(a), 18082(a); 26 U.S.C. § 36B(a), (c)(1)(A); 45 C.F.R. § 155.305(a), (f). HHS is generally responsible for determining whether a customer satisfies those requirements. If a customer does, then he can enroll in an Exchange plan for the upcoming plan year and receive APTCs. As a general matter, the ACA requires plan issuers to renew an enrollee's coverage the next year, subject to certain statutory exceptions. 42 U.S.C. § 300gg-2(a). Even when an enrollee's plan is subject to that guaranteed-renewability provision, however, an Exchange must still "redetermine" the enrollee's eligibility for subsidized Exchange coverage "on an annual basis" in accordance with HHS regulations. 45 C.F.R. § 155.335(a)(1).

The Rule sets forth procedures that will apply to certain annual eligibility redeterminations for plan year 2026. *See* 90 Fed. Reg. at 27,102; *see* 45 C.F.R. § 155.335(a)(2)(ii) (providing that

7

annual eligibility redeterminations may be conducted pursuant to "[a]lternative procedures specified by the [HHS] Secretary for the applicable benefit year"). The Rule provides that (1) if an enrollee does not submit an application for an updated eligibility determination for plan year 2026 on or before the deadline to select Exchange coverage and (2) that enrollee's post-APTC premium will be zero dollars (*i.e.*, the enrollee's coverage will be fully subsidized), then (3) the Exchange "must decrease the amount of" the APTC "applied to the [enrollee's] policy such that the remaining monthly premium owed for the policy equals \$5." NPRM, 90 Fed. Reg. at 13,031.

This temporary change to the annual eligibility redetermination process is the product of CMS's increasing concern about "the level of improper enrollments" in zero-premium plans on federal Exchanges. 90 Fed. Reg. 27,102, 27,105-06 (explaining that the gap between actual and reported enrollment in subsidized Exchange plans doubled between 2021 and 2024). CMS attributes that problem in part to agents and brokers improperly enrolling consumers in fully subsidized Exchange plans "without their knowledge" to earn commission payments. *Id.* at 27,103; *see id.* ("Because these enrollees do not receive a monthly premium bill requiring action on their part, they may not be aware they are enrolled."). CMS also notes that the recent expansion of premium subsidies via the ARPA and IRA "significantly increased the number of enrollees" who are enrolled in fully subsidized Exchange plans. *See id.* (explaining that 2.68 million enrollees were automatically re-enrolled in fully subsidized plans on federal Exchanges in plan year 2025, compared to 270,000 such enrollees in plan year 2019). The Rule thus addresses this enrollment issue by "prompt[ing]" individuals enrolled in fully subsidized Exchange plans to "update or confirm" their eligibility for such plans "or else pay a \$5 monthly premium" until they do so. *Id.* at 27,103; *see id.* at 27,102.

### a. The $5 annual eligibility redetermination program is lawful.

Plaintiffs separately claim that the Rule's eligibility redetermination provision is contrary to law because, they argue, HHS lacks the authority to set a $5 monthly premium for plans that would otherwise be fully subsidized via APTCs. *See* Pls.' Mot. for Summ. J. at 22. Yet the ACA tasks HHS with "determining" whether individuals enrolled in Exchange plans "meet[] the income and coverage requirements" for claiming PTCs, as well as with determining "the amount" of those tax credits. 42 U.S.C. § 18081(a)(2). It is likewise HHS's responsibility to determine an Exchange enrollee's eligibility for APTCs (which mirrors the applicable requirements for PTC eligibility) and to calculate the amount of those APTCs. *See id.* § 18082(a)(1), (3); 45 C.F.R. § 155.305(f)(5). And the ACA grants the HHS Secretary the authority to "establish a program" for making these eligibility determinations, 42 U.S.C. § 18081(a)(1), and to "establish procedures" for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances," *id.* § 18081(f)(1)(B). The Rule's eligibility redetermination provision comports with that grant of authority. The annual eligibility redetermination program is not a "junk fee," Pls. Mot. for Summ. J. at 22, but a tool to facilitate HHS's ability to *redetermine* enrollees' *eligibility* to remain enrolled in fully subsidized Exchange plans, and the "procedure[]" HHS opted for in the Rule is the application of a nominal premium that is designed to prompt certain enrollees to affirmatively reconfirm their eligibility. *See id.* Indeed, this approach is narrower, less invasive, and less expensive than a nationwide audit of every zero-premium automatic enrollment to redetermine eligibility or, alternatively, the rescission of auto-enrollment entirely. The unusually high level of improper enrollment in fully subsidized Exchange coverage stemming from a soon-to-expire enhanced subsidy regime, *see* 90 Fed. Reg. at 27,103, presented the "appropriate circumstances" for implementing this temporary nominal-premium procedure, 42 U.S.C. § 18081(f)(1)(B). Furthermore, that procedure will not

necessarily interfere with the Treasury Department's ability to "make" APTC payments to issuers of Exchange plans, *id.* § 18082(c)(2)(A); issuers' ability to apply those APTC payments to the premiums they charge Exchange enrollees, *id.* § 18082(c)(2)(B); or enrollees' ability to claim the full amount of their PTC on their federal income tax return. The Rule instead directs "the Exchange on the Federal platform"—that is, HHS—to apply the $5 to enrollees' plans each month. 90 Fed. Reg. at 27,222.

Lastly, Plaintiffs' "logical outgrowth" argument, *see* Pls.' Mot. for Summ. J. at 24-25, also fails for the same reasons that it does with respect to the Rule's failure to file and reconcile provision. The logical outgrowth requirement is, essentially, a notice requirement to ensure that affected individuals can anticipate the contours and requirements of a final rule from its notice of proposed rule making. *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) ("a final rule is a logical outgrowth of a proposed rule only if interested parties should have anticipated that the change was possible . . . ." (citation modified)). Here, the change that Plaintiffs contest in the final rule is the length of the policy's implementation; its substantive portions, though, remain untouched. Case law is clear: among the logical outgrowths of a proposal to implement a policy indefinitely "is surely" a final rule that "refrain[s] from taking the proposed step" at all or, alternatively, implements the policy for a limited duration. *New York v. EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005) (quoting *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C. Cir. 1989)).

**b.  The $5 annual eligibility redetermination program is not arbitrary and capricious.**

Plaintiffs claim that CMS "acted arbitrarily" by adopting this eligibility redetermination provision in the Rule because the agency purportedly "ignor[ed] important aspects of the problem" and "fail[ed] to establish a rational connection between the facts found and the policy choice that

it made." Pls.' Mot. for Summ. J. at 24. Plaintiffs argue that the annual eligibility redetermination program would cause confusion among enrollees, but CMS considered that possibility and found it would be correctable. CMS further highlighted that Exchanges will have "sufficient time" to "educate" enrollees about the Rule's eligibility redetermination provision through "updated notices," and that "training and technical assistance" will be provided to agents, brokers, issuers, and other "interested parties" so they can "assist enrollees in understanding the proposed change." *see* 90 Fed. Reg. at 27,107. Further, CMS has a strong interest in ensuring comprehensive education on this policy, as it will be more effective at identifying improper automatic enrollees if all genuine automatic enrollees are aware of the policy, affirmatively verify their reenrollment, and obviate the need for eligibility redetermination. Federal regulations often change, and though individuals may have grown accustomed to a certain policy, Plaintiffs cannot merely invoke those individuals' "reliance interest" and invalidate a rule as arbitrary and capricious. Such an approach would neuter the rule making process and eliminate agencies' ability to amend virtually all regulations. Instead, an agency need only "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 5 (2020). Defendants met this standard.

Plaintiffs overlook CMS's thorough explanation of the problem it is trying to address—*i.e.*, improper enrollments in fully subsidized Exchange plans that persist because of automatic re-enrollment procedures, *see* 90 Fed. Reg. at 27,102—and how the Rule reasonably attempts to address that problem—*i.e.*, by encouraging enrollees in fully subsidized plans to actively confirm their knowledge of and eligibility for such plans, *id.* at 27,104. *See Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297-98 (4th Cir. 2018) (requiring only a "*rational* connection between the facts

11

found and the choice made" (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (emphasis added)). CMS also acknowledged the potential effect a $5 premium could have on enrollment and the risk pool in Exchanges, as well as on individuals who are accustomed to fully subsidized coverage, *see* 90 Fed. Reg. at 27,108, 27,194-95, and reasonably concluded that the $5 figure would likely encourage consumers to actively confirm their plan eligibility (because they want to avoid paying even this "nominal" cost) without risking "undue financial hardship," *id.* at 27,107.

