**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| CITY OF COLUMBUS ET AL., | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. 25-2114-BAH |
| ROBERT F. KENNEDY, JR. ET AL., | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   ·\*   ·   \*   \*   \*   \*   \*   \*   \*

**<u>MEMORANDUM OPINION</u>**

Plaintiffs filed suit under the Administrative Procedure Act ("APA") seeking to prevent Defendants from implementing changes to federal regulations enforcing the Patient Protection and Affordable Care Act (the "ACA," or the "Act"). ECF 1 (complaint). These changes, embodied in the Marketplace Integrity and Affordability Rule (the "Rule"), were set to take effect on August 25, 2025. *See* Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025). Plaintiffs—three cities, a coalition of doctors, and an interest group representing small business owners—allege they will shoulder increased costs or see their members lose health insurance coverage if these changes are implemented. *See* ECF 1; ECF 65 (motion for summary judgment). Defendants, the Secretary of the Department of Health and Human Services ("HHS") and many in his employ charged with crafting and implementing the Rule,[1] counter that changes to ACA-related regulations are needed to prevent

---

[1] Throughout this opinion, the Court occasionally refers to the taker of the administrative actions on review as "the agency," following the example of the parties. *See, e.g.*, ECF 65-1, at 30; ECF 68-1, at 18.

fraud and to readjust the cost of health insurance. *See* ECF 68 (cross-motion for summary judgment).

The Court previously granted in part and denied in part Plaintiffs' motion to stay the Rule pursuant to 5 U.S.C. § 705 pending a final ruling on the merits of the instant matter. *See* ECF 11 (motion to stay); ECF 35 (memorandum opinion); ECF 36 (order); ECF 38 (amended order). The Court found that Plaintiffs had shown a likelihood of success on the merits of their challenge to seven provisions of the Rule. *See* ECF 38. Defendants have appealed the Court's decision to the United States Court of Appeals for the Fourth Circuit, arguing that Plaintiffs lack standing and that the Court erred in finding that Plaintiffs demonstrated a likelihood of success on their challenges to two provisions of the Rule.[2] *See* ECF 39. That appeal remains pending, and Defendants have been denied a stay pending appeal by both this Court and the Fourth Circuit. *See* ECF 49; ECF 52.

In the interim, the parties jointly moved to proceed on the merits in this Court "to account for the rate filing season for 2027." *See* ECF 57, at 2. Both parties seek a decision on the merits through cross-motions for summary judgment based on the administrative record. *Id.* The Court entered the parties' proposed briefing schedule, and the cross-motions for summary judgment are now ripe for resolution. *See* ECF 65 (Plaintiffs' motion for summary judgment); ECF 68 (Defendants' cross-motion for summary judgment); ECF 70 (Plaintiffs' reply); ECF 71 (Defendants' reply). All filings include memoranda of law, and Plaintiffs' motion includes an addendum of administrative record materials.[3] Accordingly, for the reasons stated below,

---

[2] That appeal has been docketed as Case No. 25-2012.

[3] Defendants also produced the complete administrative record to Plaintiffs via a digital vile sharing service and to the Court by mailing a flash drive. ECF 62, at 1. From this complete record, Plaintiffs compiled their addendum of record materials in support of their motion. *See* ECF 65-2

Plaintiffs' motion for summary judgment is **GRANTED in part and DENIED in part** and

Defendants' cross-motion for summary judgment is **GRANTED in part and DENIED in part.**[4]

## I. BACKGROUND

### A. The Affordable Care Act

In 2010, Congress enacted the ACA "to increase the number of Americans covered by

health insurance and decrease the cost of health care." *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012).

"Prior to the enactment of the ACA, individual health insurance markets were dysfunctional." *City*

*of Columbus v. Trump*, 453 F. Supp. 3d 770, 778 (D. Md. 2020) ("*City of Columbus I*").[5] The

ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health

insurance market."[6] *King v. Burwell*, 576 U.S. 473, 478–79 (2015). Individual market health

plans are referred to as qualified health plans ("QHPs"). Individuals primarily enroll in QHPs for

---

(Volume 1); ECF 65-3 (Volume 2). The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[4] Given the Court's earlier decision on the motion to stay under 5 U.S.C. § 705, *see City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025) ("*City of Columbus III*"), the parties "essentially ask this Court to decide the same issues, on the same record, for a second time," *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 81 (D. Md. 2025). In the interests of judicial economy, where the Court reaches the same conclusion as it did in *City of Columbus III*, it repeats its prior analysis, often verbatim. However, the Court stresses that it reaches its conclusions anew after review of the full record and with the benefit of fulsome briefing. Moreover, since the facts are undisputed and the Court previously held a lengthy hearing on the prior motion at ECF 11 addressing the same rule change, no additional hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

[5] The Court frequently cites two prior opinions by Judge Chasanow, which included the same City Plaintiffs involved in this case. One opinion is from 2020 and addresses a motion to dismiss. *See City of Columbus*, 453 F. Supp. 3d at 770 ("*City of Columbus I*"). The other opinion, from the same case, addresses the parties' cross-motions for summary judgment. *See City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021) ("*City of Columbus II*").

[6] "Individual health insurance is insurance that individuals purchase themselves, in contrast to, for example, joining employer-sponsored group health plans." *City of Columbus I*, 453 F. Supp. 3d at 778 (citation omitted).

a given benefit year during an annual open enrollment period, or under specified special enrollment periods. 42 U.S.C. § 18031(c)(6). Ultimately, the ACA "aims to achieve systemic improvements in the individual health insurance market by means of certain key reforms[.]" *City of Columbus I*, 453 F. Supp. 3d at 778.

First, the ACA's "guaranteed issue" requirement specifies that every "health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), subject to exceptions specified in the statute, such as limiting sign-ups to the aforementioned enrollment periods, *id.* § 300gg-1(b); *see Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020). "In other words, the Act 'ensure[s] that anyone can buy insurance.'" *Me. Cmty. Health Options*, 590 U.S. at 301 (quoting *King*, 576 U.S. at 493).

Second, the ACA's "guaranteed renewability" provision mandates that "the issuer must renew or continue in force such coverage at the option of the plan sponsor or the individual." 42 U.S.C. § 300gg-2(a). This provision, too, is subject to statutory exceptions, including an exception for persons who have failed to pay premiums owed on their policy. *Id.* § 300gg-2(b)(1); *see also* *id.* §§ 300gg-12, 300gg-42.

Third, the ACA requires all QHPs to cover "essential health benefits" and limits cost-sharing (in the form of deductibles and co-pays) by enrollees for these essential health benefits. 42 U.S.C. § 300gg-6(a); *id.* § 18022(a)(2). The limitation on cost-sharing is adjusted each year by a "premium adjustment percentage," which is "the percentage (if any) by which the average per capita premium for health insurance coverage in the United States for the preceding calendar year . . . exceeds such average per capita premium for 2013," the year before the ACA's reforms to the individual health insurance market went into effect *Id.* § 18022(c)(1), (4).

4

Fourth, the ACA "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 479 (quoting 42 U.S.C. § 18031(b)(1)); *see also Me. Cmty. Health Options*, 590 U.S. at 301. The Act "gives each State the opportunity to establish its own Exchange, but provides that the Federal Government will establish the Exchange if the State does not." *King*, 576 U.S. at 479; *see also* 42 U.S.C. §§ 18031, 18041. The purpose of the Exchange is to serve as a "marketplace that allows people to compare and purchase" ACA-compliant plans.[7] *Id.*

Fifth, exchange plans are categorized into different "metal tiers"—bronze, silver, gold, and platinum—based on their "level of coverage." 42 U.S.C. § 18022(d) (setting the "level of coverage" for each of the plan types). For example, "silver plans," must have an actuarial value of 70%, meaning the plan is designed such that the issuer will pay around 70% of covered medical expenses, and the enrollee will pay the remaining 30% of expenses through out-of-pocket spending.[8] *Id.* Because actuarial predictions may be imprecise, the ACA specifies that the Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS, may "provide for a de minimis variation . . . to account for differences in actuarial estimates." *Id.* § 18022(d)(3).

Sixth, the ACA "seeks to make insurance more affordable by giving refundable tax credits to individuals[.]" *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits"

---

[7] As Plaintiffs describe, "[s]ome states have elected to create Exchanges themselves (state-based Exchanges or SBEs), as is the case in Maryland, while others have created Exchanges that operate on the federal Healthcare.gov platform (state-based Exchanges on the federal platform, or SBE-FPs), such as the Exchange that Illinois used in 2025 while it transitioned to an SBE. The Exchange in other states, including Ohio, is operated by the Centers for Medicare & Medicaid Services (CMS) (federally facilitated Exchange, or the FFE)." ECF 65-1, at 11 (citing CMS, Consumer Info. & Ins. Oversight, *State-Based Exchanges*, https://perma.cc/JFT3-6EAK).

[8] Bronze, gold, and platinum plans are designed to provide benefits that are actuarially equivalent to 60%, 80%, and 90%, respectively, of the full value of benefits under the plan. 42 U.S.C. § 18022(d)(1).

("PTCs") vary depending on an individual's income—individuals who earn more must pay more toward the cost of their monthly premium—but are generally pegged to the cost of the so-called "benchmark silver plan," or the second-lowest-cost silver plan offered within a market. *See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)–(C). The ACA initially made these tax credits available to individuals with incomes between 100% and 400% of the federal poverty level ("FPL"). 26 U.S.C. § 36B(c)(1)(A). However, during the COVID-19 pandemic, Congress—via the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ("ARPA")—temporarily increased the generosity of the ACA's premium subsidies and expanded subsidy eligibility to enrollees with household incomes above 400% of the FPL. The 2022 Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 ("IRA"), extended these enhanced subsides through 2025.

PTCs are claimed on an individual's tax return after the end of the year, and are paid by the Internal Revenue Service ("IRS"). 26 U.S.C. § 36B(h). Rather than an enrollee paying the entire insurance premium up front and then later claiming a credit toward that amount on the taxpayer's tax return, HHS—the federal agency that largely administers the ACA—may also make an advance payment of the premium tax credit amount directly to the enrollee's insurance provider. 42 U.S.C. §§ 18081, 18082. Such credits are known as advance premium tax credits ("APTCs"). "APTCs act as a subsidy for low-income individuals who could not afford to purchase insurance outright." *City of Columbus II*, 523 F. Supp. 3d at 741. CMS is responsible for determining whether individuals meet the statutory eligibility requirements for APTCs, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B). The amount of the APTC owed ultimately depends on the individual's income at the end of the year. Thus, individuals must file a federal tax return each year to "reconcile" the

6

APTCs they received with the PTC amount they qualify for based on their actual income during the applicable tax year. *See* 26 U.S.C. § 36B(f)(1).

"Each year, HHS promulgates rules pursuant to its rulemaking authority under the ACA and the Public Health Service Act ('PHS Act'). Such rules are the mechanisms by which HHS makes ongoing adjustments to the regulations and processes surrounding ACA insurance markets." *City of Columbus II*, 523 F. Supp. 3d at 741.

### B.    The Marketplace Integrity and Affordability Rule

On March 19, 2025, CMS issued a Notice of Proposed Rulemaking for a proposed rule that would implement "several regulatory actions aimed at strengthening the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." 90 Fed. Reg. 12,942 (Mar. 19, 2025). CMS explained that it "expect[ed] these actions would provide premium relief to families who do not qualify for [ACA] subsidies and reduce the burden of . . . [ACA] subsidy expenditures on the Federal taxpayer." *Id.* CMS received more than 26,000 comments on the proposed rule. After reviewing those comments and revising certain provisions of the proposed rule, HHS issued (and publicly released) the Rule on June 20, 2025, and it was published in the Federal Register on June 25. 90 Fed. Reg. 27,074.

As relevant here, the Rule implements policies concerning the effectuation of new Exchange coverage when a customer owes past-due premiums to an issuer, *id.* at 27,084–91; the requirement that recipients of APTCs file a federal tax return and reconcile those APTCs with the recipient's PTC amount, *id.* at 27,113–17; and the procedures HHS uses to annually redetermine Exchange enrollees' eligibility to receive APTCs, *id.* at 27,102–10. The Rule additionally makes changes to the procedures that HHS uses to verify enrollees' eligibility for APTCs, *id.* at 27,118–32; pauses an income-based special enrollment period ("SEP"), *id.* at 27,140–48; and amends

7

certain verification procedures that apply to SEPs, *id.* at 27,148–52. The Rule also updates the methodology used to calculate the "premium adjustment percentage," *id.* at 27,166–74, and makes adjustments to the allowable ranges of actuarial values applicable to the different plan types sold on Exchanges, *id.* at 27,174–78.