## II. The premium adjustment percentage policy is neither unlawful nor arbitrary and capricious.

The ACA directs the HHS Secretary to determine an annual "premium adjustment percentage" based on "the average per capita premium for health insurance coverage in the United States for the preceding calendar year." 42 U.S.C. § 18022(c)(4). That measure of premium growth is then used to set the rate of increase for a number of parameters defined in the ACA, such as the maximum annual limitation on cost sharing under Exchange plans, *see* 45 C.F.R. § 156.130(a). Because the IRS traditionally adopts the same premium growth indexing methodology as HHS, the methodology used to calculate the premium adjustment percentage also affects how PTC and APTC amounts are calculated and, by extension, the cost of health care coverage on Exchanges. *See* 90 Fed. Reg. at 27,171. In the early days of the ACA, the premium adjustment percentage was calculated based solely on estimates of average premiums for employer-sponsored health plans because that approach "reflected trends in health care costs without being skewed by . . . premium fluctuations" in the individual insurance market. *Id.* at 27,166. HHS later adopted a methodology that also used estimates of private health insurance premiums, but in 2021, HHS reversed course and now considers only premiums for employer-sponsored coverage in the premium adjustment percentage calculation. *Id.* at 27,166-67.

In the Rule, HHS once again adopts a premium adjustment percentage methodology that takes account of premium changes in both the individual and group health insurance markets. *See id.* at 27,167. HHS explains in the Rule's preamble that this updated approach will allow it to "better achieve the statutory and regulatory goals of adopting a more comprehensive and accurate measure of premium costs across the private health insurance market," *id.* at 27,171, in keeping with the ACA's command that the premium adjustment percentage reflect the average premium "for health insurance coverage in the United States," 42 U.S.C. § 18022(c)(4). *See* 90 Fed. Reg. at 27,171 ("As the purpose of this index is to measure growth in premiums, we believe it is appropriate to use a premium measure that comprehensively reflects the actual growth in premiums in the related insurance markets.").

### a.    The premium adjustment percentage policy is lawful.

The premium adjustment percentage measures yearly changes in the "average per capita premium for health insurance coverage in the United States." 42 U.S.C. § 18022(c)(4). The statute directs HHS, in making this calculation, to compare the most recent "average per capita premium for health insurance coverage" with "such average per capita premium for 2013." 42 U.S.C. § 18022(c)(4). Plaintiffs contend that, by using the term "such," Congress unambiguously required the agency to base this comparison on growth rates in the group market, which they say are the only ones that permit "apples-to-apples" comparisons; the Rule's inclusion of individual market data into this calculation, they claim, compares time periods that are "meaningful[ly]" "differ[ent]" in terms of coverage requirements. Pls.' Br. at 26-27.

This argument places far more weight on the word "such" than it can bear. Had Congress wished to constrain the agency in the highly specific manner that Plaintiffs suggest, it could easily

13

have been more specific. Plaintiffs offer no sound reason to impose such a strained—and atextual—limitation on the agency's authority.

Had Congress intended the premium adjustment policy to include the group market only, it simply would have said so—as the statutory context underscores, including in language throughout (c)(4) that Plaintiffs themselves identify. For example, Plaintiffs argue that § 18022(c)(4)'s use of "health insurance coverage," defined under the ACA as those health insurance policies that meet its standard, requires CMS likewise to consider only those qualifying policies in its calculation of the "average per capita premium for 2013." Pls.' Mot. for Summ. J. at 27. Thus, Plaintiffs contend, premiums on the individual market cannot be used to calculate the "average per capita premium for 2013" because the ACA did not regulate individual market plans in 2013. This is incorrect. First, on a fundamental level, the individual healthcare market was not the only market that experienced a change in regulation. All markets became subject to prohibitions on annual and lifetime limits in 2014. 45 CFR § 147.126. The individual and small group markets were both restricted to calculate premium costs based only on certain factors. 45 C.F.R. § 147.102. Group markets were restricted from imposing waiting periods above 90 days. *Id*. § 147.116. Accordingly, Plaintiffs' argument relies on an incorrect premise that demands an impossibly pristine market comparison from 2013—a comparison that the text could not pragmatically be understood to require. Further, the term "health insurance coverage" only appears in the first half of (c)(4), relating to the "average per capita premium . . . for the preceding calendar year"; it is not used to describe the "average per capita premium for 2013." 42 U.S.C. § 18022(c)(4). Thus, policies qualifying as "health insurance coverage" only must be considered in the calculation of the average per capita premium for the preceding year, not necessarily for 2013. *Id.* Indeed, the plain language of the statute expressly grants the Secretary of Health and Human Services the

14

authority and discretion to "determine[]" the average premium per capita for 2013. *Id.* Had Congress intended only for policies qualifying as "health insurance coverage" to be considered in the calculation of the average per capita premium for 2013, it would not have delegated that determination to the Secretary. *Id.* Contrastingly, the statute only permits the Secretary to "estimate[]" the average per capita premium for the "preceding calendar year" using the metrics required—namely, policies qualifying as "health insurance coverage." *See id.* Likewise, there is a clear difference between the authority to "determine[]" a value and the authority to "estimate[]" a value. *Id.* An estimate of a value is implicitly constrained by metrics and formulas, whereas determination of a value is not.

### b.   The premium adjustment percentage policy is not arbitrary and capricious.

Plaintiffs' objection to the new premium adjustment percentage methodology stems almost entirely from its potential effect on the cost of Exchange plans. *See* Pls.' Mot. for Summ. J. at 27-29. HHS acknowledges that the new methodology will increase the maximum annual limitation on cost sharing and net premiums for enrollees with incomes under 400 percent of the FPL, which could in turn negatively impact the cost of Exchange coverage and enrollment. 90 Fed. Reg. at 27,171, 27,206-07. Yet contrary to Plaintiffs' assertion that HHS "disregard[ed]" these concerns, Pls.' Mot. for Summ. J. at 27, HHS addressed them head on in the Rule's preamble. *See* 90 Fed. Reg. at 27,171, 27,206-07. HHS then offered a reasonable (and compelling) explanation for why it was adopting a new premium adjustment percentage methodology nonetheless. Specifically, HHS explained that the premium adjustment percentage reflects Congress's intent to "appropriately index various parameters defined in the ACA." *Id.* at 27,172. Given how the ACA defines that percentage, "the primary consideration for setting [its] value" should be "whether it accurately and comprehensively captures the rate of premium growth in the United States." *See*

*id.*; 42 U.S.C. § 18022(c)(4). HHS acknowledges that the methodology used to calculate the premium adjustment percentage will have an impact on the cost of Exchange coverage, enrollment, and access to health care more broadly. *See* 90 Fed. Reg. at 27,171. But any such impact would be a consequence of *Congress's* decision to tie the value of certain forms of financial assistance under the ACA to the premium adjustment percentage. Placing undue weight on considerations other than the rate of premium growth "in the United States" when calculating that percentage, 42 U.S.C. § 18022(c)(4), could thus yield a figure that "artificially inflat[es] the generosity of provisions of the ACA beyond the intent of Congress," 90 Fed. Reg. at 27,172. HHS therefore concluded—and reasonably so—that a premium adjustment percentage methodology that considers "all private health insurance premiums" is "more consistent with" that congressional intent and the ACA's text. *Id.*

Plaintiffs separately contend that the new premium adjustment percentage methodology must be vacated because HHS "had an unalterably closed mind" when adopting it. Pls.' Mot. for Summ. J. at 27. Plaintiffs appear to draw this conclusion from the fact that CMS published an "Actuarial Value Calculator" discussing the new methodology seven days after the proposed rule was published for notice and comment. *Id.*[3] That publication clearly stated, however, that the changes being proposed in the proposed rule were just that—proposals. *See, e.g.*, Updated AV Calculator at 2 ("As a result of these *proposals*, we are revising the [AV Calculator] . . . to accommodate *potential* new de minimis ranges and a *potentially* updated MOOP limit." (emphasis added)). The publication also included a disclaimer stating that the document "accommodates proposed changes" that had been "published for public comment" and directing readers to the

---

[3] *See* Ctrs. for Medicare & Medicaid Servs., *Revised Final 2026 Actuarial Value (AV) Calculator Methodology* (Mar. 26, 2025), https://www.cms.gov/files/document/revised-final-2026-av-calculator-methodology-002pdf.pdf ("Updated AV Calculator").

website where comments could be submitted. *Id.* at 1 n.1. Plaintiffs nonetheless insist that CMS arrived at a "predetermined answer" with respect to the new premium adjustment percentage methodology because CMS ultimately adopted the proposed methodology "without change." Pls.' Mot. for Summ. J. at 28. Yet the Supreme Court has squarely rejected "criticisms of agency closemindedness based on an identity between proposed and final agency action." *Biden v. Texas*, 597 U.S. 785, 813 (2022). The Court should do the same with Plaintiffs' "closed-mindedness" argument here.