HHS explained in the Rule's preamble that, "[b]ased on [its] review of enrollment data and [its] experience fielding consumer complaints," it believes that the "temporary expansion of ACA premium subsidies" via the ARPA and the IRA "resulted in conditions that were exploited to improperly gain access to fully-subsidized coverage" on Exchanges. *Id.* at 27,074. More specifically, "the widespread availability" of fully subsidized plans—*i.e.*, plans with post-subsidy net premiums of $0—"created the incentive and opportunity for fraudulent and improper enrollments at scale," either by individual enrollees wanting no-cost Exchange coverage or by third-party brokers that collected commissions on improper enrollments made without customers' knowledge. *Id.* The Rule purports to "take[] a carefully curated set of temporary actions to immediately reduce the crisis-levels of improper enrollments over the short-term as the market readjusts to the new subsidy environment in which enhanced subsidies are no longer available." *Id.* The Rule also implements a number of "permanent reforms to help the markets reset to the changing subsidy environment to improve affordability and stability over the long-term." *Id.*

Plaintiffs contend that the Rule "contains a number of provisions that, in their individual and collective effect, would raise consumers' premiums for plans on the Exchanges, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers of last resort." ECF 65-1, at 13–14. According to Plaintiffs, the Rule "will lead to at least 1.8 million fewer people enrolling on the Exchanges." *Id.* at 14 (citing Young Decl. ¶ 4). Plaintiffs argue that the Rule "accomplishes this result through·

8

measures that erode the value of coverage obtained through the Exchanges, impose barriers designed to depress enrollment in the Exchanges, and impose further barriers limiting the availability of subsidized insurance even for those enrollees that do successfully enroll." *Id.*

The Rule was originally set to take effect on August 25, 2025, 90 Fed. Reg. 27,074, but many of its provisions would have applied to Exchange plans that would first become available in 2026, *see id.* at 27,178–79.

## C.     Procedural History

Plaintiffs are three city governments—the City of Columbus, Ohio; the Mayor and City Council of Baltimore, Maryland; and the City of Chicago, Illinois (collectively the "City Plaintiffs")—and two nonprofit organizations, Main Street Alliance ("MSA"), a "national network of small businesses," and Doctors for America ("DFA"), an advocacy organization consisting of "member physicians and medical trainees . . . in all 50 states." ECF 1, at 5–6 ¶¶ 8–12. Plaintiffs seek review of agency action under the APA, claiming that several of the Rule's provisions are contrary to law (Count I), and that those same provisions plus several others are arbitrary and capricious (Count II). *Id.* at 26 ¶¶ 74–82.

On July 2, 2025, Plaintiffs filed a motion for preliminary relief, in which they sought a stay of the August 25, 2025 effective date of the challenged Rule provisions under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. *See* ECF 11. The Court held a hearing on the Motion on August 14, 2025. *See* ECF 34 (Tr. of Hearing). On August 22, 2025, the Court issued a memorandum opinion and order granting in part and denying in part Plaintiffs' motion, construed as a motion for a stay under 5 U.S.C. § 705. *See* ECF 35 (memorandum opinion); ECF 36 (order). The Court's order stayed the effective dates of certain provisions of the Rule pursuant to 5 U.S.C. § 705 while this litigation remains pending. *See* ECF 38. Now the parties seek to resolve the litigation through cross-motions for summary judgment.

## II.    JURISDICTION

As an initial matter, the Court assures itself of jurisdiction. The proposition that an "interlocutory appeal does not divest the district court of jurisdiction to resolve the *merits* of a suit" has been described as an "unremarkable" one. *CASA, Inc. v. Trump*, 791 F. Supp. 3d 606, 612 (D. Md. 2025) (emphasis in original). Taking such a course is widely understood to comport with the *Griggs* principle, or the principle that "[a]n appeal, including an interlocutory appeal, 'divests the district court of its control over those aspects of the case involved in the appeal.'" *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)). Ordinarily, the Court would have no pause in concluding that its resolution of the pending motions accords with *Griggs*, especially considering that Defendants only challenge two of the Court's holdings as to Plaintiffs' likelihood of success on the merits in the interlocutory appeal. *See* USCA4 Case No. 25-2012, at ECF 28.

However, the issue of Plaintiffs' standing is also on appeal, which may present some question about this Court's jurisdiction to proceed with the merits given the concerns expressed by dissenters in the Supreme Court's relatively recent opinion in *Coinbase, Inc. v. Bielski*. In that case, which concerned the denial of a motion to compel arbitration, the dissent expressed concern that the majority's reasoning concluding that *Griggs* required an automatic stay of proceedings when such a motion is appealed could be extended to "any interlocutory appeal on a dispositive issue." *Coinbase, Inc.*, 599 U.S. at 760–61 (Jackson, J., dissenting, joined by Sotomayor & Kagan, JJ., in full & Thomas, J., in part). "How far *Coinbase* extends is an active subject in the federal appellate courts." *City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265, 269 (4th Cir. 2025). And the Fourth Circuit recently concluded that *Coinbase*'s logic encompasses appeals taken pursuant to the federal officer removal statute. *See id.* at 271.

10

Nevertheless, in *City of Martinsville*, the Fourth Circuit cautioned in a footnote that its decision should not be read to "imply that the *Griggs* principle will sweep broadly in other interlocutory appeals." *Id.* at 270 n.3. "Interlocutory appeals taken from collateral orders," the Fourth Circuit explained, "will ordinarily come with narrow automatic stays because a collateral order must, by definition, be 'completely separate from the merits of the action.'" *Id.* (quoting *Flanagan v. United States*, 465 U.S. 259, 265 (1984)). The Court concludes that it has jurisdiction to proceed with the merits here, in accordance with the well-recognized proposition that an interlocutory appeal of preliminary injunctive relief analogous to a § 705 stay does not deprive a Court of jurisdiction to proceed on the merits. Moreover, the parties filed a joint motion at the Fourth Circuit to enter a briefing schedule that ripens after this Court's resolution of the pending motions for summary judgment, which the Fourth Circuit granted, perhaps suggesting that the Fourth Circuit agrees (or at least is not alarmed by) a resolution on the merits in this Court while the appeal is pending. *See* USCA4 Case No. 25-2012, at ECF 36 (motion for extension), at ECF 37 (order granting motion to extend filing time and noting no further extensions will be granted).

But consistent with the *Griggs* principle, the Court will not address Defendants' renewed contention in their cross-motion for summary judgment that "Plaintiff Doctors for America [ ] does not have standing." ECF 68-1, at 13. That issue is an aspect of the case involved in the pending appeal. Should the Fourth Circuit have reason to conclude that this Court does not have jurisdiction to resolve the pending motions for summary judgment, the Court notes that it would have issued this opinion as an indicative ruling pursuant to Fed. R. Civ. P. 62.1 in order to facilitate the expeditious resolution of this case as the parties have requested. *Cf. CASA, Inc.*, 791 F. Supp. 3d at 614 (using an indicative ruling to indicate how the Court would decide a pending motion it could not rule on in light of a pending interlocutory appeal).

11

## III.    LEGAL STANDARD

### A.    Summary Judgment

Plaintiffs have brought their claims as an APA challenge. *See* ECF 1. "Because claims brought under the APA are adjudicated without a trial or discovery, on the basis of an existing administrative record, such claims are properly decided on summary judgment." *Audubon Naturalist Soc. of the Cent. Atl. States, Inc. v. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (citing *Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd*, 972 F.2d 338 (4th Cir. 1992)). "From this review, the Court must determine whether the plaintiff has demonstrated that the agency action should be set aside as arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Williams v. Roth*, Civ. No. 21-2135-PX, 2022 WL 4134316, at *6 (D. Md. Sept. 12, 2022) (citing 5 U.S.C. § 706(2)(A)). "[T]he ordinary summary judgment standard set forth in Rule 56 'does not apply because of the limited role of a court in reviewing the administrative record.'" *Am. Fed'n of Tchrs.*, 796 F. Supp. 3d at 89 (quoting *Deese v. Esper*, 483 F. Supp. 3d 290, 304 (D. Md. 2020)).

### B.    Review Under the APA

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Previously, "[w]hen a challenger assert[ed] that an agency action conflicts with the language of a statute, [the reviewing court] generally appl[ied] the two-step analytical framework set forth in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)." *City of Columbus II*, 523 F. Supp. 3d at 744. However, *Loper Bright* overturned *Chevron* and changed this Court's role in reviewing an administrative agency's interpretation of a statute. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Section 706 of the APA requires courts to decide "'all relevant questions of law' arising on review

12

of agency action." *Id.* at 392 (quoting 5 U.S.C. § 706). "A court may give weight to an agency's authoritative interpretation but ultimately must rule on matters of law." *Molina-Diaz v. Bondi*, 128 F.4th 568, 574–75 (4th Cir. 2025) (first citing *Loper Bright*, 603 U.S. at 2262; and then citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Loper Bright*, 603 U.S. at 400–01 ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do.").

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Agency action is generally considered arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## IV.   ANALYSIS

As noted above, Plaintiffs challenge several provisions of the Rule as either contrary to law, arbitrary and capricious, or both.[9] *See* ECF 1, at 26–29. Plaintiffs separate their challenges into three categories: challenges to provisions that erode the value of coverage, challenges to

---

[9] With respect to the motion to stay, "Plaintiffs initially challenged the revocation of the low-income SEP in their opening brief but abandoned that claim on Reply." *City of Columbus III*, 796 F. Supp. at 148. Plaintiffs do not advance or defend that challenge at summary judgment either, and thus the Court considers Plaintiffs to have abandoned the claim. *See, e.g., Tartaro-mcGowan v. Inova Home Health, LLC*, Civ. No. 121-298RDATCB, 2022 WL 2232190, at *3 (E.D. Va. June 21, 2022) ("Generally, a party abandons claims when she fails to defend them in opposition to a motion for summary judgment.") (collecting cases), *aff'd*, 91 F.4th 158 (4th Cir. 2024).

provisions that impose barriers on enrollment, and challenges to provisions that limit the availability of subsidized coverage. *See* ECF 65-1, at 14.

Plaintiffs' initial challenges raised in the "erosion of the value coverage" section of their brief seek relief from a provision imposing a monthly surcharge of $5 on enrollees to reconfirm eligibility, a provision revising the premium adjustment methodology, and a provision revising the actuarial value policy. *See id.* at 14–15. Plaintiffs' next three challenges are raised in the "barriers to enrollment" section and seek relief from a provision requiring enrollees to pay past-due premiums before receiving new coverage, a provision shortening the open enrollment period, and a provision adding verification requirements for SEP enrollments. *See id.* at 16–17. Plaintiffs' final challenges are included in the "limiting the availability of subsidized coverage" section and seek relief from a provision re-instituting a policy regarding failure-to-reconcile tax data and two provisions requiring heightened income verification when a person's projected annual income does not match IRS data or when tax data is unavailable. *See id.* at 17–18. The Court will address each challenge in turn.

## A.    Eligibility Redetermination / Imposition of a "Junk Fee"

As noted, a taxpayer is eligible for tax credits to cover the cost of premiums if he or she enrolls in coverage through the Exchange, falls within the specified income thresholds, and lacks an offer for other affordable health insurance. 26 U.S.C. § 36B(c)(1), (2). As Plaintiffs describe, "[t]he amount of the tax credit is determined by the taxpayer's income and the cost of a benchmark plan offered through the Exchange." ECF 65-1, at 28. Additionally, "[e]ligibility for, and the amount of, APTCs turn on the same statutory criteria." *Id.* (first citing 42 U.S.C. § 18081(a)(2); and then citing *id.* § 18082(a)(1)). The Rule provides that (1) if an enrollee does not submit an application for an updated APTC eligibility determination for plan year 2026 on or before the deadline to select Exchange coverage and (2) that enrollee's post-APTC premium will be zero

14

dollars (*i.e.*, the enrollee's coverage will be fully subsidized), then (3) the Exchange "must decrease the amount of" the APTC "applied to the [enrollee's] policy such that the remaining monthly premium owed for the policy equals $5." 90 Fed. Reg. at 13,031. Plaintiffs colorfully describe this requirement to reduce the value of the APTC by at least $5.00 a month as a "junk fee." ECF 65-1, at 28.

In response, Defendants argue that the fee is merely "a tool to facilitate HHS's ability to redetermine enrollees' eligibility to remain enrolled in fully subsidized Exchange plans." ECF 68-1, at 17. "The unusually high level of improper enrollment in fully subsidized Exchange coverage stemming from a soon-to-expire enhanced subsidy regime," Defendants argue, "presented the 'appropriate circumstances' for implementing this temporary nominal-premium procedure." *Id.* (first citing 90 Fed. Reg. at 27,103; and then quoting 42 U.S.C. § 18081(f)(1)(B)).