### III.    The actuarial value range policy is not arbitrary and capricious.

Under the ACA, health insurance plans offered on Exchanges must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute. 42 U.S.C. § 18022(a). A plan's "level of coverage," or actuarial value, reflects the estimated average percentage of covered health care expenses that will be paid by the insurance plan. *Id.* For example, under a plan with an actuarial value of 80 percent, the insurer will pay, on average, 80 percent of covered essential health benefits, and the enrollee will pay the remaining 20 percent of expenses through a combination of deductibles, coinsurance, co-payments, and maximum out-of-pocket limits. Consequently, the higher a plan's actuarial value, the lower an enrollee's out-of-pocket costs, on average. Of course, plans that have a higher actuarial value also have higher premiums.[4]

Health plans offered on Exchanges are divided into four "metal tiers"—bronze, silver, gold, and platinum—based on their actuarial values, *see id.* § 18022(d)(1)—covering, on average, 60, 70, 80, and 90 percent of costs, respectively. *Id.* The actuarial values of Exchange plans are

---

[4] It is important to note that plans with the same actuarial value can have very different cost-sharing structures. For example, one plan with a $4,500 deductible and no coinsurance once that deductible is met could have the same (approximate) actuarial value as a plan with a smaller deductible (*e.g.*, $1,500) but a 30 percent coinsurance rate. Additionally, irrespective of a plan's actuarial value, the percentage of covered health care costs paid by any given enrollee can vary considerably depending on the cost-sharing structure of their particular plan (*e.g.*, high deductible versus a lower deductible) and the enrollee's health care needs in a given plan year.

calculated pursuant to regulations issued by the HHS Secretary. *See id.* § 18022(d)(2). The statute also instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." *Id.* § 18022(d)(3). As relevant here, current regulations provide that the "allowable variation" in the actuarial value of silver, gold, and platinum plans is two percentage points above and below their respective benchmark actuarial values (*i.e.*, +2/-2 percentage points). 45 C.F.R. § 156.140(c)(1). The Rule will change this range to +2/-4 percentage points. 90 Fed. Reg. at 27,174. And for bronze plans, current regulations allow for a +5/-2 percentage point range, which the Rule will change to +5/-4 percentage points. *Id.*

HHS's decision to revert to a broader de minimis range similar to prior rules was not arbitrary and capricious. The ACA instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). The statute necessarily calls for the agency to exercise discretion in how much variation to permit. The phrase "de minimis" implies some play in the joints. *Cf. Ala. Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979) ("Determination of when matters are truly de minimis naturally will turn on the assessment of particular circumstances."). Congress did not, for example, demand that HHS select the "maximum feasible" standard. *Cf.* 49 U.S.C. § 32902(a) (setting such a requirement for fuel economy standards). Instead, it used an open-textured phrase to assign to HHS responsibility for setting the range, thus delegating to the agency the discretion to make reasonable policy judgments in carrying out that duty. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). In accounting for "differences in actuarial estimates," therefore, HHS may consider differences in cost-sharing and other components between plans. 90 Fed. Reg. at 27,174. HHS explained

18

that it sought to "significantly improve issuer flexibility in plan design." *Id.* at 27,176. The agency predicted that this increase in flexibility would have three key benefits: It would (1) "promote competition" by allowing issuers to be more responsive to consumer needs, (2) allow "greater continuity for consumers," and (3) encourage issuers to continue participating in the Exchanges. *Id.* The agency therefore provided a reasoned explanation for its decision to alter the actuarial-value policy.

HHS also acknowledged that its decision involved trade-offs. The agency recognized that expanding the de minimis range would likely reduce tax credits for subsidized consumers. *Id.* at 27,076. But the reason for that reduced subsidy is that premiums would be cheaper, thus increasing affordability for unsubsidized consumers. *See id.* HHS decided to prioritize getting these unsubsidized consumers into risk pools because it believed that, in the long-term, the risk pools would be more stable and coverage would be more affordable. *See id.*; *see also* NPRM, 90 Fed. Reg. at 12,997 (warning that "healthier, unsubsidized enrollees are [being] priced out of the market" and criticizing "short-sighted approach" of focusing only on maximizing subsidies). HHS did not act unreasonably in making that policy choice.

The agency has consistently understood its statutory obligation in this more holistic light. *See Loper Bright*, 603 U.S. at 388 (consistency in agency interpretation bolsters its "power to persuade" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))). Indeed, every time that HHS has set or adjusted the de minimis range, it has looked to factors beyond "differences in actuarial estimates." 90 Fed. Reg. at 27,177. When HHS set the range initially in 2013, it sought to "strike[] a balance between ensuring comparability of plans within each metal level and allowing plans the flexibility to use convenient cost-sharing metrics," and sought to "allow[] plans to retain the same plan design year to year." 78 Fed. Reg. 12,834, 12,851 (Feb. 25, 2013). When the agency

subsequently adjusted the range, it also based its reasoning on these factors, 87 Fed. Reg. 27,208, 27,307 (May 6, 2022), as well as others such as market competitiveness, 82 Fed. Reg. at 18,369. Under plaintiffs' restrictive reading of the statute, all of these prior decisions were unlawful.

Plaintiffs mainly focus on the effect these changes to the "de minimis" ranges will have on the value of PTCs that are available to Exchange enrollees. As Plaintiffs note, CMS estimates that the changes will reduce aggregate PTCs by $1.2 billion in 2026, *see* 90 Fed. Reg. at 27,208, which, according to Plaintiffs, will translate into higher premium costs for Exchange enrollees, a decrease in enrollment, and a "weaker risk pool." Pls.' Mot. for Summ. J. at 29. But Plaintiffs' vague suggestion that CMS did not adequately consider these effects in its decisionmaking process is belied by Plaintiffs' own citation to the Rule's preamble. CMS squarely considered the "impact" a wider "de minimis" range would have on PTCs and the "burden that increased cost-sharing and decreased PTCs may have on enrollees in the short-term." 90 Fed. Reg. at 27,176, 27,208. CMS just made the reasoned judgment that such "short-term" concerns about how wider ranges would affect subsidized enrollees should not necessarily take priority over the longer-term prospect of plans with lower premiums and competitive cost-sharing structures drawing unsubsidized consumers to Exchanges, "potentially improv[ing] the risk pool as coverage becomes more affordable for generally healthy people who currently may opt to forgo coverage altogether." *Id.* at 27,175. HHS, in particular, considered the decline of unsubsidized enrollees over time, which was contrary to certain government projections. *See* 90 Fed. Reg. at 27,076. Far from reflecting a failure to consider relevant factors, as Plaintiffs seem to claim, CMS's reasoning represents a paradigmatic "policy balance" between short-term costs and long-term benefits. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007). And Plaintiffs' mere disagreement with that balance does not render it arbitrary and capricious. *Id.*

20

As for Plaintiffs' claim that HHS had an "unalterably closed mind" with respect to its proposed changes to the "de minimis" ranges, Pls.' Mot. for Summ. J. at 30, that argument is indistinguishable from the one they make with respect to the Rule provision that updates the premium adjustment percentage methodology, and it fails for the same reasons. *See Biden*, 597 U.S. at 788.