As the basis for the agency's authority, Defendants argue that the "ACA grants the HHS Secretary the authority to 'establish a program' for making these eligibility determinations and to 'establish procedures' for 'redetermin[ing] eligibility on a periodic basis in appropriate circumstances.'" *Id.* (alterations in original) (first quoting 42 U.S.C. § 18081(a)(1); and then quoting *id.* § 18081(f)(1)(B)). Plaintiffs acknowledge the agency's obligation to redetermine eligibility on a periodic basis in appropriate circumstances. *See* ECF 65-1, at 12, at 28–29. However, they argue that "CMS's authority under the statute is to determine *whether* the statutory criteria for APTC eligibility are met, not to *alter* those criteria." *Id.* at 29 (emphasis added) (citing *Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 975 (E.D. Va. 2005)). Plaintiffs contend that "[n]othing in section 18081 or the remainder of the Act grants CMS the 'authority to tinker with the premium cost structure outlined in 26 U.S.C. § 36B'" by reducing APTCs by $5

per month for applicants who automatically re-enroll in a plan that would otherwise be fully subsidized. *Id.*

Relying on 42 U.S.C. § 18081(a)(2), Defendants counter that "the ACA tasks HHS with 'determining' whether individuals enrolled in Exchange plans 'meet[] the income and coverage requirements' for claiming PTCs, as well as with determining 'the amount' of those tax credits." ECF 68-1, at 17 (quoting 42 U.S.C. § 18081(a)(2)). Defendants further argue that it is "likewise HHS's responsibility to determine an Exchange enrollee's eligibility for APTCs (which mirrors the applicable requirements for PTC eligibility) and to calculate the amount of those APTCs." *Id.* (first citing 42 U.S.C. § 18082(a)(1), (3); and then citing 45 C.F.R. § 155.305(f)(5)).

Importantly, however, 26 U.S.C. § 36B provides a formula for calculation of tax credits, which is determined by income and the cost of a benchmark plan offered through the Exchange. That statutory provision states:

> The premium assistance amount determined under this subsection with respect to any coverage month is the amount equal to the lesser of—
>
> (A) the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer and which were enrolled in through an Exchange established by the State under 1311 of the Patient Protection and Affordable Care Act, or
>
> (B) the excess (if any) of—
>
>> (i) the adjusted monthly premium for such month for the applicable second lowest cost silver plan with respect to the taxpayer, over
>> (ii) an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income for the taxable year.

26 U.S.C. § 36B(b)(2). The agency cannot utilize its general rulemaking authority to override explicit statutory provisions. *See Air All. Hous. v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[I]t is well established that an agency may not circumvent specific statutory limits on its actions

16

by relying on separate, general rulemaking authority."). As such, CMS lacks authority to tinker with the premium cost structure outlined in 26 U.S.C. § 36B.

Relatedly, CMS does not have the authority to change the statutory formula for APTCs under 42 U.S.C. § 18081(f)(1)(B). That section provides that the Secretary of HHS "shall establish procedures by which the Secretary or one of such other Federal officers . . . redetermines eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B). The Court finds that the relatively limited grant of authority to "redetermine[] eligibility" for APTCs under "appropriate circumstances" does not encompass broad power to adjust the amount of APTCs, which are set according to a statutory formula. *Id.*

According to Defendants, the purpose of that provision corresponds with the purpose of the $5 fee—to "facilitate HHS's ability to *redetermine* enrollees' *eligibility* to remain enrolled in fully subsidized Exchange plans." ECF 68-1, at 17 (emphasis in original). Defendants thus argue "the 'procedure[]' HHS opted for in the Rule is the application of a nominal premium that is designed to prompt certain enrollees to affirmatively reconfirm their eligibility." *Id.* (quoting 42 U.S.C. § 18081(f)(1)(B)). But "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Merely suggesting that the purpose of the provision comports with the agency's general rulemaking authority to "redetermine eligibility" does nothing to address Plaintiffs' argument that Defendants were not free to choose a procedure that changed the statutory formula. *See* ECF 65-1, at 28–29. Defendants' interpretation of its authority stretches the "redetermine eligibility" language beyond its plausible meaning and scope. *See Util. Air Regul. Grp.*, 573 U.S. at 328 ("Agencies are not free to 'adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness.'" (citation omitted)). In short, the

17

authority to verify eligibility does not infuse the agency with authority to re-write Congress's unambiguous statutory formulas.

The Court finds that HHS lacks the authority to impose a fee on plans that would otherwise be fully subsidized through APTCs via the formula prescribed by Congress. There are explicit formulas in the statutes for calculating APTCs, and Defendants do not have authority to re-write those formulas by reading broad authority into the limited statutory directive allowing HHS to "redetermine[] eligibility" for enrollment under "appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B). Additionally, the Court agrees that the "Treasury's obligation is to pay the amount that would be owed under the section 36B formula, not a different amount arbitrarily selected by CMS." ECF 65-1, at 29. In short, the Court concludes that the Rule's "junk fee" provision is contrary to law because applicants cannot be compelled to pay a fee that is untethered to the statutory formula.[10] Accordingly, Plaintiffs are entitled to summary judgment on their challenge against this provision.

### B.    Revised Premium Adjustment Percentage Methodology

The ACA directs the HHS Secretary to determine an annual "premium adjustment percentage" based on "the average per capita premium for health insurance coverage in the United States for the preceding calendar year." 42 U.S.C. § 18022(c)(4). This measure of premium growth is then used to set the rate of increase for a number of parameters defined in the ACA, such as the maximum annual limitation on cost sharing under Exchange plans. *See* 45 C.F.R. § 156.130(a). Because the IRS traditionally adopts the same premium growth indexing methodology as HHS, the methodology used to calculate the premium adjustment percentage also

---

[10] Because the Court finds that this provision of the Rule is contrary to law, the Court does not reach Plaintiffs' alternative argument that adopting the provision was arbitrary and capricious.

affects how PTC and APTC amounts are calculated and, by extension, the cost of health care coverage on Exchanges. *See* 90 Fed. Reg. at 27,171.

HHS presently only considers premiums for *employer*-sponsored coverage in the premium adjustment percentage calculation, not insurance purchased by *individuals* on the marketplace. The Rule, however, incorporates individual insurance market data into this measure. *Id.* at 27,169. Section 1302(c)(4) of the ACA and § 156.130(e) provide that the premium adjustment percentage is the percentage (if any) by which the average per capita premium for health insurance coverage for the preceding calendar year exceeds such average per capita premium for health insurance for 2013. *Id.* at 27,166. In response to the proposed rule, commenters expressed concern that "individual market premiums should not be used to measure premium growth since 2013 because premiums in the early years of ACA were volatile[.]" *Id.* at 27,173.

Plaintiffs contend that "[a]s a result" of the Rule's incorporation of individual plan prices into the premium growth indexing methodology, "the maximum out-of-pocket limit in 2026 will be about $450 higher for an individual and $900 higher for a family than it otherwise would have been." ECF 65-1, at 33 (citing 90 Fed. Reg. at 27,206). According to Plaintiffs, "[t]his will lead to about a 4.5% increase in premiums across the board and 80,000 fewer enrollments in the Exchanges under CMS's own estimates, running the risk of a spiral of a worsening risk pool and increased premiums, as well as higher volumes of uninsured patients being seen by health centers." *Id.* (internal quotation marks and citations omitted).

### 1.    Contrary to Law

Plaintiffs now argue that the revised premium adjustment percentage methodology is contrary to law and emphasize that "[t]he statute requires the agency to compare the most recent 'average per capita premium for health insurance coverage' with 'such average per capita premium for 2013,' the year before the Act's reforms to the individual health insurance market went into

19

effect." *Id.* at 33 (quoting 42 U.S.C. § 18022(c)(4)). "By using the term 'such,'" Plaintiffs argue that "Congress directed the agency to compare average premiums in the two years for the 'same,' or 'equivalent,' coverage." *Id.* at 33–34 (citing *King*, 576 U.S. at 487). "But premiums on the individual market in 2013 were not premiums for policies that met the Act's standards for 'health insurance coverage,'" say Plaintiffs. *Id.* at 34 (first citing 42 U.S.C. §§ 300gg-91(b), 18021(b)(2); and then citing 42 U.S.C. § 300gg et seq.). "So any measurements of premiums for individual policies in 2013 wouldn't capture the cost of 'health insurance coverage,' as the Affordable Care Act uses that phrase." *Id.*

Defendants respond that Plaintiffs' "argument places far more weight on the word 'such' than it can bear." ECF 68-1, at 21. According to Defendants, "[h]ad Congress wished to constrain the agency in the highly specific manner that Plaintiffs suggest"—i.e., "to include the group market only"—"it could easily have been more specific." *Id.* at 21–22. In addition to arguing that the plain text of the statute does not naturally accommodate Plaintiffs' reading, Defendants contend that "Plaintiffs' argument relies on an incorrect premise that demands an impossibly pristine market comparison from 2013" when both "individual and small group markets" were "restricted to calculate premium costs based only on certain factors." *Id.* at 22 (citing 45 C.F.R. § 147.102).

The Court begins and ends with the text of the ACA. The provision at issue, 42 U.S.C. § 18022(c)(4), provides:

> For purposes of paragraph (1)(B)(i), the premium adjustment percentage for any calendar year is the percentage (if any) by which the average per capita premium for health insurance coverage in the United States for the preceding calendar year (as estimated by the Secretary no later than October 1 of such preceding calendar year) exceeds such average per capita premium for 2013 (as determined by the Secretary).

42 U.S.C. § 18022(c)(4). The ACA defines "health insurance coverage" to mean "benefits consisting of medical care (provided directly, through insurance or reimbursement, or otherwise

20

and including items and services paid for as medical care) under any hospital or medical service policy or certificate, hospital or medical service plan contract, or health maintenance organization contract offered by a health insurance issuer." 42 U.S.C. § 300gg-91(b)(1); *see also id.* § 18021(b)(2). Plaintiffs read this definition together with the other provisions of the ACA "setting standards, as of 2014, for health insurance coverage in the individual market" to give meaning to the phrase "health insurance coverage" as it is used in § 18022(c)(4). ECF 65-1, at 34 (citing 42 U.S.C. § 300gg et seq.).

The Court observes that the term "health insurance coverage" only appears in the first half of (c)(4), relating to the "average per capita premium . . . for the preceding calendar year"; it is not used to describe the "average per capita premium for 2013." 42 U.S.C. § 18022(c)(4). Moreover, the provision expressly grants the Secretary the authority to "determine[]" the "average per capita premium for 2013." *Id.* ("as determined by the Secretary"). By way of contrast, the first half of the provision permits the Secretary to "estimate[]" the "average per capita premium for health insurance coverage in the United States for the preceding calendar year." *Id.* Defendants argue that there is a meaningful difference between estimation and determination, in that "[a]n estimate of a value is implicitly constrained by metrics and formulas, whereas determination of a value is not." ECF 68-1, at 23. Where a statute "has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) (quoting A. Scalia & B. Garner, Reading Law 170 (2012)). However, it is not clear to the Court whether "estimated" and "determined" in this context are materially different, and Defendants do not cite a source for defining either term in support of their reading.

21

More useful to the Court is the use of the word "such" in the provision. Within (c)(4), Congress used "such" twice—once to refer back to the preceding calendar year ("such preceding calendar year") and once to refer back to the average per capita premium ("such average per capita premium"). 42 U.S.C. § 18022(c)(4). Plaintiffs suggest that "such" means the same kind or degree already described. *See* ECF 70, at 8; *Culbertson v. Berryhill*, 586 U.S. 53, 59 (2019) ("Both at the time of enactment and today, the adjective 'such' means '[o]f the kind or degree already described or implied.'" (alteration in original) (first quoting H. Fowler & F. Fowler, Concise Oxford Dictionary of Current English 1289 (5th ed. 1964); and then citing Black's Law Dictionary 1661 (10th ed. 2014))). In the first usage in this subsection, the Court observes that Congress has used "such" to effectively mean "the same as stated prior." In other words, the Secretary must estimate "the average per capita premium for health insurance coverage in the United States for the preceding calendar year [ ] as estimated by the Secretary no later than October 1 of [the same] preceding year." 42 U.S.C. § 18022(c)(4) (alteration added).

The second clause, however, resists that precise meaning for "such," because the "average per capita premium for 2013" will (of course) not necessarily be "the same" as that of the average for the year of comparison. But the *kind* of average taken can be made identical to the calculation described prior. In other words, the Secretary must determine the average per capita premium of the kind described—i.e., "for health insurance coverage"—but "for 2013." *Id.* (alteration added). The question the Court must answer, then, is whether the meaning of "health insurance coverage" is coverage that comports with the "standards, as of 2014, for health insurance coverage in the individual market" set by the ACA, *see* ECF 65-1, at 34, or whether such coverage must simply meet the definition provided for in § 300gg-91(b). The text of the statute compels the latter reading, even if the former may be of sounder policy.

As discussed, the ACA defines "health insurance coverage" to mean "benefits consisting of medical care (provided directly, through insurance or reimbursement, or otherwise and including items and services paid for as medical care) under any hospital or medical service policy or certificate, hospital or medical service plan contract, or health maintenance organization contract offered by a health insurance issuer." 42 U.S.C. § 300gg-91(b)(1). That definition alone does not include a requirement that the benefits provided comply with the other standards established by the ACA. Plaintiffs urge the Court to read the definition of "health insurance coverage" in connection with the other provisions of the ACA that set standards for such coverage, *see* ECF 65-1, at 34, so that § 18022(c)(4) must be read to involve an average per capita premium of "health insurance coverage" *that comports with the ACA* "for 2013," *see* 42 U.S.C. § 18022(c)(4). But to do so would require the Court to effectively add words to §§ 300gg-91(b)(1) or 18022(c)(4), which ordinary principles of statutory interpretation counsel against. *See Stockley v. United States*, 260 U.S. 532, 540 (1923) ("We are not at liberty to add to or take from the language of the statute.").