**IV.    The past-due premium policy is neither unlawful nor arbitrary and capricious.**

Under the Rule, issuers will instead be allowed—subject to applicable state law—(1) to attribute payments made to effectuate new coverage to past-due premium amounts owed to the issuer or an issuer in the same controlled group, and (2) to then refuse to effectuate the new coverage if both the past-due and initial premium amounts are not paid in full. 90 Fed. Reg. at 27,084. Put another way, the Rule will allow issuers to require a customer to pay (1) any past-due premiums the customer owes the issuer (or related issuers) for prior coverage *and* (2) the initial premium amount (also known as a "binder payment") required for new coverage before the latter coverage is effectuated. *Id.* at 27,084, 27,088.[5] And if the customer fails to pay that combined amount in full, the issuer can decline to effectuate the new coverage. *Id.* at 27,084. An issuer must apply any such past-due premium policy "uniformly to all individuals . . . in similar circumstances in the applicable market and State regardless of health status" and "consistent with applicable nondiscrimination requirements." *Id.* at 27,220. States also have the flexibility to choose whether to permit issuers in their State to adopt such past-due premium policies and to "apply additional parameters governing issuers' premium payment policies, to the extent permitted under Federal

---

[5] The Rule provides that an issuer "may require a consumer to pay past-due premiums owed to that issuer, or owed to another issuer in the same controlled group." 90 Fed. Reg. at 27,089; *see* 45 C.F.R. § 147.106(d)(4) (defining "controlled group"). The Rule also provides that "[t]he amount of the past-due premium an issuer may require" before effectuating new coverage "is subject to any premium payment threshold the issuer has adopted pursuant to [45 C.F.R.] § 155.400(g)." 90 Fed. Reg. at 27,089.

law." *Id.* at 27,084; *see id.* at 27,085 ("We agree that States are in the best position to decide whether it is appropriate to permit or prohibit this policy.").[6] The Rule's past-due premium policy is similar to one that CMS implemented in 2017, which was later replaced in 2022 with the current regulation regarding past-due premiums and new coverage. *See* NPRM, 90 Fed. Reg. at 12,951.[7]

As explained in the Rule's preamble, CMS anticipates that the Rule's past-due premium policy will "help to promote continuous coverage, reduce gaming and adverse selection, ensure that ACA subsidies are targeted to those who are eligible, and allow issuers to more accurately predict costs and prices." 90 Fed. Reg. at 27,084. Indeed, CMS predicts that enrollees, including healthier ones who improve the risk pool, will likely "be more inclined to remain in their coverage" if they know that they would have to pay any past-due premiums before effectuating new coverage, which would in turn encourage continuous coverage more broadly. *Id.* at 27,086. And CMS notes that this expectation is consistent with data indicating that, when the 2017 past-due premium policy was in effect, the percentage of Exchange enrollees who had their coverage terminated for non-payment of premiums "dropped substantially," from 17.3 percent in 2017 to 7.8 percent in 2020. *Id.* at 27,087; *see* NPRM, 90 Fed. Reg. at 12,951-52. Although CMS acknowledges that "there could have been other reasons for this substantial drop," the agency notes that it is nonetheless "reasonable to conclude" that the 2017 past-due premium policy contributed to the drop "at least in part . . . by encouraging more people to maintain continuous coverage." 90 Fed. Reg. at 27,087. The Rule also eliminates the perverse incentives created by the current regulation, given that an enrollee's obligation to pay past-due premium debt "[will] not change" based on whether the

---

[6] The Rule notes that the past-due premium policy, unlike other Rule provisions discussed below, "will not sunset." 90 Fed. Reg. at 27,084.

[7] HHS explains in the Rule that unlike the 2017 policy, the Rule's past-due premium policy will not (1) "limit the policy to past-due premium amounts accruing over the prior 12 months" only or (2) "require the issuer to provide any notice of" any past-due premium policy the issuer adopts consistent with the Rule. 90 Fed. Reg. at 27,220.

enrollee renews a current plan or enrolls in new coverage. NPRM, 90 Fed. Reg. at 12,953. Plaintiffs argue that this Rule provision is both contrary to the ACA and arbitrary and capricious, *see* Pls.' Mot. for Summ. J. at 31-34, but it is neither.

### a. The past-due premium policy is lawful.

Plaintiffs contend that the Rule's past-due premium policy "runs flatly contrary to" the ACA's guaranteed-availability provision, *Id.* at 31 (citing 42 U.S.C. § 300gg-1(a)), by allowing issuers to deny coverage for a reason not permitted by the ACA—namely, an enrollee's failure to pay past-due premiums plus the initial premium for new coverage. *Id*. Not so. While it is true that the ACA requires an issuer that offers health insurance coverage to "accept every . . . individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), an issuer's provision of coverage is of course contingent on the enrollee's payment of premiums, *see id.* § 300gg-2(b)(1) (providing that an issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums"). Accordingly, the ACA cannot sensibly be read to "require issuers to provide coverage to applicants who have not paid for such coverage." 90 Fed. Reg. at 27,087. And that principle applies with equal force to individuals who fail to pay the initial premium required to effectuate a new policy. *See* 45 C.F.R. § 155.400(e) (providing that federally facilitated Exchanges and State-based Exchanges on the federal platform "will . . . require payment of a binder payment" equivalent to "the first month's premium" to "effectuate an enrollment" in an Exchange plan). If an individual applies for a new Exchange plan but fails to pay the full amount of the initial premium, that plan never goes into effect.[8] This is generally true when coverage is attempted to be purchased off exchange as well. The Rule simply allows an issuer who is owed past-due premiums

---

[8]  *See* CMS, *Health Coverage Effectuation, Grace Periods, and Terminations* at 2 (June 2024), https://www.cms.gov/files/document/coverage-effectuation-job-aid.pdf ("Consumers must pay their binder payment (often the first month's premium) for enrollment to be effectuated (i.e., the policy is active)").

from a particular customer to credit any payments made by that customer for new coverage to the past-due balance before crediting any payments to the initial premium amount for the new coverage. And if, because of such an allocation policy, the consumer still has an outstanding balance on the initial premium amount, then the issuer can decline to effectuate the new policy for failure to pay the requisite initial premium. *See* 45 C.F.R. § 155.400(e)(1)(i); *see* 90 Fed. Reg. at 27,087 (explaining that if an issuer "lawfully credits all or part of" a payment made for new coverage "toward past-due premiums," the customer "has not made sufficient initial payment for the new coverage"). The Rule's past-due premium policy is thus entirely consistent with the APA and regulations governing the effectuation of a new plan via an initial premium.

### b. The past-due premium policy is not arbitrary and capricious.

Plaintiffs separately contend that the past-due premium policy is arbitrary and capricious, but their arguments largely amount to policy disagreements and otherwise lack merit. For one, Plaintiffs accuse CMS of "derid[ing]" the possibility that the policy could lead to "widespread coverage losses." Pls.' Mot. for Summ. J. at 32-34. But CMS expressly acknowledged such concerns about potential coverage losses; it just reasonably concluded that, given (1) "the importance of health coverage," (2) the limited amount of past-due premium debt that a typical enrollee could potentially accrue, and (3) the intuitive expectation that customers are "accustomed to paying in full for one contract before they are allowed to enter another with the same contracting party," any effects the past-due premium policy might have on enrollment would likely "be minimal." 90 Fed. Reg. at 27,087; *see id.* (noting that "rules regarding grace periods and termination of coverage" ensure that customers receiving APTCs "generally ow[e] no more than 1 to 3 months of past-due premium amounts per year"). As for Plaintiffs' concern that individuals "might fail to pay a premium" for "many legitimate reasons," Pls.' Mot. for Summ. J. at 33, that

24

concern does not require CMS to abandon the sensible expectation that "all individuals who enroll for coverage . . . are required to pay their share of the premium for every month of coverage" or preclude the agency from implementing lawful regulations to that effect. 90 Fed. Reg. at 27,085.