Plaintiffs are likely correct that "the coverage available on the individual market in 2013 'differ[ed] in [a] meaningful way,' from the coverage available on that market now." ECF 70, at 6–7 (alterations in original) (quoting *King*, 576 U.S. at 487). But the Court finds no statutory authority to compel the agency to use a particular formulation in its determination of the "average per capita premium for 2013" under § 18022(c)(4).

### 2.    Arbitrary and Capricious

Plaintiffs also argue that the revised premium adjustment percentage methodology was arbitrary. *See* ECF 65-1, at 34. "CMS acknowledged that its choice ran contrary to the Act's goals, but it brushed this concern aside, reasoning that it didn't need to take these issues into account when it exercised its discretion under section 18022(c)(4) to adopt an 'appropriate'

23

methodology." *Id.* at 34 (first citing 90 Fed. Reg. at 27,172; and then citing 90 Fed. Reg. 12,942, 12,990 (Mar. 19, 2025)).

Defendants do not dispute that the new Rule will affect the cost of Exchange plans. *See* ECF 68-1, at 23 ("HHS acknowledges that the new methodology will increase the maximum annual limitation on cost sharing and net premiums for enrollees with incomes under 400 percent of the FPL, which could in turn negatively impact the cost of Exchange coverage and enrollment." (citing 90 Fed. Reg. at 27,171, at 27,206–07)). However, Defendants maintain that "any such impact would be a consequence of Congress's decision to tie the value of certain forms of financial assistance under the ACA to the premium adjustment percentage." *Id.* at 24 (emphasis in original). Defendants argue that "HHS therefore concluded—and reasonably so—that a premium adjustment percentage methodology that considers 'all private health insurance premiums' is 'more consistent with' that congressional intent and the ACA's text." *Id.* (quoting 90 Fed. Reg. at 27,172). In the Rule, CMS explained that "[b]ecause the role of the premium adjustment percentage is to appropriately index various parameters defined in the ACA, the primary consideration for setting the value of the premium adjustment percentage should be whether it accurately and comprehensively captures the rate of premium growth in the United States rather than the impact of the indexing methodology on net premiums, enrollment, access to health care, health outcomes, or out-of-pocket costs for those who receive non-covered or out-of-network care." 90 Fed. Reg. at 27,172. According to the agency, "[c]onsidering these other impacts when setting the premium adjustment percentage may result in a measure of premium growth that does not accurately reflect actual premium growth in the United States, artificially inflating the generosity of provisions of the ACA beyond the intent of Congress." *Id.*

24

That the agency changed its view on how to set the premium adjustment percentage does not mean its position was not substantially justified. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). "We defer to the agency's new position no less than the old, so long as we are satisfied that the agency's change in position was intentional and considered." *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 290 (4th Cir. 2013).

Here, the agency's change in position was not arbitrary and capricious because it provided the necessary reasoned explanation for the change. In the Rule, HHS clarified that premiums from the individual market were previously excluded because they were "most affected by the significant changes in benefit design and market composition in the early years of implementation of the ACA market rules and were most likely to be subject to risk premium pricing," and later, in 2022, the agency "anticipated that these premiums would be more volatile in response to the COVID-19 PHE than employer-sponsored premiums." 90 Fed. Reg. at 27,173. However, the agency reasoned that "the ACA is now past the initial years of implementation and issuers have had the opportunity to collect data on the risk composition of the individual market and adjust pricing accordingly . . . [a]dditionally . . . premiums in the employer-sponsored market increased more rapidly than premiums in the individual market during the COVID-19 PHE, the impact of which has led to a decreasing gap in premium growth between the individual market and employer-sponsored market." *Id.* In light of those findings, the agency determined that "a comprehensive

measure incorporating both individual market and employer-sponsored premiums will more accurately reflect true premium growth going forward." *Id.*

While Plaintiffs argue that the agency "disregarded commenters who noted that the new measure would be less accurate if it included the volatility of the individual insurance market in the early years of the ACA's implementation," ECF 65-1, at 34, the Rule reflects that the agency explicitly responded to this concern by commenters:

> We acknowledge that the premium adjustment percentage is a cumulative measure and, as such, the market fluctuations in the early years of ACA implementation are included in the calculation when using private health insurance premiums (excluding Medigap and property and casualty insurance) as the data source for indexing. However, because it is a cumulative measure, the impact of these early years decreases as more time elapses between the applicable plan year and the benchmark year (2013). For example, for PY 2018, PY 2014 was 1 of 4 years of growth included in the premium adjustment percentage measure and therefore the weight of PY 2014 premium growth was approximately one quarter of the overall measure. For PY 2026, PY 2014 is 1 of 12 years of growth included in the measure. Therefore, for PY 2026, the weight of PY 2014 is only one twelfth of the overall measure. As such, the greater time between the benchmark year and the applicable plan year reduces the impacts of any individual year, even if the premium growth in that year is unusual.

90 Fed. Reg. at 27,173. HHS both explained the reasoning behind the policy change and addressed commenters' concerns that the new methodology would lead to less accurate measures of premium growth. While this policy change will undoubtedly have effects on the broader insurance market, including, as HHS concedes, an increase in premiums and a worsening risk pool, the Court is constrained to conclude that HHS did not act without explanation or rationale in making this decision. In fact, the agency took these negative effects into account when responding to comments in the final Rule, but ultimately concluded that the new methodology was more closely aligned with Congressional intent and the text of the ACA, and therefore should nonetheless be adopted despite its likely impact on premiums and enrollment. *See id.* at 27,172 (acknowledging

commenters' concern that healthy enrollees "may be less likely to enroll due to the higher net premiums that result from the change in the premium adjustment methodology" but ultimately finding "consideration of the impact of this proposal on the risk pool to be outside the scope of the indexing provisions of the ACA because the purpose of the premium adjustment percentage is to accurately index program parameters against the growth in premiums, not to control the growth of those premiums").

"The role of courts is not to assess whether executive decisions are wise." *Am. Fed'n of Tchrs.*, 796 F. Supp. 3d at 81 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 35 (2020)). As such, the Court is satisfied that "such a change in course was made as a genuine exercise of the agency's judgment." *Philip Morris*, 736 F.3d at 290; *see also City of Columbus II*, 523 F. Supp. 3d at 758 ("The court may not supplant the agency's view that the new policy is better than the old one simply because Plaintiffs prefer the old policy.").[11] Consequently, the Court concludes that the provision was not arbitrary and capricious, and that Defendants are entitled to summary judgment as to this provision.

## C.    Actuarial Value Policy

Under the ACA, health insurance plans offered on Exchanges must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute. 42 U.S.C. § 18022(a). A plan's "level of coverage," or actuarial value, reflects the estimated average percentage of covered health care expenses that will be paid by the insurance plan. For example, under a plan with an actuarial value of 80%, the insurer will pay, on average, 80% of covered

---

[11] In light of the Court's finding on this point, the Court is unconvinced that Plaintiffs' argument that the agency had an "unalterably closed mind" during rulemaking could provide an independent basis for relief on this claim. ECF 65-1, at 35. The examples put forth by Plaintiffs, *see id.* at 35–36, are insufficient to show that Defendants were "unwilling or unable to rationally consider arguments." *Mississippi Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 183 (D.C. Cir. 2015) (quotation marks and citations omitted).

27

medical expenses, and the enrollee will pay the remaining 20% of expenses through a combination of deductibles, coinsurance, co-payments, and maximum out-of-pocket limits. Consequently, the higher a plan's actuarial value, the lower an enrollee's out-of-pocket costs, on average. Plans that have a higher actuarial value also have higher premiums.

The statute instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). As relevant here, current regulations provide that the "allowable variation" in the actuarial value of silver, gold, and platinum plans is two percentage points above and below their respective benchmark actuarial values (i.e., +2/-2 percentage points). 45 C.F.R. § 156.140(c)(2). The Rule will change this range to +2/-4 percentage points. See 90 Fed. Reg. at 27,174. And for bronze plans, current regulations allow for a +5/-2 percentage point range, which the Rule will change to +5/-4 percentage points. Id.

Plaintiffs explain that "[t]he formula for PTCs turns on the cost of the second-lowest-cost silver plans available on the Exchange." ECF 65-1, at 36 (citing 26 U.S.C. § 36B(b)(2)(B)(i)–(ii)). Thus, "[b]y permitting insurers to sell cheaper, but less comprehensive, silver plans, CMS will therefore decrease the value of the tax credits for all enrollees, leading to a reduction in PTCs by $1.22 billion overall for 2026 alone, by CMS's own calculation." Id. (citing 90 Fed. Reg. at 27,208). Plaintiffs argue that "[t]he rule does not even attempt to justify the new policy as an effort to account for differences in actuarial estimates." Id. at 37–38 (citation omitted). Defendants counter that "CMS [ ] made the reasoned judgment that such 'short-term' concerns about how wider ranges would affect subsidized enrollees should not necessarily take priority over the longer-term prospect of plans with lower premiums and competitive cost-sharing structures drawing

28

unsubsidized consumers to Exchanges, 'potentially improv[ing] the risk pool as coverage becomes more affordable for generally healthy people who currently may opt to forgo coverage altogether.'" ECF 68-1, at 28 (quoting 90 Fed. Reg. at 27,175).

Generally, "an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club*, 899 F.3d at 293 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). So too, here, as the agency was constrained to rely only "on factors which Congress has [] intended it to consider" when exercising its authority under the statute. *Sierra Club*, 899 F.3d at 293. Here, as Plaintiffs point out, "[t]he purpose of the standard is set forth in section 18022(d)(3) itself and the only permissible 'de minimis' variations are those that account for uncertainties in 'differences in actuarial estimates,' not variations to reflect a new Administration's policy preference for less generous subsidies." ECF 65-1, at 37 (citation omitted).

Moreover, the agency was obligated to establish a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The Rule reflects that HHS believed "lower AVs would lead to lower premiums, and in turn potentially improve the risk pool as coverage becomes more affordable for generally healthy people who currently may opt to forgo coverage altogether." 90 Fed. Reg. at 27,175. HHS acknowledged that "although this may mean that those eligible for APTCs receive less money in tax credits, [the agency] believe[s] that in the long term there would be a sufficient choice of affordable plans." *Id.* Similarly, in response to commenters' concerns that the provision would "lead to increased out-of-pocket consumer costs

29

as plan cost-sharing generosity decreases and higher overall premiums for some consumers given a potential impact on the generosity of the SLCSP, the benchmark plan used to determine an individual's PTC," *id.* at 27,176, the agency merely stated that the "change is essential to restoring greater balance between access and affordability in the long term," and "the overall benefits to the risk pool as a result of this change will better incentivize unsubsidized enrollees to enroll in coverage, which we expect to lower overall costs and further drive down premiums as the risk pool improves," *id.* at 27,176–77.

This reasoning is conclusory and unsupported by evidence. Defendants cannot merely label something a "short-term" trade-off to avoid engaging with data and justifying the change during the rulemaking process. *See* ECF 68-1, at 28. There is no data to back up the claim and reasoning that coverage would become "more affordable" over time, which is understandable considering that *even CMS itself* estimates that the policy change widening the de minims range will reduce aggregate PTCs by $1.2 billion in 2026. *See* 90 Fed. Reg. at 27,208. And, as Plaintiffs note, data shows that "[a] typical family of four would see their subsidies decrease, and their cost of coverage rise, by up to $714 for the year." ECF 65-1, at 36 (citing Ctr. for Budget & Policy Priorities comment at 34–35 (Apr. 11, 2025), https://perma.cc/KP9W-J63N, *also available at* ECF 65-2, at 185–86). Plaintiffs argue, and the Court agrees, that the relationship between subsidies and the strength of the risk pool is well established by empirical research, but CMS simply stated that it 'expect[ed]' its rule to have the opposite effect, without citing any evidence to support this subjective belief or engaging with the record." *Id.* at 37 (quoting 90 Fed. Reg. at 27,107). Such "nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). Thus, the Court finds that Defendants provided an insufficient and conclusory rationale for altering

the de minims variation, and that the agency acted in an arbitrary and capricious manner.[12] Plaintiffs are thus entitled to summary judgment on their challenge of this provision.

### D.   Revocation of Guaranteed-Issue / Past Due Premium

The next challenged provision will allow issuers to require a customer to pay (1) any past-due premiums the customer owes the issuer (or related issuers) for prior coverage *and* (2) the initial premium amount (also known as a "binder payment") required for new coverage before the latter coverage is effectuated. *See* 90 Fed. Reg. at 27,084, at 27,220. If the customer fails to pay that combined amount in full, the issuer can decline to effectuate the new coverage. *Id.* at 27,084.