CMS also considered Plaintiffs' concern about whether to require issuers to give enrollees notice of any past-due premium policies an issuer adopts, *see* Pls.' Mot. for Summ. J. at 33, but the agency decided to instead "defer to States on any additional parameters or standards that issuers must satisfy," including "provid[ing] advance notice" of past-due premium policies to customers, "as States are best positioned to set and oversee parameters of th[at] nature." 90 Fed. Reg. at 27,085. And while CMS could not offer conclusive evidence of "widespread gaming" of the ACA's guaranteed-availability requirement, as Plaintiffs seem to demand, Pls.' Mot. for Summ. J. at 33, CMS nonetheless cited to evidence that was consistent with the agency's expectation that a past-due premium policy "encourag[es] more people to maintain continuous coverage" and, relatedly, discourages enrollees from "taking advantage of . . . guaranteed availability rules." 90 Fed. Reg. at 27,086-87. *See FCC*, 556 U.S. at 521 ("But even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense.").

## V.    The shortened open enrollment period policy is not arbitrary and capricious.

Plaintiffs challenge a modification to the timing and duration of ACA open enrollment periods. Pls.' Mot. for Summ. J. at 34. Beginning in 2027, the Rule will create a uniform open enrollment period beginning no earlier than November 1 and ending no later than December 31. This Rule thus rescinds the extended open enrollment period which was in effect over the last four years because the expected benefits of that extension "did not materialize." 90 Fed. Reg. at 27,137. HHS was also responsive to comments it received; it delayed this policy's effective date to mitigate commenters' concerns over the change.

25

Plaintiffs' principal complaints with the new open enrollment period are policy disagreements. Pls.' Mot. for Summ. J. at 34-36. Plaintiffs argue that January enrollees are "[y]ounger and healthier" and thus essential to lower exchange prices, *Id.* at 34, but, Plaintiffs claim, those young individuals tend to sign up for plans in January due to "financial pressure" at the end of the calendar year, *Id.* Yet HHS considered these concerns carefully and concluded that the Rule's benefits outweighed any new minimal burdens the Rule concurrently imposed. 90 Fed. Reg. at 27,139. In particular, HHS found the delayed start of this provision of the Rule provides extensive time to "message the clearer [open enrollment period] end date to consumers, especially the younger and healthier consumers . . . ." Relatedly, consumers are "deadline-driven" such that the tail end of an enrollment period will often see an uptick in enrollment. *Id.* Similarly, Plaintiffs' concern that the Rule creates confusion without "navigators" can likewise be mitigated given the Rule's delayed implementation of this policy. Indeed, HHS found that a uniform open enrollment period would actually reduce confusion "by aligning more closely with the open enrollment dates for other coverage for many employer-based health plans." *Id.* at 27,136.

Plaintiffs also argue that the new enrollment period will eliminate enrollees' ability to switch plans before the end of the open enrollment period if they find the policy to be inadequate or too expensive. Pls.' Mot. for Summ. J. at 36. HHS considered this concern but found few individuals took advantage of this option. 90 Fed. Reg. at 27,137 ("[O]nly a small number of consumers took advantage of the additional time to switch to a lower-cost plan after receiving a bill from their issuer in January with higher plan costs. During the most recent OEP, fewer than 3 percent of enrollees (470,000 individuals) ended their FFE or SBE–FP coverage between December 15, 2024, and January 15, 2025, including those enrollees who switched to other plans as well as those who did not."). Particularly given the limited change that this Rule imposes,

effectively reverting to the prior policy in view of the limited benefits that an extended open enrollment period yielded, HHS's decision to create a uniform open enrollment period is well reasoned and not arbitrary and capricious.

**VI.     The verification of eligibility for special enrollment periods policy is not arbitrary and capricious.**

Plaintiffs challenge two changes that the Rule makes to the eligibility verification procedures that apply to Exchange enrollment via SEPs. Under current regulations, federally facilitated Exchanges are required to conduct pre-enrollment eligibility verification only for applicants seeking to enroll in an Exchange plan under the loss-of-minimum-essential-coverage SEP; they are not permitted to conduct such pre-enrollment eligibility verification of any other category of SEP. *See* 45 C.F.R. § 155.420(g). Under the Rule, federally facilitated Exchanges will instead be required to conduct pre-enrollment eligibility verification for other categories of SEPs as well (*e.g.*, permanent move, marriage, etc.), which is in line with the eligibility verification policy that was in place between 2017 and 2022. *See* 90 Fed. Reg. at 27,148-49. The Rule further requires State Exchanges to conduct pre-enrollment eligibility verification "for at least 75 percent of new enrollments through SEPs." *Id.* at 27,150-51 ("the cost to verify eligibility for SEP triggering events with very low volumes could be greater than the benefit of verifying eligibility for them."). And for reasons related to the recent expiration of enhanced APTCs, the requirements will automatically sunset after program year 2026. *Id.*

Plaintiffs argue that the Rule's changes to the eligibility verification procedures for SEP enrollment are arbitrary and capricious because, in their view, CMS did not provide an "adequate explanation for why [it] acted at all." *See* Pls.' Mot. for Summ. J. at 36-37. But CMS clearly identified what it deemed a critical shortcoming of the current SEP eligibility verification regulations—namely that, because of their limited scope, the regulations "do not provide enough

27

protection against misuse and abuse" of SEPs, which enables otherwise ineligible individuals to enroll in Exchange plans "only after they become sick or . . . need expensive health care services," which in turn "negatively impacts both the risk pool and program integrity around determining eligibility for" APTCs and other subsidies. 90 Fed. Reg. at 27,148.

CMS explained that requiring pre-enrollment eligibility verification for all SEP categories would mitigate these problems by "restricting people from gaming SEPs" by enrolling in Exchange plans only when they need health care services, which would improve Exchange risk pools, "make[] health coverage more affordable for unsubsidized enrollees," and reduce federal expenditures on APTC subsidies. *Id.* at 27,150. CMS added that pre-enrollment verification "strengthens program integrity by denying ineligible enrollments" and "discouraging" enrollees "who know they cannot meet" applicable verification standards from attempting to improperly enroll in Exchange plans and claim APTCs for which they are not otherwise eligible. *Id.* The agency then pointed to data suggesting that pre-enrollment verification requirements that previously applied to SEPs did not create substantial barriers to Exchange enrollment, and that such requirements had the effect of "encourag[ing] continuous enrollment by making it more difficult to engage in strategic enrollment and disenrollment" based on customers' changing health status. *Id.* at 27,149. CMS also underscored its general "responsibility to comply with the ACA," *id.* at 27,152, which includes faithfully adhering to statutory and regulatory eligibility requirements. *See, e.g.*, 45 C.F.R. § 155.420(a)(3) (providing that an Exchange "must allow a qualified individual" to enroll via a SEP only if a specified "triggering event[] . . . occur[s]"). It ultimately concluded that the "positive impact" of the more robust SEP eligibility verification requirements in the Rule "far exceeds" any potential negative impacts. 90 Fed. Reg. at 27,148; *see id.* at 27,151 ("[W]e believe that the additional burden is not significant enough to outweigh the

28

merits of SEP verification and the increases in program integrity that it provides . . . .”). These explanations readily meet the agency’s burden on arbitrary and capricious review.

**VII.    The one-year failure to file and reconcile policy is neither unlawful nor arbitrary and capricious.**

    **a.    The one-year failure to file and reconcile policy is lawful.**

A basic principle animates the failure to file and reconcile policy: when means-tested subsidies are provided in advance based on projected income, there must be some way to reconcile the estimated subsidy paid with the amount a beneficiary is actually entitled to receive. Congress recognized this need by authorizing the Reconciliation Requirement, which requires APTC recipients to reconcile their actual income with their advanced credits when filing for taxes each year. *See* 26 U.S.C. § 36B(f)(1); 26 C.F.R. § 1.36B-4(a)(1)(i). The failure to file and reconcile policy applies to those who do not meet the Reconciliation Requirement.

In establishing the failure to file and reconcile policy—both in its one-year form in 2015-24 and 2026-27 and in its two-year form in 2024-25—HHS relied on its general rulemaking authority under 42 U.S.C. § 18041(a)(1), 77 Fed. Reg. at 18,444; 88 Fed. Reg. 25,740, 25,917 (Apr. 27, 2023); 90 Fed. Reg. at 27,117, and it is consistent with HHS’s authority to administer the eligibility determination process under 42 U.S.C. §§ 18082. As relevant here, the provision authorizes HHS to “issue regulations setting standards for meeting the requirements under [Title I of the ACA] with respect to” four categories including “the establishment and operation of Exchanges” and “such other requirements as the Secretary determines appropriate.” 42 U.S.C. § 18041(a)(1). Thus, to fit within this section a regulation must meet three criteria: (1) the regulation must point to a requirement under Title I of the ACA, (2) the requirement must have a nexus to one of the enumerated categories such as operating an Exchange, and (3) the regulation must set a standard for meeting the requirement.