Defendants argue that "an issuer's provision of coverage is of course contingent on the enrollee's payment of premiums." ECF 68-1, at 31 (citing 42 U.S.C. § 300gg-2(b)(1) (providing that an issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums")). Defendants also cite 45 C.F.R. § 155.400(e) in support of their argument, which provides that federally facilitated Exchanges and State-based Exchanges on the federal platform "will[] require payment of a binder payment" equivalent to "the first month's premium" to "effectuate an enrollment" in an Exchange plan. *Id.* According to Defendants, "[t]he Rule simply allows an issuer who is owed past-due premiums from a particular customer to credit any payments made by that customer for new coverage to the past-due balance before crediting any payments to the initial premium amount for the new coverage." *Id.* at 31–32. In doing so, "if, because of such an allocation policy, the consumer still has an outstanding balance on the initial premium amount, then the issuer can decline to effectuate the new policy for failure to pay the requisite initial premium." *Id.* at 32 (citations omitted). Plaintiffs maintain that the agency "was

---

[12] However, the Court is likewise unconvinced by Plaintiffs' argument that the agency had an "unalterably closed mind" during rulemaking with respect to this provision. ECF 65-1, at 38; *see supra* note 11.

not free to rewrite the text of Section 300gg-1(a) to carve out a new exception to the statute's categorical [guaranteed-issue] rule." ECF 65-1, at 39.

The ACA's guaranteed-issue requirement provides that "each health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept *every* employer and individual in the State that applies for such coverage," subject only to specified exceptions. 42 U.S.C. § 300gg-1(a) (emphasis added). Defendants invoke separate statutory provisions that relate to renewability and termination of coverage, rather than issuance, to justify the new past-due premium policy. *See* 42 U.S.C. § 300gg-2(b)(1).

The Court finds no authority in the text of the statute for the agency's decision to "credit any payments made by that customer for new coverage to the past-due balance before crediting any payments to the initial premium amount for the new coverage." ECF 68-1, at 32. As CMS itself has long understood, an exception for past-due premiums is not one of the Act's enumerated exceptions to the guaranteed-issue requirement. *See* 77 Fed. Reg. 70,584, 70,599 (Nov. 26, 2012); *see also* ECF 65-1, at 38–39. Plaintiffs clarify that "[t]here is such an exception for past-due premiums in the Act's parallel provision that guarantees the *renewability* of policies." ECF 65-1, at 39 (emphasis added) (citing 42 U.S.C. § 300gg-2(b)(1)). This demonstrates "Congress's understanding that an outstanding debt could prevent an enrollee from maintaining the policy he or she currently has, but that the debt wouldn't lock the enrollee out of the market altogether." *Id.* (citations omitted). Had Congress wanted to condition issuance of a new policy on payment of past premiums, it clearly knew how to do so expressly. *See* 42 U.S.C. § 300gg-2(b)(1) (providing that an issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums"). In the absence of an enumerated exception to the guaranteed-issue requirement, the agency "has no power to tailor legislation to bureaucratic policy goals by

32

rewriting unambiguous statutory terms." *Util. Air Regul. Grp.*, 573 U.S. at 325 (internal quotation marks omitted); *see also TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent" (cleaned up)); *Polselli v. IRS*, 598 U.S. 432, 439 (2023) ("We assume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another section of the same Act." (internal quotation marks and citations omitted)).

According to Defendants, the Rule's past-due premium policy will "help to promote continuous coverage, reduce gaming and adverse selection,[13] ensure that ACA subsidies are targeted to those who are eligible, and allow issuers to more accurately predict costs and prices." ECF 68-1, at 30 (quoting 90 Fed. Reg. at 27,084). Regardless of the merits of those arguments, they are best directed to Congress, as it is only Congress who can add enumerated exceptions to the guaranteed-issue requirement. *See Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*, 153 F.3d 155, 161 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) ("[N]either federal agencies nor the courts can substitute their policy judgments for those of Congress."). The Court is bound by the plain text of the statute in its current form, which contains a guaranteed-issue requirement, subject only to specific, enumerated exceptions. The exceptions do not include a provision permitting insurers to deny issuance of coverage based on failure to pay a past-due premium.

---

[13] The risk of "adverse selection" that Defendants refer to in the insurance context is "a situation where individuals with higher risk are more likely to select coverage than healthy individuals[.]" 90 Fed. Reg. at 27,075.

Accordingly, the Court concludes that the provision is contrary to law and will award summary judgment to Plaintiffs as to that provision.[14]

### E.    SEP Eligibility Verification Requirements

The ACA requires Exchanges to provide for SEPs during which qualifying individuals may enroll for coverage in between the annual open enrollment periods. 42 U.S.C. § 18031(c)(6)(C). Under current regulations, federally facilitated Exchanges are required to conduct pre-enrollment eligibility verification only for applicants seeking to enroll in an Exchange plan under the loss-of-minimum-essential-coverage SEP; they are not permitted to conduct such pre-enrollment eligibility verification in conjunction with any other category of SEP. *See* 45 C.F.R. § 155.420(g). Under the Rule, federally facilitated Exchanges will instead be required to conduct pre-enrollment eligibility verification for other categories of SEPs as well (permanent move, marriage, etc.), which is consistent with the eligibility verification policy that was in place between 2017 and 2022. *See* 90 Fed. Reg. at 27,148–49. The Rule further requires those federal Exchanges to conduct pre-enrollment eligibility verification "for at least 75 percent of new enrollments through SEPs." *Id.* at 27,148, at 27,223. The Rule is time-limited and will sunset at the end of 2026, and the eligibility verification requirements do not apply to State Exchanges.[15] *Id.* at 27,151.

Plaintiffs maintain that "[t]his rule will generate 293,000 verification issues to resolve in the coming year, resulting in a further barrier to coverage, through additional paperwork and administrative burdens, and costing consumers more than $7 million in 2026." ECF 65-1, at 43

---

[14] Because the Court finds that this provision of the Rule is contrary to law, the Court does not reach Plaintiffs' alternative argument that adopting the provision was arbitrary and capricious.

[15] States are given the "option" to conduct pre-enrollment eligibility verification for SEP enrollment, but they are not required to do so, a policy unchanged by the Rule. *See* 90 Fed. Reg. at 27,151 ("[T]he program integrity issues are largely concentrated in Exchanges utilizing the Federal platform.").

(citing 90 Fed. Reg. at 27,186). According to Plaintiffs, "[y]ounger and healthier people are more likely to drop coverage as a result, leading to a worsening of the risk pool, as CMS itself realized the last time it considered (and rejected) a similar policy." *Id.* (citations omitted). Plaintiffs argue that Defendants failed to provide "an adequate explanation for why the agency acted at all," and that there was a "fundamental mismatch between this rule and the problem that CMS claims it is trying to solve." *Id.* at 44, 47. Specifically, "CMS attempted to justify this policy as a response to the problem of improper enrollments by brokers," but according to Plaintiffs, "the agency fundamentally misconceived the scope of that problem and ignored the success of recent efforts to address broker misconduct." *Id.* at 44.

Defendants respond that "because of their limited scope, the regulations 'do not provide enough protection against misuse and abuse' of SEPs, which enables otherwise ineligible individuals to enroll in Exchange plans 'only after they become sick or . . . need expensive health care services,' which in turn 'negatively impacts both the risk pool and program integrity around determining eligibility for' APTCs and other subsidies." ECF 68-1, at 35–36 (quoting 90 Fed. Reg. at 27,148). According to the Rule, requiring pre-enrollment eligibility verification for all SEP categories "improves the risk pool by restricting people from gaming SEPs to wait to enroll until they need health care services."[16] 90 Fed. Reg. at 27,150. Additionally, CMS reasons that "pre-enrollment verification for SEPs strengthens program integrity by denying ineligible enrollments and discouraging ineligible enrollees who know they cannot meet verification

---

[16] CMS suggested that pre-enrollment verification requirements that previously applied to SEPs did not create substantial barriers to Exchange enrollment, and that such requirements had the effect of "encourag[ing] continuous enrollment by making it more difficult to engage in strategic enrollment and disenrollment" based on customers' changing health status. 90 Fed. Reg. at 27,149.

standards from attempting to enroll which, in turn, reduces Federal subsidies to ineligible consumers who would otherwise enroll and receive APTC and CSR subsidies." *Id.*

While an agency "is not required to choose the best solution, only a reasonable one," *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007), it is required to "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made," *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021). Importantly, courts are not free to "ignore the disconnect between the decision made and the explanation given." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.*

Here, the Court finds that the agency's chosen solution is unmoored from the problem it seeks to address. The provision purports to address "urgent program integrity concerns," 90 Fed. Reg. at 27,151, and alleged "gaming" of SEPs through enrollees waiting until they are sick to enroll in coverage, *id.* at 27,150, in an effort to "discourag[e] ineligible enrollees who know they cannot meet verification standards from attempting to enroll," *id.* But Defendants have offered no current data, reports, or evidence establishing that any "misuse and abuse" of SEPs, 90 Fed Reg. at 27,148, stems from SEP enrollment *in particular*. In the Rule, the agency cites to a "GAO undercover testing study of SEPs" from 2016, which found that "9 of 12 of GAO's fictitious applicants were approved for coverage on the Federal and selected State Exchanges." *Id.* But as noted, that study was from 2016, and the parties have not identified, nor can the Court locate, any evidence in the Rule to corroborate Defendants' conclusory assertion that abuse of SEPs is *currently* contributing to the "program integrity concerns" the agency seeks to address through this

36

provision. Accordingly, it remains merely a theory that the "temporary policy will help stabilize the marketplace in [Plan Year] 2026 as the subsidy environment normalizes and the high levels of improper enrollments are reduced before reverting back in PY 2027." 90 Fed. Reg. at 27,152. Further, the agency's conclusion that "the additional burden [on enrollees] is not significant enough to outweigh the merits of SEP verification and the increases in program integrity that it provides," *id.* at 27,151, is insufficient to address the very real concern raised by numerous commenters that the Rule change will improperly hinder the enrollment of eligible individuals.[17] Defendants similarly fail to articulate how an audit of 75% of new enrollments will curb the alleged problem. And they offer no new evidence or reasons at this stage of litigation. *See* ECF 68-1, at 36–37.

After reviewing the record, the Court finds that Plaintiffs' disagreement with CMS is more than a mere policy debate on the merits of the provision. Plaintiffs have established that Defendants' rationale was not indicative of reasoned decision-making. In short, the hypothesis that such "gaming" and "abuse" of subsidized coverage stems from enrollees and brokers fabricating events triggering SEPs is without support. *See Dep't of Com.*, 588 U.S. at 783 (remanding rule to agency where the record "reveal[ed] a significant mismatch between the decision the Secretary made and the rationale he provided"). The Court agrees with Plaintiffs' principal argument that "CMS acted arbitrarily in imposing these new burdens for 2026." ECF

---

[17] Indeed, one commenter noted that "a study published by the American Economic Association found that adding one single additional step to the enrollment process prompted a 33 percent decline in enrollment, predominantly among young, healthy, and economically disadvantaged people." *See* Ctr. for Budget & Policy Priorities comment at 29 (Apr. 11, 2025), https://perma.cc/KP9W-J63N (citing Mark Shepard & Myles Wagner, *Do Ordeals Work for Selection Markets? Evidence from Health Insurance Auto-Enrollment*, 115 Am. Econ. Rev. 772 (2025), doi: 10.1257/aer.20231133), *also available at* ECF 65-2, at 180.

37

65-1, at 44. As such, the Court finds that instituting SEP pre-enrollment verification procedures was arbitrary and capricious, and will enter judgment in favor of Plaintiffs as to that provision.

### F.    Shortened Open Enrollment Period

Under the ACA, the Secretary must require Exchanges to provide for "an initial open enrollment, as determined by the Secretary," "annual open enrollment periods, as determined by the Secretary for calendar years after the initial enrollment period," and "special enrollment periods specified in section 9801 of title 26 and other special enrollment periods" under certain circumstances. 42 U.S.C. § 18031(c)(6). Under the current policy, the open enrollment period for the Exchanges begins on November 1 and ends (at the earliest) on January 15. *See* 45 C.F.R. § 155.410(e); ECF 65-1, at 16. Starting in 2027, however, the Rule will require Exchanges to hold an open enrollment period that begins no later than November 1, and ends no later than December 31, a 60-day period in total. *See* 90 Fed. Reg. at 27,135–40. The Rule would thus rescind the extended open enrollment period which was in effect over the last four years in favor of a shorter one.

Plaintiffs argue that in attempting to enact such a Rule, "CMS ignored a wealth of evidence showing that January enrollments have been beneficial both for enrollees and for the financial health of the Exchanges." ECF 65-1, at 41. According to Plaintiffs, "CMS opined that it needed to balance the need to allow sufficient time for consumers to enroll in the Exchanges against the possibility that a longer open enrollment period would create a risk of adverse selection," but "such a trade-off is entirely illusory." *Id.* Plaintiffs assert that "[a]ll . . . available evidence from the state-based Exchanges shows that January enrollees are younger and healthier, and that their enrollments accordingly lower premiums overall." *Id.* (citations omitted). Although "[d]ata from the federally facilitated Exchange is solely in the possession of CMS," Plaintiffs maintain that "there is no reason to believe (and the agency offered none) that the result would be different in

states on that Exchange," so "by shortening the open enrollment period, the agency exacerbated the problem of adverse selection that it claimed it was trying to solve." *Id.* (citations omitted).