29

HHS has relied on this express conferral of rulemaking authority to implement numerous provisions of the ACA, like establishing federal Exchanges. *See* 77 Fed. Reg. at 18,312. Importantly, HHS's use of this authority does not amount to HHS creating an extra-statutory requirement. Rather, HHS appropriately relied on that broad authority to issue the failure to file and reconcile policy. First, the Reconciliation Requirement is a requirement under Title I of the ACA, which requires recipients of advance premium tax credits to reconcile the credits they receive. 26 U.S.C. § 36B(f)(1); *see* 26 C.F.R. § 1.36B-4(a)(1)(i). Second, the Reconciliation Requirement is a requirement "with respect to" "the establishment and operation of Exchanges," because the requirement pertains to the advance payment of a premium tax credit for taxpayers who enroll in insurance plans through Exchanges. 42 U.S.C. § 18041(a)(1)(A). Third, HHS "set[] standards for meeting [that] requirement[]." *Id.* § 18041(a)(1). It did so here by facilitating compliance with the Reconciliation Requirement, resting on the basic insight that a taxpayer who has failed to comply with that requirement in the past has not satisfied the "standard[] for meeting" those requirements in the future. *Id.* HHS thus had statutory authority to condition eligibility for advance premium tax credits on meeting the Reconciliation Requirement. And its longstanding understanding of this § 18041(a)(1) authority "constitute[s] a body of experience and informed judgment to which courts and litigants [may] properly resort for guidance." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 140); *see also id.* at 402 (reaffirming *Skidmore*).

Contrary to Plaintiffs' arguments, HHS has not violated "separate, express provisions" of the ACA in issuing the failure to file and reconcile policy. Pls.' Mot. for Summ. J. at 39 (citation omitted). Congress, of course, "prescribed" the terms of advance premium tax credits in the ACA; it determined the amount of the credit, restricted the credit to taxpayers with certain annual household incomes and prohibited "individuals not lawfully present" from obtaining any tax

credits at all. 26 U.S.C. § 36B(b)(2)-(3), (d), (e). But nothing in the structure of these interlocking provisions suggests that Congress exhaustively established eligibility criteria for advance premium tax credits. Congress certainly did not think that it was defining every aspect of advance premium tax credits, for it broadly delegated authority to HHS to "establish a program" for determining eligibility for tax credits. 42 U.S.C. § 18081(a)(2); *see also* 26 U.S.C. § 36B(h) (also authorizing Secretary of the Treasury to prescribe regulations to effectuate tax credits). Rather than cabining the agency's authority, this type of broad delegation of "discretionary authority" to "prescribe rules to 'fill up the details' of a statutory scheme" affords the agency wide latitude to act within the bounds of the statute. *Loper Bright*, 603 U.S. at 394-95 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825)). Nor did Congress expressly prohibit HHS from tying advance premium tax credit eligibility to meeting the Reconciliation Requirement. That omission is notable, because courts expect that "if Congress had intended to curtail in a particular area . . . broad rulemaking authority [it] granted," then it would "do so in language expressly describing an exception." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991).

What is more, Congress also gave HHS authority to "establish a program" to determine eligibility for Exchange participation, premium tax credits, and other benefits. *See* 42 U.S.C. §§ 18081-18082; Pub. L. No. 111-148 (2013) at § 1412. As HHS has explained, the Reconciliation Requirement is integral to the agency's program for making those eligibility determinations. *See* NPRM, 90 Fed. Reg. at 12,957. This, too, underscores that the policy falls comfortably within the agency's authority.

  **b. The one-year failure to file and reconcile policy is not arbitrary and capricious.**

Plaintiffs separately argue that the Rule's one-year failure to file and reconcile provision is arbitrary and capricious. Pls.' Mot. for Summ. J. at 39-40. That claim fails too. The "'Kafka-esque'

31

scenario" that Plaintiffs concoct with respect to enrollees not receiving adequate notice of their failure to file and reconcile status, *id.* at 39, does not comport with reality. The Rule will simply reinstate the notice procedures that CMS used before the current two-year policy was adopted in 2023, under which enrollees received their first failure to file and reconcile notice approximately six months before their APTC eligibility was impacted, and additional notices after that. 90 Fed. Reg. at 27,118. Moreover, CMS provided data suggesting that notices sent during the open enrollment period for Exchange plan enrollment "were relatively effective" in resolving failure to file and reconcile issues. *Id.* at 27,114. Plaintiffs also invoke potential delays in IRS reporting of applicants' tax information to Exchanges. Pls.' Mot. for Summ. J. at 39. But CMS made the reasonable policy judgment that the potential for "long IRS processing times" in some cases is "unlikely a sufficient reason to maintain" the current two-year policy over the Rule's one-year policy in light of "imminent program integrity concerns." 90 Fed. Reg. at 27,116. The effect of any such reporting delays will be mitigated in any event by CMS's "FTR Recheck process," under which enrollees who file their federal tax returns by the October 15 extended filing date can attest to doing so and thus maintain their APTC eligibility for the following coverage year while their failure to file and reconcile status is verified. *Id.* Lastly, Plaintiffs claim that there is a "fundamental mismatch" between the Rule's failure to file and reconcile provision and "the problem that CMS claims it is trying to solve" because the former does not address "the conduct of brokers" in any way. Pls.' Mot. for Summ. J. at 40. But a major problem the failure to file and reconcile provision aims to address is the improper receipt of APTCs by enrollees who do not comply with the ACA's reconciliation requirement, and CMS explained that a one-year failure to file and reconcile policy will address that very problem by ensuring that individuals who are improperly enrolled in subsidized Exchange coverage "lose[] APTC after 1 year of failing to file and reconcile instead of

32

2 years." 90 Fed. Reg. at 27,115.

Finally, unrelated to their contrary-to-law and arbitrary-and-capricious claims, Plaintiffs maintain that CMS ran afoul of the APA's notice-and-comment requirements by "fail[ing] to provide adequate notice" of the agency's ultimate decision to have the Rule's failure to file and reconcile provision sunset at the end of 2026. Pls.' Mot. for Summ. J. at 39. Plaintiffs level a similar charge against other Rule provisions with the same one-year duration, *see, e.g.*, *id.* at 24-25, claiming that this "unexpected" approach contravenes the requirement that "an agency's final action" be a "logical outgrowth of its proposed rule." *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 508 (D.C. Cir. 2019). But this argument too lacks merit, for reasons already explained, *see supra* Defs.' Cross Mot. for Summ. J. at 9.

## VIII.    The data matching policy is not arbitrary and capricious.

Plaintiffs challenge three Rule provisions that concern the processes by which HHS verifies "income eligibility" for APTC and cost-sharing-reduction subsidies. *See* 90 Fed. Reg. at 27,112. These provisions address the "critical balance HHS must achieve between assuring responsible stewardship of taxpayer dollars with protecting access to Federal program[s] for those who qualify for them." *Id.* at 27,113. Plaintiffs claim that the three provisions are "arbitrary" because "[e]ach . . . will make it harder for people to enroll in coverage." Pls.' Mot. for Summ. J. at 41. But all three provisions are "reasonable and reasonably explained," and thus pass muster under the deferential arbitrary-and-capricious standard. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### a.   Rescission of Automatic 60-Day Extension Regulation.