As discussed, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC*, 579 U.S. at 221. Here, the agency explained that in setting the open enrollment period, it generally "attempt[s] to balance the risk of adverse selection—a situation where individuals with higher risk are more likely to select coverage than health individuals—with the need to ensure that consumers have adequate opportunity to enroll in QHPs through an Exchange." 90 Fed. Reg. at 27,136. Accordingly, in different years, the open enrollment period has varied, opening in 2014, for example, as early as October 1, 2013, and closing in March 31, 2014. *See id.* (chart providing summary of open enrollment periods starting in 2014). At other times, such as in 2018, the open enrollment period has been shorter, starting on November 1 and ending on December 15, 45 days total. *See id.* (noting that period existed in 2018, 2019, 2020, and 2021).

However, the Rule reflects that HHS failed to explain why the adverse selection problem would be remedied by the open enrollment period it chose. It is possible that a reasoned explanation for shortening the period to 60 days exists, or could exist, as evidenced by the fact that the open enrollment period has changed over time, and indeed has been shorter than the Rule would now require. *See id.* But HHS did not provide such an explanation. Instead, it stated that although HHS formerly concluded that the "risk of adverse selection was outweighed by the benefits of increased consumer enrollments and opportunities to switch plans for consumers with unexpected plan costs," the agency's "new analysis of this experience extending the OEP to end January 15 suggests that these benefits did not materialize," and thus the "risk of adverse selection was outweighed" by those benefits. *Id.* at 27,137. However, HHS provides no specifics as to its

39

"new analysis," and it offers no current data, reports, or evidence establishing its conclusion. The closest HHS comes is reflected in the mention of HHS's "experience implementing" the prior open enrollment period, in which HHS observed that "fewer than 3 percent of enrollees (470,000 individuals) ended" coverage "between December 15, 2024, and January 15, 2025[.]" *Id.* But that observation fails to map, without more, onto the risk of adverse selection supposedly motivating the adoption of a shorter period, nor does it explain *why* the risk of adverse selection drives the *particular length* of open enrollment ultimately selected. *See id.*; *see also* 90 Fed. Reg. at 12,979. The absence of reasoned decision-making is particularly troubling given that this provision of the Rule will take the described timeframe for enrollment "away from the 470,000 individuals who relied on the opportunity" in the past. ECF 70, at 22. Because the Court is unable to discern a "rational connection between the facts found and the choice made," *Nat'l Audubon Soc'y*, 991 F.3d at 583, it concludes that the agency's decision to shorten the open enrollment period was arbitrary and capricious, and will award summary judgment to Plaintiffs as to this provision.[18]

### G.    Failure-to-Reconcile Provision

This provision reinstates a prior Failure to File and Reconcile ("FTR") policy that requires an Exchange to determine that a "tax filer" is ineligible for APTCs under the ACA if the applicant (1) received APTCs the prior year and (2) failed to comply with the statutory requirement to file a tax return and "reconcile APTC" for that year. *See* 90 Fed. Reg. at 27,113, at 27,221. This provision, which will apply only through the end of 2026 should it go into effect, *see id.* at 27,115,

---

[18] Plaintiffs also argue that the agency failed to respond to several categories of comments. *See* ECF 65-1, at 41–43. The Court does not rest its holding on these arguments, however, and notes that with respect to this provision, the agency was responsive to some commenters' concerns. *See, e.g.*, 90 Fed. Reg. at 27,138 (delaying the implementation date of this provision to 2027 in light of commenters' concerns about Navigators' ability to assist individuals due to recent cuts to the Navigators program). In short, this case appears to present the likely rare scenario where an agency was responsive to comments related to a rule change, but never provided a fundamental justification for the change in the first place.

amends the current requirement that such a determination be made only after a tax filer fails to reconcile for two consecutive tax years. *See* 45 C.F.R. § 155.305(f)(4).

The IRS requires taxpayers who receive APTCs—which are typically scaled to the recipient's projected annual household income—to reconcile those advanced payments with the PTC amount they otherwise qualify for in the applicable tax year, as determined by their actual annual household income in that year. *See* 26 U.S.C. § 36B(f). If the APTCs the taxpayer received exceed that allowable PTC amount, then the taxpayer may incur a tax liability, subject to certain income-based caps. *Id.* § 36B(f)(2). Since 2012, HHS has prohibited an Exchange from "determin[ing] a tax filer eligible for" APTCs if the filer (1) received APTCs the prior year and (2) failed to comply with the requirement to file a federal income tax return and reconcile those APTCs for that year. 45 C.F.R. § 155.305(f)(4). Taxpayers who are determined ineligible for APTCs due to their failure to reconcile can still claim on their tax returns the full amount of the PTC they are otherwise eligible for; such taxpayers just would not be able to receive that PTC amount in advance. *Id.*

In 2023, CMS amended the failure-to-reconcile regulations such that a taxpayer becomes ineligible for APTCs only after failing to file a federal income tax return and reconcile their APTCs for *two* consecutive tax years. *See* 90 Fed. Reg. at 27,113. The current Rule provision reverts back to the requirement that a taxpayer be deemed ineligible for APTCs after one year of failing to reconcile, and that change applies only through plan year 2026. *Id.*

In their contrary to law claim, Plaintiffs challenge the agency's authority to "condition eligibility for a tax credit on the reconciliation of old debts." ECF 65-1, at 46. Plaintiffs posit that although "CMS has authority to determine if the statutory standards for APTC eligibility are met, [ ] it does not have authority to alter those standards." *Id.* at 45 (citing 42 U.S.C. § 18081(a), (f)).

41

According to Plaintiffs, "[t]he statute does not contemplate that a prior tax debt affects an applicant's eligibility for APTCs in any way." *Id.* at 46.

As an initial matter, the Court observes that the parties do not relitigate their statute of limitations concern as to this claim at summary judgment. *See* ECF 65-1, at 45–47; ECF 68-1, at 37–41. The Court reiterates its prior conclusion here that Plaintiffs' challenge is not barred on account of the "reopening doctrine," which "allows an otherwise stale challenge to proceed because the agency opened the issue up anew, and then reexamined and reaffirmed its prior decision." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 346 (D.C. Cir. 2018) (internal quotation marks and citation omitted). Specifically, the "doctrine arises where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision." *CTIA–Wireless Ass'n v. FCC*, 466 F.3d 105, 110 (D.C. Cir. 2006) (internal quotation and alterations omitted). "The doctrine only applies, however, where the entire context demonstrates that the agency has undertaken a serious, substantive reconsideration of the existing rule." *All. for Safe, Efficient & Competitive Truck Transp. v. Fed. Motor Carrier Safety Admin.*, 755 F.3d 946, 954 (D.C. Cir. 2014) (internal quotation marks and citation omitted).

In 2017, another trial court in this Circuit noted that it "[could not] find [any] Supreme Court or Fourth Circuit precedent recognizing the reopening doctrine." *Indep. Cmty. Bankers of Am. v. Nat'l Credit Union Admin.*, No. 16-cv-1141, 2017 WL 346136, at *4 (E.D. Va. Jan. 24, 2017). This Court has similarly not been able to find any in-circuit case law addressing this doctrine. *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 682 n.5 (4th Cir. 2020) (not reaching the issue of whether to adopt the reopening doctrine, but recognizing its application in the D.C. Circuit); *see also Biden v. Texas*, 597 U.S. 785, 809 n.8

42

(2022) (noting that the Supreme Court has never adopted the reopening doctrine). However, the reopening doctrine remains well-established in the D.C. Circuit, which regularly hears APA claims. *See, e.g., Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021) ("When a later proceeding explicitly or implicitly shows that the agency actually reconsidered the rule, the matter has been reopened and the time period for seeking judicial review begins anew." (internal quotation marks and citations omitted)). As such, despite the lack of in-circuit precedent, the Court cannot identify a reason the reopening doctrine would not apply and thus applies it here, for the reasons stated in its prior opinion.[19] *See City of Columbus III*, 796 F. Supp. 3d at 161–62 ("By explicitly re-evaluating and subsequently affirming its statutory authority to issue the failure-to-reconcile provision during the notice and comment rulemaking process, CMS reopened the issue of Congressional authorization for the provision.").

Turning back to the merits of Plaintiffs' contrary to law challenge, the Court agrees with Plaintiffs that "[t]he statute does not contemplate that a prior tax debt affects an applicant's eligibility for APTCs in any way," and that "if Congress intended to condition eligibility for a tax credit on the reconciliation of old debts, it knew how to do so." ECF 65-1, at 46 (first citing 26 U.S.C. §§ 24(*l*), 32(k); and then citing *Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy*, 654 F.3d 496, 507 (4th Cir. 2011)). Once again, Defendants' invocation of its general rulemaking authority under 42 U.S.C. § 18041(a)(1) does not authorize it to flout separate, express provisions of the statute. *See* ECF 68-1, at 37–39; *see NRDC v. Reilly*, 976 F.2d 36, 40 (D.C. Cir. 1992) (explaining that a "general grant of rulemaking power . . . [cannot] trump the specific provisions of the act"); *see also Air All. Hous.*, 906 F.3d at 1061 ("[I]t is well established that an agency may not circumvent

---

[19] Since the issuance of the Court's prior opinion in this matter, Judge Maddox has also applied the reopening doctrine. *See Von Gronefeld v. Kendall*, Civ. No. MJM-23-1407, 2026 WL 691641, at *8 (D. Md. Mar. 11, 2026).

specific statutory limits on its actions by relying on separate, general rulemaking authority."). CMS is not free to re-write the statutory formula to accomplish its policy goals, irrespective of the efficacy of such a policy. As the Court previously described in evaluating the provision addressing the $5 fee, PTCs (and thus, by extension, APTCs) are prescribed by statutory formula. *See* 26 U.S.C. § 36B(b)(2)–(3); *supra* Section III.A. Thus, the agency's decision to condition APTC eligibility on reconciling tax information reads an exception into the statutory formula that is simply not there. Because the plain text of the statute contradicts the agency's provision, the Court concludes that the failure-to-reconcile provision is contrary to law.[20] Plaintiffs will be awarded summary judgment as to that provision.

### H.    Data-Matching Policies / Income Eligibility Verification

#### 1.    Recission of Automatic 60-Day Extension

When an Exchange attempts to verify an applicant's income for purposes of determining an applicant's eligibility for APTCs, and it finds an inconsistency in that applicant's data, it notifies the applicant and provides the applicant with an opportunity to respond. 42 U.S.C. § 18081(e)(4). The statute provides a default period of 90 days for that response. *Id.* §§ 18081(c)(4), (e)(1), (e)(4). The current regulations provide for an additional 60 days where necessary. 45 C.F.R. § 155.315(f)(7). The final Rule revokes that 60-day extension. 90 Fed. Reg. at 27,120. Plaintiffs argue that "CMS wrongly reasoned that it was compelled by the statute to impose a 90-day policy." ECF 65-1, at 48. Defendants respond that "[i]t is Plaintiffs' flawed reading of the ACA's plain text that is arbitrary, not the Rule." ECF 68-1, at 44.

The Supreme Court recently held that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."

---

[20] Because the Court finds that this provision of the Rule is contrary to law, the Court does not reach Plaintiffs' alternative argument that adopting the provision was arbitrary and capricious.

44

*Loper Bright*, 603 U.S. at 412. The Court explained that "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry," however, "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 412–13. "If a statute is ambiguous, courts exercise their independent judgment to determine the single, best meaning, but do so with the agency's body of experience and informed judgment . . . at [their] disposal." *Valladares v. Ray*, 130 F.4th 74, 83–84 (4th Cir. 2025) (alterations in original) (internal quotation marks and citations omitted).

According to Plaintiffs, 42 U.S.C. § 18081(e)(4)(A)(ii) and § 18081(c)(4)(B) grant the agency power to modify the timeline described in paragraph (e)(4)(A). *See* ECF 65-1, at 48. However, according to Defendants, "one of those provisions expressly states that the HHS Secretary 'may extend the 90-day period' for resolving income-related inconsistencies 'for enrollments *occurring during 2014*,' and makes no mention of extensions being available during any other year." ECF 68-1, at 43 (emphasis in original) (citing 42 U.S.C. § 18081(e)(4)(A)(ii)). Defendants contend that while § 18081 "provides that the HHS Secretary 'may modify' the 'methods' for verifying information prescribed by the ACA, that provision plainly limits such modifications to the methods by which HHS verifies information with trusted data sources and other federal agencies, not the methods by which Exchanges must try to resolve income-related inconsistencies *with applicants*." *Id.* (emphasis in original) (citing 42 U.S.C. § 18081(c)(4)(B)). Defendants further point out that "§ 18081(c) falls under a subsection titled 'Verification of information contained in records of specific Federal officials,' and the example of a permissible modification that the provision provides concerns the transfer of tax return information from a federal official (i.e., the Treasury Secretary) directly to another trusted data source." *Id.*

The Court begins, as it must, with the statutory text. 42 U.S.C. § 18081(c)(4)(B) provides that "[t]he Secretary may modify the methods used under the program established by this section for the Exchange and verification of information if the Secretary determines such modifications would reduce the administrative costs and burdens on the applicant." 42 U.S.C. § 18081(e)(4)(A)(ii) provides that the Exchange, in the case of an inconsistency or inability to verify, shall "provide the applicant an opportunity to either present satisfactory documentary evidence or resolve the inconsistency with the person verifying the information under subsection (c) or (d) during the 90-day period beginning the date on which the notice required under subclause (I) is sent to the applicant." The section also states that "[t]he Secretary may extend the 90-day period under subclause (II) for enrollments occurring *during 2014.*" 42 U.S.C. § 18081(e)(4)(A)(ii) (emphasis added).