The ACA prescribes the income-related information that applicants must provide to establish their eligibility for a PTC and, by extension, APTCs, as well as the means by which HHS

must verify that information. *See* 42 U.S.C. § 18081(b)(3)(A); *id.* § 18081(c)(3). Generally, if inconsistencies or other issues arise during the income verification process, the ACA requires Exchanges to notify an applicant of such issues and to provide the applicant an opportunity "to either present satisfactory documentary evidence or resolve the inconsistency" within 90 days of receiving such notice. *Id.* § 18081(e)(4)(A)(ii). This 90-day window for an applicant to verify their income with "satisfactory documentary evidence" or to "otherwise resolve" an income-related inconsistency is reflected in HHS regulations, 45 C.F.R. § 155.315(f)(2)(ii), and those regulations also allow Exchanges to extend the 90-day window if an applicant "demonstrates that a good faith effort has been made to obtain the required documentation during the period," *id.* § 155.315(f)(3). In 2023, however, HHS issued a regulation providing that Exchanges must automatically extend the 90-day period by an additional 60 days whenever an applicant needs to verify his or her household income with additional documentation. *Id.* § 155.315(f)(7)(2024).

The Rule will rescind this automatic 60-day extension, chiefly on the ground that it is incompatible with the statutory language governing the income verification process. *See* 90 Fed. Reg. at 27,120 ("[W]e believe that this change is necessary given that the requirement to automatically provide a 60-day extension . . . is inconsistent with our statutory authority.").[9] Yet CMS also explained in the Rule's preamble that even if the ACA allowed for an automatic 60-day extension, CMS's "review of how applicants used" that extension showed that it "largely does not deliver the benefits anticipated." *Id.* at 27,119. For instance, CMS reviewed data indicating that the automatic 60-day extension did not have a measurable impact on consumers' ability to resolve income-related verification issues compared to the pre-existing regime, under which consumers

---

[9] Because CMS concluded that the automatic 60-day extension regulation "falls outside of" its statutory authority, it further concluded that the Rule's rescission of the automatic extension must be made permanent. 90 Fed. Reg. at 27,119

who needed a 60-day extension could get one by "demonstrat[ing] . . . a good faith effort" to obtain the requisite documentation, 45 C.F.R. § 155.315(f)(3). *See* 90 Fed. Reg. at 27,119.

Plaintiffs principally argue that CMS's rescission of the automatic 60-day extension regulation is arbitrary because the agency "wrongly reasoned" that such a change was "compelled by . . . statute." Pls.' Mot. for Summ. J. at 41. They claim that two provisions in the ACA give HHS the requisite authority to adopt an automatic 60-day extension to the time period for applicants to resolve inconsistencies with their income verification. But one of those provisions expressly states that the HHS Secretary "may extend the 90-day period" for resolving income-related inconsistencies "for enrollments *occurring during 2014*," 42 U.S.C. § 18081(e)(4)(A)(ii) (emphasis added), and makes no mention of extensions being available during any other year. While the other provision Plaintiffs cite provides that the HHS Secretary "may modify" the "methods" for verifying information prescribed by the ACA, *id.* § 18081(c)(4)(B), that provision plainly limits such modifications to the methods by which HHS verifies information with trusted data sources and other federal agencies, not the methods by which Exchanges must try to resolve income-related inconsistencies *with applicants*. Indeed, § 18081(c) falls under a subsection titled "Verification of information contained in records of specific Federal officials," and the example of a permissible modification that the provision provides concerns the transfer of tax return information from a federal official (*i.e.*, the Treasury Secretary) directly to another trusted data source. *Id.* § 18081(c)(4)(B). Plaintiffs instead read this limited provision as granting the HHS Secretary "the power to modify any of" the verification methods set forth in § 18081, including, they contend, the 90-day timeline for resolving income-related inconsistencies found in § 18081(e)(4). Pls.' Mot. for Summ. J. at 41. But, to start, it is hardly clear that the statutory timeline set out for this process qualifies as a verification "*method.*" Regardless, even taking that

35

argument at face value, any authority the HHS Secretary might have to "*modify*" a statutorily prescribed timeline in order to "reduce the administrative costs and burdens" faced by a particular "*applicant*," 42 U.S.C. § 18081(c)(4)(B) (emphasis added), cannot be reasonably understood to include the authority to promulgate a regulation that categorically *replaces* a statutorily prescribed timeline (90 days) with a different one (90 days plus an automatic 60-day extension) for *all applicants*, *see* 45 C.F.R. § 155.315(f)(7) (2024). *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."). It is Plaintiffs' flawed reading of the ACA's plain text that is arbitrary, not the Rule.

This Court invited further briefing on the "close call" of the *expressio unius* canon's application. Mem. Op. for Prelim. Inj. at 55, ECF No. 35. "[T]he doctrine of *expressio unius est exclusio alterius* instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded." *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001). To be sure, the canon can be overcome by "contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (finding "contrary indications" when presented with a constellation of factual and legal datapoints (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002))). But there is no warrant for that here. While Plaintiffs contend that *expressio unius* is an "especially feeble helper in an administrative setting," Pls.' Mot. for Summ. J. at 42, that is not true where Congress has "directly resolved" the scope of an agency's authority, *see Cheney R.R. Co. v. Interstate Com. Comm'n*, 902 F.2d 66, 69 (D.C. Cir. 1990), as in this case. There is simply no ambiguity in the plain text of the statute: automatic 60-day extensions countermand the ACA's limited grant of extension authority in 42 U.S.C. § 18081(e)(4)(A)(ii).

36

Plaintiffs' other critiques of the rescission of the automatic 60-day extension fare no better. They claim that CMS did not "engage[] with the evidence showing the need for a 150-day verification period." Pls.' Mot. for Summ. J. at 43. But CMS very much engaged with relevant evidence suggesting that an *automatic* 150-day verification period provided no "meaningful benefit to consumers" compared to a process in which extensions can be granted on a case-by-case basis as appropriate. 90 Fed. Reg. at 27,119; *see also id.* at 27,120. Contrary to Plaintiffs' assertions, CMS also "address[ed]" other "relevant factors," Pls.' Mot. for Summ. J. at 43, including the potential effects that rescinding the automatic 60-day extension might have on enrollment and the risk pool within Exchanges, as well as on federal expenditures for APTCs given to ineligible enrollees. 90 Fed. Reg. at 27,119.

   b.  **Provision Requiring Income Verification When Data Sources Indicate Income Less Than 100 Percent of the Federal Poverty Level.**

The second income eligibility verification provision that Plaintiffs challenge as arbitrary and capricious will require Exchanges to identify and further verify income-related information when (1) a tax filer's attested projected annual household income is between 100 and 400 percent of the federal poverty line ("FPL") and (2) the income amounts returned by the IRS and other data sources with respect to that tax filer are less than 100 percent of the FPL. *Id.* at 27,121. As part of the process for verifying an applicant's household income for purposes of determining their eligibility for APTCs, an Exchange typically must consider the applicant's past tax return information, as well as the enrollee's attestation regarding their "projected annual household income." 45 C.F.R. § 155.320(c)(3)(ii)(A). Under current regulations, if an applicant's attestation regarding their projected annual household income reflects a higher household income than reflected in income data provided by the IRS or certain other sources, an Exchange generally "must accept the applicant's attestation without further verification," *id.* § 155.320(c)(3)(v), because it

37

would result in a lower APTC amount. The Rule amends this provision by requiring an Exchange to instead further verify an applicant's household income if (1) an applicant attests to income that is between 100 and 400 percent of the FPL, (2) income data from the IRS indicates household income below 100 percent of the FPL, and (3) the former income amount exceeds the latter amount by a "reasonable threshold." 90 Fed. Reg. at 27,123. The applicant may then resolve the inconsistency by providing additional documentation and taking other steps to verify their household income. *See* 45 C.F.R. § 155.315(f)(1)-(4).[10]

This Rule provision parallels a provision from a 2018 rule that was vacated in *City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021). Both then and now, the reasons for HHS wanting to take additional steps to verify an applicant's income when data from sources like the IRS indicate that the applicant's household income is less than 100 percent of the FPL are straightforward. Because individuals with household incomes below that threshold are generally not eligible for PTCs or, by extension, APTCs, *see* 26 U.S.C. § 36B(a), (c)(1), an applicant who attests to having a projected household income that is equal to or above 100 percent of the FPL might be deemed eligible for APTCs despite income data from other sources showing otherwise. 90 Fed. Reg. at 27,121. Such a discrepancy could be a consequence of an applicant overestimating his or her projected household income to obtain APTCs for which the applicant is not otherwise eligible. *Id.*

HHS's justification for the provision this time around does not suffer from the same flaws that were fatal to the 2018 provision. HHS now points to data that "provide substantial evidence that applicants with household incomes below the APTC income eligibility threshold"—that is, 100 percent of the FPL—"are strategically inflating their household incomes," or are "getting

---

[10] The Rule's revision to 45 C.F.R. § 155.320(c)(3)(iii) will sunset at the end of plan year 2026. *See* 90 Fed. Reg. at 27,123-24. Plaintiffs do not challenge this facet of the revision.

assistance from" agents and brokers that have a "financial incentive" to maximize Exchange enrollments, in order to obtain subsidized coverage in an Exchange despite their actual household incomes rendering them ineligible for such coverage. *Id.* at 27,122. Put another way, there is a reasonably deduced "*nexus*" between the current income self-attestation regulations and an increase in fraud. *See* Mem. Op. at 62.