In deciding Plaintiffs' motion for preliminary relief, it was not clear to the Court that Plaintiffs were "likely succeed on their argument that 'the agency misunderstood the scope of its authority on this score.'" *City of Columbus III*, 796 F. Supp. 3d at 164 (quoting ECF 30, at 23). As an initial matter, the Court agreed, and still does agree, that "the mere title of the subsection cannot alter the otherwise unambiguous meaning of the language in its text" and that "CMS's reading of 42 U.S.C. § 18081(c)(4)(B) is unreasonable given that the Section 'authorizes modification of methods in order to reduce administrative burdens on the applicant, and this language would make little sense if the statute permitted the agency only to modify the procedures it used with other federal agencies without the applicant's involvement.'" *Id.* at 164–65 (quoting ECF 30, at 23).

However, the 2014 limiting provision in 42 U.S.C. § 18081(e)(4)(A)(ii) expressly indicates that an agency could extend the 90-day deadline for enrollments occurring *during 2014.* Given

46

the statute's explicit reference to a specific year, the Court cannot interpret the statute to allow blanket modifications for enrollments *at any time*. "When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000). However, the matter is further complicated by the agency's internal inconsistency in applying its own modification authority. Curiously, the agency claims that its modification power is limited, but simultaneously uses that modification authority to allow extensions on a case-by-case basis to individual applicants in years other than 2014.

In an attempt to reconcile this inconsistency, Defendants argue that "any authority the HHS Secretary might have to '*modify*' a statutorily prescribed timeline in order to 'reduce the administrative costs and burdens' faced by a particular '*applicant*,' 42 U.S.C. § 18081(c)(4)(B) (emphasis added), cannot be reasonably understood to include the authority to promulgate a regulation that categorically *replaces* a statutorily prescribed timeline (90 days) with a different one (90 days plus an automatic 60-day extension) for all applicants." ECF 68-1, at 44 (emphasis in original) (first quoting 42 U.S.C. § 18081(c)(4)(B); then citing 45 C.F.R. § 155.315(f)(7); and then citing *Util. Air Regul. Grp.*, 573 U.S. at 328). The Court invited further briefing on this issue of statutory interpretation at the preliminary relief stage, *see City of Columbus III*, 796 F. Supp. 3d at 164, and the parties have offered additional arguments in their cross-motions for summary judgment, *see* ECF 65-1, at 48–49; ECF 68-1, at 44–45.

Plaintiffs now argue that the Court should not apply the *expressio unius est exclusio alterius* canon of statutory interpretation—a phrase which "means 'expressing one item of [an] associated group or series excludes another left unmentioned,'" *Children's Hosp. Ass'n of Texas*

*v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002))—to this close question. In support of its contention, Plaintiffs assert that "[t]his canon is a 'feeble helper in an administrative setting,' when a statute, such as this one, contains multiple overlapping grants of authority to an agency." ECF 65-1, at 49 (quoting *Children's Hosp. Ass'n of Texas*, 933 F.3d at 770–71). Plaintiffs further point out that "[e]ven outside of this setting, '[i]f there are other reasonable explanations for an omission in a statute, *expressio unius* may not be a useful tool.'" *Id.* (first quoting *Children's Hosp. Ass'n of Texas*, 933 F.3d at 771; then citing *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017); and then citing *United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019)). According to Plaintiffs, "[t]he most logical explanation for the phrasing of paragraph (e)(4)(A) is that Congress wished to remove any doubt as to the scope of CMS's authority in the first year of implementation for the ACA, when time was short and the agency faced numerous interpretive issues to resolve." *Id.* Plaintiffs continue that "[t]here was no reason for Congress to proceed further to reiterate the 'methods' authority it had already granted the agency under paragraph (c)(4)(B) for later years." *Id.*

Defendants acknowledge that the *expressio unius* "canon can be overcome by 'contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion.'" ECF 68-1, at 44 (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)). But Defendants contend that "there is no warrant for that here," because despite Plaintiffs contention that *expressio unius* is a "feeble helper in an administrative setting," "that is not true where Congress has 'directly resolved' the scope of an agency's authority." *Id.* (quoting *Cheney R.R. Co. v. Interstate Com. Comm'n*, 902 F.2d 66, 69 (D.C. Cir. 1990)). According to Defendants, "[t]here is simply no ambiguity in the plain text of the statute: automatic 60-day extensions

48

countermand the ACA's limited grant of extension authority in 42 U.S.C. § 18081(e)(4)(A)(ii)." *Id.*

Although the Court still believes this issue is a close call, it concludes that Plaintiffs have the better interpretation of 42 U.S.C. § 18081(e)(4)(A)(ii) and § 18081(c)(4)(B). In reaching that conclusion, the Court examines the structure of the section. *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 128 (4th Cir. 2022) ("Our inquiry begins with the text and the *structure* of the statute." (emphasis added)). Section 18081 begins by laying out the scope of the program, *see id.* § 18081(a), before laying out the requisite information applicants must provide, *see id.* § 18081(b). In the next section related to the verification of such information, the statute states that "[t]he Secretary . . . shall provide that verifications and determinations under this subsection shall be done . . . through use of an on-line system" or otherwise through "electronic submission" or "through such other method as is approved by the Secretary." *Id.* § 18081(c)(4)(A). It is in the context of methods for verification of information that (c)(4)(B) then provides that "[t]he Secretary may modify the *methods* used under the program established by this section for the Exchange and verification of information *if* the Secretary determines such modifications *would reduce the administrative costs and burdens on the applicant*[.]" *Id.* § 18081(c)(4)(B) (emphasis added). In addition to limiting such authority to modify to "methods" of verification, the other limiting principle applicable to the Secretary's flexibility to engage in modification under the section is the purpose provided for by the subsection itself: to "reduce the administrative costs and burdens on the applicant." *Id.*

The ordinary meaning of "methods" of verification of information *might* alone struggle to encompass the timeline for verification at issue here. However, the Court reads that word and the phrase it modifies in context, as it must. *See Johnson v. Zimmer*, 686 F.3d 224 (4th Cir. 2012)

49

("[I]t is a 'cardinal rule' of statutory interpretation that 'statutory language must be read in context [because] a phrase gathers meaning from the words around it.' (quoting *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 596 (2004))). After subsection (c) provides the Secretary with such power to modify, subsection (e) discusses "[a]ctions relating to verification," including "[n]otice and opportunity to correct" information. 42 U.S.C. § 18081(e)(4)(A)(ii). There, the statute provides that the Exchange "shall . . . provide the applicant an opportunity to either present satisfactory documentary evidence or resolve the inconsistency . . . during the 90-day period beginning the date on which the notice required . . . is sent to the applicant," and it further provides that "[t]he Secretary may extend the 90-day period" for doing so "during 2014." *Id.*

That structure, along with the text of the subsection headings,[21] suggests to this Court that Congress intended to provide for the opportunity to correct information—including the time in which to correct it—as one such "method" which the Secretary has the flexibility to modify with respect to the verification of information. In providing that "[t]he Secretary may extend the 90-day period under subclause (II) for enrollments occurring *during 2014*," *id.* § 18081(e)(4)(A)(ii) (emphasis added), the Court further concludes that Congress intended to permit the agency to extend that period automatically for the first year of the program, *without* engaging in the process otherwise necessary to exercise its authority to modify under § 18081(c)(4)(B). At the same time, Congress wanted to establish an ordinary period (i.e., 90 days) for correction going forward, which

---

[21] Title 42 has not been enacted as positive law. *See Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 105 n.11 (3d Cir. 2017) ("Section 1988(a) is published at 42 U.S.C. § 1988(a), which is only "prima facie" evidence of the law, as Title 42 has not been enacted into positive law. 1 U.S.C. § 204(a)."); *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993). ("Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, 1 U.S.C. § 204(a), it is the Statutes at Large that provides the 'legal evidence of laws,' § 112 . . . ."). However, the subsection headings in this section are included in the Statutes at Large that correspond with the section, so the Court may utilize them to aid in its interpretation. *See* Pub. L. No. 111-148, § 1411, 124 Stat. 119 (2010).

the Secretary could but did not necessarily have to modify pursuant to § 18081(c)(4)(B) where doing so "would reduce the administrative costs and burdens on the applicant." Thus, to enact both the standard period for opportunity to correct and to ensure extensions throughout 2014, Congress enacted the following text: "The Secretary may extend the 90-day period under subclause (II) for enrollments occurring during 2014." *Id.* § 18081(e)(4)(A)(ii). If Defendants' interpretation was correct, the Court would expect that provision to read as follows: "[t]he Secretary may extend the 90-day period . . . *only* during 2014." But Congress did not so say. Instead, it only affirmatively authorized the Secretary to grant extensions during 2014. In the context of this statute, the Court will not infer from the affirmative grant of authority an implicit limitation on the otherwise express authorization to the Secretary to modify such methods of information verification.

However, that Plaintiffs have the better reading of the statute means that it was *not* contrary to law for Defendants to modify or eliminate an extension to the ordinary period for correction, so long as (1) Defendants made the modification to "reduce the administrative costs and burdens on the applicant" and (2) their decision to do so was not otherwise arbitrary and capricious. Plaintiffs argue that CMS did not "engage[] with the evidence showing the need for a 150-day verification period" because it "wrongly believed that it was required by the statute to adopt this rule." ECF 65-1, at 49. Plaintiffs contend that "[i]f CMS had correctly understood its statutory authority, it could have engaged with the evidence showing the need for a 150-day verification period." *Id.* According to Plaintiffs, "[b]y the agency's own telling, this provision will cause 226,000 enrollees to lose eligibility for tax credits on the Exchanges." *Id.* (citing 90 Fed. Reg. at 27,199). "Apart from incorrectly asserting that its hands were tied," Plaintiffs contend that "CMS only briefly averted to 'program integrity' needs, without explaining how those needs would be advanced in any way." *Id.* at 50.

51

Defendants counter that "CMS very much engaged with relevant evidence suggesting that an automatic 150-day verification period provided no 'meaningful benefit to consumers' compared to a process in which extensions can be granted on a case-by-case basis as appropriate." ECF 68-1, at 45 (citing 90 Fed. Reg. at 27,119–20). Defendants further assert that "CMS also 'address[ed]' other 'relevant factors,' including the potential effects that rescinding the automatic 60-day extension might have on enrollment and the risk pool within Exchanges, as well as on federal expenditures for APTCs given to ineligible enrollees." *Id.* (citing 90 Fed. Reg. at 27,119).

A significant portion of Defendants' explanation for this provision of the Rule centers on a misreading of § 18081, as discussed above. *See* 90 Fed. Reg. at 27,119 ("However, as discussed previously, section 1411(c)(4)(B) of the ACA specifically limits modifications on how information is exchanged and verified between HHS and trusted data sources and does not extend to other aspects of the verification process. Therefore, section 1411(c)(4)(B) of the ACA does not provide a statutory basis to modify the length of the 90-day response period."). However, the agency also explained that "even if the statute allowed an automatic 60-day extension, our review of how applicants used the 60-day extension shows that the benefits we previously anticipated have not materialized." *Id.* Yet in attempting to explain that conclusion, in light of the 2024 automatic extension rule and its findings, the agency merely stated that it "must weigh" the "potential positive impact on the risk pool" identified by the prior rule "against the substantial increase in APTC expenditures that we identified from ineligible people who stay enrolled and receive APTC for an additional 60 days." *Id.* According to the agency, "the cost to taxpayers and decline in program integrity outweigh any possible benefit to the risk pool." *Id.*

But the statute permits the exercise of authority to modify methods for information verification "*if* the Secretary determines such modifications would reduce the administrative costs

and burdens on *the applicant*." 42 U.S.C. § 18081(c)(4)(B) (emphasis added). CMS's exercise of its authority centers on "program integrity" and "costs to taxpayers"—consideration of "the administrative costs and burdens on the applicant" are nowhere to be found, nor is any data which undermines the conclusions of the prior policy regarding the reduction in administrative costs and burdens to the applicant imposed by a 90-day timeline without extension. *See* 90 Fed. Reg. at 27,119 ("As we stated in the proposed rule (90 FR 12963), we previously determined that 90 days is often an insufficient amount of time for many applicants to provide income documentation, since it can require multiple documents from various household members along with an explanation of seasonal employment or self-employment, including multiple jobs.").