HHS cites one study, for instance, that compared estimated potential enrollment in Exchanges based on income data reported in census surveys to actual enrollment by enrollees who reported household income above the FPL-based eligibility threshold and found that actual enrollment was 136 percent higher than the total population of potential enrollments. 90 Fed. Reg. at 27,122. That same study also found that a far higher number of enrollees reported household income that was just above the Exchange-eligibility threshold in non-Medicaid expansion States compared to those in States that did expand Medicaid. *Id.* A separate analysis of 2024 open enrollment data showed that plan selections on federal Exchanges among individuals who reported household income between 100 percent and 150 percent of the FPL in non-Medicaid expansion States were 70 percent higher than potential enrollments estimated from census data at that same income level, which provides another strong indicator that enrollees are overestimating their income to obtain subsidized health coverage. *Id.*; *see id.* (estimating that between four and five million people improperly enrolled in Exchange coverage subsidized by APTCs in 2024 at a cost of $15 to $20 million). HHS "examined the relevant data," "provided an explanation for its decision," and established with data a "rational connection between the facts found and the choice made." *Ohio Valley Env't Coal.*, 556 F.3d at 192 (citation omitted). Accordingly, Defendants promulgated a rule with burdens congruent to the problem it seeks to resolve. That comports with the APA's arbitrary-and-capricious standard.

39

   c.  **Change Requiring Income Verification When Tax Data Is Unavailable.**

Plaintiffs also challenge the Rule's recission of a regulation that requires an Exchange to accept an applicant's self-attestation of projected annual household income "without further verification" whenever (1) the Exchange requests tax return data from the IRS to verify the applicant's attested income, but (2) the IRS confirms that there is no such data available, 45 C.F.R. § 155.320(c)(5). *See* 90 Fed. Reg. at 27,130. The current regulation, which was adopted in 2023, creates an exception to the general requirement that an Exchange must verify an applicant's annual household income with certain trusted data sources, 45 C.F.R. § 155.320(c)(1)(ii), and otherwise follow an alternative verification process if tax return data for an applicant is unavailable, *id.* § 155.320(c)(3)(vi). The Rule simply removes this exception and requires Exchanges to follow standard verification and data-matching procedures "when tax return data is unavailable to immediately verify a consumer's attestation of annual household income." 90 Fed. Reg. at 27,132.[11]

Plaintiffs' lone objection to this revised verification policy appears to be that CMS did not adequately consider the policy's potential effects on access to subsidized coverage on Exchanges. *See* Pls.' Mot. for Summ. J. at 40-45, ECF No. 65-1. But CMS did, in fact, consider commenters' concerns about the burden that extra verification steps might place on enrollees. *See* 90 Fed. Reg. at 27,131. The agency made the reasonable observation that applicants without tax return data will likely have documentation verifying their household income (*e.g.*, pay stubs) "readily available" to them and that the burden of submitting that documentation, by extension, would be relatively minimal. *Id.* at 27,131-32; *see also id.* at 27,132 ("[HHS] is of the view that th[e] 90-day period

---

[11] This policy requiring Exchanges to verify an applicant's attested annual household income when tax return data is unavailable will sunset at the end of program year 2026, and the current verification policy under 45 C.F.R. § 155.320(c)(5) will become effective again. *See* 90 Fed. Reg. at 27,131. Plaintiffs do not challenge this face of the policy.

provided under statute [for resolving data inconsistencies] provides ample time for applicants to provide proof of their household income before their APTC is reduced.").

Beyond these policy concerns, Plaintiffs do not dispute that annual household income is a crucial metric in determining eligibility for subsidized coverage on Exchanges, *see* 26 U.S.C. § 36B(a), (c)(1)(A), and the unavailability of tax return data does not relieve HHS of its statutory obligation to ensure compliance with such eligibility requirements, *see, e.g.*, 42 U.S.C. § 18081(a)(2) (tasking HHS with determining "whether [an] individual meets the income and coverage requirements" for claiming a PTC and "the amount of" that credit); *id.* § 18081(e)(4)(A) (prescribing procedures Exchanges must follow when an applicant's information cannot be verified with certain data sources). Thus, this provision, too, readily survives arbitrary and capricious review.

## IX.    The scope of any relief granted should be narrow to Plaintiffs only.

The Court should enter judgment for Defendants. But if it enters judgment for Plaintiffs, it should not grant the extraordinarily sweeping relief that they seek. Plaintiffs request that the Court "vacate and set aside the provisions of the 2025 Rule identified in Counts I and II under the Administrative Procedure Act." Compl., Prayer for Relief ¶ 84. That request for universal relief would transgress basic principles of jurisdiction, equity, and judicial review under the APA.

To start, where party-specific remedies can provide Plaintiffs with complete relief, any broader relief would contradict constitutional and equitable limitations on this Court's remedial authority. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," any "remedy must be tailored to redress" each State's "particular injury." *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018); *accord Texas*, 599 U.S. at 702 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) ("Any remedy . . . must not be

more burdensome to the defendant than necessary to redress the complaining parties." (cleaned up with emphasis added)). Traditional principles of equity reinforce that constitutional limitation, *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999), instructing that a remedy "be no more burdensome" to defendants "than necessary to provide complete relief" to plaintiffs, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *accord Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring) (explaining that English and early American "courts of equity" typically "did not provide relief beyond the parties to the case").  Thus, any relief should not extend more broadly than needed to remedy the injuries of any particular plaintiff found to have standing.

The APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs seek in tension with these precepts. *But see also Sierra Club v. United States Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018). As a matter of first principles, the "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703 of the APA. Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Because Plaintiffs do not purport to identify any applicable "special statutory review proceeding," § 703 affords them only traditional equitable remedies like injunctions. In contrast, § 706(2) does not address remedies at all. Rather, § 706(2) is properly understood as a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it, consistent with basic principles of judicial review. Universal vacatur is therefore not an available remedy under the APA. *See United States v. Texas*,

599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment).

The Court also has equitable alternatives to vacatur. Rather than vacating the Rule nationwide, the Court could simply enjoin Defendants from enforcing the Rule against Plaintiffs, which would alleviate any adverse effects applicable to them. In contrast, the problems caused by overbroad universal remedies are well catalogued and apply whether such a remedy takes the form of a universal vacatur or a nationwide injunction. Importantly, nearly identical parallel litigation under the APA is taking place in the District of Massachusetts, *California, et al. v. Kennedy, et al.*, Case No. 125-cv-12019 (D. Mass.), in which motions for summary judgment are also being briefed. Universal vacatur in this case could deprive another court of the opportunity to resolve this question on its own terms or, perhaps more problematically, create substantial nationwide confusion in the event of competing district court orders.

## CONCLUSION

Plaintiffs' Motion for Summary Judgment should be denied and Defendants' Cross Motion for Summary Judgment should be granted.

DATED: February 17, 2026    Respectfully Submitted

BRETT SHUMATE
Assistant Attorney
General Civil Division

ERIC B. BECKENHAUER
Assistant
Director Federal
Programs Branch

*/s/ Jordan A. Hulseberg*
JORDAN A. HULSEBERG
D.C. Bar No. 90033542
Trial Attorney
United States Department of

Justice Civil Division, Federal
Programs Branch
1100 L Street NW
Washington, DC 20005


Phone: (202) 598-3856
Fax: (202) 616-8470
Email: jordan.a.hulseberg2@usdoj.gov

*Counsel for Defendants*

44