In sum, the Court concludes that this provision of the Rule is contrary to law because it did not modify a "method[] used under the program established by" § 18081(a) based on a determination that the modification "would reduce the administrative costs and burdens on the applicant." 42 U.S.C. § 18081(c)(4)(B). And to the extent that the agency purported to do so, it did not provide "a reasoned explanation" necessary "for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations, Inc.*, 556 U.S. at 515–16. Accordingly, Plaintiffs are awarded summary judgment on their challenge to the provision of the Rule rescinding the automatic 60-day extension.

2.    Income Verification When Data Shows Income Below 100 Percent of FPL

Under current regulations, if an applicant's attestation regarding their projected annual household income reflects a higher household income than that reflected in income data provided by the IRS or certain other sources, an Exchange generally "must accept the applicant's attestation . . . without further verification." 45 C.F.R. § 155.320(c)(3)(iii)(A). The Rule amends this provision by requiring an Exchange to instead further verify an applicant's household income if (1) an applicant attests to income that is between 100% and 400% of the FPL, (2) income data

from the IRS indicates household income below 100% of the FPL, and (3) the former income amount exceeds the latter amount by a "reasonable threshold." 90 Fed. Reg. at 27,123. The applicant would then be given an opportunity to resolve the inconsistency by providing additional documentation and taking other steps to verify their household income. *See* 45 C.F.R. § 155.315(f)(1)–(4).

Plaintiffs argue that "the mandatory audit policy is arbitrary for precisely the same reasons that this Court vacated the same policy five years ago." ECF 65-1, at 50 (citing *City of Columbus II*, 523 F. Supp. 3d at 731). According to Plaintiffs, "CMS improperly assumed that these enrollees must have been attempting to defraud the Exchanges," even though "[t]here are many reasons why an individual could, in good faith, project that he or she will have income next year higher than the federal poverty level even if current-year IRS data shows a lower income." *Id.* Plaintiffs further argue that the additional verification will cause significant obstacles to enrollment, as "[m]any such people are self-employed, or may have difficulty obtaining documentation to support their projections." *Id.*

Defendants acknowledge that the provision "parallels a provision from a 2018 rule that was vacated in *City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021)." ECF 68-1, at 46. However, Defendants maintain that the verification measures are necessary because an applicant may be "overestimating his or her projected household income to obtain APTCs for which the applicant is not otherwise eligible." *Id.* As noted, a similar challenge to a similar proposed change in the Rule was raised in 2018. *See City of Columbus II*, 523 F. Supp. 3d at 762 ("Plaintiffs contend that HHS's decision to impose income verification requirements is arbitrary and capricious because it failed to support its decision with anything more than unsubstantiated conclusions and failed to acknowledge the impracticability of low-income applicants being able to meet this

54

requirement."). There, Judge Chasanow held that "Defendant's stated rationale for imposing income verification requirements—to prevent fraud in states that did not expand Medicaid—[was] unfounded," because "Defendants failed to point to any actual or anecdotal evidence indicating fraud in the record." *Id.* Judge Chasanow reasoned that "HHS improperly elevated the objective of fraud prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance. *Id.* (citing *King*, 759 F.3d at 373–74).

This time around, Defendants posit that their justification "does not suffer from the same flaws that were fatal to the 2018 provision." ECF 68-1, at 46. Specifically, Defendants argue that "HHS now points to data that 'provide substantial evidence that applicants with household incomes below the APTC income eligibility threshold'—that is, 100 percent of the FPL—'are strategically inflating their household incomes,' or are 'getting assistance from' agents and brokers that have a 'financial incentive' to maximize Exchange enrollments, in order to obtain subsidized coverage in an Exchange despite their actual household incomes rendering them ineligible for such coverage." *Id.* at 46–47 (quoting 90 Fed. Reg. at 27,122). In its current effort to change the regulation, HHS cited to a study that "compared estimated potential enrollment in Exchanges based on income data reported in census surveys to actual enrollment by enrollees who reported household income above the FPL-based eligibility threshold and found that actual enrollment was 136 percent higher than the total population of potential enrollments." *Id.* at 47 (citing 90 Fed. Reg. at 27,122). Defendants also point out that the "same study also found that a far higher number of enrollees reported household income that was just above the Exchange-eligibility threshold in non-Medicaid expansion States compared to those in States that did expand Medicaid." *Id.* (citing 90 Fed. Reg. at 27,122). However, Plaintiffs respond that "one of the authors of that study submitted a comment to CMS (which the agency ignored) cautioning that the report did not support this conclusion,

55

given the difficulties that low-income people face in estimating their future incomes." ECF 65-1, at 51 (citing Urban Institute comment at 2 (Apr. 11, 2025), https://perma.cc/F5PH-WVN2, *also available at* ECF 65-2, at 150).

It appears that the agency did not directly address the comment by one of the study's authors in the final Rule. In their reply, Defendants note that "the other two authors of the [study] did not join their coauthor's comments," and point out that the "commenter admitted that her own research 'provides evidence of some improper enrollment in the marketplace by people with incomes below the eligibility threshold of 100 percent of the federal poverty line (FPL) from 2015 to 2017.'" ECF 71, at 23. Defendants further argue that "[t]hese 'flaws' are simply data limitations common to any study, which HHS identified." *Id.* (citing 90 Fed. Reg. at 27,210).

The Rule also cites to a report from the Paragon Health Institute (the "Paragon report") that purports to find a high rate of fraudulent enrollments, specifically citing it to show that "[a] more recent analysis of 2024 open enrollment data shows plan selections on HealthCare.gov among people ages 19–64 who reported household income between 100 percent and 150 percent of the FPL in non-Medicaid expansion States were 70 percent higher than potential enrollments estimated from Census data at that same income level." 90 Fed. Reg. at 27,122. The agency thus reasoned that "[b]ased on this mismatch between enrollment and the eligible population, this study estimates four to five million people improperly enrolled in QHP coverage with APTC in 2024 at a cost of $15 to $20 billion." *Id.* Plaintiffs point out that "the Paragon report compared apples to oranges by including children in its estimated number of applicants but not in its count of eligible persons; by mismatching 2023 data to estimate improper enrollments for 2024, when many more people gained eligibility for the Exchanges in light of changes in Medicaid enrollment standards; and by using fundamentally different measures of income for its two data sets." ECF 65-1, at 19–.

20 (first citing Urban Institute comment at 2–3 (Apr. 11, 2025), https://perma.cc/7457-27KN, *also available at* ECF 65-2, at 150–51; then citing Jason Levitis et al. comment at 28–31 (Apr. 11, 2025), https://perma.cc/X3KY-KZLW, *also available at* ECF 65-2, at 220–23; then citing Ctr. for Budget & Policy Priorities comment at 4–5 (Apr. 11, 2025), https://perma.cc/KP9W-J63N, *also available at* ECF 65-2, at 155–56; and then citing Matthew Fiedler comment at 4–5 (Apr. 11, 2025), *available at* ECF 65-2, at 190–91)). Plaintiffs contend that "[t]hese flaws in the Paragon analysis were pointed out to CMS by commenters, but CMS did not explain why it chose to ignore them." *Id.* at 20.

Against this backdrop, the Court concludes that HHS failed to meaningfully address the comments pointing out potential flaws in the data contained in the Paragon report, despite continuing to rely on such data to justify the provision in the Rule. *See* 90 Fed. Reg. at 27,215 (explaining in response to commenters expressing concerns over unsound data in the Paragon Report that the agency "noted these limitations in the proposed rule and continue to reference them in this final rule. The Paragon report analysis informed our analysis, but we also incorporated Exchange data for a more fulsome analysis."). Defendants have essentially ignored the Paragon Report (and its flaws) during this litigation, except in their reply, *see* ECF 71, at 23. Defendants are not free to support a rule change with data of questionable validity and limited relevance, and then refuse to engage with commenters' reasonable concerns that the data fails to support the conclusion the agency drew from that data. This is particularly problematic where, as here, an *author* of one of the studies relied upon timely noted that the study she contributed to "did not support this conclusion, given the difficulties that low-income people face in estimating their future incomes," ECF 65-1, at 51 (citations omitted), which is the issue that purportedly motivated the rule change in the first place. The agency was thus required to meaningfully contend with this

comment because it affected a "fundamental premise" of the Rule, namely the very justification for the Rule itself. *See MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000) ("An agency is not obliged to respond to every comment, only those that can be thought to challenge a fundamental premise."). That the other two authors of that study did not join in their co-author's comment does not alter the Court's conclusion. The silence of those co-authors does nothing to rebut the legitimate reservations which the commenting author and other commenters brought to the agency's attention, and which the agency failed to adequately address.

In short, the agency refused to meaningfully engage with challenges to the data and reports used to justify the Rule, which began at the time of promulgating the final Rule and continues through this litigation. As Judge Chasanow previously (and eloquently) explained, the agency's "decision to prioritize a hypothetical risk of fraud over the substantiated risk that its decision result in immense administrative burdens at best, and a loss of coverage for eligible individuals at worst, defies logic." *City of Columbus II*, 523 F. Supp. 3d at 763. Accordingly, this Court again concludes that CMS acted arbitrarily by instituting additional verification requirements without sufficient data justifying the need to do so. Summary judgment will be awarded to Plaintiffs with respect to this provision.

### 3.   Income Verification When Tax Data is Unavailable

This provision of the Rule rescinds a regulation that requires an Exchange to accept an applicant's self-attestation of projected annual household income "without further verification" whenever (1) the Exchange requests tax return data from the IRS to verify the applicant's attested income, but (2) the IRS confirms that there is no such data available, 45 C.F.R. § 155.320(c)(5). *See* 90 Fed. Reg. at 27,130. The current regulation, which was adopted in 2023, creates an exception to the general requirement that an Exchange must verify an applicant's annual household income with certain trusted data sources, 45 C.F.R. § 155.320(c)(1)(ii), and otherwise follow an

alternative verification process if tax return data for an applicant is unavailable, *id.* § 155.320(c)(3)(vi). The Rule removes this exception and requires Exchanges to follow standard verification and data-matching procedures "when tax return data is unavailable to immediately verify a consumer's attestation of annual household income." 90 Fed. Reg. at 27,132.

Plaintiffs explain that "[i]t is a relatively common occurrence for tax data to be missing for an applicant, for entirely legitimate reasons," for example, "[a]n individual might have changed his or her name, had a change in family composition, had a change in filing status, or might not have been subject to a filing requirement for the year in question." ECF 65-1, at 52. According to Plaintiffs, "[f]or many of" the people with data discrepancies, "other documentation might not be readily available to substitute for tax data, which means that if these people are not permitted to attest to their income, they will be deprived of subsidized coverage." *Id.*

The question for the Court is not simply whether Defendants have presented sufficient evidence of fraudulent enrollment, but also whether there is sufficient evidence of a *nexus* between fraudulent enrollment and self-attestation to tax data such that it justifies requiring heightened income verification. Put differently, if the agency cannot point to data showing that self-attestation meaningfully contributes to increased fraud, then the agency adopted an incongruent solution to the problem. *See City of Columbus II*, 523 F. Supp. 3d at 762 ("HHS improperly elevated the objective of fraud prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance." (citing *King*, 759 F.3d at 373–374)).

After reviewing the agency's reasoning in the Rule, the Court finds that CMS concluded in a conclusory fashion that program integrity benefits would outweigh the administrative burden on applicants. The Court agrees with Plaintiffs that CMS "attempted to justify these burdens and these coverage losses simply by reciting that self-attestation 'may have played a role in weakening

59

the Exchange eligibility system,' but it provided no support for this assertion." ECF 65-1, at 52 (quoting 90 Fed. Reg. at 27,130). While Defendants argue that "[t]he agency made the reasonable observation that applicants without tax return data will likely have documentation verifying their household income (*e.g.*, pay stubs) 'readily available' to them and that the burden of submitting that documentation, by extension, would be relatively minimal," ECF 68-1, at 48 (quoting 90 Fed. Reg. at 27,131–32), the agency provides no basis for this conclusory statement.

In fact, this assertion is not even internally consistent, as CMS separately acknowledges in the Rule that "income verification can be more challenging for lower-income tax filers due to less consistent employment." 90 Fed. Reg. at 27,200. To address this concern, CMS merely stated "our experience with income verifications suggests the process does not impose a substantial burden." *Id.* The agency never explains what this history is or how it led to the conclusion it purportedly supports. The circular reasoning and conclusory statements offered to justify the policy change are not indicative of reasoned decision-making. This is particularly troubling because CMS, by its own estimation, acknowledges that 407,000 people will lose some, or all, of their APTCs as a result of this change. *See id.* Given the lack of sufficient data to justify this provision of the Rule, and the agency's lack of meaningful explanation for the provision, the Court finds that this provision was not "reasonable and reasonably explained."[22] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Accordingly, Plaintiffs are entitled to summary judgment as to this provision as well.

---

[22] This holding is bolstered by the fact that the Rule relied on the Paragon report, which, as the Court described above, has serious flaws the agency did not address and which Defendants have sparsely and unpersuasively defended in their reply.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted in part and denied in part, and Defendants' cross-motion for summary judgment is granted in part and denied in part.  A separate implementing order will issue.

Dated: June 12, 2026

_____/s/_____
Brendan A. Hurson
United States District Judge

61